> **THIS PROPOSED DISCLOSURE STATEMENT IS NOT A SOLICITATION OF VOTES ON THE PLAN. ACCEPTANCES AND REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS PROPOSED DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS RESERVE THE RIGHT TO AMEND, SUPPLEMENT, OR OTHERWISE MODIFY THIS DISCLOSURE STATEMENT PRIOR AND UP TO THE DISCLOSURE STATEMENT HEARING.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x

In re:                                                        :    Chapter 11
                                                              :
FIRST MODE HOLDINGS, INC., *et al.*,[1]                       :    Case No. 24-12794 (KBO)
                                                              :
          Debtors.                                            :    (Jointly Administered)

------------------------------------------------------------- x

### DISCLOSURE STATEMENT FOR FIRST AMENDED JOINT
### CHAPTER 11 PLAN OF FIRST MODE HOLDINGS, INC.
### AND ITS DEBTOR AFFILIATE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**LATHAM & WATKINS LLP**
Ray C. Schrock (admitted *pro hac vice*)
Annemarie V. Reilly (admitted *pro hac vice*)
Brian S. Rosen (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864
Email:  ray.schrock@lw.com
          annemarie.reilly@lw.com
          brian.rosen@lw.com
- and -
Caroline Reckler (admitted *pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
Email:  caroline.reckler@lw.com
- and -
Jeffrey T. Mispagel (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763
Email:  jeffrey.mispagel@lw.com

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Joseph M. Mulvihill (No. 6061)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:  mnestor@ycst.com
          kcoyle@ycst.com
          jmulvihill@ycst.com

*Counsel for Debtors and Debtors in Possession*

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: First Mode Holdings, Inc. (7177), and Synchronous LLC (1829).  The Debtors' mailing address is The Debtors' address is 3417 1st Ave S, Seattle, WA, 98134.

**IMPORTANT NOTICES**

<div style="border:1px solid">

<p align="center"><strong><u>Plan Voting</u></strong></p>

**The voting deadline to accept or reject the Plan is 4:00 p.m. Eastern Time on March 14, 2025, unless extended by the Debtors (the "<u>Voting Deadline</u>").  The record date for determining which Holders of Claims may vote on the Plan is February 5, 2025 (the "<u>Voting Record Date</u>").**

**For your vote to be counted, you must return your properly completed Ballot in accordance with the voting instructions on the Ballot so that it is <u>actually received</u> by the Debtors' voting agent, Omni Agent Solutions, Inc. (the "<u>Voting Agent</u>"), before the Voting Deadline.**

**Ballots may be returned to the Voting Agent via:**

**First Class Mail, Overnight Courier, or Hand/Personal Delivery:**

<p align="center"><strong>First Mode Holdings, Inc. Ballot Processing<br>c/o Omni Agent Solutions, Inc.<br>5955 De Soto Ave., Suite 100<br>Woodland Hills, CA 91367</strong></p>

**If you would like to coordinate hand delivery of your ballot, please email FirstModeInquiries@OmniAgnt.com and provide the anticipated date and time of your delivery.**

<p align="center"><strong><u>OR</u></strong></p>

**Online E-Ballot Portal:  visit https://omniagentsolutions.com/FirstMode-Ballots.  Click on the "Submit E-Ballot" section of the Debtors' website and follow the directions to submit your E-ballot.  If you choose to submit your ballot via Omni's E-Ballot system (the "E-Ballot Portal"), you should not also return a hard copy of your ballot.**

**Ballots will not be accepted by telecopy, facsimile, email or other electronic means of transmission.**

**Additional details on voting are discussed herein and set forth on Ballots delivered to Holders of Claims entitled to vote on the Plan.**

</div>

**IMPORTANT INFORMATION FOR YOU TO READ**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), ANY STATE SECURITIES COMMISSION OR ANY SECURITIES EXCHANGE OR ASSOCIATION, NOR HAS THE SEC, ANY STATE SECURITIES COMMISSION OR ANY SECURITIES EXCHANGE OR ASSOCIATION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

IT IS THE DEBTORS' POSITION THAT THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. RATHER, THIS DISCLOSURE STATEMENT SHALL CONSTITUTE A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THIS DISCLOSURE STATEMENT. THE DEBTORS OR THE PLAN ADMINISTRATOR MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE.  THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES. EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED (UNLESS EXPRESSLY PROVIDED HEREIN).

THE DEBTORS ARE GENERALLY MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF WHERE FEASIBLE, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO.  HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN THE VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN ARTICLE IX HEREIN, "FACTORS TO CONSIDER BEFORE VOTING."

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS BASED PRIMARILY ON THE CURRENT EXPECTATIONS OF THE DEBTORS AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AFFECTING THE FINANCIAL CONDITION OF THE DEBTORS' BUSINESSES AND ASSETS.  FORWARD-LOOKING STATEMENTS CAN OFTEN BE IDENTIFIED BY THE USE OF TERMINOLOGY SUCH AS "SUBJECT TO," "BELIEVE," "ANTICIPATE," "PLAN," "EXPECT," "INTEND," "ESTIMATE," "PROJECT," "MAY," "WILL," "SHOULD," "WOULD," "COULD," "CAN," THE NEGATIVES THEREOF, VARIATIONS THEREON AND SIMILAR EXPRESSIONS, OR BY DISCUSSIONS OF STRATEGY.  THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES, AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW IN ARTICLE IX.  IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS.  THE DEBTORS DO NOT UNDERTAKE ANY OBLIGATION TO UPDATE OR REVISE PUBLICLY ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.

**THIRD-PARTY RELEASE**

ARTICLE IX OF THE PLAN CONTAINS A THIRD-PARTY RELEASE.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MAY BE AFFECTED THEREUNDER.

HOLDERS OF GENERAL UNSECURED CLAIMS WHO EITHER DO NOT GRANT THE THIRD-PARTY RELEASE OR WHO VOTE TO REJECT THE PLAN SHALL <u>NOT</u> RECEIVE ANY DISTRIBUTION UNDER THE PLAN.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN WHO (1) EITHER VOTE TO ACCEPT THE PLAN OR ABSTAIN FROM VOTING ON THE PLAN, <u>AND</u> (2) OPT-IN TO THE THIRD PARTY RELEASES WILL BE DEEMED TO HAVE GRANTED THE THIRD-PARTY RELEASE.

YOU MAY ALSO "OPT-IN" TO THE THIRD-PARTY RELEASE BY FOLLOWING THE APPLICABLE PROCEDURES OUTLINED IN THE DISCLOSURE STATEMENT ORDER.

THE THIRD-PARTY RELEASES ARE DISCUSSED FURTHER IN ARTICLE V.G OF THIS DISCLOSURE STATEMENT.

## QUESTIONS AND ADDITIONAL INFORMATION

If you would like to obtain copies of this Disclosure Statement, the Disclosure Statement Order, the Plan, the Plan Supplement, or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or these Chapter 11 Cases generally, please contact the Debtors' voting agent, Omni Agent Solutions, Inc., by (a) visiting the Debtors' case website at https://omniagentsolutions.com/FirstMode or (b) calling 866-771-0558 (US & Canada toll free) and 747-288-6101 (International), or (c) sending an electronic message to FirstModeInquiries@OmniAgnt.com.

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................1

    A.    Material Terms of the Plan .................................................................2
    B.    Voting on the Plan ............................................................................3
    C.    Confirmation Hearing and Deadline for Objections to Confirmation ...................9
    D.    Advisors .........................................................................................9

II. OVERVIEW OF THE DEBTORS' OPERATIONS ........................................10

    A.    The Debtors' Corporate Structure...................................................10
    B.    The Debtors' Corporate History .....................................................11
    C.    The Debtors' Business ...................................................................11
    D.    The Debtors' Prepetition Capital Structure......................................12

III. EVENTS LEADING TO COMMENCEMENT OF THESE CHAPTER 11 CASES ...........13

    A.    Challenges Leading to the Chapter 11 Cases..................................13
    B.    Reductions in Force and Other Cost-Saving Measures ....................14
    C.    The Prepetition Sale and Marketing Process ..................................15
    D.    Independent Investigation...............................................................16

IV. OVERVIEW OF THESE CHAPTER 11 CASES ........................................17

    A.    Commencement of Chapter 11 Cases .............................................17
    B.    First Day Motions ..........................................................................17
    C.    Procedural Motions.........................................................................18
    D.    Retention Applications....................................................................18
    E.    DIP Financing ...............................................................................19
    F.    Appointment of the Statutory Committee of Unsecured Creditors ......................19
    G.    Sale-Related Motions.....................................................................19
    H.    Exclusivity ....................................................................................20

V. SUMMARY OF THE PLAN...........................................................................20

    A.    Classification and Treatment of Claims and Interests Under the Plan .................21
    B.    Acceptance or Rejection of the Plan; Effect of Rejection of Plan.........................22
    C.    Treatment of Executory Contracts and Unexpired Leases; Employee Benefits; and Insurance Policies ..................................................22
    D.    Provisions Governing Distributions.................................................25
    E.    Procedures for Resolving Disputed, Contingent, and Unliquidated Claims or Interests.........................................................................28
    F.    Conditions Precedent to Confirmation and the Effective Date............................29
    G.    Releases.........................................................................................31

VI. WIND-DOWN PROCESS IN THE EVENT OF A SALE TRANSACTION .......................36

    A.    Wind-Down, Plan Administrator, Dissolution of the Boards of
           Directors/Managers, and Closing of these Chapter 11 Cases ...............................36

VII. CONFIRMATION OF THE PLAN ..........................................................................39

    A.    Confirmation Hearing .........................................................................39
    B.    Confirmation ..................................................................................41
    C.    Classification of Claims and Interests...................................................45
    D.    Consummation .................................................................................45
    E.    Exemption from Certain Transfer Taxes ..............................................46
    F.    Retiree Benefits................................................................................46
    G.    Amendments ...................................................................................46
    H.    Revocation or Withdrawal of the Plan.................................................46
    I.    Post-Confirmation Jurisdiction of the Bankruptcy Court ......................47

VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
      PLAN ...........................................................................................47

    A.    Continuation of Chapter 11 Cases ......................................................47
    B.    Liquidation under Chapter 7 ..............................................................47
    C.    Dismissal of Chapter 11 Cases ..........................................................47

IX. FACTORS TO CONSIDER BEFORE VOTING ......................................................48

    A.    Risk Factors that May Affect the Recovery Available to Holders of
           Allowed Claims under the Plan ..........................................................48
    B.    Certain Bankruptcy Law Considerations...............................................49
    C.    Additional Factors............................................................................51

X. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF
      THE PLAN .....................................................................................52

    A.    U.S. Federal Income Tax Consequences to the Debtors.........................53
    B.    U.S. Federal Income Tax Consequences to Holders of GUCs .................54
    C.    Accrued Interest..............................................................................57
    D.    Information Reporting and Withholding ...............................................58

CONCLUSION AND RECOMMENDATION..............................................................59

EXHIBIT A:   Plan

EXHIBIT B:   Organizational Chart

EXHIBIT C:   Liquidation Analysis

# I.
## INTRODUCTION

First Mode Holdings, Inc. ("**First Mode**") and Synchronous LLC ("**Synchronous**"), as debtors and debtors in possession (each a "**Debtor**" and, together, the "**Debtors**") in the above-captioned chapter 11 cases (these "**Chapter 11 Cases**") pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), are providing you with the information in this disclosure statement (this "**Disclosure Statement**") because you may be a creditor of the Debtors and may be entitled to vote on the *First Amended Joint Chapter 11 Plan of First Mode Holdings, Inc. and Its Debtors Affiliate Under Chapter 11 of the Bankruptcy Code* (together with any documents comprising the Plan Supplement, and as may be modified, amended or supplemented from time to time in accordance with the terms thereof, the "**Plan**"). The Plan is attached hereto as **Exhibit A**.[2] This Disclosure Statement has been filed pursuant to section 1125 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

The Debtors are proposing the Plan following extensive arm's-length, good-faith discussions with certain of their key stakeholders. The Debtors believe the Plan represents the best available option for all creditors and other parties in interest.

On [●], 2025, the Bankruptcy Court entered the *Order (I) Approving the Disclosure Statement; (II) Establishing the Voting Record Date, Voting Deadline, and Other Dates; (III) Approving Procedures for Soliciting, Receiving, and Tabulating Votes on the Plan and for Filing Objections to the Plan; (IV) Approving the Manner and Forms of Notice and Other Related Documents; and (V) Granting Related Relief* (the "**Disclosure Statement Order**") which, among other things, (a) approved the dates, procedures and forms applicable to the process of soliciting votes on and providing notice of the Plan, as well as certain vote tabulation procedures and (b) established the deadline for filing objections to the Plan and scheduling the hearing to consider confirmation of the Plan.

This Disclosure Statement sets forth certain information regarding the prepetition operating and financial history of the Debtors, the events leading up to the commencement of these Chapter 11 Cases, material events that have occurred during these Chapter 11 Cases, and the details of an anticipated Sale Transaction. This Disclosure Statement also describes terms and provisions of the Plan, including certain effects of confirmation and effectiveness of the Plan, certain risk factors, the manner in which distributions will be made under the Plan, and certain alternatives to the Plan.[3]

---

[2]  Capitalized terms used in this Disclosure Statement, but not otherwise defined herein, shall have the meanings given to them in the Plan. To the extent there are any inconsistencies between this Disclosure Statement and the Plan, the Plan shall govern.

[3]  Additional details regarding the Debtors and the Chapter 11 Cases can be found in the *Declaration of Colin Mark Freed in Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**"), filed on the Petition Date [Docket No. 15].

A. **Material Terms of the Plan**

The Debtors believe that the implementation of the Plan is in the best interests of the Debtors and their stakeholders.  The Debtors are soliciting votes in favor of the Plan from Holders of General Unsecured Claims.  **For all of the reasons described in this Disclosure Statement, the Debtors urge you to return your Ballot accepting the Plan by the Voting Deadline, which is on March 14, 2025, at 4:00 p.m. Eastern Time**.

On December 15, 2024, the Debtors entered into that certain Asset Purchase Agreement with Cummins Inc. ("**Cummins**" or the "**Stalking Horse Bidder**" and the Asset Purchase Agreement, the "**Stalking Horse APA**").  The Stalking Horse APA provides that the Stalking Horse Bidder will purchase the majority of the Debtors' assets, along with various assets of certain non-Debtor affiliates, for a purchase price of $15 million, plus the assumption of certain Assumed Liabilities (as defined in the Stalking Horse APA).  Importantly, the Stalking Horse APA also contemplates that a significant number of the Company's employees will transition to Cummins following consummation of the sale.

Under the Bidding Procedures outlined in the Bidding Procedures Motion (defined below), the deadline for interested parties to submit Qualified Bids was January 27, 2025 at 4:00 pm (prevailing Eastern Time) (the "**Qualified Bid Deadline**").  As of the Qualified Bid Deadline, the Debtors did not receive any Qualified Bids other than the Stalking Horse Bid.  Accordingly, the Debtors cancelled the Auction [Docket No. 190] and designated the Stalking Horse Bidder as the successful bidder.

Concurrently with the Stalking Horse APA, the Debtors entered into that certain Restructuring Support Agreement (the "**RSA**") with Anglo American International Holdings Limited ("**AAIH**" or "**Prepetition Secured Lender**" or "**DIP Lender**") and Anglo American Technical & Sustainability Ltd ("**AATS**").  The RSA provides, among other things, for the Debtors to complete the sale to the Stalking Horse Bidder, or another bidder that submits a higher or otherwise better bid, and pursue confirmation of the Plan.

The Plan is a liquidating plan that contemplates a monetary contribution by Anglo American[4] and a consensual subordination of its claims.  The Plan is premised on the consummation of a value-maximizing sale followed by an efficient and orderly wind-down of the estates.

The material terms of the Plan include, among others, the following:

- Subject to the terms and conditions outlined in the Plan and the RSA, Anglo American will provide $28,870,592, subject to adjustment as set forth in the Plan (the "**Anglo Funding Amount**") to the Debtors to fund distributions to holders of Allowed Claims under the Plan and the wind down of the Debtors.

- Anglo American's DIP Claims and Prepetition Secured Lender Claims will be subordinated as and to the extent provided in the Plan.  Specifically, Anglo

---

[4] "**Anglo American**" means AATS, AAIH, Anglo American Services (UK) Ltd. ("**AAS**"), and other affiliates thereof.

American is not expected to receive a recovery on account of these Claims, other than from the sale proceeds, unless all Allowed General Unsecured Claims of Participating GUC Holders are to be paid in full.

- Holders of General Unsecured Claims will receive a pro rata share of the Distributable Proceeds if they are Participating GUC Holders. The estimated recovery for Participating GUC Holders is 100%. **Holders of General Unsecured Claims that are not Participating GUC Holders will receive no recovery on account of their General Unsecured Claims.**

  o To be a Participating GUC Holder, a Holder of a General Unsecured Claim must: (1) either accept the Plan <u>or</u> abstain from voting on the Plan, <u>and</u> (2) opt into the third party releases.

- Holders of Equity Interests will receive no distribution on account of their Equity Interests. On the Effective Date, all Equity Interests will be canceled and extinguished and will be of no further force or effect.

- The Debtors and the Releasing Parties will release the Released Parties from various claims and causes of action, as set forth in the Plan.

- Pursuant to the Plan Administration Agreement,[5] the Plan Administrator will, among other things, oversee the administration process of the Plan, which will provide for the wind down of the Debtors.

**B.    <u>Voting on the Plan</u>**

The Disclosure Statement Order approved certain procedures governing the solicitation of votes on the Plan from Holders of Claims against the Debtors, including setting the deadline for voting, which Holders of Claims are eligible to receive Ballots to vote on the Plan, and other voting procedures.

**YOU SHOULD READ THE DISCLOSURE STATEMENT ORDER, THE CONFIRMATION HEARING NOTICE, AND THE INSTRUCTIONS ATTACHED TO YOUR BALLOT IN CONNECTION WITH THIS SECTION, AS THEY SET FORTH IN DETAIL PROCEDURES GOVERNING VOTING DEADLINES AND OBJECTION DEADLINES.**

---

[5] "**<u>Plan Administration Agreement</u>**" means the liquidating agreement to be entered into by and among the Debtors and the Plan Administrator.

Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classification of Claims and Interests set forth in the Plan will be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan provides for consolidation of the Debtors solely for purposes of voting, Confirmation, and distribution, but not for any other purpose. The Debtors reserve the right to seek substantive consolidation of the Debtors in connection with Confirmation, but substantive consolidation will not change the distributions to Holders of Claims compared to what is proposed in the Plan.

1.    **Parties Entitled to Vote on the Plan**

Under the Bankruptcy Code, only Holders of Claims or Interests in "impaired" classes are entitled to vote on the Plan (unless, for reasons discussed below, such Holders of Claims are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code). Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the Holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

The following table summarizes which Classes are Impaired and which of those Classes are entitled to vote on the Plan. The table is qualified in its entirety by reference to the full text of the Plan.

| Class | Claim | Status | Voting Rights | Estimated Amount | Estimated Recovery[6] |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept | $1,000,000 | 100% |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept | $800,000 | 100% |
| 3 | Prepetition Secured Loan Claims | Unimpaired | Presumed to Accept | $76,000,000 | 0% |
| 4 | General Unsecured Claims | Unimpaired or Impaired | Entitled to Vote | $25,900,000 | 100% (for Participating GUC Holders) **OR** 0% (for Non-Participating GUC Holders) |
| 5 | Intercompany Claims | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject | N/A | N/A |
| 6 | Intercompany Interests | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject | N/A | N/A |
| 7 | Equity Interests | Impaired | Deemed to Reject | N/A | 0% |

Accordingly, only Holders of Claims in Class 4 (the "**Voting Class**"), as of February 5, 2025, the Voting Record Date established by the Debtors for purposes of the solicitation of votes on the Plan, are entitled to vote on the Plan. If your Claim is not in this Class, you are not entitled to vote on the Plan, and you will not receive a Ballot with this Disclosure Statement. If your Claim is in this Class, you should read your Ballot and follow the listed instructions carefully. Please use only the Ballot that accompanies this Disclosure Statement.

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not cast, solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Disclosure Statement Order also

---

[6]    The Anglo Funding Amount was determined based on an estimated General Unsecured Claims pool, with the intent to provide 100% recovery for the Holders of General Unsecured Claims that are Participating GUC Holders. To the extent unknown liabilities are asserted and deemed an Allowed Claim, the General Unsecured Claims recovery may be lower than 100%.

sets forth assumptions and procedures for determining the amount of Claims that each creditor is entitled to vote in these Chapter 11 Cases and how votes will be counted under various scenarios.

**Your vote on the Plan is important**.  The Bankruptcy Code requires, as a condition to confirmation of a plan, that each class that is impaired and entitled to vote under a plan votes to accept such plan, unless the plan is being confirmed under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.  Section 1129(b) permits confirmation of a plan, notwithstanding the non-acceptance of the plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims or interests votes to accept a proposed plan, without counting votes cast by insiders.  Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.  The Debtors are seeking confirmation pursuant to section 1129(b) of the Bankruptcy Code.

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by Holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the claims of that class that cast ballots for acceptance or rejection of a plan.  Thus, acceptance by a class of claims occurs only if at least two-thirds (⅔) in dollar amount and a majority in number of the Holders of claims voting cast their ballots to accept the plan.

2.    **Solicitation Materials**

The Solicitation Materials to be sent to Holders of Claims in the Voting Class entitled to vote on the Plan as of the Voting Record Date contain:

- a copy of the notice of the Confirmation Hearing, the Confirmation Objection Deadline, and the Voting Deadline (the "**Confirmation Hearing Notice**");

- a copy of this Disclosure Statement, together with the exhibits thereto, including the Plan attached hereto as **Exhibit A**;

- a copy of the Disclosure Statement Order entered by the Bankruptcy Court (without exhibits), which approved this Disclosure Statement, established the Solicitation Procedures, scheduled a Confirmation Hearing, and set the Voting Deadline and the deadline for objecting to Confirmation of the Plan;

- a cover letter from the Debtors explaining the solicitation process and urging Holders of Claims in the Voting Class to vote to accept the Plan;

- at the Debtors' sole discretion, a letter from the Committee advising holders of Claims in the Voting Class of the Committee's position with respect to the Plan (the "**Committee Letter**"); and

- an appropriate form of Ballot, instructions on how to complete the Ballot, and a prepaid, pre-addressed Ballot return envelope.

6

In addition, the following materials will be sent to Holders of Claims and Interests not in the Voting Class as of the Voting Record Date and Holders of Unclassified Claims as of the Voting Record Date:

- a copy of the Confirmation Hearing Notice;

- a notice informing such Holders that they are not entitled to vote under the terms of the Plan (the "**Notice of Non-Voting Status**"); and

- a form providing such Holders the opportunity to opt-in to the Third Party Releases contained in the Plan (the "**Opt-In Release Form**").

The following materials will be sent to counterparties to executory contracts and unexpired leases who are not already receiving Solicitation Packages:

- a copy of the Confirmation Hearing Notice; and

- a notice indicating that such party has been identified as a party to an executory contract or unexpired lease with one or both of the Debtors (the "**Contract/Lease Notice**").

To further ensure that Holders of Claims or Interests in all Classes receive an opportunity to become a Releasing Party, the Debtors will make available an opportunity for all Holders of Claims and Interests to opt in to the Third-Party Releases after the Voting Deadline through a supplemental form (the "**Supplemental Opt-In Release Form**").  The Notice and Claims Agent shall transmit a Supplemental Opt-In Release Form to any member of the Voting Class that did not cast a Ballot for or against the Plan and did not opt in to the Third-Party Releases contained in the Plan by checking the appropriate box on the Ballot.  The Debtors will also make available, upon request, a Supplemental Opt-In Release Form for all Holders of Claims and Interests not in the Voting Class.  Holders of Claims and Interests who fill out and return the Supplemental Opt-In Release Form so as to be received by the Notice and Claims Agent no later than ninety (90) days following the Effective Date of the Plan shall be deemed Releasing Parties under the Plan, notwithstanding such Holders' failure to make an opt-in election on any Ballots or Opt-In Release Forms, as applicable.

Further, the Plan, this Disclosure Statement, and, once they are filed, all exhibits to both documents (including the Plan Supplement) will be made available online at no charge at the website maintained by the Debtors' Voting Agent at https://omniagentsolutions.com/FirstMode.  The Debtors will provide parties in interest (at no charge) with hard copies of the Plan and/or Disclosure Statement, as well as any exhibits thereto, upon request to the Voting Agent by email at FirstModeInquiries@OmniAgnt.com or by telephone for U.S. callers at 866-771-0558 (US & Canada toll free) and 747-288-6101 (International).

3.    **Voting Procedures, Ballots, and Voting Deadline**

If you are entitled to vote to accept or reject the Plan, a Ballot has been enclosed in your Solicitation Materials for the purpose of voting on the Plan.  Please vote and return your Ballot(s) in accordance with the instructions accompanying your Ballot(s).

Prior to voting on the Plan, you should carefully review: (a) the Plan attached hereto as **Exhibit A** and the Plan Supplement; (b) this Disclosure Statement; (c) the Disclosure Statement Order; (d) the Confirmation Hearing Notice; (e) the cover letter from the Debtors explaining the solicitation process; (f) (if any) the Committee Letter; and (g) the detailed instructions accompanying your Ballot(s). These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated. Holders of Claims entitled to vote are also encouraged to review the relevant provisions of the Bankruptcy Code and Bankruptcy Rules and/or consult their own attorney.

Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

In order to be counted, all Ballots must be properly completed in accordance with the voting instructions on the Ballot and **actually received** by the Voting Agent no later than the Voting Deadline (*i.e.*, **March 14, 2025, at 4:00 p.m. (Eastern Time)**) through one of the following means:

First Class Mail, Overnight Courier, or Hand/Personal Delivery:

> First Mode Holdings, Inc. Ballot Processing
> c/o Omni Agent Solution, Inc.
> 5955 De Soto Ave., Suite 100
> Woodland Hills, CA 91367

If you would like to coordinate hand delivery of your ballot, please email FirstModeInquiries@OmniAgnt.com and provide the anticipated date and time of your delivery.

Online E-Ballot Portal: visit https://omniagentsolutions.com/FirstMode-Ballots. Click on the "Submit E-Ballot" section of the Debtors' website and follow the directions to submit your E-ballot. If you choose to submit your ballot via Omni's E-Ballot system (the "**E-Ballot Portal**"), you should not also return a hard copy of your ballot.

Ballots will not be accepted by telecopy, facsimile, email or other electronic means of transmission.

Detailed instructions for completing and transmitting Ballots are included with the Ballots and provided in the Solicitation Materials.

If the Voting Agent receives more than one timely, properly completed Ballot with respect to a single Claim prior to the Voting Deadline, the vote that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the vote recorded on the timely, properly completed valid Ballot, as determined by the Voting Agent, received last with respect to such Claim, provided that, if both a paper Ballot and electronic Ballot are submitted timely on account of the same General Unsecured Claim(s), the electronic Ballot will supersede and revoke the paper Ballot.

If you are a Holder of a Claim who is entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions concerning this Disclosure Statement, the Plan, the Ballot, or the procedures for voting on the Plan, please contact the Voting Agent at the phone numbers or email address listed above.

### C.    Confirmation Hearing and Deadline for Objections to Confirmation

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the Debtors have fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code.  The Confirmation Hearing is currently scheduled to take place on **March 26, 2025 at 9:30 a.m. (Eastern Time)** before the Honorable Judge Owens, United States Bankruptcy Judge for the District of Delaware, in the United States Bankruptcy Court for the District of Delaware, located at 824 North Market Street, 6th Floor, Courtroom #3, Wilmington, Delaware. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice other than an announcement being made in open court or a notice of adjournment filed on the Court's docket.  Any objection to Confirmation must:  (a) be in writing; (b) state the name and address of the objecting party and the nature of the Claim or Interest held by such party; (c) state with particularity the basis and nature of any objection or response and include, where appropriate, proposed language to be inserted in the Plan to resolve any such objection or response; and (d) be Filed, together with proof of service, with the Bankruptcy Court and served so as to be actually received on or before **March 14, 2025, at 4:00 p.m. (Eastern Time)**. Any such objections must be Filed and served upon the persons designated in the Confirmation Hearing Notice in the manner and by the deadline described therein.

### D.    Advisors

The Debtors' bankruptcy legal advisors are Latham & Watkins LLP and Young Conaway Stargatt & Taylor, LLP.  Their financial advisor is M3 Partners, LP, their investment banker is PJT Partners Inc., and their claims and noticing agent is Omni Agent Solutions, Inc.  The Debtors' advisors can be contacted at:

| Latham & Watkins LLP | 1271 Avenue of the Americas<br>New York, New York 10020<br>Attn:  Ray Schrock; Annemarie Reilly; Brian Rosen<br>Emails:  ray.schrock@lw.com<br>            annemarie.reilly@lw.com<br>            brian.rosen@lw.com<br><br>and<br><br>330 North Wabash Avenue, Suite 2800<br>Chicago, Illinois 60611<br>Attn:  Caroline Reckler<br>Email:  caroline.reckler@lw.com<br><br>and |

| | 355 South Grand Avenue, Suite 100<br>Los Angeles, California 90071<br>Attn:  Jeffrey T. Mispagel<br>Email:  jeffrey.mispagel@lw.com |
|---|---|
| Young Conaway Stargatt & Taylor, LLP | Rodney Square, 1000 North King Street<br>Wilmington, Delaware 19801<br>Attn:  Michael R. Nestor; Kara Hammond Coyle;<br>and Joseph M. Mulvihill<br>Emails:    mnestor@ycst.com<br>          kcoyle@ycst.com<br>          jmulvihill@ycst.com |
| M3 Partners, LP | 1700 Broadway, Floor 19<br>New York, New York 10019<br>Attn:  Brett Joshpe; Lyle Bauck<br>Emails:   bjoshpe@m3-partners.com<br>          lbauck@m3-partners.com |
| PJT Partners, Inc. | 280 Park Avenue,<br>New York, New York 10017<br>Attn:  Matthew Parr; Emmanuel Recachinas; and<br>William Evarts<br>Emails:   parr@pjtpartners.com<br>          recachinas@pjtpartners.com<br>          evarts@pjtpartners.com |
| Omni Agent Solutions, Inc. | 5955 De Soto Avenue, Suite 100<br>Woodland Hills, CA 91367<br>Attn:  First Mode<br>Email:  FirstMode@OmniAgnt.com |

## II.
## OVERVIEW OF THE DEBTORS' OPERATIONS

### A.    The Debtors' Corporate Structure

Debtor First Mode, a Delaware limited liability company, is owned by (a) AATS (holding approx. 81.4% of outstanding equity); and (b) certain individual shareholders (holding approx. 18.6% of outstanding equity), which includes eleven (11) founders of the Company.  Debtor Synchronous LLC, a Washington limited liability company, is a wholly-owned subsidiary of First Mode.  First Mode is managed by a board of directors and Synchronous is managed by its direct Debtor parent, First Mode.  The Board is comprised of (a) three (3) Independent Directors, Neal Goldman, Carol Flaton, and Jill Frizzley, (b) the Chief Executive Officer of the Company, Julian Soles, and (c) one of the Founders, Margaret (Maggie) Scholtz.  First Mode is also the parent

10

company to five non-Debtor foreign entities (the "**Non-US First Mode Parties**").  A copy of the organizational chart is attached hereto as **Exhibit B**.

        **B.**        **The Debtors' Corporate History**

        First Mode was founded in 2018 as an engineering consultancy business.  Following the acquisition of a majority stake in First Mode by Anglo American in 2023, the Company[7] aspired to develop products to abate the use of diesel in heavy industry applications (starting with ultra-class mine haul trucks and rail freight locomotives).  These products were intended to comprise an initial product offering of zero-emissions haulage systems based on hydrogen fuel cell technology, which was diversified, based on customer feedback and infancy of the hydrogen economy, to include diesel-battery hybrid and battery electric systems.  Additionally, recognizing that successful product deployment requires macro-level planning and integration, the Company provided certain services to ensure that the necessary infrastructure is also delivered as well as seamless integration with customers' existing fleets and management systems.

        **C.**        **The Debtors' Business**

        **1.**        **The Products**

        As part of their Path to Zero™ Program, the Debtors intended to offer three unique products to their customers.

        ***The Hybrid Electric Vehicle*** ("**HEV**").  The HEV fits a regenerative battery pack to the customer's existing heavy haulage vehicle while leaving the rest of the vehicle unchanged.  The regenerative unit captures the energy generated through braking (for example, as the truck descends a hill) and later uses it to help power the truck.  Depending on the conditions, this regenerative power can reduce fuel usage and carbon dioxide emissions by up to 25%.  By July 2024, in response to the dynamics of the capital raising environment, the Debtors decided to focus almost entirely on the HEV product, a product which promised nearer term revenue and could be developed with a much reduced cost base.

        ***The Battery Electric Vehicle*** ("**BEV**").  The BEV also includes the same regenerative battery pack as the HEV, and, therefore, customers can proceed to a full-battery retrofit without losing the already completed work.  To convert from an HEV to a BEV, the existing diesel engine is replaced with additional battery capacity to produce a zero-emission system.  The BEV's main battery is charged through regenerative braking and supported by a static multi-megawatt rapid charge system.

        ***Fuel Cell Electric Vehicle*** (**"FCEV"**).  The FCEV's regenerative battery pack is likewise the same as that used in the HEVs; so customers can proceed to the FCEV retrofit without discarding prior modifications.  In contrast to the BEV, in the FCEV, the diesel engine is replaced with a hydrogen fuel cell power module.  The fuel cells combine hydrogen with oxygen from the air to generate electricity to drive the truck's wheel motors.  The FCEV retrofit also includes the addition of a large liquid hydrogen tank, which provides the most comparable performance and

---

[7]    The "**Company**" refers collectively to the Debtors and their and their non-Debtor direct and indirect subsidiaries.

flexibility to existing diesel engines in a zero-emission vehicle. Critically, the only byproduct of this process is water, *i.e.*, no greenhouse gases are generated. In May 2023, the Debtors' proof of concept FCEV retrofit (using gaseous, rather than liquid hydrogen) completed a full year of operational trials at Anglo American's Mogalakwena mine in South Africa, logging 1,245 operational hours with zero-emissions.

### 2. The Services

In addition to their products, First Mode provides studies and other services to their customers in order to assist the successful integration of the retrofitted vehicles into their customer's operations. First Mode recognizes that each mining operation is different and varies greatly in terms of the haul road system, mining strategy, location of the operation, and ease of access to low-carbon electricity sources. Accordingly, First Mode's engineers and modelling experts work closely with clients to determine the unique needs of each mine site and what technology solution best fits each customer's needs.

### D. The Debtors' Prepetition Capital Structure

### 1. Debt

#### a. Secured Debt

The Debtors entered into that certain Facility Agreement, dated as of December 21, 2023 (as amended by that certain Amendment No. 1, dated March 11, 2024, that certain Amendment No. 2, dated April 12, 2024, and that certain Amendment No. 3, dated December 9, 2024, and as supplemented by each Deed of Accession dated as of August 4, 2024,[8] the "**Facility Agreement**"), consisting of a $150 million revolving credit facility and a $6.749 million delayed draw term loan facility. As of December 15, 2024, the principal amount of indebtedness that the Debtors have incurred under the Facility Agreement is approximately $71.5 million in aggregate principal amount plus accrued interest, fees, expenses and other charges thereon and any other obligations owing to the Lender under the Facility Agreement (such obligations, the "**Prepetition Secured Loans**"). The Debtors have also financed certain equipment in the amount of approximately $1 million.

In connection with the Facility Agreement, the Debtors and the Non-US First Mode Parties entered into various security agreements with AAIH that created a first priority security interest in favor of AAIH in all or substantially all assets of the Company. Prior to the Facility Termination, the Facility Agreement had a final maturity date of December 31, 2025.

---

[8] The "**Deed of Accession**" refers to the accession agreements entered into by First Mode SA Holdings Pty Ltd. and First Mode SA Pty Ltd., respectively, with AAIH on August 4, 2024. The Deeds of Accession were executed in connection with the Facility Agreement and made First Mode SA Holdings Pty Ltd. and First Mode SA Pty Ltd. guarantors under the Facility Agreement.

b.       **Unsecured Debt**

The Debtors have no funded unsecured debt.  In the ordinary course, the Debtors incur trade debt with certain vendors and suppliers in connection with the operation of their business, which the Debtors estimate was approximately $27 million as of the Petition Date.

2.       **Equity Structure**

As of December 14, 2024, FMH has 56,001,279 shares of common stock outstanding. AATS holds approximately 81.4% of shares, while the remaining 18.6% is held by individual shareholders who are, or were, employees of First Mode.  Of this 18.6% of shares, the majority are held by the Founders who collectively hold approximately 16.3% of shares in First Mode.

First Mode also adopted a 2019 Equity Incentive Plan ("**2019 Plan**") and a 2023 Stock Incentive Plan ("**2023 Plan**").  The 2019 Plan authorized 1,241,370 shares; however, no options or restricted stock units remain for future distribution.  Meanwhile, the 2023 Plan authorized 2,808,924 shares.

**III.**
**EVENTS LEADING TO COMMENCEMENT OF THESE CHAPTER 11 CASES**

A.       **Challenges Leading to the Chapter 11 Cases**

The Debtors operate in a highly competitive and capital-intensive industry.  As a growth-stage company, the Debtors have invested significant resources to establish their R&D, testing and low volume production facilities, develop their technology, ramp up their operations, and grow their customer base.

In early 2023, the Debtors' key strategic focus was to (a) establish the requisite infrastructure, including its proving grounds and low volume production facility, and (b) develop the technology to convert the powertrain of heavy mining haulage trucks from diesel-generated power to hydrogen-battery power in order to deliver products to Anglo American in the timeframe contemplated under the Supply Agreement.[9]  By summer 2023, however, the Debtors recognized that they were having difficulty securing customers (including securing a purchase order for the fuel cell powertrains from Anglo American) and realigned their focus to hybrid-diesel battery power.  The challenge stemmed primarily from the high costs associated with hydrogen fuel procurement, the expensive liquefaction process and expensive retrofitting of a hydrogen-battery powertrain.  While the Debtors were and are at the cutting edge of green technology, delays in securing purchase orders for the fuel cell variants also delayed any revenue beyond initial forecasts.  In the meantime, the Debtors attempted to bridge the gap to customers by offering lower-cost, gradational retrofitting that would allow for interim use of hybrid electric vehicles.

---

[9]     "**Supply Agreement**" refers to that certain Umbrella Supply Agreement (as amended from time to time), pursuant to which Anglo American agreed to purchase, and First Mode agreed to supply, certain hydrogen fuel cell retrofit kits, undertake evaluative studies, and provide other services, as required, to AAS, subject to the completion of agreed and committed studies across certain mine sites, certain performance and cost criteria, and relevant regulatory, corporate and shareholder approvals.

These offerings were potentially industry-changing in their own right; however, as a pre-revenue company, and in light of the circumstances, the Debtors ran out of time to realize their vision.

The difficulties in attracting new customers undermined the Debtors' operations, and the Debtors became unsustainably dependent on their main client relationship with Anglo American. Without the stability of multiple revenue streams or the continued support of Anglo American (which was undoubtedly instrumental to the Debtor's early growth), the Debtors were unable to explore the full potential of their technology. Recognizing the need to strengthen other relationships and raise funds from additional sources, the Company engaged in a capital raise effort with the assistance of Lazard. In light of market feedback and, upon the recommendation of Lazard, the Company took steps to simplify its business plan to focus on the HEV product and underwent a significant cost down exercise. The Company sought to raise approximately $80 million from third-party investors. The prepetition capital raise process generated several leads, with First Mode substantially agreeing to an investment term sheet with a lead investor, reflecting the market's interest and confidence in First Mode's value proposition and growth trajectory. Any third-party investment, however, was contingent on Anglo American agreeing to the conversion of its outstanding debt to equity, among other terms. Ultimately, the deal terms could not be finalized.

In August 2024, the Debtors received four Letters from Anglo American, terminating the Supply Agreement, Purchase Order, and Facility Agreement. [10] The termination of the Supply Agreement and the Purchase Order resulted in the loss of a significant source of future income for the Debtors, and the cancellation of the Facility Agreement and acceleration of the debt outstanding thereunder exacerbated the Debtors' liquidity issues. At the same time, however, through the Original Notice of Forbearance, Anglo American agreed to forbear from exercising certain of its asserted rights and remedies under the Facility Agreement for an initial period of forty-five (45) days, which has since been extended ten (10) times up to the commencement of these Chapter 11 Cases. Although each of the forbearances has included several unilaterally imposed limitations that restricted the Debtors' ability to manage its operations, they ultimately provided additional funding to the Debtors, allowing them to negotiate the RSA and enable the sale and wind-down process to be effectuated in these Chapter 11 Cases.

### B.    Reductions in Force and Other Cost-Saving Measures

Even prior to its receipt of the Letters, facing strong industry headwinds and shifting customer preferences, the Company had been forced to cut its workforce through a series of reductions in force (the "**RIFs**") in the last year. The Company first announced layoffs on January 16, 2024 and exited forty-two (42) employees, representing approximately 20% of their U.S. workforce at the time. This provided the Debtors with some cost savings, though the Debtors continued to battle changing market conditions and uncertainty over funding. As a result, the Debtors determined that further cuts were necessary in preparation for seeking new investments in

---

[10]    The "**Letters**" refer to the four letters sent by Anglo American on August 20, 2024, which comprised the following: (1) Notice of Termination of the Supply Agreement (the "**Supply Agreement Termination**"); (2) Notice of Termination of the Purchase Order ("**Purchase Order Termination**"); (3) Notice of Mandatory Prepayment and Event of Default pursuant to the Facility Agreement (the "**Facility Termination**"); and (4) Notice of Forbearance (the "**Original Notice of Forbearance**").

their operations. The Debtors considered other options, such as revisiting non-labor costs, reducing recruitment efforts, and terminating most contracted labor, but were unable to achieve a sustainable cost basis. Accordingly, on August 5, 2024, the Debtors filed a Worker Adjustment and Retraining Notification notice with the Employee Security Department of Washington State, announcing the layoff of an additional sixty-five (65) workers. The reductions represented approximately 40% of the Debtors' Washington State workforce at the time.

Following the August RIF, and in the face of the requirements imposed by the Letters, the Debtors significantly limited their operations to cut expenditure, including delaying payments to non-critical vendors to extend their runway to pursue a value-maximizing transaction. The Debtors retained a core group of employees to maintain the essential knowledge to allow business operations to restart in accordance with the preferences of the Debtors' ultimate buyer once a sale is consummated.

Since the delivery of the Letters, the Company has remained in close coordination with Anglo American to limit expenditure while attempting to maintain the Company's attractiveness to potential buyers. Accordingly, M3, the Debtors' financial advisor, has prepared numerous budgets at Anglo American's request (and as required by the Letters). In the lead up to the filing of the Chapter 11 Cases and based upon the budgets prepared in conjunction with Anglo American, on December 6, 2024, the Debtors conducted a further reduction in force impacting approximately sixteen (16) additional employees in the US and twenty-nine (29) across the Company's operations in the UK, Australia and Chile.

C.     **The Prepetition Sale and Marketing Process**

In the face of the foregoing challenges, the Company retained Latham, PJT, and M3 to assist in analyzing the Company's financial position and to explore potential sale options. Recognizing that an effective and efficient solution to the Company's cash-flow and liquidity concerns would require support from Anglo American, the Company worked alongside its advisors and Anglo American for a number of months to explore an out-of-court sale transaction that would permit the Company to continue operating as a going concern, preserve jobs, and maximize recoveries for all creditors or, in the alternative, a sale of the Company's assets. The Company's management, together with the assistance of its advisors (in particular, PJT), undertook a robust marketing process under the oversight of the Restructuring Committee.

The Company initiated outreach to a targeted group of strategic buyers, several of which were existing, long-standing partners of the company. Operating under the timeline required by the Letters, the Company, through PJT, contacted and sent form non-disclosure agreements to nineteen (19) potential buyers. The Company invited these potential buyers to execute non-disclosure agreements. In response to the initial outreach, the Company executed non-disclosure agreements with nine (9) prospective buyers of the assets, each of which received the same package of marketing materials and which were invited to participate further in the sale process.

The Company then invited the nine (9) prospective buyers to submit indications of interest by September 30, 2024. Discussions were focused initially on consummating an out-of-court sale process that would be value maximizing to all key stakeholders and permit the ongoing operation of the business as a going concern. Ultimately, only Cummins provided a bid by September 30,

2024 while one other party indicated that it would submit a preliminary offer subject to substantial additional due diligence by October 15, 2024.  Accordingly, the Company narrowed its focus on Cummins, and, in November 2024, the Company and Cummins, in consultation with Anglo American, pivoted to an in-court process, whereby Cummins would serve as a stalking horse bidder and the Debtors could pursue a plan of liquidation following consummation of the sale.

Ultimately, the prepetition marketing process culminated in the execution of the Stalking Horse APA on December 15, 2024, which was approved by the Board at the recommendation of the Restructuring Committee.  At all times, the Stalking Horse Bidder has been represented by separate counsel in negotiations resulting in execution of the Stalking Horse APA.

D.    **Independent Investigation**

At the beginning of November 2024, as it became evident that the Debtors' marketing process for an out-of-court transaction might not be achievable, and that a bankruptcy filing might be necessary to maximize the Company's value, the Company initiated an investigation to determine whether, in the context of a bankruptcy, the Debtors might have potential claims against various parties and constituencies, including those affiliated with the Company, in connection with a restructuring and chapter 11 plan.  Such investigations are frequently undertaken in this context.

To that end, the Restructuring Committee commenced an investigation into potential claims that the Company might hold against third parties, including but not limited to its current and former directors, officers, employees, lenders, stockholders and/or advisors (collectively, the "**Investigation Parties**"), in order to evaluate any potential claims and make a recommendation to the full Board in connection therewith.  The Restructuring Committee is being advised and assisted in this investigation (the "**Investigation**") by Young Conaway.  Among other things, the Investigation includes an assessment of allegations asserted by a group of the Founders as set forth in a letter to the FMH Board, dated November 8, 2024.

In furtherance of the Investigation, Young Conaway reviewed thousands of pages of relevant documents for the period of November 2020 through the present and conducted extensive interviews of eleven (11) individuals, including members of the Company's board and upper management, certain former directors and/or officers and representatives of Anglo American.  In addition, Young Conaway met with counsel for the Founders to assess whether the Company possesses any viable claims against any Investigation Party. Young Conaway met with and reported to the Restructuring Committee throughout the process, and researched the potential for any viable claims held by the Debtors and their estates against any of the Released Parties under the Plan.  Young Conaway also provided transparency to the Committee, having held several meetings to discuss the facts and potential claims as well as producing certain relevant documents. The Restructuring Committee has concluded that the facts underlying the Investigation do not support any prima facie claims against the Investigation Parties that are Released Parties; therefore,

the Debtors submit that the Debtor Release with respect to those parties is reasonable and appropriate.

# IV.
# OVERVIEW OF THESE CHAPTER 11 CASES

### A.    Commencement of Chapter 11 Cases

On December 15, 2024, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  To minimize disruptions to the Debtors' operations, and to facilitate the efficient and expeditious confirmation of the Plan, the Debtors filed numerous motions seeking traditional "first-day" and other substantive relief.

### B.    First Day Motions

On the Petition Date, the Debtors filed multiple motions seeking various forms of relief from the Bankruptcy Court, including authorization for the Debtors to maintain their operations in the ordinary course (the "**First Day Motions**").  Such relief was aimed at ensuring a seamless transition between the Debtors' prepetition and postpetition business operations, facilitating a smooth chapter 11 process, and minimizing disruptions to the Debtors' businesses.  The Debtors sought to, among other things:

- Jointly administer these Chapter 11 Cases [Docket No. 3], which the Bankruptcy Court approved on December 17, 2024 [Docket No. 42];
- Retain Omni Agent Solutions, Inc. as claims and noticing agent [Docket No. 4], which the Bankruptcy Court approved on December 17, 2024 [Docket No. 54];
- File a consolidated list of creditors and redact certain personal identification information [Docket No. 5], which the Bankruptcy Court approved on an interim basis on December 18, 2024 [Docket No. 63] and on a final basis on January 17, 2025 [ Docket No. 156];
- Pay certain prepetition taxes and fees [Docket No. 6], which the Bankruptcy Court approved on an interim basis on December 17, 2024 [Docket No. 55] and on a final basis on January 17, 2025 [ Docket No. 157];
- Continue insurance programs [Docket No. 7], which the Bankruptcy Court approved on an interim basis on December 17, 2024 [Docket No. 56] and on a final basis on January 17, 2025 [ Docket No. 158];
- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service [Docket No. 9], which the Bankruptcy Court approved on an interim basis on December 17, 2024 [Docket No. 57] and on a final basis on January 17, 2025 [ Docket No. 159];
- Pay critical vendors [Docket No. 10], which the Bankruptcy Court approved on an interim basis on December 17, 2024 [Docket No. 58] and on a final basis on January 17, 2025 [Docket No. 160];
- Continue paying certain workforce obligations and certain related claims [Docket No. 11], which the Bankruptcy Court approved on an interim basis on December 18, 2024 [Docket No. 65] and on a final basis on January 16, 2025 [ Docket No. 150]; and
- Continue the use of the Debtors' cash management system, bank accounts, and business forms [Docket No. 12], which the Bankruptcy Court approved on an interim basis on

December 17, 2024 [Docket No. 59] and on a final basis on January 16, 2025 [ Docket No. 149].

### C.    Procedural Motions

The Debtors have filed various motions regarding procedural issues common to chapter 11 cases of similar size and complexity, including, without limitation:

- A motion for entry of an order setting a bar date for the Filing of Proofs of Claim [Docket No. 8],which the Bankruptcy Court approved on January 7, 2025 [Docket No. 99];
- A motion for entry of an order establishing procedures for the interim compensation and reimbursement of expenses of professionals [Docket No. 136], which the Bankruptcy Court approved on January 31, 2025 [Docket No. 213]; and
- A motion for entry of an order authorizing the Debtors to employ professionals used in the ordinary course of business [Docket No. 90], which the Bankruptcy Court approved on January 17, 2025 [Docket No. 162].

### D.    Retention Applications

The Debtors have filed various applications regarding the retention of professionals during these Chapter 11 Cases, as is common in chapter 11 cases of similar size and complexity, including, without limitation:

- An application for entry of an order authorizing the retention of Latham & Watkins LLP [Docket No. 131],which the Bankruptcy Court approved on January 31, 2025 [Docket No. 207];
- An application for entry of an order authorizing the retention of Young Conaway Stargatt & Taylor, LLP [Docket No. 132],which the Bankruptcy Court approved on January 31, 2025 [Docket No. 211];
- An application for entry of an order authorizing the retention of M3 Partners, LP [Docket No. 133],which the Bankruptcy Court approved on February 3, 2025 [Docket No. 221];
- An application for entry of an order authorizing the retention of Omni Agent Solutions, Inc [Docket No. 134],which the Bankruptcy Court approved on February 3, 2025 [Docket No. 218]; and
- An application for entry of an order authorizing the retention of PJT Partners, Inc. [Docket No. 135],which the Bankruptcy Court approved on February 3, 2025 [Docket No. 220].

The Committee has also filed various applications regarding the retention of professionals during these Chapter 11 Cases, which remain subject to the approval of the Bankruptcy Court:

- An application for entry of an order authorizing the retention of f McDermott Will & Emery LLP [Docket No. 204]; and
- An application for entry of an order authorizing the retention of Dundon Advisers LLC [Docket No. 205].

### E.   **DIP Financing**

Pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Facility Lender, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief* [Docket No. 13], (the "**DIP Motion**") the Debtors requested authority, among other things, to enter into $26,000,000 delayed draw DIP financing facility (the "**DIP Facility**"), which will be subordinated in accordance with the terms of the RSA and is expected to provide the Debtors with sufficient liquidity during these Chapter 11 Cases. The Bankruptcy Court approved the DIP Motion on an interim basis on December 18, 2024 [Docket No. 66] and on a final basis on January 16, 2025 [ Docket No. 148].

The Debtors must comply with certain milestones, which are provided in Section 9.29 of the DIP Credit Agreement (certain of which have already been met and certain others of which have been consensually extended).[11]

### F.   **Appointment of the Statutory Committee of Unsecured Creditors**

On January 9, 2025, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed an official committee of unsecured creditors [Docket No. 111] (the "**Committee**") in the Chapter 11 Cases. The Committee has retained McDermott Will & Emery LLP as counsel and Dundon Advisers LLC as financial advisor.

### G.   **Sale-Related Motions**

On December 15, 2024, the Debtors filed the *Motion of Debtors For Entry of (I) an Order (A) Approving Bid Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Scheduling an Auction and a Sale Hearing, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Debtors to Enter into the Stalking Horse APA and Related Bid Protections, (E) Approving Procedures for the Assumption and Assignment of Contracts and Leases, and (F) Granting Related Relief; and (II) an Order (A) Approving the Sale of Substantially all of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* (the "**Bidding Procedures Motion**"), seeking authorization to conduct a competitive and robust sale process consistent with the milestones set forth in the DIP Credit Agreement, which process the Debtors believe will ensure that they maximize the value of their assets.

The Bankruptcy Court entered the *Order (I) Approving Bid Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Scheduling an Auction and a Sale Hearing, (III) Approving the Form and Manner of Notice Thereof, (IV) Authorizing the Debtors to Enter into the Stalking Horse APA and Related Bid Protections, (V) Approving Procedures for the*

---

[11]   Capitalized terms used but not otherwise defined in this section have the meaning ascribed to such terms in the Interim DIP Order or the DIP Credit Agreement.

*Assumption and Assignment of Contracts and Leases, and (VI) Granting Related Relief* on January 17, 2024 [Docket No. 166] granting certain relief requested in the Bidding Procedures Motion.

The Bankruptcy Court entered the *Order (A) Approving the Sale of Substantially all of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* on [ ● ], 2025 [Docket No. [ ● ]] granting, among other relief, approval of the sale to the Stalking Horse Bidder.

As of the date hereof, the Debtors and the Stalking Horse Bidder are working to meet the conditions precedent necessary to close the Sale Transaction.  There is no guarantee that the Sale to the Stalking Horse Bidder closes.

## H.   **Exclusivity**

Section 1121(b) of the Bankruptcy Code provides for a period of one hundred twenty (120) days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to File a plan (the "**Exclusive Plan Period**").  In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor Files a plan within the Exclusive Plan Period, it has a period of one hundred eighty (180) days after commencement of the chapter 11 case to obtain acceptances of such plan, before the expiration of which no other party in interest may File a plan (the "**Exclusive Solicitation Period**," and together with the Exclusive Plan Period, the "**Exclusive Periods**").  Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods.  The Debtors' Exclusive Plan Period currently runs through April 14, 2025, and their Exclusive Solicitation Period runs through June 13, 2025, both of which are subject to extension upon order of the Bankruptcy Court.

**V.**
**SUMMARY OF THE PLAN**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN, A COPY OF WHICH IS ATTACHED AS <u>EXHIBIT A</u> HERETO, AND IN THE DOCUMENTS REFERRED TO THEREIN, WHICH ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN).**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN. HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS AND OTHER INTERESTED PARTIES ARE URGED TO READ THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.**

**A.    Classification and Treatment of Claims and Interests Under the Plan**

Under the Bankruptcy Code, only "allowed" claims and interests may receive distributions under a chapter 11 plan.  In general, an "allowed" claim or "allowed" interest means that the debtor agrees (or the bankruptcy court has ruled) that the claim or interest, including the amount, is in fact, a valid obligation of the debtor.

The Bankruptcy Code also requires that, for purposes of treatment and voting, the chapter 11 plan divide the different claims against, and interests in, the debtor into separate classes based upon their legal nature.  Claims of substantially similar legal nature are usually classified together, as are interests of a substantially similar legal nature.  Because an entity may hold multiple claims or interests that give rise to different legal rights, the claims and interests themselves, rather than their Holders, are classified.

Under a chapter 11 plan, the separate classes of claims and interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims or interests is "impaired," the Bankruptcy Code affords certain rights to the Holders of such claims or interests, such as the right to vote on the plan (unless the plan has deemed the class to reject the plan), and the right to receive under the chapter 11 plan no less value than the Holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

Pursuant to section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (a) does not alter the legal, equitable, and contractual rights of the Holders or (b) irrespective of the Holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case, or non-performance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, compensates the Holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable, and contractual rights. Typically, this means the Holder of an unimpaired claim will receive on the later of the effective date of the plan and the date on which amounts owing are due and payable, payment in full, in cash, and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms.  Thus, other than the right to accelerate the debtor's obligations, the holder of an unimpaired claim generally will be placed in the position it would have been in had these Chapter 11 Cases not been commenced.

Consistent with these requirements, as described above, the Plan divides the Claims against, and Interests in, the Debtors into seven (7) distinct Classes.  Pursuant to the Bankruptcy Code, not all Classes are entitled to vote on the Plan.  Under the Plan: (a) Class 4 is either Unimpaired or Impaired and the Holders of Claims in such Class are entitled to vote to accept or reject the Plan; (b) Classes 1, 2 and 3 are Unimpaired and the Holders of Claims in such Class are conclusively presumed to have accepted the Plan and are thus not entitled to vote on the Plan; (c) Class 7 is Impaired and the Holders of Interests in such Class (i) will receive no distributions under the Plan on account of their Interests, (ii) are deemed to have rejected the Plan, and (iii) are not entitled to vote to accept or reject the Plan; and (d) Classes 5 and 6 are either Unimpaired or Impaired and the Holders of Intercompany Claims and Intercompany Interests in such Classes are conclusively presumed to have either accepted or rejected the Plan and are thus not entitled to vote on the Plan.

21

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtors' or the Plan Administrator's, as applicable, rights in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

**B.     Acceptance or Rejection of the Plan; Effect of Rejection of Plan**

Article III of the Plan sets forth certain additional rules governing the tabulation of votes under the Plan and related matters. Among other things, Article III provides that (a) the Plan constitutes a separate chapter 11 plan for each Debtor, but the Plan consolidates Claims against all Debtors solely for purposes of voting, Confirmation, and distribution, and the Debtors reserve the right to seek substantive consolidation of the Debtors in connection with Confirmation (III.A); (b) the Debtors will seek confirmation of the Plan pursuant to 1129(b) of the Bankruptcy Code, which permits confirmation of a plan notwithstanding the rejection or deemed rejection of one or more Classes, provided that at least one Class entitled to vote has voted to accept the plan and certain other requirements are met, including that the Plan does not discriminate unfairly and is fair and equitable with respect to each impaired, non-consenting Class of Claims under the Plan (III.C); and (c) any Class that does not have a Holder of an Allowed Claim or a Claim temporarily Allowed by this Court as of the date of the Confirmation Hearing will be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such class pursuant to section 1129(a)(8) of the Bankruptcy Code (III.E).

**C.     Treatment of Executory Contracts and Unexpired Leases; Employee Benefits; and Insurance Policies**

Article V of the Plan governs the treatment of the Debtors' Executory Contracts and Unexpired Leases, among other things. Article V.A of the Plan provides that on the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or Unexpired Leases will be deemed rejected as of the Effective Date or on such later date as may be identified on the Rejected Contracts List, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that are or were (i) previously assumed pursuant to an order of the Bankruptcy Court, (ii) assumed and assigned or to be assumed and assigned in accordance with any Sale Transaction Documentation, (iii) previously rejected pursuant to an order of the Bankruptcy Court, (iv) the subject of a pending motion to reject, assume, or assume and assign as of the Effective Date, or (v) identified on the Assumed Contract List.

Entry of an order confirming the Plan (the "**Confirmation Order**") by the Bankruptcy Court will constitute an order approving the assumptions or rejections of the Debtors' Executory Contracts and Unexpired Leases pursuant to the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-Debtor party thereto to terminate

such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

Notwithstanding anything to the contrary in the Plan, the Debtors reserve the right to amend or supplement the Assumed Contracts List and the Rejected Contracts List, with the consent of the Prepetition Secured Lender, prior to the Effective Date (or such later date as may be permitted by Article V.B or Article V.E of the Plan), *provided* that the Debtors will give prompt notice of any such amendment or supplement to any affected counterparty and such counterparty will have a reasonable opportunity to object thereto on any grounds.

Notwithstanding anything to the contrary in the Plan, the terms of any Sale Transaction Documentation, any Sale Order, and Bidding Procedures Order will govern the cure of defaults, assumption and assignment, and compliance with section 365 of the Bankruptcy Code with respect to any Executory Contracts or Unexpired Leases assumed and assigned, or to be assumed and assigned, pursuant to such Sale Transaction Documentation and Sale Order.

Article V.B of the Plan provides that any monetary defaults under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the applicable Cure Cost in Cash on the Effective Date or as soon as reasonably practicable, subject to the limitation described below, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree.

In the event of an assumption, or an assumption and assignment, of an Executory Contract or Unexpired Lease under the Plan, at least fourteen (14) days prior to the applicable objection deadline, the Debtors will File and serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, or proposed assumption and assignment, which will: (a) list the applicable Cure Cost, if any; (b) if applicable, identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption, or proposed assumption and assignment under the Plan, or the Cure Cost, must be Filed, served and actually received by the Debtors prior to the applicable objection deadline (notwithstanding anything in the Schedules or a Proof of Claim to the contrary). Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, or proposed assumption and assignment, or Cure Cost will be deemed to have consented to such matters and will be deemed to have assented to such assumption, assumption or assignment, and Cure Cost and to have forever released and waived any objection to such proposed assumption, proposed assumption and assignment, and Cure Cost.  The Confirmation Order will constitute an order of the Bankruptcy Court approving each proposed assumption, or proposed assumption and assignment, of Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any Cure Cost, (b) the ability of any Debtor or assignee to provide "adequate assurance of future performance" (within the meaning of

section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or assumed and assigned or (c) any other matter pertaining to assumption or assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving such assumption, or assumption and assignment.  If such objection is sustained by Final Order of the Bankruptcy Court, the Debtors or the Plan Administrator, as applicable, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming or assigning it. The Debtors or the Plan Administrator, as applicable, will be authorized to affect such rejection by filing a written notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within ten (10) days of the entry of such Final Order.

Upon payment of the Cure Cost, assumption of any Executory Contract or Unexpired Lease will result in the full satisfaction and cure of any Claims and defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, under any assumed Executory Contract or Unexpired Lease arising at any time prior to the effective date of assumption.

Article V.C of the Plan addresses Claims based on rejection of Executory Contracts and Unexpired Leases and provides that unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases by virtue of the Plan must be filed with the Notice and Claims Agent by the date that is twenty-one (21) days following service of an order (which may be the Confirmation Order) approving the rejection of the applicable Executory Contract or Unexpired Lease.  The deadline for Governmental Units to file any such Proofs of Claim will be the later of thirty (30) days after the effectiveness of rejection of the applicable Executory Contract or Unexpired Lease or the Governmental Bar Date as set forth in the Bar Date Order.  The notice of Effective Date will set forth the date by which Proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases must be filed. **Any Proofs of Claim arising from the rejection of the Executory Contracts and Unexpired Leases that are not timely filed** will **be forever disallowed and barred, absent a Final Order to the contrary.**  All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases will constitute General Unsecured Claims and will be treated in accordance with Article III.B of the Plan.

Article V.E of the Plan is a reservation of the Debtors' rights.  Neither the exclusion nor inclusion of any contract or lease in the Rejected Contracts List or Assumed Contracts List, as applicable, nor anything contained in the Plan or any Sale Transaction Documentation, nor the Debtors' delivery of a notice of proposed assumption and proposed Cure Cost to any contract and lease counterparties, will constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Plan Administrator, as applicable, will have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.  If there is a dispute regarding a Debtor's liability under an assumed Executory Contract or Unexpired Lease, the Plan Administrator will be authorized to move to have such dispute heard by the Bankruptcy Court pursuant to Article X.C of the Plan.

### D.      Provisions Governing Distributions

Article VI of the Plan sets forth the mechanics by which Plan distributions will be made. Article VI.A provides that except as otherwise provided in the Plan or a Final Order, or as agreed to by the relevant parties, initial distributions under the Plan on account of Claims Allowed on or before the Effective Date will be made on the Initial Distribution Date; *provided* that Allowed Priority Tax Claims will be satisfied in accordance with Article II.C of the Plan.

Article VI.B governs the distributions on account of Claims Allowed after the Effective Date. Article VI.B.1 states that except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions on account of Disputed Claims that become Allowed after the Effective Date will be made by the Plan Administrator on the next Periodic Distribution Date that is at least thirty (30) days after the Disputed Claim becomes an Allowed Claim; *provided* that (a) Disputed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business that become Allowed after the Effective Date will be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date will be treated as Allowed Priority Tax Claims in accordance with Article II.C of the Plan.

Under Article VI.B.2, after the Initial Distribution Date, the Plan Administrator will, or will direct the Distribution Agent to, distribute additional Distributable Proceeds as soon as practicable upon such Distributable Proceeds becoming available to the Debtors or the Plan Administrator, or on the next Periodic Distribution Date. Such additional Distributable Proceeds will be distributed in accordance with the terms of Article IV of the Plan.

Article VI.C provides that except as otherwise provided in the Plan, on each Periodic Distribution Date each Holder of an Allowed Claim will receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class (*i.e.*, taking into account any reserves established with respect to Disputed Claims). If and to the extent that any Disputed Claims exist, distributions on account of such Disputed Claims will be made pursuant to Article VI.B. and Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims will not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Article VI.D governs the delivery of distributions. Article VI.D.1 provides that for purposes of making distributions on the Initial Distribution Date only, the Distribution Agent will be authorized and entitled to recognize only those Holders of Claims reflected on the Claims Register as of the close of business on the Distribution Record Date. If a Claim is transferred (a) twenty-one (21) or more days before the Distribution Record Date and reasonably satisfactory documentation evidencing such transfer is Filed with the Court, the Distribution Agent will make the applicable distributions to the applicable transferee, or (b) twenty (20) or fewer days before the Distribution Record Date, the Distribution Agent will make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form is Filed with the Court and contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor. With respect to periodic distributions, the Distribution Agent will be entitled to set

a reasonable record date, and to recognize only those Holders of Claims reflected on the Claims Register as of the close of business on such date.

Article VI.D.2 provides that except as otherwise provided in the Plan, the Distribution Agent will make distributions to Holders of Allowed Claims at the address for each such Holder as indicated in the Debtors' records as of the date of any such distribution, including the address set forth in any Proof of Claim filed by that Holder, if applicable; *provided* that the manner of such distributions will be determined at the discretion of the Plan Administrator.

Article VI.D.3 states that the Debtors or the Plan Administrator, as applicable, will have the authority to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder.  To the extent the Debtors or the Plan Administrator, as applicable, determines to utilize a Distribution Agent to facilitate the distributions under the Plan to Holders of Allowed Claims, any such Distribution Agent would first be required to:  (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan; (c) waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent; and (d) post a bond, obtain a surety or provide some other form of security for the performance of its duties, the costs and expenses of procuring which will be borne by the Debtors or the Plan Administrator, as applicable.  Furthermore, the Debtors or the Plan Administrator, as applicable, will pay to the Distribution Agents all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions, or consents.  The Distribution Agents will submit detailed invoices to the Debtors or the Plan Administrator, as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement and the Debtors or the Plan Administrator, as applicable, will pay those amounts that they, in their sole discretion, deem reasonable, and will object in writing to those fees and expenses, if any, that the Debtors or the Plan Administrator, as applicable, deem to be unreasonable.  In the event that the Debtors or the Plan Administrator, as applicable, objects to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtors or the Plan Administrator, as applicable, and such Distribution Agent will endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses.  In the event that the Debtors or the Plan Administrator, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party will be authorized to move to have such dispute heard by the Bankruptcy Court.

Article VI.D.4 provides that notwithstanding anything in the Plan to the contrary, other than on account of Claims in Classes 1 and 2, the Distribution Agents will not be required to make distributions or payments aggregating less than $50 (whether Cash or otherwise) to any particular Holder of an Allowed Claim in such Classes and will not be required to make partial distributions or payments of fractions of dollars.  If any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment will reflect a rounding down of such fraction to the nearest whole dollar.

Article VI.D.5 governs the treatment of undeliverable distributions.  Undeliverable distributions will remain in the possession of the Distribution Agents until such distributions become deliverable, at which time such distributions will be made without interest, dividends, or

other accruals of any kind on account of the distributions being undeliverable; *provided* that distributions returned as undeliverable will be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the date the distributions were initially made.  After such date, all unclaimed property or interests in property will revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property Laws to the contrary) to the Estate automatically and without need for a further order by the Bankruptcy Court and the Claim or Interest of any Holder to such property or interest in property will be forever barred, absent order of the Bankruptcy Court to the contrary.

Furthermore, checks issued by the Distribution Agents on account of Allowed Claims will be null and void if not negotiated within one hundred eighty (180) days after the issuance of such check.  Requests for reissuance of any check will be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.

Article VI.E provides that in connection with the Plan, to the extent applicable, the Plan Administrator will comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant hereto will be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Plan Administrator and/or the Distribution Agent, as applicable, will be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate, including requiring as a condition to the receipt of a distribution, that the Holders of an Allowed Claim complete an IRS Form W-8 or W-9, as applicable.  The Plan Administrator reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.  For tax purposes, distributions in full or partial satisfaction of Allowed Claims will be allocated first to the principal amount (as determined for U.S. federal income tax purposes) of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

Article VI.F states that on the Effective Date or as soon as reasonably practicable thereafter, each Holder of a certificate or instrument evidencing a Claim or an Equity Interest will be deemed to have surrendered such certificate or instrument to the Distribution Agent.  Such surrendered certificate or instrument will be cancelled solely with respect to the Debtors, and except as provided otherwise under the Plan, including the Debtor Release and the Third-Party Release, such cancellation will not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any agreement that governs the rights of the Holder of a Claim or Equity Interest, which will continue in effect for purposes of allowing Holders to receive distributions under the Plan.

Article VI.G provides that except as otherwise provided in the Plan, distributions to Holders of Allowed Claims will be in accordance with the provisions of any applicable Insurance Contract.  Except for the releases and exculpation provisions of Article IX, nothing contained in the Plan will constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers under any Insurance Contracts, nor

will anything contained in the Plan constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers under the Insurance Contracts.

Article VI.H provides that the Debtors or the Plan Administrator, as applicable, will reduce a Claim, and such Claim will be disallowed to such extent without an objection having to be Filed and without any notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a Debtor or the Plan Administrator.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution under the Plan on account of such Claim and receives payment from a party that is not a Debtor or the Plan Administrator on account of such Claim, such Holder will, within fourteen days of receipt thereof, repay or return the distribution to the applicable Debtor or the Plan Administrator, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim.  The failure of such Holder to timely repay or return such distribution will result in the Holder owing the applicable Debtor or the Plan Administrator annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen day grace period specified above until the amount is repaid.

### E.      Procedures for Resolving Disputed, Contingent, and Unliquidated Claims or Interests

Article VII of the Plan governs the resolution of Disputed Claims and Interests.  Pursuant to Article VII.A, after the Effective Date, and except as otherwise provided in the Plan, the Plan Administrator will have and will retain any and all available rights and defenses that the Debtors had with respect to any Claim, including the right to assert any objection to Claims based on the limitations imposed by section 502 of the Bankruptcy Code.  The Plan Administrator may contest the amount and validity of any Disputed Claim or contingent or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.

Article VII.B provides that, except as otherwise specifically provided in the Plan, the Plan Administrator will have the authority:  (1) to file, withdraw, or litigate to judgment objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

Article VII.C addresses estimation of claims.  It provides that before or after the Effective Date, the Debtors or the Plan Administrator may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection; and the Bankruptcy Court will retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection; *provided* that if the Bankruptcy Court resolves the Allowed amount of a Claim, the Plan Administrator will not be permitted to seek an estimation of such Claim).  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to

appeal or has not been the subject of a Final Order, will be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount or a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), as determined by the Bankruptcy Court, and the Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim subject to applicable law.

Article VII.D provides that if any portion of a Claim is Disputed, no payment or distribution provided hereunder will be made on account of such Claim unless and until such Claim becomes an Allowed Claim by settlement or Final Order; *provided* that if only a portion of a Claim is Disputed, such Claim will be deemed Allowed in the amount not Disputed and payment or distribution will be made on account of such undisputed amount.

Article VII.E provides that upon the Effective Date, the Debtors, and from and after the Effective Date, the Plan Administrator, will establish a cash reserve for distributions on account of Disputed Claims in an amount deemed to be appropriate by the Debtors or the Plan Administrator, as applicable, acting in good faith. Following the Effective Date, the Plan Administrator may, from time to time, reduce such cash reserves and distribute all or a portion of such cash to Holders of Allowed Claims entitled to Distributable Proceeds as the Plan Administrator determines in good faith is appropriate. The Plan Administrator will not have any liability whatsoever if any of the reserves established pursuant to the Plan are determined to be insufficient to satisfy any Claims, including any Disputed Claims after such Claims become Allowed.

Article VII.F provides that any objections to Claims be filed on or before the Claims Objection Deadline, subject to any extensions thereof approved by the Bankruptcy Court through the filing of a motion in advance of the Claims Objection Deadline.

Article VII.G provides that on or after the applicable bar date, a Proof of Claim or Interest may not be Filed or amended without the prior written authorization of, as applicable, the Bankruptcy Court or the applicable Debtor or the Plan Administrator. Absent such authorization, any new or amended Claim or Interest Filed will be deemed disallowed in full and expunged without any further action.

F.    **Conditions Precedent to Confirmation and the Effective Date**

Article VIII of the Plan sets forth the conditions precedent to Confirmation, the Effective Date, and related matters. The conditions precedent to Confirmation set forth at Article VIII.A include that:

1.    the Plan, including any amendments, modification, or supplements thereto, is in form and substance materially consistent with the RSA and acceptable in all respects to the Debtors and the Prepetition Secured Lender;

2.    the Sale Transaction(s) will have been consummated pursuant to the Sale Transaction Documentation; and

3.  the proposed Confirmation Order will be in form and substance materially consistent with the RSA and acceptable in all respects to the Debtors and the Prepetition Secured Lender and the Debtors.

Article VIII.B addresses the effect of non-occurrence of the conditions precedent to Confirmation.  It provides that if the conditions precedent to Confirmation are not satisfied, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, will be deemed null and void; and (3) nothing contained in the Plan or the Disclosure Statement will:  (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of the Debtors or any other Entity;  or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

The conditions precedent to the Effective Date set forth at Article VIII.C include that:

1.  the Bankruptcy Court will have entered the Confirmation Order in form and substance acceptable to the Debtors and the Prepetition Secured Lender and such order will not have been reversed, stayed, modified, amended, or vacated;

2.  the Plan, the Disclosure Statement, any Sale Transaction Documentation, the Confirmation Order, and all other Definitive Documents, including any amendments, modifications, or supplements thereto, will be acceptable to the Debtors and the Prepetition Secured Lender;

3.  the Plan Administrator acceptable to the Prepetition Secured Lender will have been appointed and vested with the authority under the Plan;

4.  the Plan Administration Agreement will have been executed and delivered by all of the Entities that are parties thereto and all conditions precedent to the effectiveness thereof will have been waived or satisfied in accordance with the terms thereof;

5.  no court of competent jurisdiction or other competent governmental or regulatory authority will have issued a final and non-appealable order making illegal or otherwise restricting, limiting, preventing, or prohibiting the consummation of any Sale Transaction(s) or any related transactions;

6.  all conditions precedent to the consummation of the Sale Transaction(s) will have been satisfied in accordance with the terms thereof, and the closing of the Sale Transaction(s) will have occurred;

7.  the Professional Fee Escrow Amount will have been transferred to the Professional Fee Escrow Account;

8.  the Wind-Down Amount will have been funded in accordance with the Plan; and

9.  the RSA will remain in full force and effect, and will not have been terminated.

Article VIII.D provides that the Debtors, with the consent of the Prepetition Secured Lender, may waive any of the conditions to Confirmation or to the Effective Date set forth in

Article VIII.A and Article VIII.C of the Plan, without any notice to parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than a proceeding to confirm the Plan, except that there cannot be a waiver of the condition that the Bankruptcy Court will have entered the Confirmation Order as set forth in Article VIII.C.1 of the Plan.

Article VIII.E addresses the effect of non-occurrence of the Effective Date. It provides that if the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, will be deemed null and void; and (3) nothing contained in the Plan, the Confirmation Order, or the Disclosure Statement will: (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## G.  **Releases**

Article IX of the Plan addresses releases, injunctions and related provisions. These provisions include satisfaction of Claims and termination of Interests under the Plan (IX.A); satisfaction of Claims (IX.F); and setoffs and recoupment (IX.G). In addition, Articles IX.B, IX.C, IX.D, and IX.E of the Plan contain important releases, injunctions, and exculpatory provisions. These provisions are highlighted below.

**Article IX.C of the Plan contains a third-party release. Pursuant to Article IX.C of the Plan (a) the Debtors; (b) the Prepetition Secured Lender; (c) the DIP Lender; (d) the Consenting Parent; (e) Anglo (including, for the avoidance of doubt, Anglo American Services (UK) Limited); (f) all Holders of Claims and Interests in the Voting Class who either vote to accept the Plan or abstain from voting on the Plan, and, in each case, opt-in to the Third-Party Release; (g) all Holders of Claims and Interests in any Non-Voting Class who return an opt-in form pursuant to the procedures set forth in the Disclosure Statement Order; (h) with respect to each Entity in clauses (a) through (g), each such Entity's current and former Affiliates; and (i) with respect to each Entity in clause (a) through (h), each such Entity's Related Parties (solely to the extent such Releasing Party is legally entitled to bind such Related Party to the releases contained in the Plan under applicable non-bankruptcy law)., will grant the Third-Party Release.[12] This release is discussed further in Article V.G of this Disclosure Statement.**

The following definitions are important to understanding the scope of the releases being given under the Plan:

"**Exculpated Party**" means (a) the Debtors, (b) any Committee, and (c) solely to the extent they are estate fiduciaries, each such Entity's current officers, directors (including any sub-committee of directors), members (including ex officio members), financial advisors, partners,

---

[12]  Information concerning the opt-in procedure will be set forth in the Disclosure Statement Order.

attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such on or after the Petition Date and prior to or on the Effective Date.

"**Released Party**" means, collectively, and in each case, in their respective capacities as such: (a) the Debtors; (b) the Prepetition Secured Lender; (c) the DIP Lender; (d) the Consenting Parent; (e) Anglo (including, for the avoidance of doubt, Anglo American Services (UK) Limited); (f) with respect to each Entity in clauses (a) through (e), each such Entity's current and former Affiliates; and (g) with respect to each Entity in clause (a) through (f), each such Entity's Related Parties; provided, however, that, notwithstanding the foregoing, any Holder of a Claim or Interest that is not a Releasing Party shall not be a Released Party.

"**Releasing Party**" means, collectively, and in each case, in their respective capacities as such: (a) the Debtors; (b) the Prepetition Secured Lender; (c) the DIP Lender; (d) the Consenting Parent; (e) Anglo (including, for the avoidance of doubt, Anglo American Services (UK) Limited); (f) all Holders of Claims and Interests in the Voting Class who either vote to accept the Plan or abstain from voting on the Plan, and, in each case, opt-in to the Third-Party Release; (g) all Holders of Claims and Interests in any Non-Voting Class who return an opt-in form pursuant to the procedures set forth in the Disclosure Statement Order; (h) with respect to each Entity in clauses (a) through (g), each such Entity's current and former Affiliates; and (i) with respect to each Entity in clause (a) through (h), each such Entity's Related Parties (solely to the extent such Releasing Party is legally entitled to bind such Related Party to the releases contained in the Plan under applicable non-bankruptcy law).

a.    Releases by the Debtors (IX.B)

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed to be conclusively, absolutely, unconditionally, generally, individually, collectively, irrevocably, completely and forever released, acquitted, and discharged by the Debtors, their Estates, their assigns, and their successors in interest (including the Plan Administrator) from any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise that the Debtors, their Estates, their assigns, and their successors in interest (including the Plan Administrator) ever had, now has, or thereafter can, shall, or may have, including any derivative claims asserted or assertable on behalf of a Debtor, its Estate, its assigns, and its successors in interest (including the Plan Administrator), that such entities would have been legally entitled to assert in their own right (whether individually or collectively) or that any Holder of any Claim or Interest could have asserted on behalf of such entities, based on or relating to, or in any manner arising from, in whole or in part, (1) the Debtors, the Debtors' capital structure, the Prepetition Secured Loans or any documents related thereto, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor or Non-Debtor Subsidiary, the Umbrella Supply Agreement and the termination thereof, the HEV Purchase Order and the termination thereof, the Relationship Agreement, the marketing of the Debtors' assets, the Notice of Forbearance, the Chapter 11 Cases, (2) the formulation, preparation, dissemination, negotiation, or filing of the DIP Credit Agreement, the Wind-Down Support**

Agreement, the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Sale Transaction(s), or any contract, instrument, release, or other agreement or document created or entered into in connection with the Wind-Down Support Agreement, the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Chapter 11 Cases, the DIP Credit Agreement, the Prepetition Secured Loans, the Sale Transaction Documentation, the Sale Transaction(s), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, (3) the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, (4) the business or contractual arrangements between any Debtor and any Released Party, or (5) any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing, to the fullest extent permissible under applicable law, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, fraud or gross negligence.

Notwithstanding anything to the contrary in the foregoing or any other provision of the Plan, the releases contained in the Plan do not (i) release any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) affect the rights of Holders of Allowed Claims and Interests to receive distributions under the Plan, or (iii) release any Claims or Causes of Action against any non-Released Party.

b.      Third-Party Release (IX.C)

As of the Effective Date, except as otherwise provided herein, each Releasing Party, their Estates, their assigns and their successors in interest, is deemed to have conclusively, absolutely, unconditionally, generally, individually, collectively, irrevocably, completely and forever released each Debtor and Released Party from any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise that the Releasing Parties, their Estates, their assigns, and their successors in interest ever had, now has, or thereafter can, shall, or may have, including any derivative claims asserted or assertable on behalf of a Debtor, its Estate, its assigns, and its successors in interest (including the Plan Administrator), that the Releasing Parties, their Estates, their assigns, and their successors in interest would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, (1) the Debtors, the Debtors' capital structure, the Prepetition Secured Loans or any documents related thereto, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor or Non-Debtor Subsidiary, the Umbrella Supply Agreement and the termination thereof, the HEV Purchase Order and the termination thereof, the Relationship Agreement, the marketing of the Debtors' assets, the Notice of Forbearance, the Chapter 11 Cases, (2) the formulation, preparation, dissemination, negotiation, or filing of the DIP Credit Agreement, the Wind-Down Support Agreement, the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Sale Transaction(s), or any contract, instrument, release, or other agreement or document created or entered into in connection with the Wind-Down Support Agreement, the

33

Restructuring Support Agreement, the Disclosure Statement, the Plan, the Chapter 11 Cases, the DIP Credit Agreement, the Prepetition Secured Loans, the Sale Transaction Documentation, the Sale Transaction(s), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, (3) the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, (4) the business or contractual arrangements between any Debtor and any Released Party, or (5) any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing, to the fullest extent permissible under applicable law, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, fraud or gross negligence.

Notwithstanding anything to the contrary in the foregoing or any other provision of the Plan, the releases contained in the Plan do not (i) release any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) affect the rights of Holders of Allowed Claims and Interests to receive distributions under the Plan, (iii) release any Claims or Causes of Action against any non-Released Party, or (iv) release any claims relating to or arising under the Wind-Down Support Agreement.

c.      Exculpation (IX.D)

Effective as of the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action or for any act taken or omitted to be taken on or after the Petition Date and prior to or on the Effective Date in connection with, or related to, the administration of the Chapter 11 Cases, commencement of the Chapter 11 Cases, pursuit of Confirmation, negotiation, preparation, and consummation of the Plan, making Distributions, the Disclosure Statement, the Sale Process, the Sale Order, or the solicitation of votes for, or Confirmation of, the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors; or the transactions or documentation in furtherance of any of the foregoing, including any postpetition, pre-Effective Date act taken or omitted to be taken in connection with or in contemplation of any restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or consummation of the Plan; provided, however, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of any Person or Entity to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan or assumed pursuant to the Plan or Final Order of the Bankruptcy Court; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.  The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the

vote, consent, authorization or approval of any Person.  Notwithstanding the foregoing, nothing in this section shall or shall be deemed to prohibit the Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors, in each case unless otherwise expressly provided for in the Plan.  The Exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

<div align="center">d.    Injunction (IX.E)</div>

Except as otherwise provided in the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims, interests, Causes of Action, or liabilities that:  (a) are compromised or settled under the Plan (including pursuant to Articles II and III of the Plan); (b) have been released pursuant to the Plan; (c) are subject to exculpation pursuant to the Plan (but only to the extent of the exculpation provided in the Plan), or (d) are otherwise satisfied, stayed or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, on and after the Effective Date, from:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) on account of any such claims, interests, Causes of Action, or liabilities against the Debtors or their successors (including the Plan Administrator) or any Entity released or exculpated (or the property or estate of any such Entity); (ii) enforcing, levying, attaching (including any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order on account of any such claims, interests, Causes of Action, or liabilities against the Debtors or any Entity released or exculpated, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Entities (including the Plan Administrator), or any property of any such transferee or successor (including the Plan Administrator); (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind on account of any such claims, interests, Causes of Action, or liabilities against the Debtors or any Entity released or exculpated, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Entities (including the Plan Administrator), or any property of any such transferee or successor (including the Plan Administrator); or (iv) asserting any right of setoff, subrogation, or recoupment of any kind on account of any such claims, interests, Causes of Action, or liabilities against any obligation due from such Entities (including the Debtors or their successors (including the Plan Administrator)) or against the property of such Entities including the Debtors or their successors (including the Plan Administrator)) unless such Entity has filed a motion requesting the right to perform such setoff on or before the Effective Date or has filed a Proof of Claim or proof of Interest indicating that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise.

# VI.
# WIND-DOWN PROCESS IN THE EVENT OF A SALE TRANSACTION

### A. Wind-Down, Plan Administrator, Dissolution of the Boards of Directors/Managers, and Closing of these Chapter 11 Cases

#### 1. Plan Administrator

Article IV.G of the Plan provides that, on and after the Plan Effective Date, the Plan Administrator will act for the Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, and officers of the Debtors will be deemed to have terminated, the persons acting as managers, directors, and officers of the Debtors will be deemed to have resigned, and the Plan Administrator will be appointed as the sole manager and sole officer of the Debtors, and will succeed to the powers of the Debtors' managers, directors, and officers. From and after the Effective Date, the Plan Administrator will be the sole representative of, and will act for, the Debtors. The Plan Administrator will use commercially reasonable efforts to operate in a manner consistent with the Wind-Down Budget. The Plan Administrator will carry out any necessary functions required by the applicable Sale Transaction Documentation.

The powers of the Plan Administrator will include any and all powers and authority to implement the Plan and wind-down the businesses and affairs of the Debtors, in each case, without the need for further Court approval, including: (a) selling, disposing, liquidating, receiving, holding, investing, supervising, protecting, and abandoning the Debtors' assets; (b) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan; (c) making distributions as contemplated under the Plan; (d) establishing and maintaining bank accounts in the name of the Debtors; (e) subject to the terms set forth in this Article, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (f) paying all reasonable fees, expenses, debts, charges, and liabilities of the Debtors; (g) administering and paying taxes of the Debtors, including filing tax returns; (h) representing the interests of the Debtors before any taxing authority in all matters, including any action, suit, proceeding or audit; and (i) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan.

The Plan Administrator may resign at any time upon thirty (30) days' written notice delivered to the Bankruptcy Court, *provided* that such resignation will only become effective upon the appointment of a permanent or interim successor Plan Administrator. Upon his or her appointment, the successor Plan Administrator, without any further act, will become fully vested with all of the rights, powers, duties, and obligations of his or her predecessor and all responsibilities of the predecessor Plan Administrator relating to the Debtors will be terminated.

The Plan Administrator will be appointed by the Debtors with the consent of the Prepetition Secured Lender. The Plan Administrator will retain and have all the rights, powers, and duties

36

necessary to carry out its responsibilities under the Plan, and as otherwise provided in the Confirmation Order.

The Plan Administrator will have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The reasonable fees and expenses of such professionals will be paid by the Debtors solely from the Wind-Down Amount, upon the monthly submission of statements to the Plan Administrator. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals will be made in the ordinary course of business and will not be subject to the approval of the Bankruptcy Court.

The Plan Administrator's compensation, on a post-Effective Date basis, will be as described in the Plan Supplement and will be subject to the consent of the Prepetition Secured Lender.

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, will be deemed indemnified by the Debtors to the extent provided in the Plan Administration Agreement. The Plan Administrator may obtain, at the expense of the Debtors and solely from the Wind-Down Amount, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Debtors. The Plan Administrator may rely upon written information previously generated by the Debtors.

For the avoidance of doubt, notwithstanding anything to the contrary contained in this Article, the Plan Administrator, in its capacity as such, will have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors, other than expressly provided for by the Plan and the Plan Administration Agreement.

In accordance with and without altering Article V.A of the Plan, (i) on the Effective Date, the Debtors will be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies (including any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date pursuant to sections 105 and 365(a) of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court; (ii) confirmation of the Plan will not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed; (iii) the Debtors will retain the ability to supplement such D&O Liability Insurance Policies as the Debtors may deem necessary; and (iv) for the avoidance of doubt, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the assumption of each of the unexpired D&O Liability Insurance Policies.

In addition, on or after the Effective Date, the Plan Administrator will not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy" and all agreements, documents, or instruments related thereto) in effect on or prior to the Effective Date, with respect to conduct occurring prior thereto, and all current and former directors, officers, and managers of the Debtors who served in such capacity at any time prior to the Effective

Date will be entitled to the full benefits of any such policies for the full term of such policies regardless of whether such current and former directors, officers, and managers remain in such positions after the Effective Date, all in accordance with the terms and conditions of the D&O Liability Insurance Policies, which will not be altered.

 2. **Wind-Down**

Article IV.L of the Plan provides that, on and after the Effective Date, in accordance with the Wind-Down Budget, the Debtors will (1) continue in existence for purposes of (a) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible, (b) resolving Disputed Claims as provided hereunder, (c) paying Allowed Claims not assumed by the applicable Successful Bidder as provided hereunder, (d) filing appropriate tax returns, (e) complying with their continuing obligations under the applicable Sale Transaction Documentation (including with respect to the transfer of any permits to the applicable Successful Bidder as contemplated therein), and (f) administering the Plan in an efficient manner; and (2) thereafter liquidate and dissolve as set forth in the Plan. The Plan Administrator will carry out these actions for the Debtors.

Consistent with Article IV.G of the Plan, the Plan Administrator will also have the power and authority and will be required to exercise such power and authority, in lieu of the board of directors or similar governing body of any of the direct and indirect Non-Debtor Subsidiaries to take any action necessary to wind-down , dissolve and/or cancel such Entities, including filing a certificate of dissolution, a certificate of cancellation, or similar documents for any of such Entities, together with all other necessary corporate and company documents, to effect the dissolution and/or cancellation of such Entities under the applicable laws of the jurisdiction in which such Entities were formed.

 3. **Wind-Down Amount**

Article IV.M of the Plan provides that, on the Effective Date, the Debtors will retain Cash in the amount of the Wind-Down Amount, which will be used in accordance with the terms of the Wind-Down Budget.  Any remaining Cash held by the Debtors after making all of the disbursements contemplated by the Wind-Down Budget will promptly become Distributable Proceeds and will be promptly distributed in accordance with the Plan.

 4. **Dissolution of the Boards of the Debtors**

Article IV.N of the Plan provides that, as of the Effective Date, the Plan Administrator will act as the sole officer, director, and manager, as applicable, of the Debtors with respect to their affairs. Subject in all respects to the terms of the Plan, the Plan Administrator will have the power and authority to take any action necessary to wind-down and dissolve any of the Debtors, and will be authorized to (a) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of the applicable state(s) of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and will pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred

during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

The filing by the Plan Administrator of any of the Debtors' certificate of dissolution will be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of any of the Debtors or any of their Affiliates.

     5.     **Closing these Chapter 11 Cases**

Article IV.O of the Plan provides that upon administering in full the Chapter 11 Cases, Plan Administrator may seek authority from the Bankruptcy Court to close any of the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules, and the requirements set forth in Local Rule 3022-1.  After the Effective Date, all contested matters relating to any of the Debtors, including claim objections and any adversary proceedings, will be administered and heard in the Chapter 11 Case of First Mode Holdings, Inc., irrespective of whether such Claim(s) were Filed or such adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed.

<div align="center">

**VII.**
**<u>CONFIRMATION OF THE PLAN</u>**

</div>

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan is (a) accepted by all impaired Classes of Claims and Interests or, if rejected or deemed rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (b) in the "best interests" of the Holders of Claims and Interests impaired under the Plan; and (c) feasible.

**A.**     **<u>Confirmation Hearing</u>**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties. The Confirmation Hearing is currently scheduled for **March 26, 2025, at 9:30 a.m. (Eastern Time)**.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice Filed on the docket for these Chapter 11 Cases.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and include, where appropriate, proposed language to be inserted in the Plan to resolve any such objection or response, and must be Filed with the Bankruptcy Court, with a copy to the chambers of Judge Owens, together with proof of service thereof, and served upon all of the below parties.

<div align="center">39</div>

| Debtors | Counsel to the Debtors |
|---|---|
| First Mode Holdings, Inc.<br>3417 1st Avenue South<br>Seattle, Washington 98134<br>Attn: Will Smith<br>Email: legal@firstmode.com | Latham & Watkins LLP<br>1271 Avenue of the Americas<br>New York, New York 10020<br>Attn:  Ray Schrock; Annemarie Reilly; and Brian Rosen<br>Emails:  ray.schrock@lw.com<br>annemarie.reilly@lw.com<br>brian.rosen@lw.com<br><br>and<br><br>330 North Wabash Avenue, Suite 2800<br>Chicago, Illinois 60611<br>Attn:  Caroline Reckler<br>Email:  caroline.reckler@lw.com<br><br>and<br><br>355 South Grand Avenue, Suite 100<br>Los Angeles, California 90071<br>Attn:  Jeffrey T. Mispagel<br>Email:  jeffrey.mispagel@lw.com<br><br>-and-<br><br>Young Conaway Stargatt & Taylor LLP<br>Rodney Square, 1000 North King Street<br>Wilmington, Delaware 19801<br>Attn:  Michael R. Nestor; Kara Hammond Coyle; and Joseph M. Mulvihill<br>Emails:    mnestor@ycst.com<br>kcoyle@ycst.com<br>jmulvihill@ycst.com |

| Counsel to the Committee | Counsel to the DIP Lender and Prepetition Secured Lender |
|---|---|
| McDermott Will & Emery LLP<br>The Brandywine Building<br>1000 N. West Street, Suite 1400<br>Wilmington, Delaware 19801<br>Attn:  David R. Hurst and Andrew A. Mark<br>Email:  dhurst@mwe.com<br>         amark@mwe.com<br><br>and<br><br>One Vanderbilt Avenue<br>New York, New York 10017<br>Attn:  Kristin K. Going and Darren Azman<br>Email:  kgoing@mwe.com<br>         dazman@mwe.com | Davis Polk & Wardwell LLP<br>450 Lexington Ave<br>New York, New York 10017<br>Attn:  Darren Klein and Aryeh Falk<br>Email:  darren.klein@davispolk.com<br>         aryeh.falk@davispolk.com |
| **U.S. Trustee** | |
| Office of the United States Trustee for the District of Delaware<br>844 King Street, Suite 2207<br>Lockbox 35<br>Wilmington, Delaware 19801<br>Attn:  Jane Leamy<br>Email: Jane.M.Leamy@usdoj.gov | |

## B.    Confirmation

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan.

### 1.    Confirmation Requirements.

Confirmation of a chapter 11 plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the plan complies with the applicable provisions of the Bankruptcy Code;
- the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;
- the plan has been proposed in good faith and not by any means forbidden by law;
- any plan payment made or to be made by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

41

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan.  The appointment to, or continuance in, such office by such individual must be consistent with the interests of creditors and equity security holders and with public policy;
- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan, on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;
- subject to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code, each class of claims or interests has either accepted the plan or is not impaired under the plan;
- if a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class; and
- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims will be paid in full on the effective date (except that holders of priority tax claims may receive on account of such claims deferred cash payments, over a period not exceeding five (5) years after the petition date of a value, as of the effective date, equal to the allowed amount of such claims);
- confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

The Debtors believe that:

- the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;
- the Debtors, as the proponents of the Plan, have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and
- the Plan has been proposed in good faith.

Set forth below is a summary of certain relevant statutory confirmation requirements.

a.    Acceptance

Claims in Class 4 are either Unimpaired or Impaired under the Plan and are entitled to vote to accept or reject the Plan; Classes 1, 2, and 3 are Unimpaired and are therefore conclusively deemed to accept the Plan; Class 7 is Impaired and will receive no distributions under the Plan and therefore is conclusively deemed to reject the Plan; Classes 5 and 6 will either be Unimpaired or Impaired and receive no distributions, and will be conclusively deemed to accept or to reject the Plan, as applicable.

To the extent necessary, the Debtors will seek confirmation of the Plan over the objection of any individual Holders of Claims who are members of an accepting Class.

b.      Unfair Discrimination and Fair and Equitable Test

To obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, non-accepting Class.  The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" for, respectively, secured creditors, unsecured creditors and holders of equity interests.  In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive anything under the plan.

The test sets forth different standards for what is fair and equitable, depending on the type of claims or interests in such class.  In order to demonstrate that a plan is "fair and equitable," the plan proponent must demonstrate the following:

i.     *Secured Creditors*.  With respect to a class of impaired secured claims, a proposed plan must provide the following: (a) that the holders of secured claims retain their liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estates' interest in such property, or (b) for the sale, subject to section 363 of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) or (b) of this paragraph, or (c) that the holders of secured claims receive the "indubitable equivalent" of their allowed secured claim.

ii.    *Unsecured Creditors*.  With respect to a class of impaired unsecured claims, a proposed plan must provide the following: either (a) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

iii.   *Equity Interests.*  With respect to a class of impaired equity interests, each interest holder receives or retains property having a present value, as of the effective date of the plan, equal to the greatest of the allowed dollar amount of any fixed liquidation preference, fixed redemption price, or the value of the equity interest.

A chapter 11 plan does not "discriminate unfairly" with respect to a non-accepting class if the value of the Cash and/or securities to be distributed to the non-accepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the non-accepting class.  The Debtors believe the Plan will not discriminate unfairly against any non-accepting Class.

c.      Feasibility

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors, unless such liquidation or reorganization is proposed in the Plan. The Debtors will fund distributions under the Plan with Cash on hand, the Anglo Funding Amount, the proceeds of all non-Cash assets of the Debtors' Estates, and any proceeds of retained Causes of Action of the Estates. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors because the Plan contemplates a liquidation.

2.    **Valuation of the Debtors**

Under the Bidding Procedures Order, the Debtors are pursuing a competitive sale process for their assets. The Debtors have, therefore, concluded that the best estimate of the value of the Debtors' assets will be revealed through the sale process. The Debtors reserve the right to further supplement this Disclosure Statement with any appropriate valuation analysis in their discretion.

3.    **Best Interests Test**

The "best interests" test requires that the Bankruptcy Court find either:

- that all members of each impaired class have accepted the plan; or

- that each holder of an allowed claim or interest in each impaired class of claims or interests will receive or retain under the plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To determine what the Holders of Claims and Interests in each impaired Class would receive if the Debtors were liquidated under chapter 7 on the Effective Date, the Bankruptcy Court must determine the dollar amount that would have been generated from the liquidation of the Debtors' assets and properties in a liquidation under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. After accounting for administrative expenses, unsecured creditors (including any secured creditor deficiency claims) are paid from any remaining sale proceeds of encumbered assets in excess of any secured claims, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

The Plan contemplates the sale of all or substantially all of the Debtors' assets through a Sale Transaction, followed by a liquidation of the Debtors' remaining assets. Although a chapter

7 liquidation may achieve a similar outcome, the Debtors believe that the Plan provides a greater recovery to Holders of Claims in Class 4 than would a chapter 7 liquidation, as well as more timely recovery, as the Anglo Plan Funding would not be available to pay General Unsecured Claims under a chapter 7 liquidation.  In addition, there would be additional costs, expenses, and delays that the Debtors would incur as a result of liquidating their Estates in a chapter 7 liquidation.

To further evidence that the Plan satisfies the "best interests" test, the Debtors, with the assistance of their advisors, have prepared a liquidation analysis that summarizes the Debtors' best estimate of recoveries by Holders of Claims and Interests if these Chapter 11 Cases were instead converted to cases under chapter 7 beginning on March 19, 2025 (the "**Liquidation Analysis**"), which is attached hereto as **Exhibit C**.  The Liquidation Analysis provides a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' estates.

The Liquidation Analysis contains a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management.  The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change and significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Accordingly, the values reflected might not be realized.  The chapter 7 liquidation period is assumed to last three (3) months following the conversion of the case to chapter 7, allowing for, among other things, the reconciliation of claims and the finalization of tax affairs.  All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Plan.

Accordingly, the Debtors believe that the Holders of Allowed Claims would receive less than anticipated under the Plan if these Chapter 11 Cases were converted to chapter 7 liquidation, and, therefore, the classification and treatment of Claims and Interests under the Plan complies with section 1129(a)(7) of the Bankruptcy Code.

### C.  Classification of Claims and Interests

The Debtors believe that the Plan complies with the classification requirements of the Bankruptcy Code, which require that a chapter 11 plan place each claim and interest into a class with other claims or interests that are "substantially similar."

### D.  Consummation

The Plan will be consummated on the Effective Date.  The Effective Date will occur on the date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article VIII.A and C of the Plan have been (i) satisfied or (ii) waived pursuant to Article VIII.D of the Plan  The Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

E.      **Exemption from Certain Transfer Taxes**

To the fullest extent permitted by applicable law, all transfers consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under the Plan, the sale by the Debtors of any owned property pursuant to section 363(b) of the Bankruptcy Code, and any assumption, assignment, and/or sale by the Debtors of their interests in unexpired leases of non-residential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, will constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code, and will not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

F.      **Retiree Benefits**

The Debtors believe that, with respect to retiree benefits, the provisions of section 1129(a)(13) and section 1114 of the Bankruptcy Code are not applicable with respect to the Plan because following a Sale Transaction and the subsequent liquidation contemplated by the Plan, the Debtors will not have a business on a go-forward basis.  However, nothing in the Plan will: (a) restrict the Debtors' right to modify the terms and conditions of the retiree benefits, if any, as otherwise permitted pursuant to the terms of the applicable plans, non-bankruptcy law, or section 1114(m) of the Bankruptcy Code; or (b) be construed as an admission that any such retiree benefits are owed by the Debtors.

G.      **Amendments**

Subject to the limitations contained in the Plan, the Debtors or the Plan Administrator, as applicable, reserve the right to, in accordance with the Bankruptcy Code and the Bankruptcy Rules, as acceptable to the Prepetition Secured Lender:  (1) amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, in accordance with section 1127(a) of the Bankruptcy Code; (2) amend or modify the Plan after the entry of the Confirmation Order and before substantial consummation of the Plan in accordance with section 1127(b) of the Bankruptcy Code upon order of the Bankruptcy Court; and (3) remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan upon order of the Bankruptcy Court.

Entry of the Confirmation Order will mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

H.      **Revocation or Withdrawal of the Plan**

Subject to the conditions to the Effective Date, the Debtors reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to file subsequent plans.  If the Debtors revoke or withdraw the Plan or if entry of the Confirmation Order does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto will be deemed null and void; and (3) nothing contained in the Plan will:  (a) constitute a waiver or release of any claims by or against, or any

Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

## I.        Post-Confirmation Jurisdiction of the Bankruptcy Court

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, except to the extent set forth in the Plan, and in addition to the matters over which the Bankruptcy Court will have retained jurisdiction pursuant to the Sale Order, if any, or any other order of the Bankruptcy Court, the Bankruptcy Court will retain jurisdiction over all matters arising out of, or related to, these Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, as set forth in Article X of the Plan.

## VIII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors have determined that the Plan is the best alternative available to maximize value for all stakeholders. If the Plan is not confirmed and consummated, the alternatives to the Plan are (a) continuation of these Chapter 11 Cases, which could lead to the Filing of an alternative plan of reorganization or liquidation, (b) a liquidation under chapter 7 of the Bankruptcy Code, or (c) dismissal of these Chapter 11 Cases, leaving Holders of Claims and Interests to pursue available non-bankruptcy remedies. These alternatives to the Plan are not likely to benefit Holders of Claims and Interests.

### A.        Continuation of Chapter 11 Cases

If the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive period in which to File a plan has expired, any other party in interest) could attempt to formulate a different plan. Such a plan might involve either a reorganization and continuation of the Debtors' business, or an orderly liquidation of the Debtors' assets.

### B.        Liquidation under Chapter 7

If no plan can be confirmed, these Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The effect a chapter 7 liquidation would have on the recovery of Holders of Allowed Claims and Interests is discussed in Article VII.B above, as well as set forth in the Liquidation Analysis attached hereto as **Exhibit C**.

### C.        Dismissal of Chapter 11 Cases

If these Chapter 11 Cases were dismissed, Holders of Claims would be free to pursue non-bankruptcy remedies in their attempts to satisfy such Claims against the Debtors. However, in that event, Holders of Claims would be faced with the costs and difficulties of attempting, each, to recover on its Claims. Additionally, it could result in a race to the courthouse, whereby there may be insufficient assets to distribute to creditors on an equitable basis. Accordingly, the Debtors believe that the Plan will enable all creditors to realize the greatest possible recovery on their respective Claims with the least delay.

**IX.**
**FACTORS TO CONSIDER BEFORE VOTING**

BEFORE VOTING TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS ENTITLED TO VOTE SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, IN ADDITION TO THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, TOGETHER WITH ANY ATTACHMENTS, EXHIBITS, OR DOCUMENTS INCORPORATED BY REFERENCE HERETO. THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION.

A.   **Risk Factors that May Affect the Recovery Available to Holders of Allowed Claims under the Plan**

1.    The estimate of Allowed Claims and recoveries for Holders of Allowed Claims set forth in this Disclosure Statement are based on various assumptions. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may significantly vary from the estimated Claims contained in this Disclosure Statement. Moreover, at this time, the Debtors cannot determine with any certainty, the number or amount of Claims or Interests that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the recoveries to Holders of Allowed Claims under the Plan.

2.    The Debtors cannot know with certainty, at this time, the number or amount of Claims in the Voting Class that will ultimately be Allowed and how the amount of Allowed Claims will compare to the estimates provided herein. For example, a number of Proofs of Claim may allege Claims in an unliquidated amount that will require future resolution, making the amount of any Allowed Claim based on such Proof of Claim entirely speculative as of the date of this Disclosure Statement. In addition, the Debtors are continuing to review the Proofs of Claim Filed in these Chapter 11 Cases. As such, the estimated amount of Claims may materially change due to the Debtors' ongoing review. Accordingly, because certain Claims under the Plan will be paid on a pro rata basis, the Debtors cannot state with certainty what recoveries will be available to Holders of Allowed Claims in the Voting Class.

3.    There can be no guarantee that the Debtors will be able to retain their leadership and other core employees through the pendency of these Chapter 11 Cases, which in turn could negatively affect the Debtors' sale process.

As a result of these Chapter 11 Cases, the Debtors may experience increased levels of employee attrition. The remaining employees likely will face considerable distraction and uncertainty about their job security, which could cause them to seek out other employment. A loss of key personnel could adversely affect the Debtors' ability to maximize value in a potential sale. The Debtors' ability to engage, motivate, incentivize, or take other measures intended to retain key employees through the pendency of these Chapter 11 Cases is limited by restrictions on implementing incentive programs under the Bankruptcy Code.

48

The Debtors' remaining workforce following the RIF are a crucial group of core employees, who can manage the Debtors' assets following a Sale Transaction. If employee attrition occurs, the value of the Debtors' assets will be lower and, likely, less attractive to potential purchasers, which could, in turn, make the sale of the Debtors' remaining assets more difficult.

4.     To the extent that the Debtors are unable to satisfy the conditions precedent to Consummation of the Plan, the Debtors would be forced to pursue one of the alternatives to the Plan, as discussed in Article VIII above.

5.     The Debtors could fail to satisfy the milestones set forth in the RSA and DIP Credit Agreement or another termination event could occur, resulting in the termination of the RSA. Then, the Debtor may be unable to consummate the Plan and parties may terminate their support, financial or otherwise, prior to the Confirmation or consummation of the Plan. Any such loss of support could adversely affect the Debtors' ability to confirm or consummate the Plan.

6.     Though highly unlikely, it is possible that Allowed General Administrative Claims, Professional Fee Claims, DIP Facility Claims, Priority Tax Claims, and U.S. Trustee Fees, and the costs of the wind-down may exceed the funding available with respect to such Claims, in which case the Plan will not become effective.]

B.     **Certain Bankruptcy Law Considerations**

1.     Although the Debtors believe that the Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modification to the Plan will not be required for Confirmation or that such modifications would not necessitate re-solicitation of votes. Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if the Voting Class voted in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejects the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan. If the Plan is not confirmed, it is unclear what distributions Holders of Claims ultimately would receive with respect to their Claims in a subsequent plan of reorganization or liquidation or otherwise.

2.     As of the date of this Disclosure Statement, there can be no assurance that the conditions to the consummation of the Plan will be satisfied or waived. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article VIII of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all Holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

3.      Even where an impaired class of Claims or Interests does not accept or is deemed not to accept a plan of reorganization or liquidation, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has rejected the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to such dissenting impaired class.  Here, the Voting Class must vote to accept the Plan for these requirements to be satisfied with respect to Classes deemed to reject the Plan.

4.      Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

5.      There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan.  Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not File an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

6.      Article IX of the Plan provides for certain releases, injunctions, and exculpations for claims and Causes of Action that may otherwise be asserted against the Debtors, the Exculpated Parties, or the Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.  Importantly, the RSA requires certain releases of Anglo American, and, therefore, the Debtors may lose Anglo American's support and the Anglo Plan Funding if such provisions are not approved.

7.      The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims and Allowed Interests.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

8.      There can be no assurance that the Bankruptcy Court will not require modifications to the Plan that would necessitate re-solicitation of votes from the Voting Class.  Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan in the event votes are re-solicited.  Re-solicitation could delay confirmation of the Plan and thus delay distributions, and if the

Plan is not confirmed, it is unclear what distributions Holders of Claims ultimately would receive with respect to their Claims in a subsequent plan or other proceeding.

9.      Except as otherwise provided in the Plan, the Debtors or Plan Administrator, as applicable, reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.  Further, parties in interest may object to the amount and/or classification of any Claim under the Plan in accordance with the Bankruptcy Code.

C.      **Additional Factors**

1.      The DIP Credit Agreement contains certain provisions that give the parties thereto the ability to terminate the applicable agreement upon the occurrence or non-occurrence of certain events, including failure to achieve certain milestones in these Chapter 11 Cases.  Termination of the DIP Facility could result in highly contested and potentially protracted Chapter 11 Cases, which could, by cutting the Debtors off from their sole source of financing during these Chapter 11 Cases hinder the Debtors' ability to operate and, significantly and detrimentally impact the Debtors' relationships with vendors, suppliers, and employees.  In this event, the Debtors may need to pursue a chapter 7 liquidation.

2.      It is possible that the Debtors may not satisfy the closing conditions of the Sale Transaction, which would prevent the Debtors from consummating the Plan.  A failure to satisfy any of the closing conditions of the Sale Transaction could prevent the Sale Transaction from being consummated, which could lead to the Chapter 11 Cases being converted to cases under chapter 7 or dismissed.

3.      In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to represent or warrant that the financial information contained in this Disclosure Statement and attached hereto is without inaccuracies.

4.      The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

5.      The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

6.      No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtors may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

7.      Subject to, and without prejudice to, the rights of any party in interest, the Plan may be revoked or withdrawn before the Confirmation Date by the Debtors.

## X.
## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences expected to result from the consummation of the Plan. This discussion is only for general information purposes and only describes the expected tax consequences to Holders of General Unsecured Claims ("**GUCs**").

This discussion is not a complete analysis of all potential U.S. federal income tax consequences and does not address any tax consequences arising under any state, local or foreign tax laws or federal estate or gift tax laws. This discussion is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the Internal Revenue Service (the "**IRS**"), all as in effect on the date of this Disclosure Statement. These authorities may change, possibly retroactively, resulting in U.S. federal income tax consequences different from those discussed below. No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below. There can be no assurance that the IRS will not take a contrary position regarding the U.S. federal income tax consequences resulting from the consummation of the Plan or that any contrary position would not be sustained by a court.

This discussion does not address all U.S. federal income tax considerations that may be relevant to a particular Holder in light of that Holder's particular circumstances, including the impact of the tax on net investment income imposed by section 1411 of the Tax Code.  In addition, it does not address considerations relevant to Holders subject to special rules under the U.S. federal income tax laws, such as "qualified foreign pension funds" (as defined in section 897(l)(2) of the Tax Code), entities all of the interests of which are held by qualified foreign pension funds, financial institutions, insurance companies, brokers, dealers or traders in securities, commodities or currencies, tax-exempt organizations, tax-qualified retirement plans, partnerships and other pass-through entities, Holders subject to the alternative minimum tax, Holders who utilize installment method reporting with respect to their Claims, Holders holding their Claims as part of a hedge, straddle or other risk reduction strategy or as part of a conversion transaction or other integrated investment, Holders subject to special tax accounting rules as a result of any item of gross income with respect to their Claims being taken into account in an applicable financial statement and U.S. Holders (as defined below) who have a functional currency other than the U.S. dollar.  This discussion also does not address the U.S. federal income tax consequences to Holders

(a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to accept or deemed to reject the Plan. Additionally, this discussion does not address any consideration being received other than in a person's capacity as a Holder of a Claim.

The tax treatment of U.S. Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the U.S. Holder in exchange for the Claim and whether the U.S. Holder receives distributions under the Plan in more than one taxable year; (iii) whether the U.S. Holder falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the U.S. Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the U.S. Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the U.S. Holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the U.S. Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; (xi) whether the "market discount" rules are applicable to the U.S. Holder; and (xii) whether the Claim constitutes "property" and a "capital asset" for U.S. federal income tax purposes. Therefore, each U.S. Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such U.S. Holder of the transactions contemplated by the Plan.

HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLAN, AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER ANY STATE, LOCAL OR FOREIGN TAX LAWS, OR ANY OTHER FEDERAL TAX LAWS. THE DEBTORS WILL NOT BE LIABLE TO ANY PERSON FOR ANY HOLDERS' TAX LIABILITY IN WHATSOEVER MANNER.

A.      **U.S. Federal Income Tax Consequences to the Debtors**

The Debtors possess significant tax attributes, including net operating losses ("**NOLs**") and certain other tax attributes (together with the NOLs, the "**Tax Attributes**"). However, the Debtors' Tax Attributes are not expected to have continuing value after the Effective Date, because the Debtors intend to liquidate and dissolve in accordance with the wind-down process as set forth in the Plan.

1.      **Sale Transaction**

The Debtors expect to sell all or substantially all of their assets in the Sale Transaction and to cease to conduct any business activities thereafter. The U.S. federal income tax liability of the Debtors resulting from the consummation of the Sale Transaction and the precise composition of the Debtors remaining Tax Attributes remain subject to determination and adjustment, depending on, among other things, the determination of the allocation of purchase price among the assets sold.

2.      **Cancellation of Indebtedness and Reduction of Tax Attributes**

The Debtors generally should realize cancellation of indebtedness ("**COD**") income to the extent the amount of the Claims exceed the Cash received in settlement thereof, except that COD does not arise to the extent that payment of the liability would have given rise to a deduction.

Under Section 108 of the Tax Code, COD income realized by a debtor will be excluded from gross income if the discharge of debt occurs in a case brought under the Bankruptcy Code, the debtor is under the court's jurisdiction in such case and the discharge is granted by the court or is pursuant to a plan approved by the court (the "**Bankruptcy Exception**"). Because the Bankruptcy Exception should apply to the Debtors, the Debtors should be entitled to exclude from gross income any COD income realized as a result of the implementation of the Plan.

Under Section 108(b) of the Tax Code, a debtor that excludes COD income from gross income under the Bankruptcy Exception generally must reduce certain tax attributes by the amount of the excluded COD income. Attributes subject to reduction include NOLs, NOL carryforwards and certain other losses, credits and carryforwards, and the debtor's tax basis in its assets (including stock of subsidiaries). The reduction in a debtor's tax basis in its assets generally does not have to exceed the excess of (i) its tax basis in assets held immediately after the discharge of indebtedness over (ii) the amount of liabilities remaining immediately after the discharge of indebtedness. NOLs for the taxable year of the discharge and NOL carryovers to such year generally are the first attributes subject to reduction.

B.      **U.S. Federal Income Tax Consequences to Holders of GUCs**

1.      **Definition of U.S. Holder and Non-U.S. Holder**

A "U.S. Holder" is a beneficial owner of a GUC that, for U.S. federal income tax purposes, is or is treated as:

- an individual who is a citizen or resident of the United States;
- a corporation created or organized under the laws of the United States, any state thereof, or the District of Columbia;
- an estate, the income of which is subject to U.S. federal income tax regardless of its source; or
- a trust that (1) is subject to the primary supervision of a U.S. court and the control of one or more "United States persons" (within the meaning of section 7701(a)(30) of the Tax Code), or (2) has a valid election in effect to be treated as a United States person for U.S. federal income tax purposes.

A "Non-U.S. Holder" means a beneficial owner of a GUC that is not a U.S. Holder and is, for U.S. federal income tax purposes, an individual, corporation (or other entity classified as a corporation for U.S. federal income tax purposes), estate or trust.

If a partnership or other entity or arrangement classified as a partnership for U.S. federal income tax purposes holds a GUC, the tax treatment of a partner in such partnership generally will depend upon the status of the partner, the activities of the partnership, and certain determinations

made at the partner level.  Beneficial owners of a GUC who are partners in a partnership holding any such Claims should consult their tax advisors.

### 2.    **U.S. Holders**

#### a.    Gain or Loss Recognition

A U.S. Holder of a GUC should generally be treated as receiving its distribution of cash under the Plan in a taxable exchange under section 1001 of the Tax Code.  Other than with respect to any amounts received that are attributable to accrued but untaxed interest, each U.S. Holder of a GUC should recognize gain or loss equal to the difference between the (a) sum of any cash received in exchange for its GUC, and (b) such U.S. Holder's adjusted basis, if any, in such GUC.  A U.S. Holder's ability to deduct any loss recognized on the exchange of its a GUC will depend on such U.S. Holder's own circumstances and may be restricted under the Tax Code.

The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including:  (i) the nature and origin of a GUC; (ii) the tax status of the U.S. Holder of such GUC; (iii) whether such GUC has been held for more than one year; (iv) the extent to which the U.S. Holder previously claimed a loss or bad debt deduction with respect to such GUC; (v) whether such GUC was acquired at a market discount; and (vi) whether such GUC constitutes "property" and a "capital asset" for U.S. federal income tax purposes.  A U.S. Holder that purchased its GUC from a prior holder at a market discount may be subject to the market discount rules of the Tax Code.  Under those rules (subject to a de minimis exception), assuming that such U.S. Holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on the exchange of such GUC generally would be characterized as ordinary income to the extent of the accrued market discount on such GUC as of the date of the exchange.

#### b.    Distributions with Respect to Accrued but Unpaid Interest

A portion of the consideration received by a U.S. Holder of a GUC may be attributable to accrued interest on such GUC.  Such amount may be taxable to that U.S. Holder as interest income if such accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of GUCs may be able to recognize a deductible loss to the extent any accrued interest on such GUCs was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. If the fair value of the consideration is not sufficient to fully satisfy all principal, interest on the GUC, the extent to which such consideration will be attributable to accrued interest is unclear. The Debtors intend to take the position, and Article VI.E of the Plan provides, that the consideration distributed pursuant to the Plan will first be allocable to the principal amount of an Allowed Claim and then, to the extent necessary, to any accrued interest thereon.  See "—*Accrued Interest*" below for additional discussion of the tax considerations relating to accrued interest under the Plan.

### 3.    **Non-U.S. Holders**

The rules governing U.S. federal income taxation of a Non-U.S. Holder are complex. The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. Non-U.S. Holders should consult with their own tax advisors to determine the

effect of U.S. federal, state, and local tax laws, as well as any other applicable non-U.S. tax laws and/or treaties, with regard to their participation in the transactions contemplated by the Plan.

Whether a Non-U.S. Holder realizes gain or loss on an exchange of their GUCs pursuant to the Plan and the amount of such gain or loss and any interest is determined in the same manner as set forth above in connection with U.S. Holders.

a.        Gain Recognition

Subject to the discussions below regarding FATCA (as defined below) and backup withholding, any gain recognized by a Non-U.S. Holder on any relevant exchange generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the relevant sale, exchange or other taxable disposition occurs and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if required by an applicable income tax treaty, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is recognized, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed certain capital losses allocable to U.S. sources during the taxable year of the relevant exchange, provided the Non-U.S. Holder has timely filed U.S. federal income tax returns with respect to such losses.

If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax, on a net income basis at the regular rates, with respect to any gain recognized in the same manner as a U.S. Holder, unless an applicable income tax treaty provides otherwise. In order to claim an exemption from withholding tax, such Non-U.S. Holder generally will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such Non-U.S. Holder is a corporation for U.S. federal income tax purposes, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

b.        Distributions with Respect to Accrued but Unpaid Interest

In general, to the extent that any consideration received pursuant to the Plan by a Non-U.S. Holder of an Allowed Claim is received in satisfaction of interest accrued, in each case during its holding period, such amount may be treated as interest for U.S. federal income tax purposes in the same manner as set forth above in connection with U.S. Holders. Any such amount may be subject to withholding of U.S. federal income tax on such interest at a 30% rate, depending on the circumstances (including whether the type of income is subject to a lower treaty rate and whether appropriate documentation or other support has been provided by such Non-U.S. Holder that establishes that such Non-U.S. Holder is eligible for such reduced rate of withholding).

The Debtors intend to take the position, and Article VI.E of the Plan provides, that the consideration distributed pursuant to the Plan will first be allocable to the principal amount of an Allowed Claim and then, to the extent necessary, to any accrued interest thereon.  See "—Accrued Interest" below for additional discussion of the tax considerations relating to accrued interest under the Plan.

> c.      Additional Withholding Tax on Payments Made to Foreign Accounts

Withholding taxes may be imposed under sections 1471 to 1474 of the Tax Code (such sections commonly referred to as the Foreign Account Tax Compliance Act, or "**FATCA**") on certain types of payments made to non-U.S. financial institutions and certain other non-U.S. entities. Specifically, a 30% withholding tax may be imposed on interest or dividends paid to a "foreign financial institution" or a "non-financial foreign entity" (each as defined in the Tax Code), unless (1) the foreign financial institution undertakes certain diligence, reporting and withholding obligations, (2) the non-financial foreign entity either certifies it does not have any "substantial United States owners" (as defined in the Tax Code) or furnishes identifying information regarding each substantial United States owner, or (3) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules. If the payee is a foreign financial institution and is subject to the diligence, reporting and withholding requirements in (1) above, it must enter into an agreement with the U.S. Department of the Treasury requiring, among other things, that it undertake to identify accounts held by certain "specified United States persons" or "United States-owned foreign entities" (each as defined in the Tax Code), annually report certain information about such accounts, and withhold 30% on certain payments to non-compliant foreign financial institutions and certain other account holders. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.

Under the applicable Treasury Regulations and administrative guidance, withholding under FATCA generally applies to payments of interest and dividends. While withholding under FATCA would have applied also to payments of gross proceeds from the sale or other disposition of GUCs on or after January 1, 2019, proposed Treasury Regulations eliminate FATCA withholding on payments of gross proceeds entirely. Taxpayers generally may rely on these proposed Treasury Regulations until final Treasury Regulations are issued.

## C.      **Accrued Interest**

To the extent a Holder of a GUC receives consideration that is attributable to indebtedness and unpaid accrued interest thereon, the Debtors intend to take the position, and Article VI.E of the Plan provides, that for U.S. federal income tax purposes, such consideration should be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing unpaid accrued interest. Notwithstanding the Plan provision, there is general uncertainty regarding the extent to which the receipt of cash or other property should be attributable to unpaid accrued interest.  To the extent any cash or other property received is considered attributable to unpaid accrued interest, a Holder will recognize ordinary income to the extent the value of the cash and other property exceeds the amount of unpaid accrued interest previously included in gross income by the Holder.  A Holder

generally will be entitled to recognize a loss to the extent any accrued interest previously included in its gross income is not paid in full.

HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE EXTENT TO WHICH CONSIDERATION RECEIVED UNDER THE PLAN SHOULD BE TREATED AS ATTRIBUTABLE TO UNPAID ACCRUED INTEREST.

D.    **Information Reporting and Withholding**

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld with respect to distributions under the Plan, actual or deemed, and will comply with all applicable information reporting requirements. The IRS may make the information returns available to the tax authorities in the country in which a Non-U.S. Holder is resident or organized. In general, information reporting requirements may apply to distributions or payments, actual or deemed, under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan, actual or deemed, unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8) or otherwise establishes such Holder's eligibility for an exemption. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders should consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

THE FOREGOING DISCUSSION OF U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. EACH HOLDER SHOULD CONSULT ITS TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN. NEITHER THE PROPONENTS NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.

## <u>CONCLUSION AND RECOMMENDATION</u>

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in Class 4 to vote in favor thereof.

Respectfully submitted, as of the date first set forth above,

**First Mode Holdings, Inc.**

By:     */s/   Colin Mark Freed*
Name:   Colin Mark Freed
Title:    Chief Financial Officer

**Synchronous LLC**

By:     */s/   Colin Mark Freed*
Name:   Colin Mark Freed
Title:    Authorized Signatory

## Exhibit A

**Plan**

**THIS PLAN IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THE PLAN IS SUBJECT TO CHANGE. THIS PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------- x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| FIRST MODE HOLDINGS, INC., *et al.*,[1] | : | Case No. 24-12794 (KBO) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

---------------------------------------------------------- x

**FIRST AMENDED JOINT CHAPTER 11 PLAN
OF FIRST MODE HOLDINGS, INC. AND ITS DEBTOR
AFFILIATE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: First Mode Holdings, Inc. (7177), and Synchronous LLC (1829).  The Debtors' mailing address is 300 Lenora Street, PMG #1445, Seattle, WA 98121.

**LATHAM & WATKINS LLP**
Ray C. Schrock (admitted *pro hac vice*)
Annemarie V. Reilly (admitted *pro hac vice*)
Brian S. Rosen (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864
Email:  ray.schrock@lw.com
           annemarie.reilly@lw.com
           brian.rosen@lw.com

 - and -

Caroline Reckler (admitted *pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
Email:  caroline.reckler@lw.com

 - and -

Jeffrey T. Mispagel (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763
Email:  jeffrey.mispagel@lw.com

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
 Michael R. Nestor (No. 3526)
 Kara Hammond Coyle (No. 4410)
 Joseph M. Mulvihill (No. 6061)
 Rodney Square
 1000 North King Street
 Wilmington, DE 19801
 Telephone:  (302) 571-6600
 Facsimile:  (302) 571-1253
 Email:  mnestor@ycst.com
            kcoyle@ycst.com
            jmulvihill@ycst.com

*Counsel for Debtors and Debtors in Possession*

ii

# TABLE OF CONTENTS

<div align="right"><u>Page</u></div>

Article I. DEFINED TERMS AND RULES OF INTERPRETATION.................................................1
    A.     Defined Terms ..........................................................................................................1
    B.     Rules of Interpretation ...........................................................................................14
    C.     Definitive Documents.............................................................................................15

Article II. ADMINISTRATIVE CLAIMS, DIP FACILITY CLAIMS, PRIORITY TAX CLAIMS,
    OTHER PRIORITY CLAIMS AND UNITED STATES TRUSTEE STATUTORY FEES .....................15
    A.     Administrative Claims ............................................................................................15
    B.     DIP Facility Claims ................................................................................................17
    C.     Priority Tax Claims.................................................................................................18
    D.     United States Trustee Statutory Fees and Related Reporting Obligations .....................18

Article III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS.........................19
    A.     Classification of Claims..........................................................................................19
    B.     Treatment of Claims and Interests ..........................................................................20
    C.     Nonconsensual Confirmation..................................................................................22
    D.     Subordination.........................................................................................................22
    E.     Elimination of Vacant Classes ................................................................................23
    F.     Intercompany Claims..............................................................................................23

Article IV. MEANS FOR IMPLEMENTATION OF THE PLAN......................................................23
    A.     Corporate Existence ...............................................................................................23
    B.     Indemnification Obligations....................................................................................23
    C.     Cancellation of Agreements and Equity Interests .....................................................24
    D.     Anglo Plan Funding, Subordination, and Settlement ................................................24
    E.     Sources for Plan Distributions ................................................................................25
    F.     Exemption from Certain Transfer Taxes and Recording Fees ....................................25
    G.     Plan Administrator .................................................................................................25
    H.     Directors and Officers Insurance Policies ...............................................................27
    I.     Preservation of Rights of Action.............................................................................27
    J.     Corporate Action....................................................................................................28
    K.     Effectuating Documents; Further Transactions.........................................................28
    L.     Wind-Down............................................................................................................29
    M.     Wind-Down Amount...............................................................................................29
    N.     Dissolution of the Debtors. .....................................................................................29
    O.     Closing the Chapter 11 Cases .................................................................................30

Article V. TREATMENT OF EXECUTORY CONTRACTS  AND UNEXPIRED LEASES; EMPLOYEE
    BENEFITS; AND INSURANCE POLICIES ...............................................................................30
    A.     Assumption and Rejection of Executory Contracts and Unexpired Leases ..................30
    B.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases..................31
    C.     Claims Based on Rejection of Executory Contracts and Unexpired Leases ..................32
    D.     Reserved.................................................................................................................32
    E.     Reservation of Rights .............................................................................................32

Article VI. PROVISIONS GOVERNING DISTRIBUTIONS...........................................................32
    A.     Distribution on Account of Claims Allowed as of the Effective Date ...........................32
    B.     Distributions on Account of Claims Allowed After the Effective Date...........................32
    C.     Timing and Calculation of Amounts to Be Distributed ..............................................33
    D.     Delivery of Distributions ........................................................................................33
    E.     Compliance with Tax Requirements/Allocations.......................................................35

<div align="center">iii</div>

F.      Surrender of Canceled Instruments or Securities ........................................................35
G.      Applicability of Insurance Policies. ...........................................................................36
H.      Claims Paid or Payable by Third Parties.....................................................................36

Article VII. PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED
CLAIMS OR EQUITY INTERESTS ..............................................................................36
A.      Allowance of Claims ..................................................................................................36
B.      Prosecution of Objections to Claims...........................................................................37
C.      Estimation of Claims...................................................................................................37
D.      No Distributions Pending Allowance..........................................................................37
E.      Reserve on Account of Disputed Claims. ...................................................................37
F.      Time to File Objections to Claims ..............................................................................38
G.      Amendments for Proofs of Claims and Interests.........................................................38

Article VIII. CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE ...................38
A.      Conditions Precedent to Confirmation ........................................................................38
B.      Effect of Non-Occurrence of Conditions to Confirmation...........................................38
C.      Conditions Precedent to the Effective Date ................................................................38
D.      Waiver of Conditions ..................................................................................................39
E.      Effect of Non-Occurrence of Conditions to the Effective Date ...................................39

Article IX. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS .......................................40
A.      Satisfaction of Claims and Termination of Interests. ..................................................40
B.      Releases by the Debtors ..............................................................................................40
C.      Releases by Holders of Claims and Interests ..............................................................41
D.      Exculpation .................................................................................................................42
E.      Injunction ...................................................................................................................43
F.      Satisfaction of Claims. ................................................................................................43
G.      Setoffs and Recoupment .............................................................................................44
H.      Release of Liens..........................................................................................................44

Article X. RETENTION OF JURISDICTION .............................................................................................44

Article XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN .................................................47
A.      Modification of Plan ...................................................................................................47
B.      Effect of Confirmation on Modifications.....................................................................47
C.      Revocation of Plan; Reservation of Rights if Effective Date Does Not Occur ..............47

Article XII. MISCELLANEOUS PROVISIONS .............................................................................................48
A.      Additional Documents .................................................................................................48
B.      Reservation of Rights ..................................................................................................48
C.      Successors and Assigns................................................................................................48
D.      Service of Documents ..................................................................................................48
E.      Term of Injunctions or Stays.......................................................................................50
F.      Entire Agreement ........................................................................................................51
G.      Governing Law ...........................................................................................................51
H.      Exhibits ......................................................................................................................51
I.      Nonseverability of Plan Provisions upon Confirmation...............................................51
J.      Conflicts.....................................................................................................................52
K.      Dissolution of the Committee .....................................................................................52

iv

**FIRST AMENDED JOINT CHAPTER 11 PLAN**
**OF FIRST MODE HOLDINGS, INC. AND ITS DEBTOR**
<u>**AFFILIATE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**</u>

First Mode Holdings, Inc. and its affiliated debtor and debtor-in-possession in the above captioned cases (each a "<u>**Debtor**</u>" and, collectively, the "<u>**Debtors**</u>"), propose this joint Plan (as defined herein) for the resolution of the outstanding Claims against, and Interests in, the Debtors. Capitalized terms used in this Plan and not otherwise defined have the meanings ascribed to such terms in <u>Article I.A</u> of this Plan.

Although proposed jointly for administrative purposes, this Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in <u>Article III</u> of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. This Plan provides for consolidation of the Debtors solely for purposes of voting, Confirmation, and distribution, but not for any other purpose.

**The Debtors are currently pursuing a Sale Transaction of all or substantially all of their assets, as described in further detail in the Disclosure Statement. The proceeds thereof shall be distributed in accordance with the applicable provisions of this Plan, the DIP Orders, the DIP Documents, and/or the Sale Order, and the Debtors will be wound down.**

Reference is made to the Disclosure Statement, filed contemporaneously with this Plan, for a discussion of the Debtors' history, businesses, results of operations, and historical financial information, as well as a summary and analysis of this Plan and certain related matters, including distributions to be made under this Plan.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.**

Article I.

**DEFINED TERMS AND RULES OF INTERPRETATION**

*A. Defined Terms*

The following terms shall have the following meanings when used in capitalized form herein:

1.    "<u>**510(b) Equity Claim**</u>" means any Claim subordinated pursuant to section 510(b) of the Bankruptcy Code.

2.    "<u>**Administrative Claim**</u>" means a Claim (other than an Intercompany Claim) arising on or before the Effective Date for costs and expenses of administration under sections

364(c)(1), 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Professional Fee Claims (to the extent Allowed by the Bankruptcy Court); and (c) U.S. Trustee Fees.

3.      "**Administrative Claims Bar Date**" means the date that is the 30th day after service of notice of the Effective Date, which notice shall set forth the Administrative Claims Bar Date, or such other date as is ordered by the Bankruptcy Court.

4.      "**Affiliate**" means an affiliate as defined in section 101(2) of the Bankruptcy Code.

5.      "**Allowed**" means: (a) any Claim or Interest (i) as to which no objection has been Filed prior to the applicable Claims Objection Deadline and that is evidenced by a Proof of Claim or Interest, as applicable, that is Filed or that is not required to be evidenced by a Filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, the DIP Orders or a Final Order, and no request for estimation or other challenge, including pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed, or (ii) as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective Holder; (b) any Claim or Interest that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated, and as for which no Proof of Claim or Interest, as applicable, has been Filed in an unliquidated or a different amount; (c) any Claim or Interest that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors; (d) any Claim or Interest as to which the liability of the Debtors, and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; or (e) any Claim or Interest expressly allowed under this Plan. "Allow," "Allows," and "Allowing" shall have correlative meanings.

6.      "**Anglo**" means the Prepetition Secured Lender collectively with its Affiliates other than FMH and its direct and indirect subsidiaries.

7.      "**Anglo Funding Amount**" means, subject to entry of the Confirmation Order and the satisfaction or waiver of each of the conditions precedent to the occurrence of the Effective Date of this Plan in accordance with Article VIII of this Plan, Cash in the amount of $28,870,592, *less* (i) the amount of any payments of any prepetition Claim during the Chapter 11 Cases, except to the extent such payment is paid or otherwise reimbursed (including by means of a purchase price adjustment) by the Successful Bidder, and (ii) the amount, if any, by which (x) the actual amount of Allowed Professional Fee Claims of Committee Professionals exceeds (y) the amount of such professional fees set forth in the Initial Budget (as defined in the DIP Credit Agreement) that is an Approved Budget (as defined in the DIP Credit Agreement).

8.      "**Anglo Plan Funding**" means the funding of the Anglo Funding Amount by Anglo American International Holdings Limited pursuant to this Plan.

9.      "**Assumed Contracts**" means those Executory Contracts and Unexpired Leases that are to be assumed and assigned by the Debtors to the Successful Bidder(s) or its designee pursuant to and as set forth in the Sale Order and any applicable Sale Transaction Documentation.

10.      "**Assumed Contracts List**" means the list or lists of Assumed Contracts, which will be included in preliminary form in the Plan Supplement, which shall be in form and substance acceptable to the Prepetition Secured Lender.

2

11.     "**Assumed Liabilities**" has the meaning set forth in any Sale Transaction Documentation (or such other similar term as may be used in such Sale Transaction Documentation).

12.     "**Avoidance Actions**" means any and all actual or potential avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

13.     "**Ballot**" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of this Plan in accordance with this Plan and the procedures governing the solicitation process.

14.     "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

15.     "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Chapter 11 Cases.

16.     "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court.

17.     "**Bar Date**" means the applicable bar date by which Proofs of Claim must be Filed, as established by: (a) the Bar Date Order; (b) a Final Order of the Bankruptcy Court; or (c) this Plan; *provided that* if there is a conflict relating to the bar date for a particular Claim, this Plan shall control.

18.     "**Bar Date Order**" means the *Order (I) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Claims Arising Under Section 503(b)(9) of the Bankruptcy Code), (II) Approving the Form and Manner of Notice Thereof, and (III) Granting Related Relief* [Docket No. 99].

19.     "**Bidding Procedures**" means the bidding procedures attached as Exhibit 1 to the Bidding Procedures Order, as such bidding procedures may be amended from time to time in accordance with its terms, which shall be in form and substance acceptable to the Prepetition Secured Lender.

20.     "**Bidding Procedures Order**" means the *Order (I) Approving Bid Procedures in Connection with the Sale of Substantially All of the Debtors' Assets; (II) Scheduling an Auction and a Sale Hearing; (III) Approving the Form and Manner of Notice Thereof; (IV) Authorizing the Debtors to Enter into the Stalking Horse APA and Related Bid Protections; (V) Approving Procedures for the Assumption and Assignment of Contracts and Leases; and (VI) Granting Related Relief* [Docket No. 166], as such order may be amended, supplemented, or modified from time to time, which shall be in form and substance acceptable to the Prepetition Secured Lender.

3

21.    "**Business Day**" means any day, other than a Saturday, Sunday or "legal holiday" (as that term is defined in Bankruptcy Rule 9006(a)).

22.    "**Cash**" means the legal tender of the United States of America or the equivalent thereof.

23.    "**Causes of Action**" means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws).  For the avoidance of doubt, Cause of Action also includes (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (e) any Avoidance Action or state law fraudulent transfer claim.

24.    "**Chapter 11 Case(s)**" means (a) when used with reference to a particular Debtor, the chapter 11 case filed for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases for all of the Debtors.

25.    "**Claim**" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

26.    "**Claims Objection Deadline**" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) (i) with respect to Administrative Claims, 150 days after the Administrative Claims Bar Date or (ii) with respect to all other Claims, 180 days after the Effective Date and (b) such other deadline as may be specifically fixed by the Debtors and approved by an order of the Bankruptcy Court.

27.    "**Claims Register**" means the official register of Claims maintained by the Notice and Claims Agent.

28.    "**Class**" means a category of Claims or Interests as set forth in <u>Article III</u> of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

29.    "**Committee**" means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the United States Trustee, if any.

30.    "**Committee Professionals**" means Persons or firms retained by the Committee appointed in the Chapter 11 Cases pursuant to section 328 or 1103 of the Bankruptcy Code.

31.    "**Confirmation**" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

32.    "**Confirmation Date**" means the date upon which Confirmation occurs.

33.    "**Confirmation Hearing**" means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

34.    "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code in form and substance acceptable to the Prepetition Secured Lender.

35.    "**Consenting Parent**" means Anglo American Technical & Sustainability Limited.

36.    "**Cure Cost**" means all amounts, which may be an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties to an Executory Contract or Unexpired Lease) that is to be assumed, or assumed and assigned, by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

37.    "**D&O Liability Insurance Policies**" means, collectively, all insurance policies (including any "tail policies" and all agreements, documents, or instruments related thereto) issued at any time to or providing coverage to of any of the Debtors for current or former directors', managers', and officers' liability.

38.    "**Debtor Professionals**" means Persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code, including Latham & Watkins LLP, Young Conaway Stargatt & Taylor, LLP, M3 Advisory Partners, LP, PJT Partners LP, and Omni Agent Solutions, Inc.

39.    "**Debtor Release**" means the releases set forth in Article IX.B of the Plan.

40.    "**Definitive Documents**" has the meaning set forth in the Restructuring Support Agreement.  The Definitive Documents shall be in form and substance acceptable to the Prepetition Secured Lender.

41.    "**DIP Credit Agreement**" means that certain *Senior Secured Superpriority Debtor-in-Possession Facility Agreement*, dated as of December 18, 2024, among the Debtors and the DIP Lender, as may be amended, supplemented, or modified from time to time.

42.    "**DIP Documents**" means the DIP Credit Agreement and any and all other agreements, documents, notes, pledges, collateral agreements, loan and security agreements, mortgages, control agreements, deeds of trust, intercreditor agreements, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) delivered or executed in connection with the DIP Facility, each of which shall be in form and substance acceptable to the Prepetition Secured Lender.

43.    "**DIP Facility**" means that certain credit facility, the terms of which are governed by the DIP Credit Agreement and the DIP Documents (each as may be amended, modified, ratified,

extended, renewed, restated or replaced from time to time in accordance with their terms and the DIP Orders), all as approved by the DIP Orders.

44.    "**DIP Facility Claim**" means any Claim held by the DIP Lender derived from, based upon, relating to, or arising under the DIP Facility, the DIP Documents, or the DIP Orders, including claims for all principal amounts outstanding, interest, fees, and expenses under the DIP Facility.

45.    "**DIP Lender**" means Anglo American International Holdings Limited, in its capacity as lender under the DIP Credit Agreement.

46.    "**DIP Loans**" means the term loans provided by the DIP Lender under the DIP Credit Agreement.

47.    "**DIP Orders**" means, collectively, the Interim DIP Order and the Final DIP Order, as such orders may be modified from time to time in accordance with the terms thereof.

48.    "**Disallowed**" means, with respect to any Claim or Interest, as of any date, that such Claim or Interest (or portion thereof) (a) is disallowed by Final Order, or pursuant to a settlement, or (b) was required, pursuant to the Bar Date Order to be the subject of a Proof of claim by such date but no Proof of Claim was timely filed pursuant to the Bar Date Order or another order of the Bankruptcy Court.

49.    "**Disclosure Statement**" means the disclosure statement for this Plan, including all exhibits and schedules thereto, as amended, supplemented, or modified from time to time, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable law, which shall be in form and substance acceptable to the Prepetition Secured Lender.

50.    "**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the Disclosure Statement, which shall be in form and substance acceptable to the Prepetition Secured Lender.

51.    "**Disputed**" means, with respect to any Claim or Equity Interest, a Claim or Interest that is not yet Allowed or Disallowed.

52.    "**Distributable Proceeds**" means all cash (including the Anglo Plan Funding) and cash proceeds generated from the use, sale, lease, liquidation, or other disposition of any property of the Debtors after the Effective Date in excess of the sum of (a) amounts necessary to satisfy (i) all Administrative Claims (other than DIP Facility Claims), and claims for fees and charges assessed against the Estates under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911 and 1930, (ii) Professional Fee Claims, (iii) Priority Tax Claims, (iv) Other Priority Claims, (v) Other Secured Claims, in each case (i) through (v), to the extent Allowed against the Debtors, and (b) the wind-down costs as set forth in the Wind Down Budget.

53.    "**Distribution Agent**" means the Debtors or any Entity or Entities chosen by the Debtors, with the consent of the Prepetition Secured Lender, which Entities may include one or more of the Notice and Claims Agent or the Plan Administrator, to make or to facilitate distributions required by this Plan.

54.    "**Distribution Record Date**" means, the date for determining which Holders of Claims, if such Claims are Allowed, are eligible to receive distributions on the Initial Distribution Date under this Plan, which date shall be the Effective Date or such other date designated in a Final Order.

55.    "**Effective Date**" means the first date on which:  (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article VIII.A and C of the Plan have been (i) satisfied or (ii) waived pursuant to Article VIII.D  of this Plan.

56.    "**Effective Date Distributable Proceeds**" means all cash of the Debtors as of the Effective Date (other than the Anglo Plan Funding) less (i) an amount reasonably acceptable to the Prepetition Secured Lender reserved for the satisfaction of all Allowed Administrative Claims (other than DIP Facility Claims) and claims for fees and charges assessed against the Estates under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911 and 1930, and (ii) the Professional Fee Escrow Amount.

57.    "**Entity**" means an entity as defined in section 101(15) of the Bankruptcy Code.

58.    "**Equity Interest**" means (a) any common stock, limited liability company interests, equity securities (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, units, or shares in FMH, including all issued, unissued, authorized, or outstanding shares of capital stock of FMH and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in FMH, and (b) any 510(b) Equity Claim.

59.    "**Estate**" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code.

60.    "**Exculpated Party**" means (a) the Debtors, (b) any Committee, and (c) solely to the extent they are estate fiduciaries, each such Entity's current officers, directors (including any sub-committee of directors), members (including ex officio members), financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such on or after the Petition Date and prior to or on the Effective Date.

61.    "**Exculpation**" means the exculpation provision set forth in Article IX.D of this Plan.

62.    "**Executory Contract**" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

63.    "**File**," "**Filed**," or "**Filing**" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Notice and Claims Agent or the Bankruptcy Court.

64.    "**Final DIP Order**" means the *Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims With Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the*

7

*Prepetition Facility Lender, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief*
[Docket No. 148], which shall be in form and substance acceptable to the Prepetition Secured
Lender.

65. "**Final Order**" means an order or judgment of the Bankruptcy Court or other court
of competent jurisdiction with respect to the relevant subject matter that has not been reversed,
stayed, modified, vacated, or amended, and as to which the time to appeal, seek reconsideration
under Rule 59(b) or 59(e) of the Federal Rules of Civil Procedure, seek a new trial, reargument, or
rehearing and, where applicable, petition for certiorari has expired and no appeal, motion for
reconsideration under Rule 59(b) or 59(e) of the Federal Rules of Civil Procedure, motion for a
new trial, reargument or rehearing or petition for certiorari has been timely taken, or as to which
any appeal that has been taken or any petition for certiorari that has been or may be filed has been
resolved by the highest court to which the order or judgment was appealed or from which certiorari
was sought, or as to which any motion for reconsideration that has been filed pursuant to Rule
59(b) or 59(e) of the Federal Rules of Civil Procedure or any motion for a new trial, reargument,
or rehearing shall have been denied, resulted in no modification of such order, or has otherwise
been dismissed with prejudice; *provided* that the possibility that a motion pursuant to Rule 60 of
the Federal Rules of Civil Procedure or Bankruptcy Rule 9024, or any analogous rule, may be filed
relating to such order or judgment shall not cause such order or judgment not to be a Final Order.

66. "**FMH**" means First Mode Holdings, Inc.

67. "**General Administrative Claim**" means any Administrative Claim, other than
(a) a Professional Fee Claim, (b) a DIP Facility Claim, or (c) a Claim for U.S. Trustee Fees.

68. "**General Unsecured Claim**" means any unsecured Claim other than an
Administrative Claim, a Priority Tax Claim, an Other Priority Claim, an Intercompany Claim, or
a 510(b) Equity Claim.

69. "**Governmental Unit**" means a governmental unit as defined in section 101(27) of
the Bankruptcy Code.

70. "**HEV Purchase Order**" means that certain HEV Purchase Order between Anglo
American Services (UK) Limited and FMH dated 1 December 2023.

71. "**Holder**" means an Entity holding a Claim or Interest.

72. "**Impaired**" means "impaired" within the meaning of section 1124 of the
Bankruptcy Code.

73. "**Initial Distribution Date**" means the date that is on or as soon as practicable after
the Effective Date when distributions under this Plan shall commence for each Class entitled to
receive distributions.

74. "**Insurance Contract**" means all insurance policies that have been issued at any
time to or provide coverage to any of the Debtors and all agreements, documents or instruments
relating thereto, including D&O Liability Insurance Policies.

75.   "**Insurer**" means any company or other entity that issued an Insurance Contract, any third party administrator, and any respective predecessors and/or affiliates thereof.

76.   "**Intercompany Claims**" means any Claim held by a Debtor or any direct or indirect subsidiary of FMH against any Debtor.

77.   "**Intercompany Interest**" means any issued, unissued, authorized, or outstanding shares of common stock, preferred stock, or other instrument evidencing an ownership interest in a Debtor held by another Debtor.

78.   "**Interests**" means, collectively, Equity Interests and Intercompany Interests.

79.   "**Interim DIP Order**" means the *Interim Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Facility Lender, (VI) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief* [Docket No. 66], which shall be in form and substance acceptable to the Prepetition Secured Lender.

80.   "**Lien**" means a lien as defined in section 101(37) of the Bankruptcy Code.

81.   "**Local Bankruptcy Rules**" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

82.   "**Net Distributable Proceeds**" means Distributable Proceeds less (a) actual amounts paid on account of Allowed General Unsecured Claims of Participating GUC Holders pursuant to the Plan, and (b) reasonable amounts that the Plan Administrator, in good faith, believes will be sufficient to pay any remaining General Unsecured Claims of Participating GUC Holders that are or may become Allowed.

83.   "**Non-Debtor Subsidiary**" means any direct or indirect subsidiary of either Debtor.

84.   "**Non-Participating GUC Holder**" means any Holder of a General Unsecured Claim that is not a Participating GUC Holder.

85.   "**Notice and Claims Agent**" means Omni Agent Solutions, Inc., in its capacity as noticing, claims, and solicitation agent for the Debtors, pursuant to one or more orders of the Bankruptcy Court.

86.   "**Notice of Forbearance**" means that certain Notice of Forbearance, dated as of August 20, 2024, provided by Anglo American International Holdings Limited, and including any amendments thereto and extensions thereof.

87.   "**Other Priority Claim**" means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code other than a General Administrative Claim, DIP Facility Claim, Professional Fee Claim, or Priority Tax Claim.

88.   "**Other Secured Claim**" means any Secured Claim other than a DIP Facility Claim or a Prepetition Secured Loan Claim.

US-DOCS\155636709.16

89.     "**Participating GUC Holder**" means any Holder of an Allowed General Unsecured Claim that (a) does not vote to reject the Plan and (b) is a Releasing Party on the Effective Date or becomes a Releasing Party on or prior to the date that is ninety (90) days after the Effective Date.

90.     "**Periodic Distribution Date**" means the first Business Day that is as soon as reasonably practicable occurring approximately sixty (60) days after the immediately preceding Periodic Distribution Date.  The first Periodic Distribution Date shall be the Initial Distribution Date.

91.     "**Person**" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company, firm, trust, association, government, governmental agency or other Entity, whether acting in an individual, fiduciary or other capacity.

92.     "**Petition Date**" means the date on which each of the Debtors commenced the Chapter 11 Cases.

93.     "**Plan**" means this joint plan under chapter 11 of the Bankruptcy Code, as it may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the terms hereof, as the case may be, including all exhibits, supplements, appendices, and schedules hereto, including the Plan Supplement, which is incorporated herein by reference and made part of the Plan as if set forth herein.

94.     "**Plan Administration Agreement**" means the liquidating agreement to be entered into by and among the Debtors and the Plan Administrator regarding administration of this Plan, and which shall provide for the wind-down of the Debtors, shall be included in the Plan Supplement, and shall be in form and substance acceptable to the Prepetition Secured Lender.

95.     "**Plan Administrator**" means the person or entity, or any successor thereto, who, on and after the Effective Date shall have the rights, powers, and duties set forth in this Plan.  The identity and compensation of the Plan Administrator shall be agreed to by the Debtors and the Prepetition Secured Lender and shall be set forth in the Plan Supplement.

96.     "**Plan Settlement**" has the meaning set forth in Article IV.D of this Plan.

97.     "**Plan Supplement**" means a supplement or supplements to the Plan containing certain documents and forms of documents, schedules and exhibits, relevant to the implementation of the Plan, to be filed with the Bankruptcy Court, as amended, modified or supplemented from time to time in accordance with the Bankruptcy Code and the Bankruptcy Rules, which shall be in form and substance acceptable to the Prepetition Secured Lender and which may include the following documents:  (a) the Assumed Contracts List; (b) the Rejected Contracts List; (c) a list of retained Causes of Action; (d) the identity of the Plan Administrator; (e) the Plan Administration Agreement; and (f) the Wind-Down Budget.

98.     "**Plan Supplement Filing Date**" means the date that is at least seven (7) days prior to the Voting Deadline.

10

99.    "**Prepetition Facility Agreement**" means that certain Facility Agreement, dated as of December 21, 2023, as amended by that certain Amendment No. 1, dated March 11, 2024, that certain Amendment No. 2, dated April 12, 2024, and that certain Amendment No. 3, dated December 9, 2024, and as further amended, modified or supplemented from time to time in accordance with its terms, together with all exhibits thereto.

100.    "**Prepetition Secured Lender**" means Anglo American International Holdings Limited, which holds Prepetition Secured Loan Claims.

101.    "**Prepetition Secured Loan Claim**" means any and all Claims arising under, derived from, or based upon the Prepetition Secured Loans and/or the Prepetition Facility Agreement, including any accrued interest, fees, expenses and other charges thereon and any other obligations owing to the Prepetition Secured Lender under the Prepetition Facility Agreement.

102.    "**Prepetition Secured Loans**" means the loans made by the Prepetition Secured Lender pursuant to the Prepetition Facility Agreement.

103.    "**Priority Tax Claim**" means a Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

104.    "**Professional Fee Claim**" means a Claim by a Retained Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred during the Chapter 11 Cases, through and including the Effective Date, under sections 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

105.    "**Professional Fee Escrow Account**" means an account funded by the Debtors with Cash no later than the Effective Date in an amount equal to the Professional Fee Escrow Amount.

106.    "**Professional Fee Escrow Amount**" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses the Retained Professionals have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Effective Date, which shall be estimated pursuant to the method set forth in Article II.A.2 of this Plan.

107.    "**Proof of Claim**" means a proof of Claim filed against any Debtor in the Chapter 11 Cases.

108.    "**Reinstated**" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

109.    "**Rejected Contracts List**" means the list of Executory Contracts and/or Unexpired Leases (including any amendments or modifications thereto) that will be rejected pursuant to this Plan.

110.    "**Relationship Agreement**" means that certain Relationship Agreement, dated as of January 5, 2023, by and among the Consenting Parent, FMH, and the FMH Founding Stockholders (as defined therein).

111.    "**Related Party**" means, with respect to an Entity, such Entity's current and former officers, directors, managers, principals, members, employees, agents (including any disbursing agent), advisory board members, financial advisors, partners, limited partners, general partners,

US-DOCS\155636709.16

attorneys, accountants, investment bankers, consultants, representatives, other professionals, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, management companies, fund advisors, managers, fiduciaries, trustees, other representatives, and other professionals (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such, and the respective heirs, executors, estates, servants and nominees of the foregoing, each in their capacity as such.

112.    "**Released Party**" means, collectively, and in each case, in their respective capacities as such: (a) the Debtors; (b) the Prepetition Secured Lender; (c) the DIP Lender; (d) the Consenting Parent; (e) Anglo (including, for the avoidance of doubt, Anglo American Services (UK) Limited); (f) with respect to each Entity in clauses (a) through (e), each such Entity's current and former Affiliates; and (g) with respect to each Entity in clause (a) through (f), each such Entity's Related Parties; provided, however, that, notwithstanding the foregoing, any Holder of a Claim or Interest that is not a Releasing Party shall not be a Released Party.

113.    "**Releasing Party**" means, collectively, and in each case, in their respective capacities as such: (a) the Debtors; (b) the Prepetition Secured Lender; (c) the DIP Lender; (d) the Consenting Parent; (e) Anglo (including, for the avoidance of doubt, Anglo American Services (UK) Limited); (f) all Holders of Claims and Interests in the Voting Class who either vote to accept the Plan or abstain from voting on the Plan, and, in each case, opt-in to the Third-Party Release; (g) all Holders of Claims and Interests in any Non-Voting Class who return an opt-in form pursuant to the procedures set forth in the Disclosure Statement Order; (h) with respect to each Entity in clauses (a) through (g), each such Entity's current and former Affiliates; and (i) with respect to each Entity in clause (a) through (h), each such Entity's Related Parties (solely to the extent such Releasing Party is legally entitled to bind such Related Party to the releases contained in the Plan under applicable non-bankruptcy law).

114.    "**Restructuring Support Agreement**" means that certain Restructuring Support Agreement, dated December 15, 2024, by and among the Debtors, the Consenting Lender, and the Consenting Parent, including all exhibits, annexes, and schedules thereto, as may be amended, supplemented, or otherwise modified from time to time.

115.    "**Retained Professional**" means an Entity: (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and/or 1103 of the Bankruptcy Code and to be compensated for services rendered on or prior to the Effective Date, pursuant to sections 327, 328, 329, 330, 331, 363, or 1103 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code, upon a motion on notice.

12

116.    "**Sale Order**" means one or more orders of the Bankruptcy Court approving the sale of any assets of the Debtors' Estates pursuant to section 363(b) of the Bankruptcy Code in form and substance acceptable to the Prepetition Secured Lender.

117.    "**Sale Process**" means the sale process conducted in accordance with the Bidding Procedures.

118.    "**Sale Transaction**" means a sale of all or substantially all of the assets of the Debtors (and certain of their non-Debtor subsidiaries) pursuant to section 363 or 1123 of the Bankruptcy Code to either the Stalking Horse Bidder or to such other purchaser that is a Successful Bidder.

119.    "**Sale Transaction Documentation**" means one or more asset purchase agreements or purchase and sale agreements and related documents, including any list of Assumed Contracts, pursuant to which the Debtors effectuate any Sale Transaction, and each of which shall be in form and substance acceptable to the Prepetition Secured Lender.

120.    "**Sale Transaction Proceeds**" means all proceeds from the consummation of the Sale Transaction(s) that are distributable or payable to the Estates, and such proceeds may consist of Cash, debt instruments, or other non-Cash consideration.

121.    "**Secured Claim**" means a Claim: (a) secured by a Lien on property in which one or more Estates has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, to the extent of the value of the creditor's interest in the Estate's interest in such property, or (b) that is based upon a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the amount of the setoff, as determined pursuant to section 506(a) of the Bankruptcy Code, or (c) otherwise Allowed pursuant to this Plan or order of the Bankruptcy Court as a secured claim.

122.    "**Stalking Horse Bidder**" means Cummins, Inc.

123.    "**Successful Bidder**" means any Entity or Entities whose bid for any or all of the Debtors' assets is selected by the Debtors and approved by the Bankruptcy Court as the highest or otherwise best bid pursuant to the Bidding Procedures, which may Entity may be the Stalking Horse Bidder.  For the avoidance of doubt, the Successful Bidder may be more than one Entity, submitting one or more bids, and, if applicable, use of the term "Successful Bidder" herein may be read as "Successful Bidders."

124.    "**Third-Party Release**" means the releases set forth in Article IX.C of the Plan.

125.    "**Umbrella Supply Agreement**" means that umbrella supply agreement between Anglo American Services (UK) Limited and FMH dated January 5, 2023.

126.    "**Unexpired Lease**" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

127.    "**Unimpaired**" means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

13

128.  "**United States Trustee**" means the Office of the United States Trustee for the District of Delaware.

129.  "**U.S. Trustee Fees**" means all fees incurred pursuant to 28 U.S.C. § 1930(a)(6) and, to the extent applicable, any interest assessed pursuant to 31 U.S.C. § 3717.

130.  "**Voting Deadline**" means 4:00 p.m. (prevailing Eastern time) on March 14, 2025, which is the date and time set forth in the Disclosure Statement Order by which Ballots for accepting or rejecting the Plan must be received by the Notice and Claims Agent.

131.  "**Voting Record Date**" means the date established as the voting record date pursuant to the Disclosure Statement Order.

132.  "**Wind-Down**" means the wind-down and dissolution of the Debtors' Estates as set forth in Article IV.M.

133.  "**Wind-Down Support Agreement**" means that certain First Mode Non-U.S. Subsidiary Wind-Down Support Agreement, dated December 9, 2024, by and among the Debtors, certain affiliates of the Debtors party thereto, and the Consenting Lender.

134.  "**Wind-Down Amount**" means Cash in an amount to be determined by the Debtors, to be retained by the Debtors to wind-down the Estates and these Chapter 11 Cases in accordance with the Wind-Down Budget.

135.  "**Wind-Down Budget**" means a budget for the reasonable activities and expenses to be incurred in winding down the Chapter 11 Cases, including the liquidation of any residual assets and entities not transferred to the Successful Bidder(s), as set forth in the Plan Supplement, which shall be in form and substance acceptable to the Debtors and the Prepetition Secured Lender.

*B.*    *Rules of Interpretation*

1.    For purposes herein:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) unless otherwise specified, any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented, as applicable; (d) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan; (e) the words ''herein,'' "hereof," and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (g) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (h) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Equity Interests," "Holders of Interests," "Disputed Interests," and the like, as applicable; (i) captions and headings to Articles and subdivisions thereof

are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (j) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (k) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (l) any effectuating provisions may be interpreted by the Plan Administrator in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall control; and (m) references to docket numbers are references to the docket numbers of documents filed in the Chapter 11 Cases under the Bankruptcy Court's CM/ECF system.

2.      The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  Unless otherwise specified herein, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

3.      All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

C.      *Definitive Documents.*

1.      Notwithstanding anything herein to the contrary, any and all consultation, information, notice and consent rights of the Prepetition Secured Lender, the DIP Lender, or the Consenting Parent (in any capacity) set forth in the Restructuring Support Agreement or any Definitive Document with respect to the form and substance of any Definitive Document, and any consents, waivers or other deviations under or from any such documents pursuant to such rights, shall be incorporated herein by this reference and shall be fully enforceable as if stated in full herein.

Article II.

**ADMINISTRATIVE CLAIMS, DIP FACILITY CLAIMS, PRIORITY TAX CLAIMS, OTHER PRIORITY CLAIMS AND UNITED STATES TRUSTEE STATUTORY FEES**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Fee Claims), DIP Facility Claims, Priority Tax Claims, and Claims on account of U.S. Trustee Fees have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III.

A.      *Administrative Claims*

1.      <u>General Administrative Claims</u>

Except to the extent that a Holder of an Allowed General Administrative Claim and the applicable Debtor(s) agree to less favorable treatment with respect to such Allowed General Administrative Claim, each Holder of an Allowed General Administrative Claim will be paid the full unpaid amount of such Allowed General Administrative Claim in Cash:  (a) on the Effective Date or as soon as reasonably practicable thereafter or, if not then due, when such Allowed General Administrative Claim is due or as soon as reasonably practicable thereafter; (b) if a General Administrative Claim is Allowed after the Effective Date, on the date such General Administrative

US-DOCS\155636709.16

Claim is Allowed or as soon as reasonably practicable thereafter or, if not then due, when such Allowed General Administrative Claim is due or as soon as reasonably practicable thereafter; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtors, with the consent of the Prepetition Secured Lender; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court; *provided* that any Allowed General Administrative Claim that has been assumed by the Successful Bidder under the Sale Transaction Documentation shall not be an obligation of the Debtors and shall not be entitled to any recovery from the Estates under this Plan.

2.  Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred on and after the Petition Date and prior to and on the Effective Date must be Filed no later than forty-five (45) days after the Effective Date.  Any party seeking payment of a Professional Fee Claim that arises under sections 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code must file a motion for approval of the same.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders.  The Plan Administrator shall pay Professional Fee Claims in Cash to such Retained Professionals in the amount the Bankruptcy Court Allows from funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court; *provided* that the Debtors' obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the Allowed amount of Professional Fee Claims owing to the Retained Professionals, the Plan Administrator shall pay such amounts within ten (10) Business Days after entry of the order approving such Professional Fee Claims.

No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Retained Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full in Cash to the Retained Professionals pursuant to one or more orders of the Bankruptcy Court.  Except as otherwise expressly set forth in the last sentence of this paragraph, no Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way.  Before all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full in Cash to the Retained Professionals pursuant to one or more orders of the Bankruptcy Court, no funds held in the Professional Fee Escrow Account shall be property of the Estates of the Debtors or the Plan Administrator, as applicable.  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full in Cash to the Retained Professionals pursuant to one or more orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly revert to the Debtors, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, which amounts shall be Distributable Proceeds and promptly distributed in accordance with this Plan.

The Retained Professionals shall deliver to the Debtors a reasonable and good-faith estimate of their unpaid fees and expenses incurred in rendering services to the Debtors (which

16

estimate may include a cushion to cover unexpected or unknown fees) before and as of the Effective Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate no later than three (3) Business Days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of a Retained Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court, and such Retained Professionals are not bound to any extent by the estimates. If a Retained Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Retained Professional for inclusion in the Professional Fee Escrow Amount. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided* that the Plan Administrator shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

3.    Administrative Claims Bar Date

All requests for payment of an Administrative Claim (other than DIP Facility Claims, Cure Costs, Professional Fee Claims, post-petition tax claims arising under section 503(b)(1)(D) of the Bankruptcy Code, claims arising under section 503(b)(9) of the Bankruptcy Code, or U.S. Trustee quarterly fees payable pursuant to Article II.D below) that accrued on or before the Effective Date must be filed with the Bankruptcy Court and served on the Debtors and the Plan Administrator, as applicable, no later than the Administrative Claims Bar Date. If a Holder of an Administrative Claim (other than DIP Facility Claims, Cure Costs, Professional Fee Claims, claims arising under section 503(b)(9) of the Bankruptcy Code, or U.S. Trustee quarterly fees payable pursuant to Article II.D below) that is required to, but does not, file and serve a request for payment of such Administrative Claim by the Administrative Claims Bar Date, such Administrative Claim shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, their Estates, or the Plan Administrator.

The Plan Administrator in its discretion, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval. The Debtors or the Plan Administrator, as applicable, may also choose to object to any Administrative Claim no later than the applicable Claims Objection Deadline, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court. Unless the Debtors or the Plan Administrator, as applicable, (or other party with standing) objects to a timely-filed and properly served Administrative Claim, such Administrative Claim will be deemed Allowed in the amount requested after expiration of the applicable Claims Objection Deadline (as may be extended). In the event that the Debtors or the Plan Administrator objects to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be Allowed and, if so, in what amount.

*B.    DIP Facility Claims*

The DIP Facility Claims shall be deemed Allowed as of the Effective Date in an amount equal to the full amount due and owing under the DIP Credit Agreement, including, for the avoidance of doubt, (a) the principal amount outstanding under the DIP Facility on such date,

17

(b) all interest accrued and unpaid thereon through and including the date of payment, (c) all accrued and unpaid fees, expenses and noncontingent indemnification obligations payable under the DIP Facility and the Final DIP Order and (d) all other "Obligations" as provided for in the DIP Credit Agreement.

Unless the DIP Lender agrees to a less favorable treatment, the DIP Lender shall receive (a) on the Effective Date, all Effective Date Distributable Proceeds, up to the Allowed amount of the DIP Facility Claims; (b) thereafter, as determined by the Plan Administrator from time to time in its reasonable discretion, all Net Distributable Proceeds as of the time of such determination. To the extent the Net Distributable Proceeds are insufficient to satisfy the DIP Facility Claims in full, the DIP Lender shall not receive any distribution on account of any resulting deficiency claims. For the avoidance of doubt, the DIP Lender shall not receive on account of its DIP Facility Claims any Net Distributable Proceeds unless all Allowed General Unsecured Claims of Participating GUC Holders are expected to be paid in full in the good faith judgment of the Plan Administrator.

C.     *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor(s) against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors, either (a) the full unpaid amount of such Allowed Priority Tax Claim in Cash on the later of the Effective Date and the date on which such Priority Tax Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Priority Tax Claim is due or as soon as reasonably practicable thereafter), or (b) equal annual installment payments in Cash, of a total value equal to the Allowed amount of such Priority Tax Claim, over a period ending not later than five (5) years after the Petition Date, in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plan (other than cash payments made to a class of creditors under section 1122(b)); *provided* that any Allowed Priority Tax Claim that has been expressly assumed by the Successful Bidder under the Sale Transaction Documentation shall not be an obligation of the Debtors. Once an Allowed Priority Tax Claim has been paid in full, any Liens securing such Allowed Priority Tax Claim shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order or rule, or the vote, consent, authorization, or approval of any Person.

D.     *United States Trustee Statutory Fees and Related Reporting Obligations*

All U.S. Trustee Fees that are due and owing as of the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date. The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due. After the Effective Date, the Plan Administrator shall file with the Bankruptcy Court separate UST Form 11-PCR report for each of the Debtors when they become due. After the Effective Date, any and all U.S. Trustee Fees shall be paid in full in Cash when due and payable under 28 U.S.C. § 1930(a)(6). Each and every one of the Debtors, and the Plan Administrator shall remain obligated to pay U.S. Trustee Fees to the Office of the U.S. Trustee until the earliest of the closure, dismissal, or conversion to a case under Chapter 7 of the Bankruptcy Code of the case of that particular Debtor. The U.S. Trustee shall not be treated as providing any release under the Plan. The U.S. Trustee Fees are Allowed. The U.S.

18

Trustee shall not be required to file any proof of claim or any request for administrative expense for U.S. Trustee Fees. The provisions of this paragraph shall control notwithstanding any other provision(s) in this Plan to the contrary.

<div align="center">

Article III.

**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

</div>

A.    *Classification of Claims*

This Plan constitutes a separate chapter 11 plan for each Debtor. Except for the Claims addressed in <u>Article II</u> above (or as otherwise set forth herein), all Claims and Interests are placed in Classes for each of the applicable Debtors. The Plan consolidates Claims against all Debtors solely for purposes of voting, Confirmation, and distribution (for instance, a General Unsecured Claim against any Debtor is classified in Class 4, and to the extent Allowed, is entitled to share pro rata with all other Allowed Class 4 Claims, in the treatment provided for Class 4, without any allocation thereof among the Debtors) but not for any other purpose. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, DIP Facility Claims, and Priority Tax Claims, as described in <u>Article II</u>.

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. This Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or an Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

<div align="center">

**Summary of Classification and Treatment of Claims and Interests**

</div>

| Class | Claim | Status | Voting Rights |
|:---:|:---|:---:|:---:|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Prepetition Secured Loan Claims | Unimpaired | Presumed to Accept |
| 4 | General Unsecured Claims | Unimpaired or Impaired | Entitled to Vote |
| 5 | Intercompany Claims | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject |
| 6 | Intercompany Interests | Unimpaired or Impaired | Presumed to Accept or Deemed to Reject |
| 7 | Equity Interests | Impaired | Deemed to Reject |

<div align="center">

19

</div>

B.    *Treatment of Claims and Interests*

    1.    <u>*Class 1 — Other Priority Claims*</u>

a)    *Classification*: Class 1 consists of all Other Priority Claims.

b)    *Treatment*:  On the Effective Date, except to the extent that a Holder of an Allowed Other Priority Claim and the Debtor against which such Allowed Other Priority Claim is asserted agree to less favorable treatment for such Allowed Other Priority Claim, each Holder thereof shall receive payment in full in Cash or other treatment rendering such Claim Unimpaired.  Any Allowed Other Priority Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Transaction Documentation shall not be an obligation of the Debtors.

c)    *Voting*:  Class 1 is Unimpaired and Holders of Class 1 Other Priority Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1 Other Priority Claims are not entitled to vote to accept or reject this Plan.

    2.    <u>*Class 2 — Other Secured Claims*</u>

a)    *Classification*: Class 2 consists of all Other Secured Claims.

b)    *Treatment*:  On the Effective Date, except to the extent that a Holder of an Allowed Other Secured Claim and the Debtor against which such Allowed Other Secured Claim is asserted agree to less favorable treatment for such Allowed Other Secured Claim, each allowed Other Secured Claim shall, at the option of the applicable Debtor with the consent of the Prepetition Secured Lender (not to be unreasonably withheld), (i) be paid in full in Cash, (ii) receive the collateral securing its Allowed Other Secured Claim, or (iii) receive any other treatment that would render such Claim Unimpaired.  Any Allowed Other Secured Claim that has been expressly assumed by the applicable Successful Bidder under the applicable Sale Transaction Documentation shall not be an obligation of the Debtors.

c)    *Voting*:  Class 2 is Unimpaired and Holders of Class 2 Other Secured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 2 Other Secured Claims are not entitled to vote to accept or reject this Plan.

    3.    <u>*Class 3 — Prepetition Secured Loan Claims*</u>

a)    *Classification*:  Class 3 consists of all Prepetition Secured Loan Claims.

b)    *Allowance*:  On the Effective Date, the Prepetition Secured Loan Claims shall be Allowed in an amount equal to (a) the aggregate outstanding principal amount of $71,513,729 plus (b) all accrued and unpaid interest as of the Petition Date plus (c) all fees, expenses, and other charges due and owing under the Prepetition Secured Loans as of the Petition Date plus (d) all other accrued and unpaid interest on the Prepetition Secured Loans as of the Effective Date to the extent permitted under section 506(b) of the Bankruptcy Code.

c) *Treatment*: Solely to the extent that the DIP Facility Claims are paid in full, and unless the Prepetition Secured Lender agrees to less favorable treatment, the Prepetition Secured Lender shall receive on account of its Prepetition Secured Loan Claims, on the Effective Date and periodically thereafter, as determined by the Plan Administrator from time to time in its reasonable discretion, all Net Distributable Proceeds after the DIP Facility Claims have been satisfied in full. To the extent the Net Distributable Proceeds are insufficient to satisfy the Prepetition Secured Loan Claims in full, the Prepetition Secured Lender shall not receive any distribution on account of any resulting deficiency claims. For the avoidance of doubt, the Prepetition Secured Lender shall not receive on account of its Prepetition Secured Loan Claims any Net Distributable Proceeds unless all Allowed General Unsecured Claims of Participating GUC Holders are expected to be paid in full in the good faith judgment of the Plan Administrator.

d) *Voting*: Class 3 is Unimpaired and the Prepetition Secured Lender is conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holder of Class 3 Prepetition Secured Loan Claims are not entitled to vote to accept or reject this Plan.

   4.   <u>*Class 4 — General Unsecured Claims*</u>

a) *Classification*: Class 4 consists of all General Unsecured Claims.

b) *Treatment*: As soon as reasonably practicable after the Effective Date, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment for such Allowed General Unsecured Claim:

   i.    each Participating GUC Holder shall receive the lesser of (a) payment in full in cash; and (b) its pro rata share of Distributable Proceeds; and

   ii.   each Non-Participating GUC Holder shall receive no consideration on account of its General Unsecured Claims.

c) *Voting*: Class 4 is either Unimpaired or Impaired and Holders of Class 4 General Unsecured Claims are entitled to vote to accept or reject this Plan.

   5.   <u>*Class 5 — Intercompany Claims*</u>

a) *Classification*: Class 5 consists of all Intercompany Claims.

b) *Treatment*: On the Effective Date, each Holder of an Allowed Intercompany Claim shall receive no distribution under this Plan, and all Intercompany Claims shall be adjusted, reinstated, or eliminated in the applicable Debtor's discretion, unless otherwise agreed to by the Debtors and Anglo.

c) *Voting*: Class 5 is either (i) Unimpaired and Holders of Class 5 Intercompany Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or (ii) Impaired and not receiving any distribution under this Plan and Holders of Class 5 Intercompany Claims are deemed to have rejected this Plan pursuant to

US-DOCS\155636709.16

section 1126(g) of the Bankruptcy Code.  Therefore, in each case, Holders of Class 5 Intercompany Claims are not entitled to vote to accept or reject this Plan.

      6.    *Class 6 — Intercompany  Interests*

a)  *Classification:* Class 6 consists of all Intercompany Interests.

b)  *Treatment*: On the Effective Date, each Holder of an Allowed Intercompany Interest shall receive no distribution under this Plan, and all Intercompany Interests shall be adjusted, Reinstated, or eliminated in the applicable Debtor's discretion, unless otherwise agreed to, with the consent of Anglo and the Debtors.

c)  *Voting*:  Class 6 is either (i) Unimpaired and Holders of Class 6 Intercompany Interests are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or (ii) Impaired and not receiving any distribution under this Plan and Holders of Class 6 Intercompany Interests are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, in each case, Holders of Class 6 Intercompany Interests are not entitled to vote to accept or reject this Plan.

      7.    *Class 7 — Equity Interests*

a)  *Classification*: Class 7 consists of all Equity Interests.

b)  *Treatment*:  Holders of Equity Interests shall receive no distribution on account of their Equity Interests.  On the Effective Date, all Equity Interests will be canceled and extinguished and will be of no further force or effect.

c)  *Voting*:  Class 7 is Impaired and Holders of Class 7 Equity Interests are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 7 Equity Interests are not entitled to vote to accept or reject the Plan.

C.    *Nonconsensual Confirmation*

    Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by an Impaired Class of Claims, determined without including any acceptance of this Plan by any insider.  The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

D.    *Subordination*

    The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under the Plan, shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Plan Administrator and the Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.

*E.      Elimination of Vacant Classes*

Any Class of Claims that is not occupied as of the date of commencement of the Confirmation Hearing by the Holder of an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 (*i.e.*, no Ballots are cast in a Class entitled to vote on the Plan) shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptances or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

*F.      Intercompany Claims*

To the extent Reinstated under the Plan, any distributions on account of Intercompany Claims are not being received by Holders of such Intercompany Claims on account of their Intercompany Claims but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure to preserve ordinary course intercompany operations and in exchange for the Debtors' or the Plan Administrator's, as applicable, agreement under this Plan to make certain distributions to the Holders of Allowed Claims.

<div align="center">Article IV.</div>

<div align="center">**MEANS FOR IMPLEMENTATION OF THE PLAN**</div>

*A.      Corporate Existence*

For the purposes set forth in <u>Article IV.L</u> of the Plan, and except as otherwise provided in this Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by this Plan, by the Debtors, or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to this Plan and require no further action or approval.

*B.      Indemnification Obligations*

Any obligations of the Debtors currently in place (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, applicable state law or otherwise) to indemnify, reimburse, or limit the liability of any person in respect of any claims, demands, suits, causes of action, or proceedings against such persons based upon any act or omission related to such persons' service with, for, or on behalf of the Debtors prior to the Effective Date with respect to all present and future actions, suits, and proceedings relating to the Debtors shall be assumed and shall survive confirmation and consummation of the Plan and except as set forth therein, remain unaffected thereby, and shall not be discharged, irrespective of whether such defense, indemnification, reimbursement, or limitation of liability accrued or is owed in connection with an occurrence before or after the Petition Date; provided

<div align="center">23</div>

that, notwithstanding anything herein to the contrary, the Debtors' obligation to fund such indemnification obligations after the Effective Date of the Plan shall be limited to the extent of coverage available under any insurance policy assumed by the Debtors, including any directors and officers insurance policies; *provided*, *further*, for the avoidance of doubt that all such policies shall be assumed by the Debtors on the Effective Date of the Plan.  For the avoidance of doubt, neither the Debtors nor the Estates shall have any obligation to reimburse such indemnity claims or expenses.

C.      *Cancellation of Agreements and Equity Interests*

Except as otherwise provided for in this Plan, on the later of the Effective Date and the date on which the relevant distributions are made pursuant to Articles II and VI:  (i) the obligations of the Debtors under the DIP Credit Agreement, the Prepetition Secured Loans, and any other note, bond, indenture, or other instrument or document directly or indirectly evidencing or creating any indebtedness of the Debtors; and (ii) any certificate, equity security, share, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating an ownership interest in the Debtors (except, in each case, such certificates, notes or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan), shall be cancelled as to the Debtors, and they shall not have any continuing obligations thereunder; and (b) the obligations of the Debtors pursuant, relating or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated or entered into pursuant to this Plan) shall be released; *except that* the DIP Loans and the Prepetition Secured Loans shall continue in effect solely for the purpose of: (a) allowing the DIP Lender and the Prepetition Secured Lender to receive distributions from the Debtors under this Plan as set forth in Articles II and VI of this Plan; (b) preserving the DIP Lender and the Prepetition Secured Lender's right to all amounts due under the DIP Loans and the Prepetition Secured Loans; and (c) preserving the DIP Lender's and Prepetition Secured Lender's right to indemnification from the Debtors pursuant and subject to the terms of the DIP Loans and the Prepetition Secured Loans.

D.      *Anglo Plan Funding, Subordination, and Settlement*

Subject to the entry of the Confirmation Order and satisfaction or waiver of each of the conditions precedent to the occurrence of the Effective Date, Anglo shall provide the Anglo Plan Funding in the Anglo Funding Amount.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for, and as a requirement to receive, the distributions and other benefits provided pursuant to the Plan, including the Anglo Plan Funding, the provisions of the Plan shall constitute a good faith global and integrated compromise and settlement (the "**Plan Settlement**") of all actual and potential disputes between and among the Debtors and Anglo, including without limitation, any and all issues relating to (1) the incurrence of the obligations under the Prepetition Facility Agreement, the termination of any facilities thereunder, and acceleration of any loans thereunder, (2) the Umbrella Supply Agreement and the termination thereof, (3) the HEV Purchase Order and

24

the termination thereof, and (4) the Relationship Agreement.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Plan Settlement as well as a finding by the Bankruptcy Court that the Plan Settlement is in the best interests of the Debtors, their estates, and holders of claims and interests and is fair, equitable, and reasonable.  The Plan Settlement shall be binding upon all creditors and all other parties in interest pursuant to section 1141(a) of the Bankruptcy Code.

E.      *Sources for Plan Distributions*

The Debtors shall fund distributions under this Plan with Cash on hand, the Anglo Funding Amount, the proceeds of all non-Cash assets of the Debtors' Estates, and any proceeds of retained Causes of Action of the Estates.

F.      *Exemption from Certain Transfer Taxes and Recording Fees*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to any Entity pursuant to or in connection with this Plan, including: (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any U.S. federal, state or local document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate U.S. state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

G.      *Plan Administrator*

On and after the Plan Effective Date, the Plan Administrator shall act for the Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, and officers of the Debtors shall be deemed to have terminated, the persons acting as managers, directors, and officers of the Debtors shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole manager and sole officer of the Debtors, and shall succeed to the powers of the Debtors' managers, directors, and officers.  From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Debtors.  The Plan Administrator shall use commercially reasonable efforts to operate in a manner consistent with the Wind-Down Budget.  The Plan Administrator shall carry out any necessary functions required by the applicable Sale Transaction Documentation.

The powers of the Plan Administrator shall include any and all powers and authority to implement this Plan and wind-down the businesses and affairs of the Debtors, in each case, without the need for further Court approval, including: (a) selling, disposing, liquidating, receiving, holding, investing, supervising, protecting, and abandoning the Debtors' assets; (b) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under this Plan; (c) making distributions as contemplated under this Plan; (d) establishing and maintaining bank accounts in the name of the Debtors; (e) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating this Plan to the extent necessary; (f) paying all reasonable fees, expenses, debts, charges, and liabilities of the Debtors; (g) administering and paying taxes of the Debtors, including filing tax returns; (h) representing the interests of the Debtors before any taxing authority in all matters, including any action, suit, proceeding or audit; and (i) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to this Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of this Plan.

The Plan Administrator may resign at any time upon thirty (30) days' written notice delivered to the Bankruptcy Court, *provided* that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator.  Upon his or her appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of his or her predecessor and all responsibilities of the predecessor Plan Administrator relating to the Debtors shall be terminated.

1. Appointment of the Plan Administrator

The Plan Administrator shall be appointed by the Debtors with the consent of the Prepetition Secured Lender.  The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out its responsibilities under this Plan, and as otherwise provided in the Confirmation Order.

2. Retention of Professionals

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties.  The reasonable fees and expenses of such professionals shall be paid by the Debtors solely from the Wind-Down Amount, upon the monthly submission of statements to the Plan Administrator.  The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

3. Compensation of the Plan Administrator

The Plan Administrator's compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement and shall be subject to the consent of the Prepetition Secured Lender.

US-DOCS\155636709.16

## 4. Plan Administrator Exculpation, Indemnification, Insurance, and Liability Limitation

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed indemnified by the Debtors to the extent provided in the Plan Administration Agreement.  The Plan Administrator may obtain, at the expense of the Debtors and solely from the Wind-Down Amount, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Debtors.  The Plan Administrator may rely upon written information previously generated by the Debtors.

For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator, in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors, other than expressly provided for by this Plan and the Plan Administration Agreement.

*H.    Directors and Officers Insurance Policies*

In accordance with and without altering Article V.A of the Plan, (i) on the Effective Date, the Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies (including any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date pursuant to sections 105 and 365(a) of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court; (ii) confirmation of this Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under this Plan as to which no Proof of Claim need be filed; (iii) the Debtors shall retain the ability to supplement such D&O Liability Insurance Policies as the Debtors may deem necessary; and (iv) for the avoidance of doubt, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the assumption of each of the unexpired D&O Liability Insurance Policies.

In addition, on or after the Effective Date, the Plan Administrator shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy" and all agreements, documents, or instruments related thereto) in effect on or prior to the Effective Date, with respect to conduct occurring prior thereto, and all current and former directors, officers, and managers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policies for the full term of such policies regardless of whether such current and former directors, officers, and managers remain in such positions after the Effective Date, all in accordance with the terms and conditions of the D&O Liability Insurance Policies, which shall not be altered.

*I.    Preservation of Rights of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to the releases set forth in this section and in Article IX below, and to the extent not transferred to a Successful Bidder in any Sale Transaction, all Causes of Action that a Debtor may hold against any Entity other than those Causes of Actions released pursuant to the releases and exculpations contained in the Plan, including Article IX below, shall vest in the Plan Administrator on the Effective Date.  Thereafter,

27

the Plan Administrator, with the consent of the Debtors, shall have the right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, whether arising before or after the Petition Date, and to decline to do any of the foregoing without the consent or approval of any other third party or further notice to or action, order, or approval of the Bankruptcy Court. **No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any specific Cause of Action as any indication that the Debtors or the Plan Administrator will not pursue any and all available Causes of Action. The Debtors and the Plan Administrator expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in this Plan,** and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to any Cause of Action as a consequence of the Confirmation or the occurrence of the Effective Date.

J.       *Corporate Action*

Upon the Effective Date, all actions contemplated by this Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, or officers of the Debtors, the Plan Administrator, or any other Entity, including, as applicable:  (1) the rejection or assumption, as applicable, of Executory Contracts and Unexpired Leases and (2) all other acts or actions contemplated, or reasonably necessary or appropriate to promptly consummate the transactions contemplated by this Plan (whether to occur before, on, or after the Effective Date). All matters provided for in this Plan involving the company structure of the Debtors, and any company action required by the Debtors or the Plan Administrator in connection therewith, shall be deemed to have occurred on, and shall be in effect as of, the Effective Date, without any requirement of further action by the security holders, directors, managers, authorized persons, or officers of the Debtors.

On or prior to the Effective Date, the appropriate officers, directors, managers, or authorized persons of the Debtors (including any president, vice-president, chief executive officer, treasurer, general counsel, or chief financial officer thereof) shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, certificates of incorporation, certificates of formation, bylaws, operating agreements, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by this Plan) in the name of and on behalf of the applicable Debtors.  The authorizations and approvals contemplated by this Article IV.I shall be effective notwithstanding any requirements under non-bankruptcy law.

K.       *Effectuating Documents; Further Transactions*

Prior to, on, and after the Effective Date, the Debtors and the directors, managers, officers, authorized persons, and members of the boards of directors or managers and directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, notes, instruments, certificates, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of this Plan, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant to this Plan.

28

L.      *Wind-Down*

On and after the Effective Date, in accordance with the Wind-Down Budget, the Debtors shall (1) continue in existence for purposes of (a) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible, (b) resolving Disputed Claims as provided hereunder, (c) paying Allowed Claims not assumed by the applicable Successful Bidder as provided hereunder, (d) filing appropriate tax returns, (e) complying with their continuing obligations under the applicable Sale Transaction Documentation (including with respect to the transfer of any permits to the applicable Successful Bidder as contemplated therein), and (f) administering this Plan in an efficient manner; and (2) thereafter liquidate and dissolve as set forth in this Plan.  The Plan Administrator shall carry out these actions for the Debtors.

Consistent with Article IV.G of this Plan, the Plan Administrator shall also have the power and authority and shall be required to exercise such power and authority, in lieu of the board of directors or similar governing body of any of the direct and indirect Non-Debtor Subsidiaries to take any action necessary to wind-down and dissolve such Entities, including filing a certificate of dissolution or similar documents for any of such Entities, together with all other necessary corporate and company documents, to effect the dissolution of such Entities under the applicable laws of the jurisdiction in which such Entities were formed.

M.      *Wind-Down Amount.*

On the Effective Date, the Debtors shall retain Cash in the amount of the Wind-Down Amount, which shall be used in accordance with the terms of the Wind-Down Budget.  Any remaining Cash held by the Debtors after making all of the disbursements contemplated by the Wind-Down Budget shall promptly become Distributable Proceeds and shall be promptly distributed in accordance with this Plan.

N.      *Dissolution of the Debtors.*

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, and manager, as applicable, of the Debtors with respect to their affairs.  Subject in all respects to the terms of this Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind-down and dissolve any of the Debtors, and shall be authorized to (a) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of the applicable state(s) of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of any of the Debtors or any of their Affiliates.

O.      *Closing the Chapter 11 Cases*

Upon administering in full the Chapter 11 Cases, the Plan Administrator may seek authority from the Bankruptcy Court to close any of the Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules, and the requirements set forth in Local Rule 3022-1. After the Effective Date, all contested matters relating to any of the Debtors, including claim objections and any adversary proceedings, shall be administered and heard in the Chapter 11 Case of First Mode Holdings, Inc., irrespective of whether such Claim(s) were Filed or such adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed.

<div align="center">

Article V.
**TREATMENT OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES; EMPLOYEE BENEFITS; AND INSURANCE POLICIES**

</div>

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases will be deemed rejected as of the Effective Date or on such later date as may be identified on the Rejected Contracts List, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that are or were (i) previously assumed pursuant to an order of the Bankruptcy Court, (ii) assumed and assigned or to be assumed and assigned in accordance with any Sale Transaction Documentation, (iii) previously rejected pursuant to an order of the Bankruptcy Court, (iv) the subject of a pending motion to reject, assume, or assume and assign as of the Effective Date, or (v) identified on the Assumed Contract List.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions, assumptions and assignments, or rejections of the Debtors' Executory Contracts and Unexpired Leases pursuant to the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease, then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

Notwithstanding anything to the contrary in the Plan, the Debtors reserve the right to amend or supplement the Assumed Contracts List and the Rejected Contracts List, with the consent of the Prepetition Secured Lender, prior to the Effective Date (or such later date as may be permitted by Article V.B or Article V.E below), *provided* that the Debtors shall give prompt notice of any such amendment or supplement to any affected counterparty and such counterparty shall have a reasonable opportunity to object thereto on any grounds.

Notwithstanding anything to the contrary herein, the terms of any Sale Transaction Documentation, any Sale Order, and Bidding Procedures Order shall govern the cure of defaults, assumption and assignment, and compliance with section 365 of the Bankruptcy Code with respect

<div align="center">30</div>

to any Executory Contracts or Unexpired Leases assumed and assigned, or to be assumed and assigned, pursuant to such Sale Transaction Documentation and Sale Order.

B.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to this Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the applicable Cure Cost in Cash on the Effective Date or as soon as reasonably practicable, subject to the limitation described below, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree.

In the event of an assumption, or an assumption and assignment, of an Executory Contract or Unexpired Lease under the Plan, at least fourteen (14) days prior to the applicable objection deadline, the Debtors shall File and serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, or proposed assumption and assignment, which will: (a) list the applicable Cure Cost, if any; (b) if applicable, identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption, or proposed assumption and assignment under the Plan, or the Cure Cost, must be Filed, served and actually received by the Debtors prior to the applicable objection deadline. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, or proposed assumption and assignment, or Cure Cost will be deemed to have consented to such matters and will be deemed to have assented to such assumption, assumption or assignment, and Cure Cost and to have forever released and waived any objection to such proposed assumption, proposed assumption and assignment, and Cure Cost.

In the event of a dispute regarding (a) the amount of any Cure Cost, (b) the ability of any Debtor or assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or assumed and assigned or (c) any other matter pertaining to assumption or assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving such assumption, or assumption and assignment.  If such objection is sustained or partially sustained by Final Order of the Bankruptcy Court, the Debtors or the Plan Administrator, as applicable, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming or assigning it. The Debtors or the Plan Administrator, as applicable, shall be authorized to effect such rejection by filing a written notice of rejection with the Bankruptcy Court and serving such notice on the applicable counterparty within thirty (30) days of the entry of such Final Order.

Upon payment of the Cure Cost, assumption of any Executory Contract or Unexpired Lease shall result in the full satisfaction and cure of any Claims and defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, under any assumed Executory Contract or Unexpired Lease arising at any time prior to the effective date of assumption.

31

C.      *Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases by virtue of this Plan must be filed with the Notice and Claims Agent by the date that is twenty-one (21) days following service of an order (which may be the Confirmation Order) approving the rejection of the applicable Executory Contract or Unexpired Lease.  The deadline for Governmental Units to file any such Proofs of Claim shall be the later of thirty (30) days after the effectiveness of rejection of the applicable Executory Contract or Unexpired Lease or the Governmental Bar Date as set forth in the Bar Date Order.  The notice of Effective Date shall set forth the date by which Proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases must be filed.  **Any Proofs of Claim arising from the rejection of the Executory Contracts and Unexpired Leases that are not timely filed shall be forever disallowed and barred, absent a Final Order to the contrary.**  All Allowed Claims arising from the rejection of the Executory Contracts and Unexpired Leases shall constitute General Unsecured Claims and shall be treated in accordance with Article III.B of the Plan.

D.      *Reserved.*

E.      *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease in the Rejected Contracts List or Assumed Contracts List, as applicable, nor anything contained in this Plan or any Sale Transaction Documentation, nor the Debtors' delivery of a notice of proposed assumption and proposed Cure Cost to any contract and lease counterparties, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Plan Administrator, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.  If there is a dispute regarding a Debtor's liability under an assumed Executory Contract or Unexpired Lease, the Plan Administrator shall be authorized to move to have such dispute heard by the Bankruptcy Court pursuant to Article X.C of the Plan.

Article VI.
**PROVISIONS GOVERNING DISTRIBUTIONS**

A.      *Distribution on Account of Claims Allowed as of the Effective Date*

Except as otherwise provided in this Plan or a Final Order, or as agreed to by the relevant parties, initial distributions under this Plan on account of Claims Allowed on or before the Effective Date shall be made on the Initial Distribution Date; *provided* that Allowed Priority Tax Claims shall be satisfied in accordance with Article II.C herein.

B.      *Distributions on Account of Claims Allowed After the Effective Date*

1.      Payments and Distributions on Disputed Claims

Except as otherwise provided in this Plan, a Final Order, or as agreed to by the relevant parties, distributions on account of Disputed Claims that become Allowed after the Effective Date

32

shall be made by the Plan Administrator on the next Periodic Distribution Date that is at least thirty (30) days after the Disputed Claim becomes an Allowed Claim; *provided* that (a) Disputed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date shall be treated as Allowed Priority Tax Claims in accordance with <u>Article II.C</u> of the Plan.

2.      <u>Distributions of Distributable Proceeds</u>

After the Initial Distribution Date, the Plan Administrator shall, or shall direct the Distribution Agent to, distribute additional Distributable Proceeds as soon as practicable upon such Distributable Proceeds becoming available to the Debtors or the Plan Administrator, or on the next Periodic Distribution Date. Such additional Distributable Proceeds shall be distributed in accordance with the terms of <u>Article IV</u> of this Plan.

C.      *Timing and Calculation of Amounts to Be Distributed*

Except as otherwise provided herein, on each Periodic Distribution Date each Holder of an Allowed Claim shall receive the full amount of the distributions that this Plan provides for Allowed Claims in the applicable Class (*i.e.* taking into account any reserves established with respect to Disputed Claims). If and to the extent that any Disputed Claims exist, distributions on account of such Disputed Claims shall be made pursuant to <u>Article VI.B</u> and <u>Article VII</u> of this Plan. Except as otherwise provided in this Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in this Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

D.      *Delivery of Distributions*

1.      <u>Record Date for Distributions</u>

For purposes of making distributions on the Initial Distribution Date only, the Distribution Agent shall be authorized and entitled to recognize only those Holders of Claims reflected on the Claims Register as of the close of business on the Distribution Record Date. If a Claim is transferred (a) twenty-one (21) or more days before the Distribution Record Date and reasonably satisfactory documentation evidencing such transfer is Filed with the Court, the Distribution Agent shall make the applicable distributions to the applicable transferee, or (b) twenty (20) or fewer days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form is Filed with the Court and contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor. With respect to periodic distributions, the Distribution Agent shall be entitled to set a reasonable record date, and to recognize only those Holders of Claims reflected on the Claims Register as of the close of business on such date.

33

2.        Delivery of Distributions in General

Except as otherwise provided in the Plan, the Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated in the Debtors' records as of the date of any such distribution, including the address set forth in any Proof of Claim filed by that Holder, if applicable; *provided* that the manner of such distributions shall be determined at the discretion of the Plan Administrator.

3.        Distributions by Distribution Agents

The Debtors or the Plan Administrator, as applicable, shall have the authority to enter into agreements with one or more Distribution Agents to facilitate the distributions required hereunder. To the extent the Debtors or the Plan Administrator, as applicable, determines to utilize a Distribution Agent to facilitate the distributions under this Plan to Holders of Allowed Claims, any such Distribution Agent would first be required to: (a) affirm its obligation to facilitate the prompt distribution of any documents; (b) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under this Plan; (c) waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required under this Plan to be distributed by such Distribution Agent; and (d) post a bond, obtain a surety or provide some other form of security for the performance of its duties, the costs and expenses of procuring which shall be borne by the Debtors or the Plan Administrator, as applicable.

The Debtors or the Plan Administrator, as applicable, shall pay to the Distribution Agents all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions, or consents. The Distribution Agents shall submit detailed invoices to the Debtors or the Plan Administrator, as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement and the Debtors or the Plan Administrator, as applicable, shall pay those amounts that they, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors or the Plan Administrator, as applicable, deem to be unreasonable. In the event that the Debtors or the Plan Administrator, as applicable, objects to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtors or the Plan Administrator, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses. In the event that the Debtors or the Plan Administrator, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

4.        Minimum Distributions

Notwithstanding anything herein to the contrary, other than on account of Claims in Classes 1 and 2, the Distribution Agents shall not be required to make distributions or payments aggregating less than $50 (whether Cash or otherwise) to any particular Holder of an Allowed Claim in such Classes and shall not be required to make partial distributions or payments of fractions of dollars. If any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment will reflect a rounding down of such fraction to the nearest whole dollar.

5.      Undeliverable Distributions

a.      Holding of Certain Undeliverable Distributions

Undeliverable distributions shall remain in the possession of the Distribution Agents until such distributions become deliverable, at which time such distributions shall be made without interest, dividends, or other accruals of any kind on account of the distributions being undeliverable; *provided* that distributions returned as undeliverable shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the date the distributions were initially made.  After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property Laws to the contrary) to the Estate automatically and without need for a further order by the Bankruptcy Court and the Claim or Interest of any Holder to such property or interest in property shall be forever barred, absent order of the Bankruptcy Court to the contrary.

b.      Failure to Present Checks

Checks issued by the Distribution Agents on account of Allowed Claims shall be null and void if not negotiated within 180 days after the issuance of such check.  Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.

E.      *Compliance with Tax Requirements/Allocations*

In connection with this Plan, to the extent applicable, the Plan Administrator shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, the Plan Administrator and/or the Distribution Agent, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate, including requiring as a condition to the receipt of a distribution, that the Holders of an Allowed Claim complete an IRS Form W-8 or W-9, as applicable.  The Plan Administrator reserves the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.  For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount (as determined for U.S. federal income tax purposes) of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

F.      *Surrender of Canceled Instruments or Securities*

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a certificate or instrument evidencing a Claim or an Equity Interest shall be deemed to have surrendered such certificate or instrument to the Distribution Agent.  Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and except as provided otherwise under this Plan, including the Debtor Release and the Third-Party Release, such

35

cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any agreement that governs the rights of the Holder of a Claim or Equity Interest, which shall continue in effect for purposes of allowing Holders to receive distributions under this Plan.

G.    *Applicability of Insurance Policies.*

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Contract.  Except for the releases and exculpation provisions of <u>Article IX</u>, nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers under any Insurance Contracts, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers under the Insurance Contracts.

H.    *Claims Paid or Payable by Third Parties*

1.    Claims Paid by Third Parties

The Debtors or the Plan Administrator, as applicable, shall reduce a Claim, and such Claim shall be disallowed to such extent without an objection having to be Filed and without any notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a Debtor or the Plan Administrator.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution under the Plan on account of such Claim and receives payment from a party that is not a Debtor or the Plan Administrator on account of such Claim, such Holder shall, within fourteen days of receipt thereof, repay or return the distribution to the applicable Debtor or the Plan Administrator, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor or the Plan Administrator annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen day grace period specified above until the amount is repaid.

Article VII.
**PROCEDURES FOR RESOLVING DISPUTED,
CONTINGENT, AND UNLIQUIDATED CLAIMS OR EQUITY INTERESTS**

A.    *Allowance of Claims*

After the Effective Date, and except as otherwise provided in this Plan, the Plan Administrator shall have and shall retain any and all available rights and defenses that the Debtors had with respect to any Claim, including the right to assert any objection to Claims based on the limitations imposed by section 502 of the Bankruptcy Code.  The Plan Administrator may contest the amount and validity of any Disputed Claim or contingent or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.

US-DOCS\155636709.16

B.      *Prosecution of Objections to Claims*

Except as otherwise specifically provided in this Plan, the Plan Administrator shall have the authority: (1) to file, withdraw, or litigate to judgment objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

C.      *Estimation of Claims*

Before or after the Effective Date, the Debtors or the Plan Administrator may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection; and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection; *provided* that if the Bankruptcy Court resolves the Allowed amount of a Claim, the Plan Administrator shall not be permitted to seek an estimation of such Claim). Notwithstanding any provision otherwise in this Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount or a maximum limitation on such Claim for all purposes under this Plan (including for purposes of distributions), as determined by the Bankruptcy Court, and the Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim subject to applicable law.

D.      *No Distributions Pending Allowance*

If a Claim is Disputed, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Claim becomes an Allowed Claim by settlement or Final Order; *provided* that if only a portion of a Claim is Disputed, such Claim shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

E.      *Reserve on Account of Disputed Claims.*

Upon the Effective Date, the Debtors, and from and after the Effective Date, the Plan Administrator, shall establish a cash reserve for distributions on account of Disputed Claims in an amount deemed to be appropriate by the Debtors or the Plan Administrator, as applicable, acting in good faith. Following the Effective Date the Plan Administrator may, from time to time, reduce such cash reserves and distribute all or a portion of such cash to Holders of Allowed Claims entitled to Distributable Proceeds as the Plan Administrator determines in good faith is appropriate.

The Plan Administrator shall not have any liability whatsoever if any of the reserves established pursuant to the Plan are determined to be insufficient to satisfy any Claims herein, including any Disputed Claims after such Claims become Allowed.

F.      *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the Claims Objection Deadline, subject to any extensions thereof approved by the Bankruptcy Court, upon a motion on notice served on all affected claimants.

G.      *Amendments for Proofs of Claims and Interests*

On or after the applicable bar date, a Proof of Claim or Interest may not be Filed or amended without the prior written authorization of, as applicable, the Bankruptcy Court or the applicable Debtor or the Plan Administrator.  Absent such authorization, any new or amended Claim or Interest Filed shall be deemed disallowed in full and expunged without any further action.

Article VIII.

**CONDITIONS PRECEDENT TO
CONFIRMATION AND THE EFFECTIVE DATE**

A.      *Conditions Precedent to Confirmation*

The following are conditions precedent to Confirmation that must be satisfied or waived in accordance with Article VIII.D hereof:

1.   This Plan, including any amendments, modification, or supplements thereto, is in form and substance materially consistent with the Restructuring Support Agreement and acceptable in all respects to the Debtors and the Prepetition Secured Lender;

2.   The Sale Transaction(s) shall have been consummated pursuant to the Sale Transaction Documentation; and

3.   The proposed Confirmation Order shall be in form and substance materially consistent with the Restructuring Support Agreement and acceptable in all respects to the Debtors and the Prepetition Secured Lender.

B.      *Effect of Non-Occurrence of Conditions to Confirmation*

If the conditions precedent to Confirmation are not satisfied, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected under this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (3) nothing contained in this Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

C.      *Conditions Precedent to the Effective Date*

The following are conditions precedent to the Effective Date that must be satisfied or waived in accordance with Article VIII.D hereof:

38

1. the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Debtors and the Prepetition Secured Lender and such order shall not have been reversed, stayed, modified, amended, or vacated;

2. this Plan, the Disclosure Statement, any Sale Transaction Documentation, the Confirmation Order, and all other Definitive Documents, including any amendments, modifications, or supplements thereto, shall be acceptable to the Debtors and the Prepetition Secured Lender;

3. the Plan Administrator acceptable to the Prepetition Secured Lender shall have been appointed and vested with the authority under the Plan;

4. the Plan Administration Agreement shall have been executed and delivered by all of the Entities that are parties thereto and all conditions precedent to the effectiveness thereof shall have been waived or satisfied in accordance with the terms thereof;

5. no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, limiting, preventing, or prohibiting the consummation of any of the transactions contemplated by the Plan, the Sale Transaction(s) or any related transactions;

6. all conditions precedent to the consummation of the Sale Transaction(s) shall have been satisfied in accordance with the terms thereof, any the closing of the Sale Transaction(s) shall have occurred;

7. the Professional Fee Escrow Amount shall have been transferred to the Professional Fee Escrow Account;

8. the Wind-Down Amount shall have been funded in accordance with this Plan; and

9. the Restructuring Support Agreement shall remain in full force and effect, and shall not have been terminated.

D.    *Waiver of Conditions*

The Debtors, with the consent of the Prepetition Secured Lender, may waive any of the conditions to Confirmation or to the Effective Date set forth above at any time, without any notice to parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than a proceeding to confirm the Plan, except that there cannot be a waiver of the condition that the Bankruptcy Court shall have entered the Confirmation Order as set forth in Article VIII.C.1.

E.    *Effect of Non-Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur and upon a notice filed by the Debtors to state the non-occurrence of the Effective Date**,** then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected under this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (3) nothing contained in this Plan, the Confirmation

39

Order, or the Disclosure Statement shall: (a) constitute a waiver or release of any Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

<div align="center">Article IX.</div>

<div align="center">

**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

</div>

*A.*     ***Satisfaction of Claims and Termination of Interests.***

Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest in the Debtors that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date with respect to a Claim that is Unimpaired by the Plan, once such Unimpaired Claim is paid in full.

*B.*     ***Releases by the Debtors***

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed to be conclusively, absolutely, unconditionally, generally, individually, collectively, irrevocably, completely and forever released, acquitted, and discharged by the Debtors, their Estates, their assigns, and their successors in interest (including the Plan Administrator) from any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise that the Debtors, their Estates, their assigns, and their successors in interest (including the Plan Administrator) ever had, now has, or thereafter can, shall, or may have, including any derivative claims asserted or assertable on behalf of a Debtor, its Estate, its assigns, and its successors in interest (including the Plan Administrator), that such entities would have been legally entitled to assert in their own right (whether individually or collectively) or that any Holder of any Claim or Interest could have asserted on behalf of such entities, based on or relating to, or in any manner arising from, in whole or in part, (1) the Debtors, the Debtors' capital structure, the Prepetition Secured Loans or any documents related thereto, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor or Non-Debtor Subsidiary, the Umbrella Supply Agreement and the termination thereof, the HEV Purchase Order and the termination thereof, the Relationship Agreement, the marketing of the Debtors' assets, the Notice of Forbearance, the Chapter 11 Cases, (2) the formulation, preparation, dissemination, negotiation, or filing of the DIP Credit Agreement, the Wind-Down Support Agreement, the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Sale Transaction(s), or any contract, instrument, release, or other agreement or document created or entered into in connection with the Wind-Down Support Agreement, the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Chapter 11 Cases, the DIP Credit Agreement, the Prepetition Secured Loans, the Sale Transaction Documentation, the Sale Transaction(s), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, (3) the administration and implementation of the Plan, including the distribution of property under the Plan or any other related**

<div align="center">40</div>

agreement, (4) the business or contractual arrangements between any Debtor and any Released Party, or (5) any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing, to the fullest extent permissible under applicable law, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, fraud or gross negligence.

Notwithstanding anything to the contrary in the foregoing or any other provision of the Plan, the releases contained in the Plan do not (i) release any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) affect the rights of Holders of Allowed Claims and Interests to receive distributions under the Plan, or (iii) release any Claims or Causes of Action against any non-Released Party.

**C.     *Releases by Holders of Claims and Interests***

As of the Effective Date, except as otherwise provided herein, each Releasing Party, their Estates, their assigns and their successors in interest, is deemed to have conclusively, absolutely, unconditionally, generally, individually, collectively, irrevocably, completely and forever released each Debtor and Released Party from any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise that the Releasing Parties, their Estates, their assigns, and their successors in interest ever had, now has, or thereafter can, shall, or may have, including any derivative claims asserted or assertable on behalf of a Debtor, its Estate, its assigns, and its successors in interest (including the Plan Administrator), that the Releasing Parties, their Estates, their assigns, and their successors in interest would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, (1) the Debtors, the Debtors' capital structure, the Prepetition Secured Loans or any documents related thereto, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor or Non-Debtor Subsidiary, the Umbrella Supply Agreement and the termination thereof, the HEV Purchase Order and the termination thereof, the Relationship Agreement, the marketing of the Debtors' assets, the Notice of Forbearance, the Chapter 11 Cases, (2) the formulation, preparation, dissemination, negotiation, or filing of the DIP Credit Agreement, the Wind-Down Support Agreement, the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Sale Transaction(s), or any contract, instrument, release, or other agreement or document created or entered into in connection with the Wind-Down Support Agreement, the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Chapter 11 Cases, the DIP Credit Agreement, the Prepetition Secured Loans, the Sale Transaction Documentation, the Sale Transaction(s), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, (3) the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, (4) the business or contractual arrangements between any Debtor and any Released Party, or (5) any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing, to

41

the fullest extent permissible under applicable law, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct, fraud or gross negligence.

Notwithstanding anything to the contrary in the foregoing or any other provision of the Plan, the releases contained in the Plan do not (i) release any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (ii) affect the rights of Holders of Allowed Claims and Interests to receive distributions under the Plan, (iii) release any Claims or Causes of Action against any non-Released Party, or (iv) release any claims relating to or arising under the Wind-Down Support Agreement.

### D.    *Exculpation*

Effective as of the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any claims or Causes of Action or for any act taken or omitted to be taken on or after the Petition Date and prior to or on the Effective Date in connection with, or related to, the administration of the Chapter 11 Cases, commencement of the Chapter 11 Cases, pursuit of Confirmation, negotiation, preparation, and consummation of the Plan, making Distributions, the Disclosure Statement, the Sale Process, the Sale Order, or the solicitation of votes for, or Confirmation of, the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the purchase, sale, or rescission of the purchase or sale of any asset or security of the Debtors; or the transactions or documentation in furtherance of any of the foregoing, including any postpetition, pre-Effective Date act taken or omitted to be taken in connection with or in contemplation of any restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or consummation of the Plan; provided, however, that the foregoing provisions of this exculpation shall not operate to waive or release: (i) any Causes of Action arising from willful misconduct, actual fraud, or gross negligence of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (ii) the rights of any Person or Entity to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan or assumed pursuant to the Plan or Final Order of the Bankruptcy Court; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions or inactions.  The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person.  Notwithstanding the foregoing, nothing in this section shall or shall be deemed to prohibit the Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any Person that is based upon an alleged breach of a confidentiality or non-compete obligation owed to the Debtors, in each case unless otherwise expressly provided for in the Plan.  The Exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

E.    *Injunction*

**Except as otherwise provided in the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims, interests, Causes of Action, or liabilities that: (a) are compromised or settled under the Plan (including pursuant to Articles II and III of the Plan); (b) have been released pursuant to the Plan; (c) are subject to exculpation pursuant to the Plan (but only to the extent of the exculpation provided in the Plan), or (d) are otherwise satisfied, stayed or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, on and after the Effective Date, from:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any action or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) on account of any such claims, interests, Causes of Action, or liabilities against the Debtors or their successors (including the Plan Administrator) or any Entity released or exculpated (or the property or estate of any such Entity); (ii) enforcing, levying, attaching (including any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order on account of any such claims, interests, Causes of Action, or liabilities against the Debtors or any Entity released or exculpated, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Entities (including the Plan Administrator), or any property of any such transferee or successor (including the Plan Administrator); (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind on account of any such claims, interests, Causes of Action, or liabilities against the Debtors or any Entity released or exculpated, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Entities (including the Plan Administrator), or any property of any such transferee or successor (including the Plan Administrator); or (iv) asserting any right of setoff, subrogation, or recoupment of any kind on account of any such claims, interests, Causes of Action, or liabilities against any obligation due from such Entities (including the Debtors or their successors (including the Plan Administrator)) or against the property of such Entities including the Debtors or their successors (including the Plan Administrator)) unless such Entity has filed a motion requesting the right to perform such setoff on or before the Effective Date or has filed a Proof of Claim or proof of Interest indicating that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise.**

F.    *Satisfaction of Claims.*

Subject to the occurrence of the Effective Date, as of the Effective Date, except as provided in the Plan, the treatment and rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall be in exchange for and in complete satisfaction of all Claims against the Debtors, and in satisfaction of all Interests and the termination of Interests in the Debtors. Accordingly, except as otherwise provided in the Plan or the Confirmation Order, Confirmation of the Plan shall, as of the Effective Date, satisfy, terminate and cancel all Claims against and Interests in the Debtors and other rights of equity security holders in the Debtors.  Subject to the occurrence of the Effective Date, as of the Effective Date, except as provided in the Plan, all Persons shall be precluded from asserting against the Debtors, the Plan Administrator, or their respective successors or property, any other or further Claims, debts, rights, Causes of Action,

43

liabilities or Interests based upon any act, omission, transaction or other activity of any kind or nature.  No Person holding a Claim may receive on account of such Claim any payment from, or seek recourse or recovery against, any Cash or other assets that are to be distributed under the Plan, other than Cash or assets required to be distributed to that Person under the Plan.

G.    *Setoffs and Recoupment*

Except as otherwise provided herein, the Plan Administrator, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable bankruptcy or non-bankruptcy law, or as may be agreed to by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to this Plan on account of such Allowed Claim, any claims, rights, and Causes of Action of any nature that the applicable Debtor may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to this Plan, a Final Order or otherwise); *provided* that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to this Plan shall constitute a waiver or release by the Plan Administrator of any such claims, rights, and Causes of Action.  The Plan Administrator shall provide notice to the affected claimant of any setoffs or recoupments, and such claimant may challenge in Bankruptcy Court or any other court with jurisdiction any such setoffs or recoupments.

H.    *Release of Liens*

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released.

To the extent that any Holder of a Secured Claim that has been satisfied in full pursuant to this Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Plan Administrator that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of Uniform Commercial Code termination statements, deposit account control agreement terminations, and any other applicable filings or recordings, and the Plan Administrator shall be entitled to file Uniform Commercial Code terminations or to make any other such filings or recordings on such Holder's behalf.

Article X.
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, except to the extent set forth herein, and in addition to the matters over which the Bankruptcy Court shall have retained jurisdiction pursuant to the Sale Order(s), if any, or any other order of the Bankruptcy Court, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

44

A.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

B.    decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Retained Professionals required by the Bankruptcy Code or this Plan;

C.    resolve any matters related to: (1) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Costs arising therefrom, including Cure Costs pursuant to section 365 of the Bankruptcy Code; (2) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (3) any dispute regarding whether a contract or lease is or was executory, terminated, or expired;

D.    ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

E.    adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

F.    adjudicate, decide, or resolve any and all matters related to Causes of Action;

G.    adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

H.    resolve any cases, controversies, suits, or disputes that may arise in connection with General Unsecured Claims, including the establishment of any bar dates, related notices, claim objections, allowance, disallowance, estimation and distribution;

I.    enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with this Plan or the Disclosure Statement;

J.    enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

K.    resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of this Plan or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to this Plan, or any Entity's rights arising from or obligations incurred in connection with this Plan;

US-DOCS\155636709.16

L.      issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of this Plan;

M.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in this Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

N.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

O.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

P.      determine any other matters that may arise in connection with or related to this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with this Plan or the Disclosure Statement;

Q.      enter one or more orders or final decrees concluding or closing the Chapter 11 Cases;

R.      adjudicate any and all disputes arising from or relating to distributions under this Plan;

S.      consider any modification of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

T.      determine requests for payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

U.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan;

V.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

W.      hear and determine all disputes involving any dispute relating to any liability arising out of any termination of employment, regardless of whether such termination occurred prior to or after the Effective Date;

X.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the releases, injunctions, and exculpations provided under Article IX of this Plan;

Y.      resolve any cases, controversies, suits, disputes, or Causes of Action to recover all assets of the Debtors and property of the Debtors' Estates, wherever located;

46

Z.      enforce all orders previously entered by the Bankruptcy Court; and

AA.     hear any other matter over which the Court has jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this <u>Article X</u> of the Plan, the provisions of <u>Article X</u> of the Plan shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

<div align="center">Article XI.

**MODIFICATION, REVOCATION, OR WITHDRAWAL OF PLAN**</div>

A.      *Modification of Plan*

Subject to the limitations contained in this Plan, the Debtors or the Plan Administrator, as applicable, reserve the right to, in accordance with the Bankruptcy Code and the Bankruptcy Rules, as acceptable to the Prepetition Secured Lender: (1) amend or modify this Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, in accordance with section 1127(a) of the Bankruptcy Code; (2) amend or modify this Plan after the entry of the Confirmation Order and before substantial consummation of this Plan in accordance with section 1127(b) of the Bankruptcy Code upon order of the Bankruptcy Court; and (3) remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan upon order of the Bankruptcy Court.

B.      *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      *Revocation of Plan; Reservation of Rights if Effective Date Does Not Occur*

Subject to the conditions to the Effective Date, the Debtors reserve the right to revoke or withdraw this Plan prior to the entry of the Confirmation Order and to file subsequent plans.  If the Debtors revoke or withdraw this Plan or if entry of the Confirmation Order does not occur, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of executory contracts or leases effected by this Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in this Plan shall:  (a) constitute a waiver or release of any claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

Article XII.

**MISCELLANEOUS PROVISIONS**

*A.    Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.  The Debtors or Plan Administrator, as applicable, and all Holders of Claims receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.

*B.    Reservation of Rights*

This Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  None of the filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by any Debtor with respect to this Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests unless and until the Effective Date has occurred.

*C.    Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries or guardian, if any, of each Entity.

*D.    Service of Documents*

Any notice, direction or other communication given regarding the matters contemplated by this Plan must be in writing, sent by personal delivery, electronic mail or courier, and addressed as follows:

48

| Debtors | Counsel to the Debtors |
|---|---|
| First Mode Holdings, Inc.<br>Synchronous LLC<br>300 Lenora Street, PMB #1445<br>Seattle, WA 98121<br>Attn: Julian Soles<br>Email: julian.soles@firstmode.com | **LATHAM & WATKINS LLP**<br>Caroline Reckler (admitted *pro hac vice*)<br>330 North Wabash Avenue, Suite 2800<br>Chicago, IL 60611<br>Telephone: (312) 876-7700<br>Facsimile: (312) 993-9767<br>Email: caroline.reckler@lw.com<br><br> - and -<br><br>Annemarie V. Reilly (admitted *pro hac vice*)<br>Brian S. Rosen (admitted *pro hac vice*)<br>1271 Avenue of the Americas<br>New York, NY 10020<br>Telephone: (212) 906-1200<br>Facsimile: (212) 751-4864<br>Email: annemarie.reilly@lw.com<br>        brian.rosen@lw.com<br><br> - and -<br><br>Jeffrey T. Mispagel (admitted *pro hac vice*)<br>355 South Grand Avenue, Suite 100<br>Los Angeles, CA 90071<br>Telephone: (213) 485-1234<br>Facsimile: (213) 891-8763<br>Email: jeffrey.mispagel@lw.com<br><br>-and-<br><br>**YOUNG CONAWAY STARGATT & TAYLOR LLP**<br>Michael R. Nestor (No. 3526)<br>Kara Hammond Coyle (No. 4410)<br>Joseph M. Mulvihill (No. 6061)<br>Rodney Square<br>1000 North King Street<br>Wilmington, DE 19801<br>Telephone: (302) 571-6600<br>Facsimile: (302) 571-1253<br>Email: mnestor@ycst.com<br>        kcoyle@ycst.com<br>        jmulvihill@ycst.com |

49

| Counsel to the Prepetition Secured Lender and DIP Lender | |
|---|---|
| **DAVIS POLK & WARDWELL LLP**<br>450 Lexington Ave<br>New York, New York 10017<br>Attn:   Darren Klein<br>         Aryeh Ethan Falk<br>Email: darren.klein@davispolk.com<br>         aryeh.falk@davispolk.com<br><br>-and-<br><br>**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**<br>1201 North Market Street, 16th Floor<br>Wilmington, Delaware 19899-1347<br>Attn:   Robert J. Dehney<br>Email: rdehney@morrisnichols.com | |

After the Effective Date, the Plan Administrator has authority to send a notice to Entities indicating that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Plan Administrator is authorized to limit the list of Entities receiving documents pursuant to a pre-Effective Date request under Bankruptcy Rule 2002 to those Entities who have filed renewed requests pursuant to Bankruptcy Rule 2002.

In accordance with Bankruptcy Rules 2002 and 3020(c), within ten (10) Business Days of the date of entry of the Confirmation Order, the Debtors shall serve the Notice of Confirmation by United States mail, first class postage prepaid, by hand, or by overnight courier service to all parties served with the Confirmation Hearing Notice; *provided* that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Confirmation Hearing Notice, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address, provided that the Debtors are unable to ascertain new address information for such Entity after a commercially reasonable search.  Mailing of the Notice of Confirmation in the time and manner set forth in this paragraph shall be good and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c), and no further notice is necessary.

E.      *Term of Injunctions or Stays*

Unless otherwise provided in this Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

US-DOCS\155636709.16

F.      *Entire Agreement*

On the Effective Date, the Confirmation Order, this Plan, and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects.

G.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of this Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to Debtors not incorporated in Delaware shall be governed by the laws of the state of incorporation of the applicable Debtor.

H.      *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of this Plan as if set forth in full in this Plan.  Except as otherwise provided in this Plan, such exhibits and documents included in the Plan Supplement shall initially be filed with the Bankruptcy Court on or before the Plan Supplement Filing Date to the extent practicable.  After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' case website at https://omniagentsolutions.com/FirstMode or the Bankruptcy Court's website at www.deb.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of this Plan shall control.

I.      *Nonseverability of Plan Provisions upon Confirmation*

If, prior to Confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to this Plan and may not be deleted or modified without the consent of the Debtors; and (3) non-severable and mutually dependent.

J.       *Conflicts*

To the extent that any provision of the Disclosure Statement (or any exhibits, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of this Plan, this Plan shall govern and control.  To the extent that any provision of the Plan Supplement (or any exhibits, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of this Plan, the Plan Supplement shall govern and control.  To the extent that any provision of this Plan, the Plan Supplement, or the Disclosure Statement conflicts with or is in any way inconsistent with any provision of the Confirmation Order, the Confirmation Order shall govern and control.

K.       *Dissolution of the Committee*

The Committee shall dissolve, and the current and former members of the Committee shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases on the Effective Date; provided that the Committee and its professionals shall have the right to file, prosecute, review, and object to any applications for compensation and reimbursement of expenses filed in accordance with Article II.A.2 hereof.

52

Respectfully submitted,

Dated: February 4, 2025                    **FIRST MODE HOLDINGS INC**


By: */s/    Colin Mark Freed*
Name:  Colin Mark Freed
Title:    Chief Financial Officer


**SYNCHRONOUS LLC**


By*: /s/    Colin Mark Freed*
Name:  Colin Mark Freed
Title:    Authorized Signatory

53

**<u>Exhibit B</u>**

**Organizational Chart**

# Organizational Structure Chart
*As of Petition Date*



**Exhibit C**

**Liquidation Analysis**

**LIQUIDATION ANALYSIS**
**FIRST MODE[1]**

**I.  Introduction**

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, a Bankruptcy Court may not confirm a plan of reorganization or plan of liquidation unless the plan provides each holder of an allowed claim or interest that does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  To demonstrate that the Plan filed by the Debtors satisfies the best interests of creditors test, the Debtors, with the assistance of their advisors, have prepared a hypothetical liquidation analysis (the "**Liquidation Analysis**"), which is based upon certain assumptions discussed in the accompanying notes to this Liquidation Analysis.

**II.  Approach and Statement of Limitations**

The preparation of a liquidation analysis involves the use of estimates and assumptions that (although considered reasonable by the Debtors based upon their business judgment and input from their advisors) are inherently subject to significant business, economic, and competitive risks, uncertainties, and contingencies.  These risks, uncertainties, and contingencies are difficult to predict and many are beyond the control of the Debtors, their management, and their advisors.  Inevitably, some assumptions in this Liquidation Analysis may not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results of an actual chapter 7 liquidation.

This Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code.

**THIS LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE.  THE UNDERLYING FINANCIAL INFORMATION IN THIS LIQUIDATION ANALYSIS AND VALUES STATED HEREIN HAVE NOT BEEN SUBJECT TO ANY REVIEW, COMPILATION, OR AUDIT BY ANY INDEPENDENT ACCOUNTING FIRM.**

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of the Debtors' financial statements and business judgement from management. In addition, the Liquidation Analysis includes estimates for claims not currently asserted in the chapter 11 cases, but which could be asserted and allowed in a chapter 7 liquidation, including unpaid chapter 11 administrative claims and chapter 7 administrative claims such as wind-down costs, chapter 7 trustee fees, and the chapter 7 trustee's professionals' fees. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied upon for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims under the Plan.

---

[1] Terms used but not otherwise defined herein shall have the meaning ascribed to them in the Disclosure Statement for the Joint Chapter 11 Plan of First Mode Holdings, Inc. and its Debtor Affiliate (as altered, amended, modified, or supplemented from time to time, the "**Disclosure Statement**"), to which this exhibit is attached, or the Joint Chapter 11 Plan of First Mode Holdings, Inc. and its Debtor Affiliate (as altered, amended, modified, or supplemented from time to time, the "**Plan**"), as applicable.

1

**NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION OR ALLOWANCE BY THE DEBTORS (OR ANY OTHER PARTY) OF ANY CLAIMS BY OR AGAINST THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN ANY BANKRUPTCY CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY OR AMEND THE ANALYSIS SET FORTH HEREIN.**

## III.  Global Assumptions

The Liquidation Analysis should be read in conjunction with the following global assumptions:

### a.  Basis of Presentation

The Liquidation Analysis has been prepared assuming that the Debtors' chapter 11 cases are converted to chapter 7 cases on March 19, 2024 (the "**Conversion Date**"), after the sale of substantially all assets to the Stalking Horse Bidder. The unaudited financial statements used to produce this analysis have been derived from the books and records of the Debtors as of November 30, 2024; however, this information has not been subject to certain procedures that would typically be applied to financial information in accordance with Generally Accepted Accounting Principles ("**GAAP**"), and upon application of such procedures the financial information could be subject to material change. The Liquidation Analysis does not purport to represent financial statements prepared in accordance with GAAP, nor is it intended to fully reconcile to any financial statements prepared by the Debtors. Therefore, combining the assets and liabilities set forth in the Liquidation Analysis could result in amounts that could be substantially different from any financial information regarding the Debtors prepared on a consolidated basis under GAAP.

Additionally, in several instances, adjustments were made to net book values to arrive at estimated book values at March 19, 2024 ("**Projected Book Values**").  The adjustments to arrive at Projected Book Values incorporate any material change in book value based on the Debtors' financial projections through the Conversion Date, and, for some assets, may include adjustments to more appropriately reflect market value where applicable and certain other adjustments related to liquidation value not presently reflected in book value, and to adjust for any assets assumed to be purchased by the Stalking Horse Bidder.

### b.  Chapter 7 Process

On the Conversion Date, it is assumed that the Bankruptcy Court would appoint a chapter 7 trustee (the "Trustee") to oversee the liquidation of the Debtors' estates during which time all major assets of the Debtors' would be sold and the cash proceeds, net of liquidation-related costs, would be distributed to creditors and equity holders in accordance with applicable law. It is assumed that certain assets of the Debtors which existed as of December 15, 2024 (the "**Petition Date**") will no longer exist, as the Conversion Date is assumed to occur after the sale of substantially all of the Debtors' assets. There can be no assurance that the liquidation would be completed in a limited time frame, nor is there any assurance that the recoveries assigned to the assets would in fact be realized. Under section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally at distressed prices) as is compatible with the best interests of parties-in-interest. The Debtors have assumed a wind down of the estates, and final distributions to creditors, if any, would occur over approximately 3 months.

### c.  Distribution of Net Proceeds

The Liquidation Analysis assumes that proceeds would be distributed in accordance with section 726 of the Bankruptcy Code. If the Debtors were liquidated pursuant to chapter 7 proceedings, the amount of liquidation value available to creditors and equity holders would be reduced, first, by the costs of the liquidation, fees and expenses of the chapter 7 Trustee and fees and expenses of other professionals retained to assist with the liquidation; second, by the postpetition DIP loan; third, by Secured Claims; and fourth, any remaining value would be used to satisfy any Administrative and Priority Expense Claims and then Unsecured Claims, in each case in accordance with the distribution waterfall set forth in section 726 of the Bankruptcy Code.

### d.  Avoidance Actions

No recovery or related litigation costs attributable to any potential avoidance actions under the Bankruptcy Code, including potential preference or fraudulent transfer actions, are assumed within this analysis.

## IV.  Conclusion

As illustrated by this Liquidation Analysis, Holders of Claims in Impaired Classes and Holders of Claims or Interests in certain Unimpaired Classes that would otherwise receive a full recovery under the Plan would receive a lower recovery in a hypothetical liquidation.  Further, unless consenting to a specified treatment under the Plan,[2] no Holder of a Claim or Interest would receive or retain property under the Plan of a value that is less than such Holder would receive in a chapter 7 liquidation.  Accordingly, the Debtors believe that the Plan satisfies the "best interests of creditors" test.

## V.  Liquidation Analysis

*See following pages.*

---

[2] As outlined in the Plan, the Pre-petition Secured Lender shall not receive on account of its Pre-petition Secured Loan Claims any Net Distributable Proceeds unless all Allowed General Unsecured Claims of Participating GUC Holders are expected to be paid in full in good faith judgement of the Plan Administrator.

| Net Proceeds Available for Distribution | | | | | | |
|---|---|---|---|---|---|---|

| ($ in thousands) | | Projected Book Value | Est. Recovery (%) | | Est. Recovery ($) | |
|---|---|---|---|---|---|---|
| | Note | 3/19/25 | Low | High | Low | High |
| **Gross Liquidation Proceeds** | | | | | | |
| Cash and Cash Equivalents | [1] | $3,035 | 100% | 100% | $3,035 | $3,035 |
| Accounts Receivables | [2] | 1,448 | 0% | 0% | – | – |
| Inventory | [3] | – | – | – | – | – |
| Fixed Assets | [4] | – | – | – | – | – |
| Investment in Subsidiaries | [5] | – | – | – | – | – |
| Intercompany Receivables | [6] | – | – | – | – | – |
| Other Assets | [7] | 821 | 0% | 5% | – | 41 |
| **Total Liquidation Proceeds** | | | | | $3,035 | $3,076 |
| **Less: Costs Associated with Liquidation** | | | | | | |
| Carve Out Fees | [8] | | | | (1,051) | (851) |
| Chapter 7 Trustee Fees | [9] | | | | (114) | (116) |
| Chapter 7 Professional Fees | [10] | | | | (1,500) | (1,000) |
| Wind Down Costs | [11] | | | | (1,000) | (500) |
| **Total Costs Associated with Liquidation** | | | | | ($3,665) | ($2,467) |
| **Net Proceeds Available for Distribution to Creditors** | | | | | – | $610 |

| Distribution to Creditors | | | | | | |
|---|---|---|---|---|---|---|

| | | | Est. Recovery (%) | | Est. Recovery ($) | |
|---|---|---|---|---|---|---|
| | | Claim | Low | High | Low | High |
| **Superpriority Senior Secured Claims** | | | | | | |
| DIP Loan | [12] | (9,726) | – | 6% | – | (610) |
| **Total Superpriority Senior Secured Claims** | | ($9,726) | – | 6% | – | ($610) |
| **Net Proceeds Available for Secured Claims** | | | | | – | – |
| **Secured Claims** | [13] | | | | | |
| Prepetition Secured Loan Claims | | (76,002) | – | – | – | – |
| Other Secured Claims | | (802) | – | – | – | – |
| **Total Secured Claims** | | ($76,804) | – | – | – | – |
| **Net Proceeds Available for Administrative & Priority Claims** | | | | | – | – |
| **Administrative & Priority Claims** | | | | | | |
| Priority Tax Claims | [14] | (971) | – | – | – | – |
| Administrative Claims | [15] | (543) | – | – | – | – |
| **Total Administrative & Priority Claims** | | ($1,514) | – | – | – | – |
| **Net Proceeds Available for Unsecured Claims** | | | | | – | – |
| **Unsecured Claims** | | | | | | |
| General Unsecured Claims | [16] | (25,946) | – | – | – | – |
| Intercompany Claims | [17] | – | – | – | – | – |
| **Total Unsecured Claims** | | ($25,946) | – | – | – | – |
| **Net Proceeds Available for Equity** | | | | | – | – |
| Intercompany Interests | | NA | – | – | – | – |
| Equity Interests | | NA | – | – | – | – |

4

## VI.  Notes to the Liquidation Analysis

**Gross Liquidation Proceeds:**

1. Cash and Cash Equivalents

   - Consists of forecasted unrestricted cash in the Debtors' bank accounts as of the Conversion Date on March 19, 2024. For the avoidance of doubt, this excludes any amounts funded to the professional escrow account.
   - The estimated recovery from this asset category is 100% in both the low and high recovery cases.

2. Accounts Receivables

   - Includes trade vendor receivables assumed to be uncollectible due, in part, to estimated pre-petition outstanding trade payable balances to the same counterparties.
   - The estimated recoveries from this asset category are 0% in both the low and high recovery cases.

3. Inventory

   - Considering the Conversion Date occurs after the sale of all or substantially all of the Debtors' assets, inventory primarily consisting of batteries is assumed to not be an asset of the Debtors' estate on the Conversion Date.
   - The estimated recoveries from this asset category are 0% in both the low and high recovery cases.

4. Fixed Assets

   - Considering the Conversion Date occurs after the sale of all or substantially all of the Debtors' assets, certain fixed assets are assumed to not be an asset of the Debtors' estate on the Conversion Date.
   - The estimated recoveries from this asset category are 0% in both the low and high recovery cases.

5. Investment in Subsidiaries

   - Pursuant to the wind down support agreement and certain transactions that occurred pre-petition, the Debtors have investments in non-US subsidiaries that will be wound down through solvent proceedings according to local law and regulations and there is not expected to be any residual value once these entities are wound down.

6. Intercompany Receivables

   - As stated in Note 5, the Non-Debtor subsidiaries will be wound down through solvent proceedings and, pursuant to the wind down support agreement and the resolution of intercompany claims contemplated thereunder, no recovery is expected on account of intercompany receivables.
   - The estimated recoveries from this asset category are 0% in both the low and high recovery cases.

7.  Other Assets

- Constituted of prepaid expenses with respect to insurance not assumed by the stalking horse bidder.
- The estimated recoveries from this asset category are 0% and 5% in the low and high recovery cases, respectively.

**Costs Associated with Liquidation:**

Given the limited Debtor assets to exit on the Conversion Date, the Liquidation Analysis assumes a chapter 7 proceeding takes approximately 3 months from the Conversion Date. In any actual liquidation, the process and length of wind-down could be significantly longer or more expensive than the amounts assumed herein and thereby could significantly reduce the actual recoveries compared to this analysis.

8.  Carve Out Fees

- Carve Out Fees include accrued but unpaid United States Trustee fees incurred through the Conversion Date, in both the low- and high-range recovery scenarios, plus allowed fees up to the Debtor Post-Carve-Out Cap and Committee Post-Carve-Out Cap. The assumption is that the Chapter 7 Trustee would require the services of the Debtor Professionals in the period immediately following conversion to assist with the wind down and liquidation of the estates.

9.  Chapter 7 Trustee Fees

- Trustee fees include all fees that would be paid to the chapter 7 trustee by each Debtor, consistent with the Bankruptcy Code requirements. Pursuant to 11 U.S. Code § 326, fees estimated to be payable to the chapter 7 trustee are calculated as 25% on the first $5,000 or less, of gross proceeds, 10% on amounts in excess of $5,000 but not in excess of $50,000, 5% on amounts in excess of $50,000 but not in excess of $1,000,000, and 3% of amounts in excess of $1,000,000.

10.  Chapter 7 Professional Fees

- Chapter 7 professional fees include fees payable to legal and financial advisors required to facilitate the liquidation and wind-down process.

11.  Wind Down Costs

- Wind down costs include other potential operating costs associated with the liquidation, wind down process, and dissolution of the Debtor entities.

**Claims:**

12.  Superpriority Senior Secured Claims

- On the Conversion Date, after the paydown from estimated sale proceeds, the Debtors are forecasted to have $9.7 million of outstanding post-petition debtor-in-possession borrowings from the DIP Lender, including any estimated unpaid payment-in-kind interest or fees.
- Based upon the assumed liquidation value of the Debtors' assets, the DIP Lender is assumed to recover 0% and 6% in the low and high recovery cases, respectively.

13.  Secured Claims

- The Debtors have $76.0 million of pre-petition debt from parent company Anglo American and $802 thousand of other secured claims.
- Based upon the assumed liquidation value of the Debtors' assets, the pre-petition secured claims and other secured claims are assumed to recover 0% in the low and high recovery cases.

6

14. Administrative & Priority Tax Claims

- At the Conversion Date, the Debtors are estimated to have accrued and unpaid taxes of approximately $971 thousand and $543 thousand of administrative claims associated with accrued post-petition operating expenses.
- Based on the assumed liquidation value of the Debtors' assets, Administrative & Priority Tax Claims are assumed to recover 0% in the low and high recovery cases.

15. General Unsecured Claims

- The Debtors' General Unsecured Claims pool is estimated to be approximately $25.9 million.
- Based on the assumed liquidation value of the Debtors' assets, General Unsecured Claims are assumed to recover 0% in the low and high recovery cases.

16. Intercompany Claims

- Pursuant to the wind down support agreement and the resolution of intercompany payables contemplated thereunder, it is assumed that Non-Debtor affiliates do not assert any intercompany claims.