**<u>Exhibit 1</u>**

**<u>Stalking Horse APA</u>**

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**dated as of**

**December 15, 2024**

**by and among**

**CUMMINS INC.,**

**FIRST MODE HOLDINGS, INC.,**

**SYNCHRONOUS LLC,**

**FIRST MODE IPP LTD.,**

**FIRST MODE PTY LTD.,**

**FIRST MODE SA PTY,**

**and**

**FIRST MODE SA HOLDINGS**

_____

# TABLE OF CONTENTS

Page

ARTICLE I. CERTAIN DEFINITIONS ........................................................................2

    1.1    Definitions..............................................................................................2
    1.2    Construction..........................................................................................15

ARTICLE II. PURCHASE AND SALE; CLOSING .......................................................16

    2.1    Purchase of Assets. ...............................................................................16
    2.2    Excluded Assets. ...................................................................................17
    2.3    Assumed Liabilities. .............................................................................18
    2.4    Excluded Liabilities. .............................................................................19
    2.5    Nontransferable Assets and Liabilities. ...............................................20
    2.6    Closing. .................................................................................................21
    2.7    Closing Deliverables ............................................................................21

ARTICLE III. PURCHASE PRICE; ALLOCATION; WITHHOLDING ....................22

    3.1    Purchase Price ......................................................................................22
    3.2    Allocation of Purchase Price.................................................................23
    3.3    Withholding. .........................................................................................24
    3.4    Deposit. .................................................................................................24

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF SELLERS ...............25

    4.1    Corporate Organization of the Company.................................................25
    4.2    Other Sellers..........................................................................................25
    4.3    Due Authorization.................................................................................25
    4.4    No Conflict. ...........................................................................................26
    4.5    Governmental Consents. .......................................................................26
    4.6    Financial Statements; Inventory. ..........................................................26
    4.7    Undisclosed Liabilities..........................................................................27
    4.8    Litigation and Proceedings. ..................................................................27
    4.9    Legal Compliance. ................................................................................28
    4.10    Contracts; No Defaults...........................................................................28
    4.11    Company Benefit Plans..........................................................................30
    4.12    Labor Relations. ....................................................................................32
    4.13    Taxes. ....................................................................................................33
    4.14    Licenses, Permits and Authorizations...................................................35
    4.15    Sufficiency of Assets; Machinery, Equipment and Other Tangible
            Personal Property; ................................................................................35
    4.16    Real Property. ........................................................................................36
    4.17    Intellectual Property..............................................................................37
    4.18    Absence of Changes..............................................................................38
    4.19    Affiliate Matters....................................................................................39

| | | |
|---|---|---|
| 4.20 | Brokers' Fees | 39 |
| 4.21 | No Additional Representations or Warranties. | 39 |

**ARTICLE V. REPRESENTATIONS AND WARRANTIES OF BUYER** ...............39

| | | |
|---|---|---|
| 5.1 | Corporate Organization. | 39 |
| 5.2 | Due Authorization. | 39 |
| 5.3 | No Conflict. | 40 |
| 5.4 | Litigation and Proceedings. | 40 |
| 5.5 | Governmental Consents. | 40 |
| 5.6 | Financial Ability. | 41 |
| 5.7 | Brokers' Fees. | 41 |
| 5.8 | No Outside Reliance. | 41 |
| 5.9 | No Additional Representations or Warranties. | 41 |

**ARTICLE VI. BANKRUPTCY COURT MATTERS** ...............42

| | | |
|---|---|---|
| 6.1 | Competing Transaction | 42 |
| 6.2 | Bankruptcy Court Filings. | 42 |
| 6.3 | Assumption of Assigned Contracts. | 43 |
| 6.4 | No Successor Liability | 46 |

**ARTICLE VII. CERTAIN PRE-CLOSING ACTIONS** ...............46

| | | |
|---|---|---|
| 7.1 | Conduct of the Business. | 46 |
| 7.2 | Investigation by Buyer | 49 |
| 7.3 | Employment Matters. | 49 |
| 7.4 | Section 280G | 52 |

**ARTICLE VIII. COVENANTS** ...............53

| | | |
|---|---|---|
| 8.1 | Retention of Books and Records. | 53 |
| 8.2 | Tax Matters. | 53 |
| 8.3 | Wrong Pocket Assets; Intercompany Accounts; Further Assurances. | 54 |

**ARTICLE IX. CONDITIONS PRECEDENT** ...............55

| | | |
|---|---|---|
| 9.1 | Conditions to Each Party's Obligation | 55 |
| 9.2 | Conditions Precedent of Buyer | 55 |
| 9.3 | Conditions Precedent of Sellers | 56 |
| 9.4 | Frustration of Conditions | 57 |

**ARTICLE X. TERMINATION** ...............57

| | | |
|---|---|---|
| 10.1 | Events of Termination. | 57 |
| 10.2 | Effect of Termination. | 59 |

ARTICLE XI. MISCELLANEOUS ...............................................................................................60

    11.1    Survival of Representations, Warranties and Covenants ...........................60
    11.2    Waiver..........................................................................................................61
    11.3    Notices. ........................................................................................................61
    11.4    Assignment. .................................................................................................62
    11.5    Rights of Third Parties. ...............................................................................62
    11.6    Expenses. .....................................................................................................62
    11.7    Governing Law. ...........................................................................................62
    11.8    Captions; Counterparts.................................................................................62
    11.9    Schedules and Annexes................................................................................63
    11.10    Entire Agreement. ........................................................................................63
    11.11    Amendments. ...............................................................................................63
    11.12    Severability. ................................................................................................63
    11.13    Jurisdiction; Waiver of Jury Trial. ..............................................................63
    11.14    Enforcement. ...............................................................................................64
    11.15    Non-Recourse. .............................................................................................64
    11.16    Waivers and Releases. .................................................................................65
    11.17    Waiver of Conflicts Regarding Representations; Non-Assertion of
              Attorney-Client Privilege............................................................................66
    11.18    Public Announcements ................................................................................67
    11.19    Fiduciary Obligations..................................................................................68

**Exhibits**

Exhibit A –Escrow Agreement

Exhibit B – Sale Order

Exhibit C – Form of Bill of Sale and Assignment

Exhibit D – Form of Intellectual Property Assignment

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of December 15, 2024, is entered into by and among (i) Cummins Inc., an Indiana corporation ("Buyer") and (ii) First Mode Holdings, Inc., a Delaware corporation (the "Company"), Synchronous LLC, a Washington limited liability company, First Mode IPP Ltd., a private limited company organized under the laws of England and Wales, First Mode Pty Ltd., a proprietary company organized under the laws of Australia, First Mode SA Pty, private company organized under the laws of South Africa and First Mode SA Holdings, a private company organized under the laws of South Africa (each of the foregoing described in this clause (ii), a "Seller" and collectively, the "Sellers").

## RECITALS

WHEREAS, the Company owns, directly or indirectly, all of the outstanding equity interests of the other Sellers;

WHEREAS, Sellers are engaged in the Business and collectively own all of the Purchased Assets;

WHEREAS, Buyer and Sellers desire to effect the sale of the Business through Buyer's acquisition of the Purchased Assets and assumption of the Assumed Liabilities, all on the terms and subject to the conditions set forth herein;

WHEREAS, First Mode Holdings, Inc. and Synchronous LLC (each a "Debtor") will commence voluntary cases under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Cases") by filing petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court", and the date of the filing of such petitions, the "Petition Date");

WHEREAS, Sellers will seek entry by the Bankruptcy Court of the Bid Procedures Order approving the Bid Procedures;

WHEREAS, Buyer and Sellers intend, among other things, that following the execution of this Agreement, Buyer will act as a "stalking horse bidder" pursuant to the Bid Procedures for the Purchased Assets;

WHEREAS, in the absence of Sellers' acceptance of a higher or better bid made in accordance with the Bid Procedures Order or any other order of the Bankruptcy Court, Buyer will purchase, and Sellers will sell, Sellers' right, title and interest in and to the Purchased Assets and Buyer will assume the Assumed Liabilities, in each case on the terms and subject to the conditions set forth in this Agreement, pursuant to, among other provisions thereof, Section 363 of the Bankruptcy Code and in accordance with the Bid Procedures and subject to entry of the Sale Order by the Bankruptcy Court; and

WHEREAS, concurrently with the execution and delivery of this Agreement, Buyer, the Company, and Escrow Agent shall have entered into the Escrow Agreement.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement, and for other

good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound by this Agreement, Buyer and Sellers agree as follows:

## ARTICLE I.
## CERTAIN DEFINITIONS

1.1   <u>Definitions</u>.

As used herein, the following terms shall have the following meanings:

"<u>Accrued Compensation Obligations</u>" means, with respect to each Transferred Employee, such employee's (i) accrued but unpaid base salary or wages and (ii) accrued but unpaid vacation, holiday, sick time and other paid time off that is required to be paid out under applicable Law or Company policy, in each case, as of the Closing.

"<u>Action</u>" means any claim, action, charge, complaint, grievance, suit, audit, assessment, arbitration, inquiry, demand, litigation, citation, summons, subpoena, proceeding or investigation, in each case, by or before any Governmental Authority, of any nature, whether civil, criminal, administrative, regulatory or otherwise and whether at law or in equity.

"<u>Affiliate</u>" means, with respect to any specified Person, any Person that, directly or indirectly, controls, is controlled by, or is under common control with, such specified Person, through one or more intermediaries or otherwise.

"<u>Agreement</u>" has the meaning specified in the Preamble.

"<u>Alternate Transaction</u>" has the meaning specified in <u>Section 10.1(b)</u>.

"<u>Anglo</u>" means collectively, Anglo American International Holdings Limited and/or one or more of its Affiliates.

"<u>Anglo Facility</u>" means that certain Facility Agreement, dated as of December 21, 2023, by and among the Company, the Subsidiaries of the Company and Anglo American International Holdings Limited, as amended, supplemented or otherwise modified before the date hereof.

"<u>Approved Expenditure Amount</u>" has the meaning specified in <u>Section 7.1(c)</u>.

"<u>Assigned Contracts</u>" has the meaning specified in <u>Section 6.3(c)</u>.

"<u>Assigned Contracts Schedule</u>" has the meaning specified in <u>Section 6.3(c)</u>.

"<u>Assumed Liabilities</u>" has the meaning specified in <u>Section 2.3</u>.

"<u>Assumption Notice</u>" has the meaning specified in <u>Section 6.3(b)</u>.

"<u>Auction</u>" has the meaning specified in the Bid Procedures Order.

"<u>Available Contract</u>" has the meaning specified in <u>Section 6.3(a)</u>.

"Back-Up Bidder" has the meaning specified in the Bid Procedures Order.

"Back-Up Termination Date" means the first to occur of (a) 30 days after entry of the Sale Order or an order of the Bankruptcy Court approving consummation of an Alternate Transaction, (b) consummation of an Alternate Transaction with the successful bidder, or (c) Buyer's receipt of notice from the Sellers of the release of Buyer's obligations as Back-Up Bidder under any order of the Bankruptcy Court approving bidding procedures in connection with the Transactions or an Alternate Transaction.

"Bankruptcy Cases" has the meaning specified in the Recitals.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. § 101 et seq.

"Bankruptcy Court" has the meaning specified in the Recitals.

"Bid Procedures" means those certain bidding procedures to be filed and approved by the Bankruptcy Court attached as Exhibit 1 to the Bid Procedures Order.

"Bid Procedures Order" means a Governmental Order by the Bankruptcy Court approving (A) the Bid Procedures and (B) the Bid Protections (including as an administrative expense in the Bankruptcy Cases pursuant to sections 503 and 507 of the Bankruptcy Code), in form and substance reasonably acceptable to Buyer.

"Bid Protections" has the meaning set forth in Section 10.2(c).

"Bill of Sale and Assignment" has the meaning specified in Section 2.7(a)(i).

"Break-Up Fee" has the meaning specified in Section 10.2(b).

"Business" means the design, manufacture or distribution of hydrogen refueling equipment and zero emission, hybrid electric and battery electric drive trains for trucks in the manner conducted by the Company and its Subsidiaries as of the date hereof.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks in New York or London are closed.

"Business Employee" means any employee of the Company or one of its Subsidiaries who primarily renders services to the Business but excluding any such employee primarily located in the United Kingdom.

"Business Records" has the meaning specified in the Section 2.1(a)(vi).

"Buyer" has the meaning specified in the Preamble.

"Buyer 401(k) Plan" has the meaning specified in Section 7.3(d).

"Buyer Fundamental Representations" means Section 5.1 (Corporate Organization), Section 5.2 (Due Authorization) and Section 5.7 (Brokers' Fees).

3

"Buyer Releasee" has the meaning specified in Section 11.16(b).

"Buyer Releasor" has the meaning specified in Section 11.16(b).

"Cap" has the meaning specified in Section 7.1(c).

"Cash" means, as of any date and time, the marketable securities, cash and cash equivalents of the Company and its Subsidiaries.

"Chile Employee Obligations Amount" means seventy seven thousand dollars ($77,000).

"Closing" has the meaning specified in Section 2.6.

"Closing Date" has the meaning specified in Section 2.6.

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code, or similar state or local Law.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning specified in the Preamble.

"Company Benefit Plan" has the meaning specified in Section 4.11(a).

"Company Releasee" has the meaning specified in Section 11.16(a).

"Company Releasor" has the meaning specified in Section 11.16(a).

"Company Transaction Expenses" means the sum (without duplication) of (a) all fees, expenses, liabilities and other unpaid costs of the Company and its Subsidiaries in connection with or in anticipation of the negotiation, execution and delivery of this Agreement or the consummation of the transactions contemplated by this Agreement, including the fees and expenses of professionals (including investment bankers, attorneys, accountants and other consultants and advisors), in each case, to the extent incurred prior to the Closing and that remain unpaid as of the Closing, (b) any transaction, stay bonus, retention, sale or change of control payments or benefits or any incentive compensation, commission payments or other similar compensation arising as a result of, or in connection with, (whether alone or as the result of the passage of time) the Transactions, in each case payable by the Company or its Subsidiaries to current or former employees, directors, officers, consultants or other individual service providers, (c) any and all accrued or earned but unpaid annual or special bonuses, commissions or profit-sharing payments attributable to pre-Closing periods (whether or not accrued) and payments owing under any appreciation right, phantom or profit-sharing plan and any deferred compensation, retention, separation or severance obligations arising with respect to (i) any termination of a director or employment of any employee, independent contractor, consultant or officer of the Company or any Subsidiary (other than an Offer Employee to the extent such termination occurs following Buyer's, or one of its Subsidiaries' failure to offer employment to such Offer Employee on terms consistent with Section 7.3(b)) prior to Closing or (ii) any resignation (or for which notice

4

is provided) of an employee, independent contractor, consultant or officer of the Company or any Subsidiary (other than an Offer Employee to the extent such resignation (or notice) occurs following Buyer's, or one of its Subsidiaries' failure to offer employment to such Offer Employee on terms consistent with Section 7.3(b)) prior to Closing, (d) amounts that remain outstanding under the Company's retention plan to the extent that they remain unpaid as of Closing, (e) the employer portion of any employment and payroll Taxes payable by the Company or its Subsidiaries, with respect thereto or in connection with such payment in clauses (b), (c) and (d) above; provided that, "Company Transaction Expenses" shall exclude Transfer Taxes and liabilities for Taxes relating to the ownership of the Purchased Assets and the operation of the Business attributable to any Post-Closing Tax Period (determined in accordance with Section 8.2).

"Competing Bid" has the meaning set forth in Section 6.1.

"Confidentiality Agreement" means that certain Confidentiality Agreement, dated as of September 11, 2024, by and between the Company and Buyer.

"Contracts" means any legally binding contracts, agreements, subcontracts, leases, subleases, licenses, sublicenses, instruments, notes, bonds, mortgages, indentures, deeds of trust, warranties, and sales or purchase orders.

"Cure Costs" means the monetary amounts that are required to be paid under Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and/or assignment of any Assigned Contracts to which a Debtor is a party, as agreed upon by the parties hereto, or determined by the Bankruptcy Court pursuant to the procedures in the Bid Procedures Order.

"Cure Objection" has the meaning specified in Section 6.3(d).

"Debt" means, the aggregate indebtedness of the Company and its Subsidiaries, including, without duplication, as of any date and time (a) all indebtedness for borrowed money, including the amounts outstanding under the Anglo Facility and any inter-company debt between or among the Company or one or more of its Subsidiaries, such obligations evidenced by notes, bonds (including surety bonds), debentures or similar instruments as well as any obligation or liability under any loan, grant or assistance provided by any Governmental Authority, whether or not such grant or assistance is eligible for forgiveness, (b) all capitalized finance lease obligations of the Company and its Subsidiaries determined in accordance with GAAP, (c) all reimbursement obligations of the Company and its Subsidiaries under letters of credit and surety bonds solely to the extent such letters of credit have been drawn or claims have been made under such surety bonds, (d) any off-balance sheet financing, including synthetic leases and project financing, (e) any obligations with respect to forward currency exchanges, interest rate swaps, collars, caps and similar hedging obligations (including any applicable breakage costs), (f) any unfunded or underfunded pension or pension-like liabilities or obligations and any unfunded or underfunded post-retirement and post-employment benefits, liabilities or obligations and any obligations and liabilities in respect of any unfunded or underfunded nonqualified deferred compensation plan, programs, agreements or arrangements (including the employer portion of any payroll Taxes associated therewith), (g) all obligations secured by any Liens (other than Permitted Liens and Assumed Liabilities) existing on property or assets owned by such Person, whether or not

indebtedness secured thereby has been assumed, and (h) all obligations in respect of interest, premiums, penalties, make-whole payments, reimbursements, indemnities and other expenses, fees or charges of the obligations in respect of any of the foregoing on prepayment (regardless if any of such are actually paid), as a result of or in connection with the consummation of the Transactions; provided that, "Debt" shall exclude Transfer Taxes and liabilities for Taxes relating to the ownership of the Purchased Assets and the operation of the Business attributable to any Post-Closing Tax Period (determined in accordance with Section 8.2).

"Debtor" has the meaning specified in the Recitals.

"Deposit" has the meaning specified in Section 3.4(a).

"Designated Person" has the meaning specified in Section 11.17(a).

"DGCL" means the Delaware General Corporation Law.

"Environmental Laws" means any and all Laws relating to pollution or the protection of the environment or natural resources, health and safety or relating to the use, generation, management, manufacture, processing, treatment, storage, transportation, remediation, cleanup, handling, disposal or Release or threatened Release of, or exposure to, Hazardous Materials.

"Environmental Liabilities" means all Liabilities, obligations, responsibilities, remedial actions, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants and costs of investigation and feasibility studies), fines, penalties, sanctions, supplemental environmental projects in lieu of any fines, penalties or sanctions, and interest incurred as a result of any claim or demand by any other Person or in response to any violation of or Liability under Environmental Law, whether known or unknown, accrued or contingent, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute, to the extent based upon, related to, or arising under or pursuant to any Environmental Law, Permit, order or agreement with any Governmental Authority or other Person, which relates to any environmental, health or safety condition, violation of Environmental Law or a Release or threatened Release of, or exposure to, Hazardous Materials.

"ERISA" has the meaning specified in Section 4.11(a).

"ERISA Affiliate" means any trade or business (whether or not incorporated) which together with the Company would be treated as a single employer under Section 414 of the Code or Section 4001 of ERISA.

"Escrow Agent" means JPMorgan Chase Bank, N.A.

"Escrow Agreement" means that certain Escrow Agreement, dated as of the date hereof, by and among the Company, Buyer and the Escrow Agent attached as Exhibit A.

"Excluded Assets" has the meaning specified in Section 2.2.

6

"Excluded Books and Records" means the following originals and copies of those books and records, documents, data and information (in whatever form maintained) of Sellers and the Business: (i) all corporate minute books (and other similar corporate records) and stock records and the Organizational Documents of Sellers, (ii) any books and records relating to the Excluded Assets, Excluded Liabilities or Taxes paid or payable by Sellers (excluding such books and records related solely to the Purchased Assets), (iii) all Tax Returns of Sellers (excluding such Tax Returns related solely to the Purchased Assets), (iv) any records, documents or other information solely to the extent related to any current or former employee of Sellers and the Business who is not a Transferred Employee, or (v) any books, records or other materials that Sellers (x) are required by Law to retain (copies of which, to the extent permitted by Law, will be made available to Buyer upon Buyer's reasonable request) or (y) reasonably believe are necessary to enable them to prepare or file Tax Returns.

"Excluded Contracts" means all Contracts of Sellers other than the Assigned Contracts.

"Excluded Intellectual Property" means all Intellectual Property and goodwill of Company or its Subsidiaries set forth on Schedule 1.1(b).

"Excluded Liabilities" has the meaning specified in Section 2.4.

"Existing Representation" has the meaning specified in Section 11.17(a).

"Expense Reimbursement Amount" means the aggregate amount of all reasonable and documented out of pocket costs, expenses and fees incurred by Buyer in connection with evaluating, negotiating, documenting and performing the Transactions, including fees, costs and expenses of any professionals (including financial advisors, outside legal counsel, accountants, experts and consultants) retained by or on behalf of Buyer in connection with or related to the authorization, preparation, investigation, negotiation, execution and performance of this Agreement and the Transactions, including the Bankruptcy Cases and other judicial and regulatory proceedings related to such transactions, in an aggregate amount not to exceed five hundred fifty thousand dollars ($550,000).

"Final Allocation Schedule" has the meaning specified in Section 3.2(b).

"Final Order" means a Governmental Order (a) as to which no appeal, leave to appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing, or motion for new trial has been timely filed (in cases in which there is a date by which such filing is required to occur or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all respects without the possibility for further appeal thereon), (b) in respect of which the time period for instituting or filing an appeal, leave to appeal, motion for rehearing or motion for a new trial shall have expired (in cases in which such time period is capable of expiring), and (c) as to which no stay is in effect.

"Financial Statements" means (a) the audited consolidated balance sheets, and the and the related consolidated statements of operations and comprehensive (loss) income, of stockholders' equity and of cash flows, of the Company and its Subsidiaries as of and for the

twelve-month period ended December 31, 2022, the period from January 1 to January 5, 2023, and the period from January 6 to December 31, 2023, together with the auditor's reports thereon and (b) the Interim Financial Statements.

"FM Chile" has the meaning specified in Section 2.1(a)(vii).

"FM Chile Benefit Plan" has the meaning specified in Section 4.11(a).

"Fraud" means, with respect to any Person, an actual and intentional fraud by such Person with respect to the making of representations and warranties contained in this Agreement (after giving effect to the disclosures set forth in the Schedules) or certification delivered in connection herewith by such Person and not with respect to any other matters and shall only be deemed to exist if (a) such Person had knowledge that the representations and warranties made by such Person were inaccurate when made, (b) that such representations or warranties were made with the intent to induce the other Person to rely thereon and that such other Person would take action or inaction to such other Person's detriment, (c) such reliance and subsequent action or inaction by such other Person was justifiable and (d) such action or inaction resulted in actual Liabilities to such other Person.

"GAAP" means United States generally accepted accounting principles, as in effect as of the date of this Agreement (or in reference to any financial statements of the Company as of an earlier date, as of such date).

"Governmental Authority" means any federal, state, provincial, municipal, local or foreign government, governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency, instrumentality, court or tribunal, in each case including (a) any self-regulatory organization or (b) any other body exercising judicial, regulatory, administrative, taxing or other governmental authority, including any arbitral body or tribunal.

"Governmental Order" means any award, ruling, order, judgment, injunction, decree, writ, stipulation, determination or award, in each case, issued, promulgated, approved or entered by or with any Governmental Authority.

"Hazardous Materials" means (a) any substance, material, or waste that is listed, classified or regulated as hazardous or toxic or as a pollutant or contaminant pursuant to any Environmental Law, or that is otherwise regulated by, or for which Liability or standards of care may be imposed under, Environmental Laws; and (b) any petroleum, petroleum distillate or petroleum-derived products, radon, radioactive materials or wastes, per- and polyfluoroalkyl substances, silica, asbestos or asbestos-containing materials, lead or lead-containing materials, urea formaldehyde foam insulation, and polychlorinated biphenyls.

"Improvements" has the meaning specified in Section 4.16.

"Intellectual Property" means any of the following: (a) patents and patent applications, including all reissues, reexaminations, divisionals, extensions, provisionals, continuations, continuations-in-part and foreign counterparts thereof; (b) registered and unregistered trademarks, service marks, trade names, service names, trade dress, logos, brands, and other source identifiers, including all registrations, extensions, and renewals of any of the

8

foregoing, and all of the goodwill associated therewith, as well as pending trademark and service mark registration applications, and intent-to-use registrations or similar reservations of marks ("Trademarks"); (c) copyrights and rights in works of authorship, moral rights, database rights, and design rights, in each case whether or not registered, and all registrations, applications for registration, renewals, extensions, and reversions thereof; (d) internet domain names; (e) Trade Secrets; and (f) rights in Software.

"Intellectual Property Assignment" has the meaning specified in Section 2.7(a)(ii).

"Interim Financial Statements" means the unaudited consolidated balance sheet and statements of income and comprehensive income of the Company and its Subsidiaries as of and for the nine-month period ended September 30, 2024.

"International Plan" has the meaning specified in Section 4.11(h).

"Inventory" has the meaning specified in Section 2.1(a)(iii).

"IRS" means the Internal Revenue Service.

"knowledge of Buyer" or any other similar knowledge qualification in this agreement means to the actual knowledge, after reasonable inquiry, of the Persons set forth in Schedule 1.1(c).

"knowledge of the Company" or any other similar knowledge qualification in this agreement means to the actual knowledge, after reasonable inquiry, of the Persons set forth in Schedule 1.1(d).

"Law" means any federal, state, county, local, municipal, foreign, supranational or other law (including common law), statute, constitution, treaty, directive, resolution, ordinance, code, license, permit, decision, order, edict, writ, decree, rule, regulation, judgment, ruling, injunction, guidance, or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Authority.

"Leased Real Property" means the leased premises located at (a) 3417 1st Ave S. Seattle, WA 98134, and (b) 913 Big Hanaford Road, Centralia, WA 98531.

"Liability" means any liability, fine, penalty, loss, interest, charge, damage, duty, demand, obligation, commitment, claim, cost, expense or debt of any kind, character or description, and whether known or unknown, choate or inchoate, liquidated or unliquidated, accrued, absolute, contingent or otherwise, and regardless of when asserted or by whom.

"Lien" means any pledge, lien, charge, encumbrance or, security interest, deed of trust, deed to secure debt, license, covenant, hypothecation, declaration, right-of-way, easement, lease, mortgages, encroachment, title defect, option, levy, right of first refusal or first offer or other third party (or governmental) right or similar encumbrance of any kind or any other restriction that adversely affects the right, title or interest in or to any particular property or asset (including any restriction on the voting of any security or restriction on the transfer, use or ownership of any security or other asset other than those created under applicable securities laws) of any kind or

nature, including liens issued pursuant to Section 361, 363 or 364 of the Bankruptcy Code.

"Material Adverse Effect" means any event, occurrence, fact, circumstance, condition or change that has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Business or the Purchased Assets, taken as a whole; provided, however, that in no event would any of the following, alone or in combination, be deemed to constitute, nor shall any of the following (including the effect of any of the following) be taken into account in determining whether there has been or will be, a "Material Adverse Effect": (a) any change in applicable Law or GAAP or any interpretation thereof; (b) general economic, political or business conditions or changes therein (including commencement, continuation or escalation of war, armed hostilities or national or international calamity); (c) financial and capital markets conditions, including interest rates and currency exchange rates, or changes therein; (d) any change generally affecting the industries in which the Business operates; (e) the entry into or announcement of this Agreement, the consummation of the Transactions or the performance of this Agreement or any other Transaction Document, including any adverse change in customer, supplier, governmental, landlord, employee or similar relationships resulting therefrom or with respect thereto; (f) weather conditions, global health conditions (including any epidemic, pandemic or disease outbreak) or other force majeure events, any act of God or natural disaster, including any material worsening of such conditions threatened or existing as of the date hereof or any commercially reasonable responses thereto; (g) the taking of any action (or the omission of any action) specifically required by this Agreement or any other Transaction Document or taken (or omitted to be taken) with the written consent of Buyer; (h) any acts of terrorism or changes in geopolitical conditions, (i) any failure of the Business to meet any projections, business plans or forecasts (provided that, this clause (i) shall not prevent a determination that any change or effect underlying such failure to meet projections, business plans or forecasts has resulted in a Material Adverse Effect (to the extent such change or effect is not otherwise excluded from this definition of Material Adverse Effect)), (j) actions taken in preparation for the commencement of, or the commencement of, the Bankruptcy Cases or the filing for relief in the Bankruptcy Court (including any action or inaction by the customers, suppliers, landlords, employees or consultants of Seller or their Affiliates as a result thereof), (k) any objections in the Bankruptcy Court related to the Transactions and (l) the termination of that certain HEV Purchase Order, dated December 21, 2023, as amended by Amendment No. 1 to the HEV Purchase Order, dated April 12, 2024, by and between the Company and Anglo American Services (UK) Ltd. and the events precipitating therefrom; provided, further, that in the case of the foregoing clauses (a), (b), (c), (d), (f) and (h), except to the extent that such matters materially and disproportionately impact the Company and its Subsidiaries (taken as a whole) relative to other Persons in the industries in which the Company or its Subsidiaries operate.

"Multiemployer Plan" has the meaning specified in Section 4.11(a).

"Non-Debtor Contract Costs" has the meaning specified in Section 6.3(a).

"Non-Transferred Asset" has the meaning specified in Section 2.5.

"Off-the-Shelf Software" means any commercially available, "off the shelf" or "shrink wrapped" Software that is generally, commercially available to the public and is non-exclusively licensed to the Company or one of its Subsidiaries and that has an annual license,

subscription or other fees of $100,000 or less in the aggregate.

"Offer Conditions" has the meaning specified in Section 7.3(b).

"Offer Employees" means any Business Employee set forth on Schedule 1.1(a), other than those employed by FM Chile.

"Open Source Software" means any Software that is distributed (a) as "free software" (as defined by the Free Software Foundation), (b) as "open source software" or pursuant to any license identified as an "open source license" by the Open Source Initiative (www.opensource.org/licenses) or any other license that substantially conforms to the Open Source Definition (www.opensource.org/osd), or (c) under a license that (i) requires any other Software that is a derivative work of, or based on, such Software to be made available in source code form and/or licensed for purposes of creating derivative works of such other Software or (ii) prohibits the receipt of consideration in connection with sublicensing or distributing such Software.

"Organizational Documents" means any charter, certificate of incorporation, certificate of formation, articles of incorporation, articles of association, memorandum of association, bylaws, operating agreement, partnership agreement or similar formation or governing documents and instruments and, with the respect to the Company, that certain Relationship Agreement, dated as of January 5, 2023, by and among the Company and certain other parties thereto.

"Outside Date" has the meaning specified in Section 10.1(g).

"Permits" has the meaning specified in Section 4.14.

"Permitted Liens" means (a) immaterial mechanics, materialmen's and similar statutory Liens arising or incurred in the ordinary course of business with respect to any amounts not yet delinquent or which are being contested in good faith through appropriate proceedings and for which adequate reserves have been maintained in accordance with GAAP, (b) Liens for Taxes not yet due and payable or which are being contested in good faith through appropriate proceedings and for which adequate reserves have been established in the financial statements in accordance with GAAP, (c) Liens securing rental payments under capital lease agreements, (d) Liens on Leased Real Property (including easements, covenants, rights of way and other restrictions of record) that (i) encumber the fee estate of Leased Real Property, (ii) are matters of record that do not materially interfere with the current use of such Leased Real Property or, (iii) would be disclosed by a current, accurate survey or physical inspection of such Leased Real Property that do not materially interfere with the current use of such Leased Real Property or (e) statutory landlord's, sublandlord's, or similar liens or encumbrances, (f) in the case of Intellectual Property, non-exclusive licenses or other similar non-exclusive grants granted by a Seller in the ordinary course of business of the Sellers described on Schedule 1.1(e) and (g) Liens described on Schedule 1.1(e).

"Person" means any individual, firm, corporation, partnership, limited liability company, incorporated or unincorporated association, joint venture, joint stock company, governmental agency or instrumentality or other entity of any kind.

11

"Petition Date" has the meaning specified in the Recitals.

"Post-Closing Confidentiality Agreement" means that certain Confidentiality Agreement, dated as of the date hereof, by and between the Company and Buyer.

"Post-Closing Matters" has the meaning specified in Section 11.17(a).

"Post-Closing Representations" has the meaning specified in Section 11.17(a).

"Post-Closing Tax Period" means any taxable period beginning after the Closing Date and the portion of any Straddle Period beginning after the Closing Date.

"Pre-Closing Designated Persons" has the meaning set forth in Section 11.17(b).

"Pre-Closing Privileges" has the meaning set forth in Section 11.17(b).

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and that portion of any Straddle Period ending on (and including) the Closing Date.

"Preliminary Allocation Schedule" has the meaning specified in Section 3.2(a).

"Previously Omitted Contract" has the meaning specified in Section 6.3(g).

"Previously Omitted Contract Notice" has the meaning specified in Section 6.3(g).

"Prior Company Counsel" has the meaning specified in Section 11.17(a).

"Purchase Price" has the meaning specified in Section 3.1(a).

"Purchased Assets" has the meaning specified in Section 2.1(a).

"Qualifying Termination" has the meaning specified in Section 10.2(b).

"Real Property Leases" has the meaning specified in Section 4.10(a)(iv).

"Related Party" has the meaning specified in Section 4.19.

"Release" means any release, spill, emission, leaking, pumping, pouring, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Materials into or through the indoor or outdoor environment or into or out of any property, including the movement of Hazardous Materials through or in the air, soil, sediment, surface water or groundwater.

"Remedies Exception" has the meaning specified in Section 4.3.

"Reverse Break-Up Fee" has the meaning specified in Section 10.2(b).

"Sale Motion" means the motion, pleading or other filing of the Sellers, in form and substance acceptable to the Buyer, seeking entry of the Bid Procedures Order and the Sale Order.

12

"Sale Order" means a Governmental Order of the Bankruptcy Court approving and authorizing this Agreement and all of the terms and conditions hereof (including approving and authorizing the Company's assumption and assignment pursuant to Section 365 of the Bankruptcy Code of the Assigned Contracts, and approving and authorizing the Company to consummate the Transactions contemplated hereby free and clear of Liens to the full extent permitted pursuant to Section 363(f) of the Bankruptcy Code and containing a finding that Buyer has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code), in form and substance reasonably acceptable to Buyer. A form of acceptable Sale Order shall be appended to this Agreement as Exhibit B prior to the Closing Date.

"Schedules" has the meaning specified in the first sentence of ARTICLE IV.

"Seattle Headquarters" means the seat of Sellers' corporate operations in the United States located at 542 First Avenue South, Suites 200-500, Seattle, Washington 98104.

"Section 280G Approval" has the meaning specified in Section 7.4.

"Section 280G Payments" has the meaning specified in Section 7.4.

"Section 338(g) Election" has the meaning specified in Section 8.2(d).

"Seller" has the meaning specified in the Preamble.

"Seller Fundamental Representations" means Section 4.1 (Corporate Organization of the Company), Section 4.2 (other Sellers), Section 4.3 (Due Authorization) and Section 4.20 (Brokers' Fees ).

"Seller IT Assets" means all computers, servers, workstations, routers, hubs, switches, data communications lines and all other information technology equipment, including all third party Software, and all documentation related to the foregoing, owned by, or licensed or leased to Sellers or any of their Subsidiaries that are listed on Schedule 1.1(f).

"Software" means (a) computer programs (whether in source code, object code, human readable form or other form), code (including software implementations of algorithms, models, and methodologies) applications, application programming interfaces, firmware, software development kits, library functions, operating systems and virtualization environments, and (b) documentation, including user manuals and training materials, related to any of the foregoing.

"Straddle Period" has the meaning specified in Section 8.2(b).

"Subsidiary" means, with respect to a Person, a corporation or other entity of which more than 50% of the voting power of the equity securities or equity interests is owned, directly or indirectly, by such Person.

"Successful Bidder" has the meaning set forth in the Bid Procedures.

"Superannuation Fund" means a superannuation fund as regulated under the *Superannuation Guarantee (Administration) Act 1992* (Cth) and the *Superannuation Guarantee*

*Charge Act 1992* (Cth) and as contributed to by a Seller on behalf of a Transferred Employee.

"Tax Returns" means any return, declaration, report, statement, information statement or other document filed or required to be filed with respect to Taxes, including any claims for refunds of Taxes and any amendments or supplements of any of the foregoing.

"Taxes" means all federal, state, local, foreign or other tax, including all income, gross receipts, license, escheat, unclaimed property, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, ad valorem, value added, inventory, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, alternative or add-on minimum, or estimated tax, and including any interest, penalty or addition thereto.

"Trade Secrets" means confidential and proprietary information, including rights relating to know-how and trade secrets, including ideas, concepts, methods, techniques, inventions (whether patentable or unpatentable), research in progress, algorithms, data, designs, processes, drawings, schematics, blueprints, flow charts, models, strategies, customer lists, supplier lists, mailing lists, business plans and techniques that derive independent economic value, actual or potential, from not being generally known or readily ascertainable by others.

"Transaction Documents" means this Agreement, the Escrow Agreement, the Bill of Sale and Assignment, the Intellectual Property Assignment, the Bid Procedures Order, the Sale Order and any other agreements, instruments and certificates contemplated hereby or thereby or agreements arrangement as the parties and their respective legal counsels deem reasonably necessary to effect the Transactions.

"Transactions" means the transactions contemplated by this Agreement.

"Transfer Regulations" means the Transfer of Undertakings (Protection of Employment) Regulations 2006 (as amended from time to time) or any local similar or equivalent applicable Law.

"Transfer Taxes" means any and all direct and indirect transfer, documentary, sales, use, court, gross receipts, stamp, registration, goods and services, reporting, filing, value added, recording, escrow and other similar Taxes and fees imposed in connection with the Transactions.

"Transferred Employee" means the Business Employees of FM Chile and each Offer Employee who, as of the Closing, becomes an employee of Buyer or one of its Subsidiaries by acceptance of Buyer's or one of its Subsidiary's offer of employment pursuant to Section 7.3(b).

"Transferred Employee Records" has the meaning specified in Section 2.1(a)(v).

"Transferred Intellectual Property" means all Intellectual Property other than Excluded Intellectual Property that is owned or purported to be owned by the Company or any of its Subsidiaries and is related to, or necessary for furtherance of, the Business of the Company or any of its Subsidiaries (including, without limiting the foregoing, all Intellectual Property set forth on Schedule 4.17(a)). For the avoidance of doubt, "Transferred Intellectual Property" includes all

Transferred Registered Intellectual Property and Transferred Software.

"Transferred Registered Intellectual Property" has the meaning set forth in Section 4.17(a).

"Transferred Software" means all proprietary Software included in the Transferred Intellectual Property.

"Waived Payments" has the meaning specified in Section 7.4.

"Wrong Pocket Assets" has the meaning specified in Section 8.3(a).

1.2     Construction.

(a)     Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby," "hereto" and derivative or similar words refer to this entire Agreement; (iv) the terms "Article", "Section", "Schedule" or "Annex" refer to the specified Article or Section of, or Schedule or Annex to, this Agreement; (v) the word "including" shall mean "including, without limitation," and (vi) the word "or" shall be disjunctive but not exclusive.

(b)     Unless the context of this Agreement otherwise requires, references to agreements and other documents shall be deemed to include all subsequent amendments and other modifications thereto.

(c)     Unless the context of this Agreement otherwise requires, references to statutes shall include all subsequent amendments and other modifications thereto, and all rules and regulations promulgated thereunder.

(d)     Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified and any such period shall exclude the date specified as the beginning of the period and shall conclude at 5:00 pm (Eastern Time) on the final day of such period.

(e)     The phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if".

(f)     The phrases "provided to Buyer" or "made available to Buyer" or words of similar import, mean providing the referenced materials to Buyer or any of its representatives in the online data room titled "Gemstone VDR" hosted by Datasite in connection with the Transactions no later than two (2) Business Days prior to the date hereof.

(g)     All accounting terms used herein and not expressly defined herein shall have the meanings given to them under GAAP.

(h)      All amounts payable pursuant to this Agreement shall be paid in U.S. dollars, and all references to "$" or "dollars" shall mean the lawful currency of the United States of America.

(i)      The parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties to express their mutual intent and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement, nor shall any rule of strict construction be applied against any party.

## ARTICLE II.
## PURCHASE AND SALE; CLOSING

2.1     Purchase of Assets.

(a)      Subject to the terms and conditions set forth herein, at the Closing, Sellers shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall purchase, acquire and accept from Sellers, free and clear of all Liens (other than Permitted Liens), all right, title and interest of Sellers in, to and under all the assets, rights and properties owned, licensed or used by Sellers, in each case, except as otherwise specified in this ARTICLE II, to the extent primarily used in, primarily held for use in or primarily related to the Business (collectively, the "Purchased Assets"); provided, however, that the Purchased Assets shall not include any Excluded Assets, but, without limiting the foregoing, shall include:

(i)      the Assigned Contracts, subject to the Assigned Contract identification process set forth in Section 6.3;

(ii)      all Transferred Intellectual Property;

(iii)      all supplies and other inventories, including all raw materials, works-in-process, finished goods, packaging, supplies and parts used in the Business or produced in or by the Business, whether held at any location or facility of Sellers or owned by Sellers but in transit (the "Inventory");

(iv)      all equipment, machinery, vehicles and other tangible personal property, including office furniture and fixtures, computers, networking equipment, industrial equipment and supplies primarily used in the Business, whether owned or leased, and all Seller IT Assets that are listed on Schedule 1.1(f);

(v)      all physical or electronic copies of all personnel records (including those as required by applicable Law and those pertaining to, as applicable, performance, training history, job experience and compensation history, and for the three-year period immediately preceding the Closing) for the Transferred Employees, except where (A) the transfer or disclosure of such records is prohibited by applicable Law or (B) consent of the relevant employee is required by applicable Law but not given (the "Transferred Employee Records");

16

(vi)    all books and records, customer lists, customer credit information, supplier lists, product specifications, documents, copies of all accounting books and records (including any information relating to any Taxes imposed), any data and information (in whatever form maintained), in each case, that relates to the Business and the Purchased Assets or are required to fulfill any obligation under any Assigned Contracts (collectively, the "Business Records");

(vii)    equity interests in First Mode Chile SpA, company organized under the laws of Chile ("FM Chile");

(viii)    to the extent transferable, the Permits of Sellers (including any applications that are in process) (i) used in the Business or (ii) required to conduct the Business or perform the Assigned Contracts;

(ix)    all claims, rights or causes of action against third parties related to any of the Purchased Assets or the Assumed Liabilities (including all guaranties, warranties, indemnities and similar rights in favor of Sellers), including any rights, claims or causes of action arising under the Bankruptcy Code, in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date; and

(x)    the assets listed on Schedule 2.1(a)(x).

(b)    At Closing, Buyer (i) at Buyer's sole cost, shall have the right to reasonably direct the manner of delivery of the Purchased Assets from Sellers and (ii) shall have the right to direct that Sellers sell, transfer, assign, convey and deliver the Purchased Assets, or any portion thereof, directly to any Affiliate of Buyer.

2.2    Excluded Assets.

Notwithstanding the provisions of Section 2.1 or anything to the contrary herein, any and all assets, title, rights and interest in, to and under the following assets and interests of Sellers (collectively, the "Excluded Assets") shall be retained by Sellers, and Buyer and its designees shall acquire no right, title or interest in the Excluded Assets in connection with the Transactions:

(a)    all Cash (including any cash collateralizing obligations), investment securities and other short- and medium-term investments and all accounts with any banks or other financial institutions;

(b)    any interest or consideration received by Sellers or their Affiliates pursuant to, and all rights of Sellers and their Affiliates under, this Agreement and the Transaction Documents, including the right to receive the Purchase Price and to enforce Sellers' rights and remedies thereunder, subject to the terms hereof and thereof;

(c)    all Tax refunds, overpayments, credits or other attributes with respect to Taxes that are Excluded Liabilities;

17

(d)     all Excluded Contracts;

(e)     the Excluded Books and Records;

(f)     any and all proceeds relating to any and all bonds, letters of credit, guarantees or other security provided by Sellers;

(g)     any shares or other equity interests in Sellers or any other Person or any securities of Sellers or any other Person, except for the equity interests of FM Chile;

(h)     all Excluded Intellectual Property;

(i)     all of Sellers' and their Subsidiaries' rights, claims or causes of action against third parties relating to the assets, properties, business or operations of Sellers (including all guaranties, warranties, indemnities and similar rights in favor of Sellers or any of their Affiliates), including the rights to insurance proceeds, in each case, to the extent relating to the Excluded Assets or Excluded Liabilities, in each case, whether arising out of transactions occurring prior to, on or after the Closing Date;

(j)     all rights under the Company Benefit Plans and any trusts, funding vehicles and other assets related thereto;

(k)     all claims, rights or causes of action by or in the rights of a Seller or any of its Subsidiaries, on the one hand, against any current or former director, officer, employee, partner, member, representative or agent of a Seller or any of its Subsidiaries (other than Transferred Employees), on the other hand, whether arising by counterclaim or otherwise;

(l)     all property located at the Seattle Headquarters;

(m)     any Seller IT Assets that are not listed on Schedule 1.1(f); and

(n)     the assets listed on Schedule 2.2(n).

2.3     Assumed Liabilities.

        Subject to the conditions specified in this Agreement, from and after the Closing Date, Buyer will not assume or in any way be responsible for any Liabilities of Sellers or any other Liabilities whatsoever related to the ownership, operation or condition of the Business or the Purchased Assets at any time prior to the Closing Date, except as specifically provided below. From and after the Closing, Buyer will assume and agree to pay, defend, discharge and perform, as and when due, only the following specific Liabilities to the extent relating to the Purchased Assets ("Assumed Liabilities"):

        (a)     all Liabilities relating to the Purchased Assets to the extent such Liabilities arise from and after Closing or relate to events, facts and circumstances arising after the Closing; provided, that Buyer shall assume Liabilities relating to the Assigned Contracts and the purchase orders listed on Schedule 2.3(e) whether arising before or after the

18

Closing, but only to the extent such Assigned Contracts are actually assigned to (or the benefits passed through pursuant to Section 2.5 and Section 6.3); provided, further, that with respect to any Assigned Contract subsequently designated as an Excluded Contract following the Closing pursuant to Section 6.3, Buyer shall be solely responsible for payment of obligations and liabilities incurred between the Closing and the designation of such Assigned Contract as an Excluded Contract;

(b)     any Transfer Taxes apportioned to Buyer pursuant to Section 8.2;

(c)     subject to Section 6.3, all Cure Costs;

(d)     all Liabilities (if any) specifically assumed by Buyer pursuant to Section 7.3 (including Liabilities arising out of, relating to or in connection with Buyer's, or one of its Subsidiaries' failure to offer employment to any Offer Employee on terms consistent with Section 7.3(b)), and all Liabilities (if any) that transfer to Buyer or its Affiliates under applicable Law with respect to FM Chile or with respect to Transferred Employees residing in Australia; and

(e)     without limiting the foregoing, all other Liabilities that are listed on Schedule 2.3(e).

2.4     Excluded Liabilities.

Buyer shall not assume or be obligated to pay, perform or otherwise discharge any Liabilities of any Seller or any of Seller's Affiliates, direct or indirect, known or unknown, absolute or contingent, not expressly assumed by Buyer pursuant to Section 2.3 and Transaction Documents (all such Liabilities not being assumed, the "Excluded Liabilities") and, notwithstanding anything in Section 2.3 to the contrary, each of the following shall be Excluded Liabilities for purposes of this Agreement:

(a)     any Liabilities in respect of (i) current or former employees of any Seller who are not Business Employees or (ii) any individual service providers, contractors or consultants of the Sellers or their Subsidiaries (other than of FM Chile), in each case, including any benefits or compensation therefor, arising at any time;

(b)     all Liabilities in respect or arising out of, relating to or resulting from the employment or engagement by Sellers and their Subsidiaries of any Business Employees, or the termination by Sellers and their Subsidiaries of such employment or engagement (excluding Liabilities arising out of, relating to or in connection with Buyer's, or one of its Subsidiaries' failure to offer employment to any Offer Employee on terms consistent with Section 7.3(b)), including any benefits or compensation therefor, in each case arising prior to Closing, other than all Liabilities (if any) (i) specifically assumed by Buyer pursuant to Section 7.3 or (ii) that transfer to Buyer or its Affiliates under applicable Law with respect to FM Chile or with respect to Transferred Employees residing in Australia;

(c)     any Liabilities in respect of any Company Benefit Plan (including terminated Company Benefit Plans and any retention or incentive program that is approved by the

19

Bankruptcy Court as contemplated by Section 7.1(b)(vii)), other than any FM Chile Benefit Plan;

(d)        any Liabilities arising from a breach of the Transfer Regulations (excluding Liabilities arising out of, relating to or in connection with any act or omission of Buyer or one of its Subsidiaries);

(e)        Any Liabilities for (i) Taxes of Sellers, and (ii) Taxes relating to the ownership of the Purchased Assets and the operation of the Business attributable to any Pre-Closing Tax Period (determined in accordance with Section 8.2(b)), in each case excluding Transfer Taxes;

(f)        any Liabilities relating to the failure or alleged failure by any Seller to comply with Law or perform its obligations under or otherwise comply with the terms of any Contract;

(g)        any Debt or Company Transaction Expenses;

(h)        any Liabilities relating to errors or omissions or alleged errors or omissions by any Seller or any employees of any Seller in performing services prior to the Closing;

(i)        all Environmental Liabilities arising out of or relating to the ownership or operation of Sellers or Purchased Asset on or prior to the Closing Date;

(j)        except with respect to Cure Costs, any Liabilities in respect of Actions to which any Seller is a party or its assets or properties are otherwise subject;

(k)        All Liabilities in respect of any trade accounts payable of Sellers to third parties in connection with the Business except for such trade accounts payable of Sellers set forth on Schedule 2.3(e); and

(l)        any Liabilities arising out of or related to Excluded Assets.

2.5      Nontransferable Assets and Liabilities.

Notwithstanding anything herein to the contrary, this Agreement shall not constitute an agreement to sell, convey, assign, sublease or transfer any Purchased Asset if any attempted sale, conveyance, assignment, sublease or transfer of such Purchased Asset, without the consent of a third party (including a Governmental Authority) (after giving effect to the Sale Order or any other applicable Governmental Order of the Bankruptcy Court that effects such transfer without any required consents) to such transfer, would constitute a breach by any Seller or Buyer with respect to such Purchased Asset (each, a "Non-Transferred Asset"). Non-Transferred Assets shall be considered Excluded Assets hereunder unless and until the applicable consent is obtained. If such consent has not been obtained or such other action has not been taken prior to the Closing, then, at Buyer's election, Sellers and Buyer shall use their commercially reasonable efforts to obtain any consent necessary to sell, convey, assign, sublease or assign each such Non-Transferred Asset to Buyer as soon as possible after the Closing Date. Once a consent described in this Section 2.5 is obtained from, or such other action described in this Section 2.5 is taken by, such third party

or Governmental Authority, the applicable assets shall be deemed Purchased Assets and shall be deemed to have been automatically transferred to Buyer on the terms set forth in this Agreement as of immediately prior to the Closing for no consideration. Notwithstanding the foregoing, at Buyer's election, (i) subject to the requirement for Buyer to pay to the Company (on behalf of Sellers) any Non-Debtor Contract Costs in accordance with <u>Section 6.3(c)</u>, any Non-Transferred Asset shall be an Excluded Asset and Buyer shall have no obligation with respect to any such any Non-Transferred Asset or any liability with respect thereto, and (ii) to the extent elected by Buyer, Sellers shall use their commercially reasonable efforts to obtain for Buyer substantially all of the practical benefits and assume the associated obligations and burdens of such property or rights of the any Non-Transferred Asset (in which case Buyer shall (x) reasonably assist Sellers in the performance of such any Non-Transferred Asset and (y) pay or satisfy any liabilities associated with such any Non-Transferred Asset to the extent Buyer would have been responsible for such liabilities if consent under the any Non-Transferred Asset had been obtained), including by (1) entering into appropriate and reasonable alternative arrangements on terms mutually agreeable to Buyer and Sellers and (2) subject to the consent and control of Buyer, enforcing any and all rights of Sellers against the third party thereto arising out of the breach or cancellation thereof by such other party or otherwise. For the avoidance of doubt, nothing in this <u>Section 2.5</u> shall require Sellers or Buyer to expend money, incur any Liability, commence any litigation or offer or grant any accommodation (financial or otherwise) to any third party (including any Governmental Authority) in order to obtain the applicable consent.

2.6    <u>Closing</u>.

Subject to the terms and conditions of this Agreement and the applicable provisions of the DGCL, the closing of the purchase and sale of the Purchased Assets (the "<u>Closing</u>") shall take place remotely by electronic exchange of signature pages as promptly as practicable, and in no event later than two (2) Business Days, after the date on which all of the conditions set forth in <u>ARTICLE VII</u> (excluding conditions that, by their terms, are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permitted by applicable Law, waiver of all such conditions at or prior to the Closing), have been satisfied or, to the extent permitted by applicable Law, waived in writing by the party entitled to the benefit of the same, unless another time or date is agreed to in writing by the parties. The day that the Closing takes place is referred to herein as the "<u>Closing Date</u>".

2.7    <u>Closing Deliverables</u>.

(a)    Sellers, as applicable, shall deliver, or cause to be delivered, to Buyer at the Closing:

(i)    the bill of sale and assignment and assumption agreement substantially in the form of <u>Exhibit C</u> ("<u>Bill of Sale and Assignment</u>"), executed by the applicable Sellers;

(ii)    the assignment of the Transferred Intellectual Property substantially in the form of <u>Exhibit D</u> (the "<u>Intellectual Property Assignment</u>"), executed by the applicable Sellers;

(iii)    an IRS Form W-9 or the appropriate IRS Form W-8, if applicable, properly completed and duly executed for each Seller (or, if applicable, its regarded owner for U.S. federal income tax purposes);

(iv)    a certificate delivered pursuant to Section 9.2(a)(iii), executed by Sellers;

(v)    a copy of the Sale Order as entered by the Bankruptcy Court, vesting the Purchased Assets of Sellers in Buyer free and clear of all Liens;

(vi)    a certificate evidencing the equity interests of FM Chile duly endorsed by the Company in blank or accompanied by stock powers or other appropriate instruments necessary to transfer such equity interests to the Buyer;

(vii)    such other instruments of assumption and other instruments or documents, in each case, in form and substance reasonably acceptable to Buyer, reasonably necessary for the effective assignment of any Purchased Assets to Buyer, the recordation of the assignments, the release of Liens or otherwise consummate the Transactions, in accordance with the requirements of applicable Law and this Agreement, in each case duly executed by Sellers.

(b)    Buyer, as applicable, shall deliver, or cause to be delivered, to Sellers at the Closing:

(i)    the Bill of Sale and Assignment, executed by Buyer;

(ii)    the Intellectual Property Assignment, executed by Buyer;

(iii)    evidence of payment by Buyer of the Cure Costs, including the funding to Sellers of amounts necessary for the establishment of customary reserves for payment to the extent any Cure Costs have not been determined as of the date of Closing;

(iv)    a certificate delivered pursuant to Section 9.3(a)(iii), executed by Buyer; and

(v)    such other instruments of assumption and other instruments or documents, in each case, in form and substance reasonably acceptable to Sellers, reasonably necessary for the effective assignment of any Purchased Assets to Buyer and the assumption of Assumed Liabilities by Buyer, the recordation of the assignments, the release of Liens or otherwise consummate the Transactions, in accordance with the requirements of applicable Law and this Agreement, in each case duly executed by Buyer.

## ARTICLE III.
## PURCHASE PRICE; ALLOCATION; WITHHOLDING

3.1    Purchase Price.

(a)     At the Closing, upon the terms and subject to the conditions set forth herein in full consideration for the sale, transfer, conveyance, assignment and delivery of the Purchased Assets to Buyer, Buyer shall pay to the Company (on behalf of Sellers) an aggregate purchase price equal to (a) fifteen million dollars ($15,000,000.00) in cash (the "Purchase Price"), *plus* (b) the Approved Expenditure Amount (if any), *minus* (c) the Deposit, *plus* (d) the Accrued Compensation Obligations, *minus* (e) the Chile Employee Obligations Amount, by irrevocable wire transfer of immediately available funds in accordance with payment instructions delivered by the Company (on behalf of Sellers) to Buyer at least three (3) Business Days prior to the Closing. For the avoidance of doubt, Buyer shall promptly pay, or cause to be paid, to the applicable counterparty any Cure Costs, including such Cure Costs that arise after the Closing. The parties agree to allocate the Purchase Price for tax purposes as provided in Section 3.2.

(b)     At the Closing, Buyer and the Company shall instruct the Escrow Agent to pay the Deposit to the Company, by wire transfer of immediately available funds, in accordance with the terms of the Escrow Agreement.

3.2     Allocation of Purchase Price.

(a)     Within thirty (30) days after the date hereof, Buyer shall deliver to the Company (which shall act on behalf of all Sellers with respect to this Section 3.2) a schedule allocating for applicable Tax and financial accounting purposes the Purchase Price (and any liabilities considered assumed by Buyer treated as purchase consideration for Tax purposes) among the Purchased Assets in a manner consistent with the residual method principles of Section 1060 of the Code and the Treasury Regulations promulgated thereunder (the "Preliminary Allocation Schedule"). If, within thirty (30) days following delivery of the Preliminary Allocation Schedule, the Company (on behalf of Sellers) does not notify Buyer in writing of its disagreement with the Preliminary Allocation Schedule (including in such communication a detailed description of the basis of its disagreement), the Preliminary Allocation Schedule shall be final and binding. If within such thirty (30) day period the Company (on behalf of Sellers) so notifies Buyer, Buyer shall revise the Preliminary Allocation Schedule incorporating Sellers' reasonable comments; provided, that if the Company (on behalf of Sellers) and Buyer are unable to resolve any dispute with respect to the Preliminary Allocation Schedule within fifteen (15) days after the Company so notifies Buyer of its disagreement with the Preliminary Allocation Schedule, such dispute shall be resolved by an impartial nationally-recognized firm of independent certified public accountants mutually appointed by Buyer and the Company (provided that the fees and expenses of such accounting firm shall be borne equally by Buyer and the Company). Following such revision, if any, the Preliminary Allocation Schedule shall be final and binding.

(b)     The Preliminary Allocation Schedule, upon becoming final and binding in accordance with this Section 3.2, shall constitute the "Final Allocation Schedule." The parties shall file their respective Tax Returns (including IRS Form 8594) in all respects and for all purposes consistent with the Final Allocation Schedule, and no party shall take any position (whether in audits, Tax Returns or otherwise) that is inconsistent with the Final Allocation Schedule, unless otherwise required by a final determination within the

meaning of Section 1313 of the Code or any corresponding provision of state, local or non-U.S. Law, or as the Buyer or the Company (as applicable) determines is necessary to settle a dispute with a Governmental Authority after making a good faith effort to defend the Final Allocation Schedule.

(c)    Notwithstanding the foregoing, the parties hereto recognize that certain allocations may be necessary prior to the times set forth in <u>Section 3.2(b)</u>, such as in the case of any Transfer Tax filings, and agree to reasonably cooperate in determining the appropriate allocations as necessary in such circumstances in a timely manner.

(d)    Each Seller agrees that following the Closing the Company shall have no obligation to segregate or maintain the funds received on account of the Purchase Price and the Company may use such funds in its sole discretion (including to fund the costs of the Bankruptcy Cases and to repay any financing obtained in connection with the Bankruptcy Cases).

3.3    <u>Withholding</u>.

Buyer shall be entitled to deduct and withhold from the consideration otherwise payable or deliverable to any Person in connection with the Transactions such amounts that the Buyer is required to deduct and withhold with respect to any such deliveries and payments under the Code or any provision of state, local, provincial or foreign Law. Other than any deduction or withholding with respect to any employment compensation payment, before making any such deduction or withholding, Buyer shall use commercially reasonable efforts to (i) provide the Person on behalf of which such deduction or withholding is proposed advance written notice of the intention to make such deduction or withholding and (ii) cooperate with such Person to obtain reduction of or relief from such deduction or withholding to the extent permitted by Law. To the extent that amounts are so withheld in compliance with this <u>Section 3.3</u>, and duly and timely deposited with or otherwise paid to the appropriate Governmental Authority, by Buyer, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

3.4    <u>Deposit</u>.

(a)    No later than one (1) Business Day after the date hereof, Buyer will make an earnest money deposit (the "<u>Deposit</u>") into escrow with the Escrow Agent in the amount equal to one million five hundred thousand dollars ($1,500,000) by wire transfer of immediately available funds. The Deposit shall not be subject to any Lien, attachment, trustee process or any other judicial process of any creditor of any of the Sellers or Buyer and shall be applied against payment of the Purchase Price. At the Closing, the Deposit shall be delivered to the Company (on behalf of Sellers) in accordance with <u>Section 3.1(b)</u> and the terms of the Escrow Agreement and credited toward payment of the Purchase Price.

(b)    If this Agreement has been validly terminated prior to the Closing by the Company pursuant to <u>Section 10.1(e)</u> then, within three (3) Business Days after the date of such termination, Buyer and the Company (on behalf of Sellers) shall jointly instruct

the Escrow Agent to disburse the Deposit to the Company (on behalf of Sellers).

(c)     If this Agreement has been validly terminated prior to the Closing by any party hereto for any reason other than as contemplated by Section 3.4(b) then, within three (3) Business Days after the date of such termination, Buyer and the Company (on behalf of Sellers) shall jointly instruct the Escrow Agent to disburse the Deposit to Buyer.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the schedules delivered concurrently with to this Agreement (the "Schedules"), the Company (on behalf of Sellers) represents and warrants to Buyer as of the date of this Agreement and as of the Closing as follows:

4.1     Corporate Organization of the Company.

The Company has been duly incorporated and is validly existing as a corporation in good standing under the Laws of the State of Delaware and has the corporate power and authority to own, operate or lease the Purchased Assets currently owned, operated or leased by the Company and to conduct its respective portion of the Business as it is now being conducted in all material respects. The Company is duly licensed or qualified to do business and (where applicable) is in good standing in each jurisdiction in which the ownership, operation or leasing of its property or the character of its activities is such as to require it to be so licensed or qualified or in good standing, as applicable, except where the failure to be so licensed would not, individually or in the aggregate, reasonably be expected to be material to the Purchased Assets or the Business, taken as a whole. The Company has delivered to Buyer true and complete copies of the Organizational Documents, each as amended as of the date hereof, of the Company and its Subsidiaries.

4.2     Other Sellers.

Sellers (other than the Company) and their jurisdiction of incorporation or organization are set forth on Schedule 4.2. Such Sellers have been duly formed or organized and are validly existing under the laws of their respective jurisdictions of incorporation or organization and have the power and authority to own, operate or lease the Purchased Assets and to conduct their respective portions of the Business, in each case, as it is now being conducted in all material respects. Each Seller (other than the Company) is duly licensed or qualified to do business and (where applicable) in good standing as a legal entity in each jurisdiction in which the ownership, operation or leasing of the Purchased Assets or the character of its activities is such as to require it to be so licensed or qualified, except where the failure to be so licensed or qualified or in good standing would not reasonably be expected to have a Material Adverse Effect.

4.3     Due Authorization.

Each Seller has all requisite company power and authority to execute and deliver this Agreement and, as applicable, the other Transaction Documents to which the such Seller is a party and (subject to the consents, approvals, authorizations and other requirements described in Schedule 4.5) to consummate the Transactions. The execution and delivery of this Agreement by each Seller and, as applicable, the other Transaction Documents to which such Seller is party, and

the consummation by such Seller of the Transactions have been duly and validly authorized and approved by the board of directors (or an equivalent governing body) and the requisite equityholders of such Seller, as applicable, and no other corporate proceeding on the part of such Seller is necessary to authorize this Agreement. This Agreement and, as applicable, the other Transaction Documents to which each Seller is a party, have been duly and validly executed and delivered by such Seller and (assuming such agreements constitute the legal, valid and binding obligations of Buyer) constitute the legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity (collectively, the "Remedies Exception").

4.4     No Conflict.

Subject to the receipt of the consents, approvals, authorizations and other requirements set forth in Schedule 4.5, and except as may result from any facts or circumstances related solely to Buyer or its Affiliates, the execution and delivery of this Agreement and, as applicable, the other Transaction Documents to which each Seller is a party and the consummation by each Seller of the Transactions do not (a) violate in any material respects any provision of, or result in the breach of, any applicable Law to which the such Seller is subject or by which any Purchased Asset is bound, (b) conflict with the Organizational Documents of such Seller, (c) violate in any material respects any provision of or result in a breach in any material respects of, or require a consent under, any Contract listed on Schedule 4.10(a), or terminate or result in the termination of any such Contract, or result in the creation of any Lien (other than a Permitted Lien) under any such Contract upon any of the Purchased Assets of such Seller, or constitute an event which, after notice or lapse of time or both, would result in any such violation, breach, termination or creation of such a Lien or (d) result in a violation or revocation of any required material license, permit or approval.

4.5     Governmental Consents.

Assuming the truth and completeness of the representations and warranties of Buyer contained in this Agreement and except as may result from any facts or circumstances related solely to Buyer or any of its Affiliates, no consent, approval or authorization of, or designation, declaration or filing with, any Governmental Authority is required on the part of any Seller with respect to such Person's execution or delivery of this Agreement or the consummation by the Company of the Transactions, except (a) for any consents, approvals, authorizations, designations, declarations or filings, the absence of which would not reasonably be expected to be material to the Purchased Assets or the Business, taken as a whole, or (b) as otherwise disclosed on Schedule 4.5.

4.6     Financial Statements; Inventory.

(a)     The Company has provided true, correct and complete copies of the Financial Statements. The Financial Statements (a) have been prepared from, and are in accordance with the books and records of the Business in all material respects (except as may be indicated in the notes thereto), (b) fairly present in all material respects the Purchased

26

Assets and Assumed Liabilities and combined results of operations of the Business as of the respective dates or for the respective time periods set forth therein and (c) were prepared in accordance with GAAP, subject, in the case of the Interim Financial Statements, to normal recurring year-end adjustments and the absence of notes (none of which would individually or in the aggregate be material to the Business). The Company and its Subsidiaries maintain a system of internal accounting controls that is designed to provide reasonable assurances that (i) the Financial Statements have been prepared and are fairly presented free from material misstatements, (ii) access to the properties and assets of the Company and its Subsidiaries are permitted only in accordance with authorization by management of the Company and its Subsidiaries, and (ii) all transactions are executed with such management's authorization and accurately recorded in the correct period as necessary to permit the preparation of financial statements in accordance with GAAP.

(b)       All accounts receivables are reflected properly in the Financial Statements or the accounting records of the Business as of the date of the Interim Financial Statements and represent or will represent valid obligations arising from sales actually made or services actually performed in the ordinary course of business. Such accounts receivable are current and collectible, except to the extent reserved in the Financial Statements. There is no contest, claim, defense or right of setoff, other than returns in the ordinary course of business, relating to the amount or validity of such accounts receivable. No such account receivable is or was subject to any rebate, discount, counterclaim or setoff, and neither the Company nor any Subsidiary has issued any credit or credit memorandum with respect thereto.

(c)       All accounts payable and notes payable by the Company and its Subsidiaries to third parties reflected on the Financial Statements have arisen from the purchase of goods and services in the ordinary course of business. The Financial Statements accurately reflect, in all material respects, all amounts owed by the Company and its Subsidiaries with respect to trade accounts due and other payables. The charges, accruals and reserves on the books of the Company and its Subsidiaries in respect of the accounts receivables and accounts payable as of the date thereof were calculated in accordance with GAAP.

(d)       The Inventory reflected on the Financial Statements and in the records of the Business since the most recent date of the balance sheet in the Financial Statements is of a quality and a quantity usable in the ordinary course of business in all material respects.

4.7     <u>Undisclosed Liabilities.</u>

Except as set forth in the <u>Schedule 4.7</u>, there is no Liability of the Company or any of its Subsidiaries, except for liabilities and obligations (a) reflected or reserved for on the Financial Statements or disclosed in the notes thereto, (b) that have arisen since the date of the most recent balance sheet included in the Financial Statements in the ordinary course of the operation of business of the Company and its Subsidiaries and which are not, individually or in the aggregate, material in amount or significance or (c) that constitute Excluded Liabilities.

4.8     <u>Litigation and Proceedings.</u>

Except as set forth on <u>Schedule 4.8</u>, there are, and since the date that is three (3) years before the date hereof, there have been, no pending or, to the knowledge of the Company, threatened in writing, Actions against the Company or any of its Subsidiaries, the Business or the Purchased Assets that, in each case, if resolved adversely to the Company or any of its Subsidiaries, would reasonably be expected to be material to the Business or the Purchased Assets, taken as a whole. Except as set forth on <u>Schedule 4.8</u>, neither the Company nor any Subsidiary are subject of any judgment, decree, injunction, or order of any Governmental Authority. To the knowledge of the Company, no officer, director, agent or employee of the Company or any Subsidiary or is subject to any order of any Governmental Authority that prohibits such officer, director, agent or employee from engaging in or continuing any conduct, activity, or practice relating to the Business or the Purchased Assets. Except as set forth on <u>Schedule 4.8</u>, there is not any Action or claim by the Company or any Subsidiary pending, or that the Company or any Subsidiary is named as a plaintiff or intends to initiate, against any other Person. To the knowledge of the Company, there is no investigation by any Governmental Authority of, or affecting, the Business or Purchased Assets.

4.9   <u>Legal Compliance.</u>

Except as set forth on <u>Schedule 4.9</u>, the Company and its Subsidiaries are, and since the date that is three (3) years before the date hereof the Company and its Subsidiaries have been, in compliance in all material respects with all applicable Laws with respect to the conduct of the Business and the ownership and use of the Purchased Assets. None of the Company or any of its Subsidiaries has received at any time since the date that is three (3) years before the date hereof, any written notice regarding any actual, alleged, or potential violation of, or failure to comply with, in any material respect any applicable Law with respect to the conduct of the Business and the ownership and use of the Purchased Assets.

4.10   <u>Contracts; No Defaults.</u>

(a)   <u>Schedule 4.10(a)</u> contains a listing of all Contracts described in clauses (i) through (viii) below to which (I) the Company or any of its Subsidiaries is a party (other than Company Benefit Plans) or by which it is bound in connection with the Business or the Purchased Assets or (II) any of the Purchased Assets are bound or affected. True and complete copies of the Contracts listed on <u>Schedule 4.10(a)</u> have been delivered to or made available to Buyer or its representatives.

(i)   Each Contract that involves annual payments or consideration furnished by or to the Company or any of its Subsidiaries of more than $300,000;

(ii)   Each note, debenture, other evidence of indebtedness, guarantee, loan, credit, indemnity, surety arrangement or financing agreement or instrument or other Contract (A) for any Debt of the Business, the Company or any of its Subsidiaries, in each case, in excess of $300,000, (B) imposing a Lien (other than a Permitted Lien) on any of the Purchased Assets or (C) that is a hedging, futures, options or other derivative Contract, other than in the case of (A) and (B), the Anglo Facility;

(iii)   Each Contract for the merger, consolidation, reorganization, acquisition,

28

sale, spin-off or outsourcing or any similar transaction involving any Person, or any business division thereof, or the disposition of any assets of the Company or any of its Subsidiaries, other than dispositions of immaterial amounts of assets in the ordinary course of business;

(iv)     Each lease, sublease, license or occupancy agreement governing the Leased Real Property (collectively, the "Real Property Leases") or other Contract that, in each case, provides for the ownership of, leasing of, title to, use of, or any leasehold or other interest in any real or personal property;

(v)      Each joint venture Contract, partnership agreement or limited liability company agreement with a third party (in each case, other than with respect to wholly owned Subsidiaries of the Company);

(vi)     Each Contract with a Governmental Authority, or any Contract relating to grants or other forms of assistance received from any Governmental Authority;

(vii)    Each Contract (including but not limited to any collective bargaining agreement) with any labor union, employee association, or other labor organization;

(viii)   Each Contract containing (A) covenants expressly limiting in any material respect the freedom of the Company or any of its Subsidiaries to compete with any Person in a product line or line of business, to operate in any geographic area, acquire any product or other asset or any services from any other Person, sell any product or other asset to or perform any services for any other Person, or manufacture or create any products, including Contracts that contain, any exclusive rights to provide, license, market, deliver, sell or distribute any product to any Person or otherwise contemplating an exclusive relationship between the Company or a Subsidiary, on one hand, and any other Person, on the other hand and (B) a "most favored nation" clause or similar term pursuant to which the Company or any of its Subsidiaries provides preferential pricing or treatment to any other Persons;

(ix)     Each Contract pursuant to which (A) the Company or any of its Subsidiaries is licensed or otherwise permitted by a third party to use (or is granted rights by a third party in) any material Intellectual Property (other than (1) nondisclosure or confidentiality agreements entered into in the ordinary course of business, (2) employee invention assignment agreements or (3) licenses to Off-the-Shelf Software), or (B) any third party is licensed or otherwise permitted to use (or has been granted rights in) any Transferred Intellectual Property (other than non-exclusive licenses or nondisclosure or confidentiality agreements entered into in the ordinary course of business);

(x)      Each Contract to which FM Chile is a party or otherwise bound; and

(xi)     Each Contract that was entered into outside the ordinary course of business of any the Company or a Subsidiary and that is material to the operation of the Business or the Purchased Assets, taken as a whole.

(b)      All of the Contracts set forth on <u>Schedule 4.10(a)</u> and any other Contract set forth on <u>Schedule 6.3(c)</u> on the date hereof are (i) in full force and effect, and enforceable by the Company or a Subsidiary party thereto in accordance with its terms, subject to the Remedies Exception, and (ii) represent the valid and binding obligations of the Company or one of its Subsidiaries party thereto and, to the knowledge of the Company, represent the valid and binding obligations of the other parties thereto. Except as set forth on <u>Schedule 4.10(b)</u>, (x) neither the Company, any of its Subsidiaries nor, to the knowledge of the Company, any other party thereto, is in material breach of or material default under any such Contract, (y) neither the Company nor any of its Subsidiaries has received any written claim or notice of a material breach of or material default under any such Contract, and (z) to the knowledge of the Company, no event has occurred which, individually or together with other events, would reasonably be expected to result in a material breach of or a material default under any such Contract or give any Person the right to declare a default or exercise any remedy under, accelerate the maturity or performance of, or cancel, terminate or modify any such Contracts (in each case, with or without notice, lapse of time or both). Neither the Company nor a Subsidiary has waived any of its respective material rights under any such Contracts. No Person has a contractual right pursuant to the terms of any such Contracts to unilaterally renegotiate any amount paid or payable to the Company or a Subsidiary under any such Contracts or any other material term or provision of any such Contracts.

4.11    <u>Company Benefit Plans.</u>

(a)      <u>Schedule 4.11(a)</u> sets forth a complete list of each material Company Benefit Plan. "<u>Company Benefit Plan</u>" shall mean (i) any "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>"), whether or not subject to ERISA and whether written or unwritten, and (ii) any other compensation, stock option, stock purchase, stock appreciation rights, phantom equity or other equity or equity-based awards, individual employment, consulting, severance, tax gross-up, change in control, retention, bonus, incentive, deferred compensation, profit-sharing, retirement, health, cafeteria, medical, dental, vision, disability, flexible spending, tuition reimbursement, scholarship, vacation, paid time off, severance or termination pay, fringe- or other benefit plan, policy, practice, agreement, arrangement or program, whether written or unwritten, which is maintained, sponsored, contributed to, or required to be contributed to, by the Company or any of its Subsidiaries or under which the Company or any of its Subsidiaries has any obligation or Liability, in each case, to provide compensation or benefits to or for the benefit of (i) any Offer Employee or (ii) any current or former director officer, employee or individual independent contractor of FM Chile (a "<u>FM Chile Benefit Plan</u>"), but excluding in each case any plan or program that is sponsored solely by a Governmental Authority or a "multiemployer plan" (as defined in Section 3(37) of ERISA) (a "<u>Multiemployer Plan</u>"). Notwithstanding the foregoing, <u>Schedule 4.11(a)</u> need not identify an offer letter if such offer letter is substantially similar to a form which has been provided to Buyer.

(b)      With respect to each Company Benefit Plan, the Company has delivered or made available to Buyer or its representatives copies of, to the extent applicable, (i) the plan document (or, with respect to any unwritten Company Benefit Plan, a summary of the

material terms thereof) and all amendments thereto, (ii) the most recent summary plan description and all summaries of material modification, (iii) all related trust agreements, insurance contracts or other funding agreements, including any amendment thereto, (iv) the most recent determination, opinion or advisory letter, issued by the Internal Revenue Service and (v) annual testing (including nondiscrimination and coverage) results for the most recently completed plan year.

(c)     (i) Each Company Benefit Plan has been administered in all material respects in accordance with its terms and all applicable Laws, including, to the extent applicable, ERISA and the Code; and (ii) each Company Benefit Plan which is intended to be qualified within the meaning of Section 401(a) of the Code (A) has received a currently-effective favorable determination opinion letter as to its qualification or (B) has been established under a standardized master and prototype or volume submitter plan for which a current favorable Internal Revenue Service advisory letter or opinion letter has been obtained by the plan sponsor and is valid as to the adopting employer and, in either case, there are no existing circumstances or events that have occurred that could reasonably be expected to cause and the loss of any such qualification status of any such Company Benefit Plan.

(d)     No Company Benefit Plan is subject to Title IV of ERISA, Section 302 of ERISA or Section 412 of the Code and neither the Company nor any of its Subsidiaries has sponsored or contributed to or been required to contribute to a Multiemployer Plan at any time or other pension plan subject to Title IV of ERISA, Section 302 of ERISA or Section 412 of the Code at any time within the previous six (6) years and neither the Company nor its Subsidiaries have or could reasonably be expected to have any Liability (including on account of their ERISA Affiliates) with respect to a Multiemployer Plan or Company Benefit Plan subject to Title IV of ERISA, Section 302 of ERISA or Section 412 of the Code. None of the Company or any of its ERISA Affiliates has any Liability as a result of a violation of COBRA.

(e)     None of the Company, any of its Subsidiaries, or any Company Benefit Plan provides, or has any obligation to provide, current or former employees of the Company or its Subsidiaries with respect to the Business (or any beneficiaries thereof) welfare benefits (including medical and life insurance benefits) after such person terminates employment with the Company or its Subsidiaries, except for the coverage continuation requirements of COBRA or continued coverage until the end of the month during which termination occurs.

(f)     With respect to each Offer Employee, neither the execution of this Agreement nor the consummation of the Transactions (either alone or in combination with another event) will or can be reasonably expected to (i) entitle any Offer Employee to any compensatory payment (including severance pay or similar compensation), any cancellation of indebtedness, or any increase in compensation; (ii) result in the acceleration of payment, funding or vesting under any Company Benefit Plan; or (iii) result in any increase in benefits payable under any Company Benefit Plan. No amount paid or payable (whether in cash, in property, or in the form of benefits) in connection with the Transactions (either alone or in combination with another event) could

reasonably be expected to constitute an "excess parachute payment" within the meaning of Section 280G of the Code. Neither the Company nor any of its Subsidiaries has any obligation to make a "gross-up" or similar payment to an Offer Employee in respect of any Taxes that may become payable under Section 4999 of the Code.

(g)     Except as set forth on Schedule 4.11(g), neither the Company nor any Subsidiary is a party to, or is proposing to introduce, a formal or informal severance or redundancy payment scheme or customary arrangement in addition to or that provides entitlements in excess of statutory minimums under applicable Law, in any case, with respect to an Offer Employee.

(h)     With respect to each Company Benefit Plan that is subject to Laws of a jurisdiction outside the United States (each an "International Plan"): (i) each International Plan required to be registered with a Governmental Authority has been registered and is in good standing with applicable Governmental Authorities; (ii) if intended to qualify for special Tax treatment, each International Plan is so qualified; and (iii) each International Plan has been administered in all material respects accordance with its terms and all applicable Laws. Except with respect to employees residing in the United States, neither the Company nor any Subsidiary has been a party to, a sponsoring employer of, or otherwise is under any Liability with respect to any defined benefit pension scheme, any final salary scheme or any death, disability or retirement benefit calculated by reference to age, salary or length of service or any other item.

4.12    Labor Relations.

(a)     The Company has provided to Buyer a true and correct list of all Offer Employees and all Business Employees of FM Chile containing: (i) their names (or identification number) and status as an employee; (ii) the entity with which they are employed or engaged and their location (country, state, city); (iii) their start dates; (iv) their job titles; (v) their full-time, part-time, or temporary status; (vi) their base salaries or base hourly wage or contract rate; (vii) their target bonus rates or target commission rates; (viii) any other compensation payable to them (including compensation payable pursuant to any other bonus, deferred compensation, commission arrangements or other compensation, and/or severance payments); (ix) their visa status, if applicable, (x) designation of whether they are classified as exempt or non-exempt for purposes of the Fair Labor Standards Act and any similar state law; (xi) with respect to Offer Employees residing in Australia, accrued but unused vacation, holiday and/or paid time off; (xii) leave status and anticipated return to work date, if applicable; and (xiii) any promises or commitments made to them with respect to changes or additions to their compensation or benefits.

(b)     Except as set forth in Schedule 4.12(a), there are no currently pending, and have not been during the past three (3) years, any Actions, claims (oral or written), charges, complaints, grievances, arbitrations, investigations or other legal proceedings against the Company or any of its Subsidiaries, or to the knowledge of the Company, threatened to be brought or filed, by or with any Person or any Governmental Authority or arbitrator in connection with the employment or engagement of any Business Employee or any current or former employee, applicant, individual independent contractor, or other

individual service provider of FM Chile, including, without limitation, any claim relating to unfair labor practices, employment discrimination, harassment, retaliation, equal pay, wage or hours violations, unpaid wages, misclassification, unpaid commissions, wrongful termination or any other employment related matter arising under applicable Laws.

(c)     Except as set forth in Schedule 4.12(c), during the past three (3) years neither the Company nor its Subsidiaries have implemented or effectuated a "plant closing," "mass layoff," partial "plant closing," "relocation," or "termination" (each as defined in the Worker Adjustment and Retraining Notification Act or similar state or local Law) affecting any site of employment or one or more facilities or operating units within any site of employment or facility of the Company or any of its Subsidiaries.

(d)     Each Person providing services to FM Chile during the past three (3) years that has been characterized as a consultant or independent contractor and not as an employee has been properly characterized pursuant to applicable Law as such and the Company and its Subsidiaries, including but not limited to, FM Chile, do not have any material Liability arising out of the hiring or retention of Persons to provide services to the Company or its Subsidiaries, including but not limited to, FM Chile and treating such Persons as consultants or independent contractors and not as employees of the Company or its Subsidiaries, including but not limited to, FM Chile. All Offer Employees have been correctly classified as exempt or non-exempt for purposes of the Fair Labor Standards Act and any similar Law, and overtime has been properly recorded and paid for all such employees classified as non-exempt.

(e)     To the knowledge of the Company, during the past three (3) years, (i) no allegations of harassment, discrimination or misconduct have been made against any (A) officer or director of the Company or its Subsidiaries who is an Offer Employee or any officer or director of FM Chile, or (B) any Offer Employee or any employee of FM Chile who, directly or indirectly, supervises or has managerial authority over other employees or service providers of the Company or its Subsidiaries, and (ii) the Company and its Subsidiaries have not entered into any settlement agreement as a result of any investigation related to allegations of harassment, discrimination or misconduct with respect to an Offer Employee, an employee of FM Chile and/or by an Offer Employee.

(f)     To the extent applicable, the Company and its Subsidiaries have properly verified the employment eligibility of all of the Offer Employees in compliance in all material respects with the Immigration Reform and Control Act and has retained an accurately completed and executed Form I-9 for each Offer Employee and any required supporting documentation as required by any Laws.

(g)     No transaction contemplated by this Agreement will give rise to a relevant transfer, or result in the automatic transfer of employees to the Buyer or its Subsidiaries, pursuant to the Transfer Regulations.

4.13   Taxes.

(a)      All material Tax Returns required by Law to be filed by or with respect to the Business, the Purchased Assets and FM Chile have been timely filed, and all such Tax Returns are true and complete in all material respects. No extension of time within which to file any such Tax Return is in effect.

(b)      No waiver of any statute of limitations relating to material Taxes with respect to the Business, the Purchased Assets or FM Chile is in effect, and no written request for such a waiver is outstanding.

(c)      All material Taxes which are due and payable with respect to the Business, the Purchased Assets and FM Chile (whether or not shown as due and payable on any Tax Return) have been paid.

(d)      None of the Purchased Assets (excluding the equity interests in FM Chile) is an interest in an entity taxable as a corporation, partnership, trust or real estate mortgage investment conduit for U.S. federal income Tax purposes.

(e)      All material Taxes (i) with respect to the Business or the Purchased Assets required by applicable Law to be withheld or (ii) which FM Chile is required by applicable Law to withhold, have been withheld and paid over to the appropriate Governmental Authority.

(f)      No deficiency for any material Taxes with respect to the Business, the Purchased Assets or FM Chile has been asserted or assessed by any Governmental Authority in writing (or, to the knowledge of the Company, has been threatened or proposed in writing), except for deficiencies which have been satisfied by payment, settled or withdrawn. No Action with respect to any Taxes is in progress, pending, proposed or threatened in writing with respect to the Business, the Purchased Assets or FM Chile.

(g)      None of the Sellers or FM Chile has been a member of a federal, state, local or foreign consolidated, combined, unitary or similar group (other than a group the common parent of which is First Mode Holdings Inc.). There are no Tax indemnification or Tax sharing agreements under which the Buyer would reasonably be expected to be liable after the Closing Date for any Tax liability of any Seller or FM Chile, other than with respect to customary agreements with customers, vendors, lessors, lenders and the like or other similar agreements included in the Purchased Assets or Assumed Liabilities and entered into in the ordinary course of business that do not substantially relate to Taxes. None of the Sellers or FM Chile has any liability for material Taxes of another Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign law) as a transferee or successor.

(h)      None of the Sellers or FM Chile has entered into or participated in a "listed transaction" that has given rise to a disclosure obligation under Section 6011 of the Code and the Treasury Regulations promulgated thereunder and that has not been disclosed in the relevant Tax Return of the relevant Seller.

(i)      There are no Liens for Taxes on the Purchased Assets or the assets of FM Chile other than Permitted Liens.

(j)      No claim related to the Business, the Purchased Assets or the Taxes of FM Chile has been made by any Governmental Authority in a jurisdiction where any Seller or FM Chile does not file a particular type of Tax Return claiming that such Seller is or may be required to file such Tax Return or pay a particular type of Tax in such jurisdiction or is or may be subject to taxation by that jurisdiction, in each case, that remains unresolved.

(k)      FM Chile is classified as a corporation for U.S. federal income tax purposes.

(l)      There are no Tax rulings or requests for rulings relating to Taxes of FM Chile.

(m)      FM Chile (i) is not and has never been a "surrogate foreign corporation" within the meaning of Section 7847(a)(2)(B) of the Code or is treated as a U.S. corporation under Section 7874(b) of the Code; or (ii) was not created or organized in the United States such that such entity would be taxable in the United States as a domestic entity pursuant to United States Treasury Regulations Section 301.7701-5(a).

(n)      FM Chile will not be required to include any material item of income in, or exclude any material item of deduction or loss from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any (i) installment sale or open transaction disposition made prior to the Closing, (ii) prepaid amount or deferred revenue received prior to the Closing, (iii) change in method of accounting for a taxable period ending on or prior to the Closing Date, (iv) "closing agreement" as described in Section 7121 of the Code (or any similar provision of state, local or non-U.S. Tax Law) entered into prior to the Closing, (v) use of an improper method of accounting for a taxable period ending on or prior to the Closing Date, or (vi) a gain recognition agreement under Section 367 of the Code (or any similar provision of state, local or non-U.S. Tax Law).

(o)      No transaction contemplated by this Agreement is subject to withholding under Section 1445 of the Code (relating to "FIRPTA") (or similar provision of state, local or foreign law).

4.14    Licenses, Permits and Authorizations.

Sellers hold, and are in compliance with, all of the licenses, approvals, consents, registrations and permits (collectively, "Permits") necessary under applicable Laws to permit Sellers own, operate, use and maintain their respective Purchased Assets in the manner in which they are now operated, used and maintained and to conduct their respective portions of the Business as currently conducted, except where the absence of, or the failure to be in compliance with, any such Permit would not reasonably be expected to be material to the Purchased Assets or the Business, taken as a whole. There are no pending or, to the knowledge of the Company, threatened in writing, Actions that would reasonably be expected to result in the revocation or termination of any Permit that is material to the conduct of the Business as currently conducted, except for any such revocation or termination that would not reasonably be expected to be material to the Business or the Purchased Assets, taken as a whole.

4.15    Sufficiency of Assets; Machinery, Equipment and Other Tangible Personal Property;

(a)      The Company or one of its Subsidiaries owns and has good title to the Purchased Assets, free and clear of all Liens other than Permitted Liens.

(b)      The equipment, fixtures and other tangible assets included in the Purchased Assets (i) have been maintained in all material respects in accordance with the ordinary course policies, procedures and standards of the Company or its Subsidiaries, and are not the subject to any material deferred maintenance or deferred capital expenditures, (ii) are in good condition and repair (ordinary wear and tear excepted) and (iii) are suitable for the uses for which intended, and none of such tangible assets are in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in cost or nature. The leased personal property included in the Purchased Assets are in all material respects in the condition required of such property by the terms of the lease applicable thereto.

4.16    Real Property.

None of the Company or any of its Subsidiaries own any real property. Neither the Company nor any of its Subsidiaries is obligated or bound by any options, obligations or rights of first refusal or contractual rights to sell, lease or acquire any real property. Schedule 4.16 lists the street addresses of all Leased Real Property and a description of all Real Property Leases. The Company or one of its Subsidiaries has a valid and enforceable leasehold estate in all Leased Real Property, subject to the Remedies Exception and free and clear of all Liens except any Permitted Liens. Neither the Company nor any of its Subsidiaries has received any written notice from any lessor or similar third party of such Leased Real Property of, nor does the Company or any of its Subsidiaries have knowledge of the existence of, any default, event or circumstance that, with or without notice, lapse of time, or both, would constitute a default under any of the Real Property Leases. The Company or the Subsidiary, as applicable, has the right to use all of the Leased Real Property for the full term of each such Real Property Lease (and any renewal options) relating thereto. Neither the Company nor any of its Subsidiaries has assigned, transferred or pledged any interest in any of the Real Property Leases. Neither the whole nor any part of the Leased Real Property is subject to any pending suit for condemnation or other taking by any public authority, and, to the knowledge of the Company, no such condemnation or other taking is threatened or contemplated. The use and occupancy of the Leased Real Property by the Company or its Subsidiary and the conduct of the Business thereat as presently conducted does not violate in any material respect any applicable Laws (including zoning Laws). There are no leases, subleases, licenses or other agreements granting to any Person other than the Company or its Subsidiaries the right of use or occupancy of any portion of the Leased Real Property (except under the Real Property Leases). All buildings, structures, facilities and improvements located on the Leased Real Property, including buildings, structures, facilities and improvements which are under construction (collectively, "Improvements") comply in all material respects with valid and current certificates of occupancy or similar permits to the extent required by Laws for the use thereof, and conform in all material respects with all applicable Laws. The Improvements are in all material respects (A) in good operating condition and repair (ordinary wear and tear excepted) and (B) suitable and adequate for continued use in the manner in which they are presently being used. The Leased Real Property constitutes all of the real property used by the Company or any of its Subsidiaries in the conduct of its business.

4.17    Intellectual Property.

(a)    Schedule 4.17(a) sets forth a complete, accurate and current list of all the following included in the Transferred Intellectual Property: (A) issued or registered Intellectual Property and pending applications for issuances or registrations of Intellectual Property, including for each such item (to the extent applicable), the record owner, the jurisdiction in which such item has been issued, registered, or filed, and the issuance, registration, or application number and date (the "Transferred Registered Intellectual Property"), (B) material unregistered Trademarks, (C) material Transferred Software, and (D) Trade Secrets. All Transferred Registered Intellectual Property is subsisting, unexpired, valid, and enforceable. The Company and its Subsidiaries are in compliance with all applicable requirements (including payment of filing, examination, and maintenance fees) required to maintain the Transferred Registered Intellectual Property in full force and effect.

(b)    Except as set forth on Schedule 4.17(b), all Transferred Intellectual Property is owned by the Company or one of its Subsidiaries free and clear of any Liens (other than Permitted Liens).

(c)    The Company or one of its Subsidiaries owns, or has sufficient rights in and to pursuant to a valid and subsisting license, sublicense, agreement or other permission, to use all Intellectual Property in the manner in, and to the extent to, which it is used in the operation of the business of the Company and its Subsidiaries, as conducted as at the date of this Agreement and as at Closing.

(d)    The Company and its Subsidiaries use and have used commercially reasonable efforts to maintain and protect the confidentiality of the Trade Secrets of the Company and its Subsidiaries that are material to the business. All Persons who are privy to any such Trade Secrets have executed and delivered to the Company or one of its Subsidiaries, as applicable, a written agreement pursuant to which such Person has agreed to hold such Trade Secrets in confidence. To the knowledge of the Company, no Trade Secrets, know-how or other proprietary information of the Company or any of its Subsidiaries are owned by any current or former employee, founder, contractor, consultant, or any other individual or entity other than the Company or any of its Subsidiaries. There has been and is no misuse of Trade Secrets by the Company or any of its Subsidiaries and the Company, its Subsidiaries and the Sellers have not made any disclosure of know-how to any person, other than to the Buyer or in the ordinary and usual course of business and on the basis that such disclosure is to be treated as being of a confidential character.

(e)    All Persons who have independently or jointly contributed to the creation, development, conception, or reduction to practice of any Transferred Intellectual Property, including any Transferred Intellectual Property that was created prior to the formation of the Company or any of its Subsidiaries, have executed and delivered to the Company or one of its Subsidiaries, as applicable, a valid and enforceable written agreement pursuant to which such Person irrevocably and unconditionally assigns all rights, title, and interest in and to such Intellectual Property to the Company or one of its

Subsidiaries, as applicable. No such Person has retained any rights in or to such Transferred Intellectual Property.

(f)        Except as set forth on <u>Schedule 4.17(f)</u>, neither the Company nor any of its Subsidiaries has delivered, licensed or made available to any escrow agent or other Person any material source code included in the Transferred Software, except for disclosures to employees and independent contractors for the Company or any of its Subsidiaries that are subject to written confidentiality obligations to maintain the confidentiality of such software code and who have had such access only during the term of their employment with, or provision of services to, the Company or any of its Subsidiaries, as applicable, and no Software that is licensed, distributed or otherwise made available to others by the Company or any of its Subsidiaries incorporates any Open Source Software or similar license that requires any source code included in the Transferred Software to be disclosed, distributed, or licensed to any other Person.

(g)        Except as set forth on <u>Schedule 4.17(g)</u> no third party is infringing upon, misappropriating or otherwise violating any Transferred Intellectual Property. Neither the Company nor any of its Subsidiaries has given any notice, charge, complaint, claim or other assertion asserting or threatening to assert any Action against any Person involving or relating to any Transferred Intellectual Property or other Intellectual Property which is material to the conduct of the business as it is conducted at the date of this Agreement and at Closing.

(h)        Neither the Company nor any of its Subsidiaries is a member of, participant in or contributor to any standards-setting organization or patent pool that requires the Company or any of its Subsidiaries to license, release, covenant not to asset or make available any Transferred Intellectual Property to any other Person. Neither the Company nor any of its Subsidiaries has used any funding, facilities, personnel or other resources of any Governmental Authority, academic or research institution to invent, develop or create any Transferred Intellectual Property.

4.18    <u>Absence of Changes.</u>

(a)        From the date of the most recent balance sheet included in the Financial Statements to the date of this Agreement, there has not been any Material Adverse Effect.

(b)        Except as expressly contemplated by this Agreement, from the date of the most recent balance sheet included in the Financial Statements through the date of this Agreement, the Company and its Subsidiaries have, in all material respects, conducted the Business and operated the Purchased Assets in the ordinary course of business.

(c)        Except as set forth in <u>Schedule 4.18(c)</u>, since the date of most recent balance sheet included in the Financial Statements, neither the Company nor any of its Subsidiaries has taken any action that would require the Buyer's consent pursuant subsections (ii), (v) or (vii) to <u>Section 7.1(b)</u>.

4.19    Affiliate Matters.

None of the Contracts set forth on Schedule 6.3(c) on the date hereof are between (x) any Seller or FM Chile, on the one hand, and (y) any Affiliate of any Seller or FM Chile or any officer, director, equityholder or employee of any Seller or FM Chile, on the other hand (each, a "Related Party"). Except as set forth on Schedule 4.19, no Related Party (a) owns any of the Purchased Assets, (b) owes any money to, or is owed any money by, any Seller or FM Chile (excluding advances for business expenses in the ordinary course of business) or (c) provides material services to FM Chile or the Business or with respect to any Purchased Asset.

4.20    Brokers' Fees

Except as set forth on Schedule 4.20, no broker, finder, investment banker or other Person is entitled to any brokerage fee, finders' fee or other similar commission, for which Buyer, the Company or any of its Subsidiaries would be liable in connection with the Transactions based upon arrangements made by the Company, any of its Subsidiaries or any of their Affiliates.

4.21    No Additional Representations or Warranties.

Except as provided in this ARTICLE IV, the Schedules or, as applicable, any other Transaction Document to which any Seller is a party, neither Sellers nor any of their Affiliates, nor any of their respective managers, directors, officers, employees, stockholders, partners, members, agents or representatives has made, or is making, any representation or warranty whatsoever, express or implied, at law or in equity, to Buyer or its Affiliates, directors, officers, employees, stockholders, partners, members or representatives.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth in the Schedules, Buyer represent and warrant to the Company as of the date of this Agreement and as of the Closing as follows:

5.1    Corporate Organization.

Buyer has been duly incorporated and is validly existing as a corporation in good standing under the Laws of the State of Delaware and has the corporate power and authority to own, operate or lease its properties and to conduct its business as it is now being conducted. Buyer is duly licensed or qualified and (where applicable) is in good standing in each jurisdiction in which the ownership, operation or leasing of its property or the character of its activities is such as to require it to be so licensed or qualified except as would not, individually or in the aggregate, reasonably be expected to interfere with, prevent or delay the ability of Buyer to enter in to and perform its obligations under the Transaction Documents to which it is a party or to consummate the transactions contemplated thereby.

5.2    Due Authorization.

Buyer has all requisite corporate power and authority to execute and deliver this Agreement and the other Transaction Documents to which Buyer is a party and (subject to the

consents, approvals, authorizations and other requirements described in <u>Section 5.5</u>) to perform all obligations to be performed by it hereunder. The execution and delivery of this Agreement and the other Transaction Documents to which Buyer is a party and the consummation by Buyer of the Transactions have been duly and validly authorized and approved by the board of directors of Buyer, and no other corporate proceeding on the part of Buyer is necessary to authorize this Agreement. This Agreement and the other Transaction Documents to which Buyer is a party have been duly and validly executed and delivered by Buyer and (assuming such agreements constitute the legal, valid and binding obligations of the applicable Sellers) constitute the legal, valid and binding obligations of Buyer, enforceable against Buyer in accordance with its terms, subject to the Remedies Exception.

5.3    <u>No Conflict.</u>

Except as may result from any facts or circumstances related solely to Sellers or their Affiliates, the execution and delivery of this Agreement by Buyer and the other Transaction Documents to which Buyer is a party and the consummation by Buyer of the Transactions do not (a) conflict with, violate any provision of, or result in the breach of any applicable Law to which Buyer is subject or by which any property or asset of Buyer is bound, (b) conflict with the Organizational Documents of Buyer or any Subsidiary of Buyer, or (c) conflict with, violate any provision of, result in a breach of, constitute a default (or an event which, with or without notice, lapse of time or both, would become a default) under, require a consent under, give to any person any right of acceleration, termination, modification or cancellation under, result in the creation of any Lien (other than Permitted Liens) under, or terminate or result in the termination of, any material Contract to which Buyer or any Subsidiary of Buyer is a party or by which Buyer or any Subsidiary of Buyer may be bound, or terminate or result in the termination of any such Contract, or result in the creation of any such Lien under any such Contract upon any of the properties or assets of Buyer or any Subsidiary of Buyer constitute an event which, after notice or lapse of time or both, would result in any such violation, breach, termination or creation of such Lien, except to the extent that the occurrence of the foregoing items set forth in clauses (a) or (c) would not, individually or in the aggregate, interfere with, prevent or delay in any material respect the ability of Buyer, as applicable, to enter into and perform its obligations under the Transaction Documents to which it is a party or consummate the transactions contemplated thereby.

5.4    <u>Litigation and Proceedings.</u>

There are no Actions pending or, to the knowledge of Buyer, threatened, against Buyer or any of their respective Affiliates or their respective representatives which, in each case, if resolved adversely to Buyer or any of their respective Affiliates or representatives, would reasonably be expected to interfere with, prevent or delay in any material respect the ability of Buyer, as applicable, to enter into and perform its obligations under the Transaction Documents to which it is a party or consummate the transactions contemplated thereby.

5.5    <u>Governmental Consents.</u>

Assuming the truth and completeness of the representations and warranties of the Company contained in this Agreement, no consent, approval or authorization of, or designation, declaration or filing with, any Governmental Authority is required on the part of Buyer with respect

to Buyer's execution or delivery of this Agreement or the consummation of the Transactions.

5.6     Financial Ability.

Buyer has cash on hand or undrawn amounts immediately available under existing credit facilities necessary to consummate the Transactions, and to satisfy all of the obligations of Buyer under this Agreement.

5.7     Brokers' Fees.

Except as set forth on Schedule 5.7, no broker, finder, investment banker or other Person is entitled to any brokerage fee, finders' fee or other similar commission in connection with the Transactions based upon arrangements made by Buyer or any of its Affiliates.

5.8     No Outside Reliance.

Notwithstanding anything contained in this ARTICLE V or any other provision hereof, Buyer acknowledges and agrees that neither the Company nor any of its Affiliates, nor any of its or their respective directors, officers, employees, stockholders, partners, members, agents or representatives, has made, or is making, any representation or warranty whatsoever, oral or written, express or implied, beyond those expressly given in ARTICLE IV or any other Transaction Document, including any implied warranty or representation as to condition, merchantability, suitability or fitness for a particular purpose or trade as to any Purchased Asset or the Business. Without limiting the generality of the foregoing, it is understood that any cost estimates, financial or other projections or other predictions that may be contained or referred to in the Schedules or elsewhere, as well as any information, documents or other materials (including any such materials contained in any "data room" or reviewed by Buyer or any of its Affiliates, nor any of their respective directors, officers, employees, stockholders, partners, members, agents or representatives agents or representatives pursuant to the Confidentiality Agreement) or management presentations or due diligence discussions that have been or shall hereafter be provided to or engaged in with Buyer or any of its Affiliates or any of their respective directors, officers, employees, stockholders, partners, members, agents or representatives are not and will not be deemed to be representations or warranties of the Company or any of its Affiliates or any of their respective directors, officers, employees, stockholders, partners, members agents or representatives, and no representation or warranty is made as to the accuracy or completeness of any of the foregoing, except as may be expressly set forth in ARTICLE IV or any other Transaction Document. Buyer understands and agrees that any Inventory that is a Purchased Asset is furnished "as is", and "where is" and, subject only to the representations and warranties contained in ARTICLE IV, with all faults and without any other representation or warranty of any nature whatsoever. Notwithstanding anything to the contrary in the foregoing, nothing contained in this Section 5.8 shall limit the applicability of any claim for Fraud.

5.9     No Additional Representations or Warranties.

Except as provided in this ARTICLE V or any other Transaction Document to which it is a party, neither Buyer nor any of their Affiliates, nor any of their respective managers, directors, officers, employees, stockholders, partners, members, agents or representatives has made, or is making, any representation or warranty whatsoever, express or implied, at law or in

equity, to Sellers or their respective Affiliates, directors, officers, employees, stockholders, partners, members or representatives.

## ARTICLE VI.
## BANKRUPTCY COURT MATTERS

6.1    Competing Transaction.

This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or better competing bids in respect of all or any part of the Purchased Assets, as determined in accordance with the provisions of the Bid Procedures Order (each, a "Competing Bid").

6.2    Bankruptcy Court Filings.

(a)    Subject to Section 6.1, Sellers shall use commercially reasonable efforts to take all actions as may be necessary to cause the Sale Order to be issued and entered by the Bankruptcy Court and become a Final Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court, which Sale Order shall provide for the transfer of the Purchased Assets and the Assumed Liabilities to Buyer free and clear of any Liens and free from all successor or transferee Liability to the fullest extent permitted by Section 363 of the Bankruptcy Code. Sellers shall comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the Bankruptcy Court in obtaining the entry of the Sale Order. Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order, including a finding of adequate assurance of future performance by Buyer, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" Buyer under Section 363(m) of the Bankruptcy Code. If the Sale Order, or any other orders of the Bankruptcy Court relating to this Agreement or the Transactions are appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bid Procedures Order and the Sale Order, or such other Order), subject to rights otherwise arising from this Agreement, Sellers shall take all actions as may be necessary to prosecute and defend such appeal, petition or motion and obtain an expedited resolution thereof.

(b)    Sellers shall use its commercially reasonable efforts to (i) hold the Auction, unless an Auction is not required to be held pursuant to the terms of the Bid Procedures, on or before the date that is 40 days following the Petition Date, and (ii) have the Sale Order entered on or before the date that is 50 days following the Petition Date.

(c)    The parties shall consult with each other regarding pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably

affect the Bankruptcy Court's approval of, the Sale Order, including, (i) sharing in advance of filing the Sale Motion, any proposed Bid Procedures Order, any proposed Sale Order, together with any motions, declarations, or replies submitted by the Sellers in support of entry of Bid Procedures Order or the Sale Order, and (ii) to the extent reasonably practicable, sharing in advance of filing any drafts of any other documents in connection with the Sale Order. Sellers shall not seek any modification to the Sale Order by the Bankruptcy Court or any other Governmental Authority of competent jurisdiction to which a decision relating to the Bankruptcy Cases has been appealed, in each case, without the prior written consent of Buyer, not to be unreasonably withheld.

6.3    Assumption of Assigned Contracts.

(a)    Schedule 6.3(a) sets forth a complete list of all executory Contracts and unexpired leases, including Real Property Leases, and non-executory Contracts (collectively, the "Available Contracts") to which any Seller is a party and that are used or held for use in the operation of, or relating to, the Business or Purchased Assets, including (x) with respect to each such executory Contract to which a Debtor is a party, a good faith estimate of the Cure Costs in respect of each such executory Contract and (y) with respect to each such Contract to which a Debtor is not a party, the monetary amounts that the Sellers believe are required to be paid in connection with the assumption and/or assignment of each such Contract (such monetary amounts as set forth on Schedule 6.3(a), the "Non-Debtor Contract Costs"). The Sellers have, to their knowledge, made available to Buyer prior to the execution of this Agreement true and complete copies of all such Available Contracts.

(b)    With respect to any Available Contracts to which a Debtor is a party, on or before the date that is two Business Days following the date on which the Bid Procedures Order is entered by the Bankruptcy Court, Sellers shall file (or cause to be filed) a customary notice of assumption (the "Assumption Notice") with the Bankruptcy Court and serve such notice on each counterparty to an Available Contract listed thereon. The Assumption Notice shall identify all Available Contracts to which a Debtor is a party that Sellers and Buyer believe may be assumed and assigned in connection with the sale of the Purchased Assets and set forth a good faith estimate of the amount of Cure Costs applicable to each such Available Contract (and if no Cure Cost is estimated to be applicable with respect to any particular Available Contract, the amount of such Cure Cost designated for such Available Contract shall be "$0.00"). In accordance with the Bid Procedures Order, the parties hereto reserve the right to supplement and/or modify such list of Available Contracts and have Sellers provide additional notice thereof, as applicable, and to remove (subject to Section 6.3(c)) an Available Contract from, or add a Contract to, such list of Available Contracts, up to two (2) days prior to the Closing Date. Solely to the extent consistent with the Bid Procedures Order, the Assumption Notice and any notice of supplementation or modification with respect thereto shall provide that any failure by a non-Debtor counterparty to timely object to the Cure Costs set forth in the applicable Assumption Notice shall make binding the Cure Costs set forth in the applicable Assumption Notice or notice of supplementation or modification with respect thereto.

(c)    Schedule 6.3(c) sets forth a list of Available Contracts that Buyer intends to include on the Assigned Contract Schedule as of the date hereof. Not less than two (2) Business Days before the Auction or cancellation thereof, Buyer shall provide to Sellers an updated list of the Available Contracts that the Buyer intends to include on the Assigned Contract Schedule (as defined below, and such Contracts that Buyer intends to have Sellers assume and assign to Buyer at the Closing, the "Assigned Contracts"). Buyer shall be entitled, in its sole discretion, to (i) remove any Available Contract from the Assigned Contracts or (ii) add any Available Contract to the Assigned Contracts at any time up to two (2) days prior to the Closing Date by providing Sellers written notice of such removal or addition, as applicable, without any downward adjustment to the Purchase Price. In the event that Buyer removes any such Available Contract from the list of Assigned Contracts (as finalized at two (2) days prior to the Closing Date, the "Assigned Contracts Schedule"), such Available Contract will constitute an Excluded Contract and, to the extent a Debtor is a party to such Available Contract, Sellers will provide the relevant counterparty notice that the applicable Available Contract is no longer identified as an Assigned Contract. Subject to Section 6.3(d), for the avoidance of doubt, only those Available Contracts that remain identified as Assigned Contracts on the Assigned Contracts Schedule as of the Closing Date will be assumed by Sellers and assigned to Buyer (x) with respect to such Assigned Contracts to which a Debtor is a party, pursuant to the Sale Order or (y) with respect to such Assigned Contracts to which a Debtor is not a party, pursuant to the terms hereof (subject to Section 2.5) and, in each case, included as Purchased Assets. With respect to the Assigned Contracts to which a Debtor is a party, Sellers shall file such motions or pleadings as may be appropriate or necessary to assume and assign such Assigned Contracts and to determine the amount of the Cure Costs with respect thereto. With respect to the Assigned Contracts to which a Debtor is not a party, Sellers and Buyer shall, and shall cause their respective subsidiaries to, use commercially reasonable efforts prior to the Closing to obtain the consents, waivers, approvals, orders and authorizations necessary to transfer, assign or permit a change in control with respect to any such Assigned Contracts; provided, that, for the avoidance of doubt, any such Assigned Contracts for which the requisite consent, waiver, approval, order or authorization is not obtained prior to the Closing shall be deemed a Non-Transferred Asset in accordance with Section 2.5. Notwithstanding the foregoing, nothing herein shall preclude Sellers from filing one or more motions to reject any Available Contracts to which a Debtor is a party that are not Assigned Contracts; provided, that Sellers shall confirm with Buyer before filing any motion to reject any such Available Contracts that Buyer does not intend to assume any such Available Contract. At the Closing, Sellers shall assume and assign to Buyer (x) the Assigned Contracts to which a Debtor is a party, in each case, pursuant to Section 365 of the Bankruptcy Code and the Sale Order, subject to provision by Buyer of adequate assurance and payment of future performance to the extent required under Section 365 of the Bankruptcy Code and the terms of the Sale Order and (y) the Assigned Contracts to which a Debtor is not a party pursuant to the terms and subject to the conditions hereof.

(d)    For the avoidance of doubt and notwithstanding anything to the contrary herein, Buyer shall be liable for all Cure Costs (including, for the avoidance of doubt, any such Cure Costs that arise after Closing). If an objection from a duly noticed counterparty is timely filed in the Bankruptcy Court (each, a "Cure Objection") with respect to an

Assigned Contract to which a Debtor is a party and such Cure Objection is not consensually resolved or finally determined by the Bankruptcy Court, in each case prior to Closing and to Buyer's satisfaction, then at Buyer's election (i) such Assigned Contract will be removed from the list of Assigned Contracts and shall be deemed an Excluded Contract for purposes of this Agreement, (ii) such Assigned Contract shall be assumed by the Seller and assigned to Buyer on the Closing with a Cure Cost equal to that asserted by the Contract counterparty or (iii) such Assigned Contract shall be deemed assumed by the applicable Seller and assigned to the Buyer on the Closing, subject to the preservation of the non-Seller counterparty's Cure Objection, and with respect to the foregoing clauses (ii) and (iii), Buyer shall be required to pay or cause to be paid such Cure Costs. For the avoidance of doubt, at any time during the pendency of a dispute with respect to a Cure Objection and, in any event, within five (5) Business Days after the date on which the Bankruptcy Court has entered an order fixing a Cure Cost that is higher than the amount listed in the Assumption Notice and/or the Assigned Contracts Schedule, Buyer may designate such Assigned Contract as an Excluded Contract in accordance with this <u>Section 6.3</u> and such contract shall be deemed an Excluded Contract for purposes of this Agreement, with no payment of any Cure Costs; <u>provided</u>, that with respect to any Assigned Contract subsequently designated as an Excluded Contract following the Closing, Buyer shall be solely responsible for payment of obligations and liabilities incurred between the Closing and the designation of such Assigned Contract as an Excluded Contract; <u>provided</u>, <u>further</u>, that the applicable Seller shall not reject such Assigned Contract until Buyer's designation (if any).

(e)      If Sellers receive a Cure Objection and such Cure Objection is consensually resolved or finally determined by the Bankruptcy Court, in each case, prior to Closing and to Buyer's satisfaction, then any remaining Cure Costs owing to such non-Seller counterparty with respect to the subject Assigned Contract shall promptly be paid by Buyer.

(f)      From the date of the filing of the Assumption Notice, Sellers shall (i) not (x) increase the Cure Costs or Non-Debtor Contract Costs set forth on <u>Schedule 6.3(a)</u> with respect to any Available Contract, (y) reject any Available Contract, or (z) resolve any Cure Objection, in each case without Buyer's prior written consent (not to be unreasonably withheld), and (ii) consult with Buyer with respect to any Cure Objections or the resolution thereof.

(g)      If, prior to Closing, it is discovered that a Contract should have been listed on <u>Schedule 6.3(a)</u> but was not so listed (any such Contract, a "<u>Previously Omitted Contract</u>"), then Sellers shall, as soon as reasonably possible following the discovery thereof, notify Buyer in writing of such Previously Omitted Contract (the "<u>Previously Omitted Contract Notice</u>") and provide Buyer with a copy of such Previously Omitted Contract and the Cure Cost (if any) in respect thereof. Buyer shall thereafter deliver notice to Sellers no later than two (2) days prior to Closing noting whether Buyer elects to so include such Previously Omitted Contract on the Assigned Contracts Schedule and make it an Assigned Contract. Any Previously Omitted Contract not added to the Assigned Contracts Schedule shall be deemed an Excluded Contract for purposes of this Agreement. If Buyer includes a Previously Omitted Contract on the Assigned Contracts

45

Schedule in accordance with Section 6.3(g), and a Debtor is a party to such Previously Omitted Contract, Sellers shall file and serve a customary notice on the counterparty to such Previously Omitted Contract notifying such counterparty of the Sellers' intention for the Seller to assume and assign such contract, including in such notice the proposed Cure Cost (if any).

(h)     Prior to Closing, Sellers and Buyer shall take action to provide adequate assurance and payment of Cure Costs as may be required under Section 365 of the Bankruptcy Code and the terms of the Sale Order. At the Closing (or, if applicable, in accordance with clause (iii) of Section 6.3(d)), the Cure Costs with respect to any Assigned Contract (including Previously Omitted Contracts that become Assigned Contracts pursuant to Section 6.3(g)) that is consensually resolved or finally determined by the Bankruptcy Court shall be paid in accordance with Section 6.3(d).

(i)     Sellers shall use reasonable best efforts to facilitate introductions to the counterparties to any Contract of Sellers or its Subsidiaries pertaining to the Business or the Purchased Assets, and Buyer may (during the period between the date hereof and Closing) discuss with each such counterparty the terms on which Buyer is willing to assume such Contract. Upon an agreement between Sellers, Buyer and the applicable counterparty to any Assigned Contract to which a Debtor is a party on the Cure Costs that shall be payable in connection with assignment and assumption of such Assigned Contract, subject to Buyer's consent, which agreement is binding on the counterparty pursuant to an order of the Bankruptcy Court, such amount shall be deemed to be the Cure Cost applicable to such Assigned Contract for all purposes hereunder.

(j)     Notwithstanding any provision in this Agreement to the contrary, from and after the date hereof through the Closing Date, Sellers will not reject or take any action (or fail to take any action that would result in rejection by operation of Law) to reject, withdraw, repudiate or disclaim any Contract materially or primarily related to the Business unless Buyer has provided its prior written consent (email being sufficient).

6.4     No Successor Liability

The parties hereto agree that the Sale Order shall provide that to the fullest extent permitted under Section 363(f) of the Bankruptcy Code and any other applicable Law, (a) neither Buyer nor any of its Affiliates shall be liable for any Liability or Lien (other than Assumed Liabilities and Permitted Liens) against Sellers or any of their predecessors; and (b) neither Buyer nor any of its Affiliates shall have any successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Purchased Assets or any Liabilities of Sellers who are a debtor in the Bankruptcy Cases arising on or prior to the Closing Date.

## ARTICLE VII.
## CERTAIN PRE-CLOSING ACTIONS

7.1     Conduct of the Business.

(a)     Except (i) as set forth on Schedule 7.1(b), (ii) as may be approved in advance in

writing by Buyer, including pursuant to Section 7.1(c) and (iii) as is otherwise required by a Governmental Order of the Bankruptcy Court, from the date hereof through the Closing, Sellers shall use their reasonable best efforts to (A) enter or cause FM Chile to enter the Contracts set forth on Schedule 7.1(c) and purchase Inventory or other assets or services in accordance with Section 7.1(c); provided, that, for the avoidance of doubt, Sellers' failure to enter or cause FM Chile to enter such Contracts or purchase such Inventory or other assets or services shall not constitute a breach of this Section 7.1(a) for purposes Section 9.2(a)(i) and (B) use their reasonable best efforts keep and maintain the tangible Purchased Assets in good operating condition and repair.

(b)     Without limiting the generality of Section 7.1, except as expressly contemplated by this Agreement or as set forth in Schedule 7.1(b), Sellers shall not, without the express prior written approval of Buyer (including pursuant to Section 7.1(c)):

(i)     sell, lease (as lessor), transfer or otherwise dispose of (including any transfers to any equityholders of the Company or any affiliates of such equityholders), or mortgage or pledge, or impose or suffer to be imposed any Lien on, any of the Purchased Assets, except for minor amounts of personal property sold or otherwise disposed of for fair value in the ordinary course of the business of the Company or its Subsidiaries consistent with past practice;

(ii)     acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of any business or any corporation, partnership or other business organization or otherwise acquire any assets (except assets purchased for minor amounts in the ordinary course of the business of the Company or its Subsidiaries consistent with past practice ), that as of the Closing would constitute Purchased Assets;

(iii)     cancel any debts owed to or claims held by the Company or its Subsidiaries (including the settlement of any claims or litigation) in connection with the Business or the Purchased Assets other than in the ordinary course of the business of the Company or its Subsidiaries consistent with past practice;

(iv)     create, incur or assume, or agree to create, incur or assume, any indebtedness for borrowed money or enter into, as lessee, any capitalized lease obligations in connection with the Business or the Purchased Assets (other than for reasonably necessary repairs and ordinary course maintenance), except to the extent the foregoing would constitute Excluded Liabilities;

(v)     delay or accelerate payment of any account payable or other liability beyond or in advance of its due date or the date when such liability would have been paid in the ordinary course of the business of the Company or its Subsidiaries consistent with past practice in connection with the Business or the Purchased Assets, except to the extent the foregoing would constitute Excluded Liabilities;

(vi)     (A) prepare or file any material Tax Return inconsistent with past practice or, on any such Tax Return, take any position, make any election, or adopt any

47

method that is inconsistent with positions taken, elections made or methods used in preparing or filing similar Tax Returns in prior periods, in each case, in respect of material Taxes, (B) file any material amended Tax Return, (C) settle or compromise any claim related to material Taxes, (D) enter into any closing agreement or similar agreement relating to material Taxes, (E) otherwise settle any dispute relating to material Taxes, (F) surrender any right to claim a material Tax refund, material offset or other material reduction in Tax liability, or (G) request any ruling or similar guidance with respect to material Taxes, in each case (A) through (G), with respect to FM Chile or the Purchased Assets;

(vii)    except as required by Law, the terms of any Company Benefit Plan as in effect on the date hereof or as provided in any incentive or retention program or similar arrangement approved by the Bankruptcy Court (the liabilities for which shall be treated as an Excluded Liability), institute any increase in any compensation payable to any Offer Employees or any Business Employees of FM Chile or in any profit-sharing, bonus, incentive, deferred compensation, insurance, pension, retirement, medical, hospital, disability, welfare or other payments or benefits made available to any such employees;

(viii)    enter into, materially amend or modify or terminate any Contract that is listed on Schedule 4.10(a) or Schedule 6.3(c);

(ix)    terminate the employment of any Offer Employee or Business Employee of FM Chile other than for cause;

(x)    fail to take all necessary action to maintain and protect the Transferred Intellectual Property or otherwise cause loss of rights in the Transferred Intellectual Property;

(xi)    enter into any agreement or commitment with any Affiliate of the Company or any of its Subsidiaries that would be a Purchased Asset; or

(xii)    enter into or become committed to enter into any material transaction except in the ordinary course of business of the Company or its Subsidiaries in connection with the Business or the Purchased Assets.

(c)    Following the date hereof and prior to the Closing, Buyer and Sellers anticipate that Sellers and/or FM Chile will (i) enter into Contracts with certain Persons identified on Schedule 7.1(c) and (ii) incur expenditures for the purchase of Inventory or procurement of other assets or services as described on Schedule 7.1(c) in connection with such Contracts; provided, that the aggregate amount of expenditures incurred pursuant to this Section 7.1(c) shall not exceed $2,175,000 (the "Cap"). Sellers shall provide Buyer with copies of such Contracts and reasonable supporting documentation with respect to such expenditures and obtain the prior written consent of Buyer prior to entering into any such Contract or making any such expenditures (the aggregate of such approved and incurred expenditures, the "Approved Expenditure Amount"), and, for the avoidance of doubt, the Approved Expenditure Amount shall not exceed the Cap. The

48

Purchase Price shall be increased by the Approved Expenditure Amount in accordance with Section 3.1.

(d)      During the period prior to the Closing Date, the Company will notify Buyer of (i) any Action that is threatened, brought, asserted or commenced against any Seller that would have been listed in Schedule 4.8 if such lawsuit, claim, proceeding or investigation had arisen prior to the date hereof, (ii) any notice or other communication from any third Person alleging that the consent of such third Person is or may be required in connection with the Transactions or (iii) any default by a Seller under any material Contract listed on Schedule 4.10(a) or Schedule 6.3(c); provided, that failure to deliver any such notice pursuant to the foregoing clause (iii) by the Company shall not constitute a failure of the conditions to Closing set forth in Section 9.1 or Section 9.2 to be satisfied.

7.2    Investigation by Buyer.

Sellers shall afford the officers, employees and authorized representatives of Buyer (including independent public accountants and attorneys) reasonable access during normal business hours to the offices, properties, employees and business and financial records (including computer files, retrieval programs and similar documentation) and such access and information to the extent Buyer shall deem necessary or desirable in each case, to the extent related to the Business or the Purchased Assets. Sellers shall furnish to Buyer or its authorized representatives such additional information concerning the Purchased Assets and the Business as shall be reasonably requested, including all such information as shall be necessary to enable Buyer or its Representatives to: (a) verify the accuracy of the representations and warranties contained in this Agreement; (b) verify that the covenants of Sellers contained in this Agreement have been complied with; (c) determine whether the conditions set forth in Section 9.1 have been satisfied; and (d) permit Buyer to facilitate the transition of the Business and Purchased Assets to Buyer at the Closing. Buyer agrees that such investigation shall be conducted in such a manner as not to interfere unreasonably with the operations of Sellers. Further, Sellers shall afford Buyer's human resources personnel reasonable access during normal business hours to the Business's offices, employees and applicable records for the purpose of facilitating the transition of the Transferred Employees from Sellers to Buyer as contemplated by Section 7.3.

7.3    Employment Matters.

(a)      To the extent permitted by applicable Law, no later than fifteen (15) days after the date of this Agreement, the Company shall provide Buyer with an updated Schedule 1.1(a) of Offer Employees, containing the information required by Section 4.12(a), and Sellers shall update such information periodically (and no less frequently than every thirty (30) days) prior to the Closing Date to reflect leaves of absence and anticipated return to work dates, employment terminations, and any other material changes thereto, and provide copies of such updated lists and information to Buyer. For the avoidance of doubt, no Business Employees may be added to the list of Offer Employees by the Company or its Subsidiaries without the consent of Buyer.

(b)      At least ten (10) Business Days prior to the Closing, the Buyer shall, or shall cause one of its Subsidiaries to, make an offer of employment to each Offer Employee in

accordance with the terms set out in this <u>Section 7.3(b)</u> and having the terms set forth on <u>Section 7.3(b)</u>, with such employment to be effective immediately upon the Closing (which offer of employment and employment shall be subject to (i) such Offer Employee being employed by the Company or one of its Subsidiaries as of the Closing Date, (ii) such Offer Employee's satisfaction of Buyer's standard hiring requirements and on-boarding process, including but not limited to background checks and immigration control, and (iii) obtainment of all necessary licenses or other clearances if required by U.S. export controls or sanctions regulations and (iv) such Offer Employee not becoming subject to formal or final written disciplinary or corrective action related to misconduct in violation of any of Sellers' policies (collectively, the "<u>Offer Conditions</u>")). Unless prohibited by applicable Law, any Offer Employee residing in the United States who accepts Buyer's offer of employment and is on a leave of absence as of the Closing Date shall become a Transferred Employee effective immediately on the date such Offer Employee returns to active employment, subject to (x) such Offer Employee's satisfaction of the Offer Conditions and (y) such Offer Employee returning to active employment within six (6) months following the Closing Date (or such later date as may be required by applicable Law), and references to "Closing Date" or "Closing" in this <u>Section 7.3(b)</u> and with respect to the definition of Transferred Employee shall refer to the date on which such Offer Employee returns to active employment. Where Buyer or one of its Subsidiaries makes an offer of employment to an Offer Employee in accordance with this <u>Section 7.3(b)</u> and such Offer Employee fails to accept such offer no later than five Business Days prior to the Closing Date, fails to present for work (including remotely) on the Closing Date (or the first Business Day following the Closing Date on which such Business Employee is scheduled, expected or permitted to return to work (taking into account time off or leave)) or such Offer Employee fails to satisfy any of the Offer Conditions, the Company or the applicable Seller shall be responsible for any liability for the continued employment or termination of employment of such Offer Employee and Sellers agree that any liability arising in respect of such employment or termination shall be treated as an Excluded Liability. Buyer shall be solely responsible for any Liabilities arising out of, relating to or in connection with Buyer's, or one of its Subsidiary's, failure to offer employment to any Offer Employee on terms consistent with this <u>Section 7.3(b)</u> (including any termination, severance or redundancy Liabilities arising in connection therewith), or continue the employment of any Transferred Employee after the Closing Date (and such Liabilities shall be treated as Assumed Liabilities).

(c)     For a period of six (6) months following the Closing Date, Buyer shall, or shall cause one of its Subsidiaries to, provide for each Transferred Employee (i) at least the same base salary or wage rate, as applicable, as those provided to the Transferred Employee immediately before the Closing and (ii) other employee benefits (including incentive opportunities and severance but excluding equity-based compensation and defined benefit plan benefits) that are substantially similar to those provided to similarly situated employees of Buyer or one of its Affiliates.

(d)     Effective not later than the Closing Date, Buyer shall, or shall cause one of its Subsidiaries to, have in effect one or more defined contribution plans that include a qualified cash or deferred arrangement within the meaning of Section 401(k) of the Code

(and a related trust exempt from tax under Section 501(a) of the Code) (as applicable, the "<u>Buyer 401(k) Plan</u>"). Each Transferred Employee shall be eligible to become a participant in the Buyer 401(k) Plan as of or following the Closing Date in accordance with the terms and conditions thereof. Buyer or one of its Subsidiaries shall take the necessary action, including any necessary plan amendments, to cause the Buyer 401(k) Plan to permit each Transferred Employee to make rollover contributions of "eligible rollover distributions" (within the meaning of Section 402(f)(2)(A) of the Code), exclusive of loans, in the form of cash in an amount equal to the full amount of the eligible rollover distribution distributable to such Transferred Employee from a Benefit Plan that is a defined contribution plan that includes a qualified cash or deferred arrangement within the meaning of Section 401(k) of the Code Plan immediately prior to the Closing to Buyer 401(k) Plan.

(e)    The Company or its applicable Subsidiary shall be responsible for paying out, or causing to be paid out all Accrued Compensation Obligations in connection with the Closing. As of the Closing, the Transferred Employees shall cease participation in, and shall cease accruing benefits under, any Company Benefit Plans. For the avoidance of doubt, the Transferred Employees will continue to participate in and accrue benefits under any Superannuation Fund, as applicable.

(f)    The Company, the Buyer and their Subsidiaries, as applicable, shall be responsible for complying with the requirements of Section 4980B of the Code with respect to any "M&A qualified beneficiary" in accordance with the requirements of Treasury Regulation Section 54.4980B-9. The Company shall deliver written notice to Buyer of its intention to terminate any group health plan maintained by the Company or any of its United States Subsidiaries as soon as administratively practicable following such decision but in no event less than thirty (30) Business Days prior to such termination and shall (i) simultaneously with the delivery of such notice, provide Buyer with a list of individuals receiving COBRA continuation coverage under any such group health plan and (ii) following delivery of such notice, provide Buyer with any updates or other information in respect of such individuals that Buyer reasonably requests.

(g)    Prior to the Closing, the Company shall provide complete copies of the Transferred Employee Records to Buyer and any other personnel records required to be provided to or retained by Buyer and its Subsidiaries under applicable Law or otherwise as necessary for Buyer to establish payroll systems or employee benefit plans as of the Closing Date.

(h)    The Company and its Subsidiaries shall be responsible for all liabilities or obligations under the WARN Act arising out of actions or omissions occurring prior to, on, or following the Closing Date with respect to or involving all employees of the Company and its Subsidiaries, including but not limited to the Business Employees, except that Buyer or one of its Subsidiaries shall be responsible for all liabilities or obligations under the WARN Act resulting from (i) any "employment loss" (as defined in the WARN Act) occurring after the Closing solely with respect to or involving the Transferred Employees or (ii) Buyer's, or one of its Subsidiary's, failure to offer employment to any Offer Employee on terms consistent with this <u>Section 7.3</u> and in

accordance with applicable Law or continue the employment of any Transferred Employee after the Closing Date.

(i)      In the event that any Offer Employee declines an offer of employment made by Buyer or its Subsidiary to such Offer Employee, (i) provided that such offer is made in accordance with the terms set out in <u>Section 7.3(b)</u>, Buyer or its Subsidiary may extend an offer of employment to a former Business Employee whose employment terminated prior to the Closing to replace such Offer Employee; and (ii) for six (6) months after the Closing, Buyer and its Subsidiaries will refrain from making an offer to, or hiring, such Offer Employee; provided however, that an Offer Employee shall not be deemed to have declined an offer of employment if such Offer Employee is negotiating the terms of the offer with Buyer or its Subsidiary.

(j)      Nothing in this <u>Section 7.3</u> shall (i) be construed as an amendment or other modification of any Company Benefit Plan or other employee benefit plan, (ii) create any third-party beneficiary or other right (A) in any other Person, including any current or former director, officer, employee, independent contractor or other individual service provider of the Company or any of its Subsidiaries or any participant in any Company Benefit Plan or other employee benefit plan, agreement or other arrangement (or any dependent or beneficiary thereof) or (B) to continued employment with Buyer or any of its Affiliates, (iii) shall restrict Buyer or any of its Affiliates from terminating the employment of any employee following the Closing or (iv) limit the right of Buyer or any of its Affiliates to terminate or amend any employee benefit plan.

7.4    <u>Section 280G.</u>

To the extent that the execution of this Agreement or the consummation of the Transactions (either alone or together with any other event) may reasonably be expected to entitle any "disqualified individual" to any payments or benefits that, separately or in the aggregate, may constitute "parachute payments" (as each such term is defined in Section 280G of the Code and the applicable rulings and final regulations thereunder ("<u>Section 280G Payments</u>")), then, if requested by Buyer and prior to the Closing, the Sellers will (i) use commercially reasonable efforts to obtain a waiver from each such disqualified individual of his or her right to receive or retain any payment or benefit that could reasonably be expected to constitute a Section 280G Payment (collectively, the "<u>Waived Payments</u>"), (ii) submit the Waived Payments for approval in a manner intended to meet the requirements of Section 280G(b)(5)(B) of the Code and the applicable rulings and final regulations thereunder (the "Section 280G Approval"), and (iii) provide all required disclosure to all Persons entitled to vote under Section 280G(b)(5)(B)(ii) of the Code, such that, if such waiver(s) and Section 280G Approval are obtained, the deduction of the Waived Payments will not be limited by the application of Section 280G of the Code and the applicable rulings and final regulations thereunder. At least five (5) Business Days prior to the submission to the Persons entitled to approve the Waived Payments, the Sellers will forward to Buyer and provide Buyer with a reasonable opportunity to review and comment on copies of the disclosure statement and waiver prepared by the in connection with this <u>Section 7.4</u>, as well as the parachute payment calculations prepared by the Sellers and/or their advisors.

# ARTICLE VIII.
# COVENANTS

8.1    <u>Retention of Books and Records.</u>

For a period of seven (7) years from the Closing Date, Buyer shall, and shall cause its Subsidiaries to (a) retain all books, ledgers, files, reports, plans, records and any other documents of the Company and its Subsidiaries in the possession of Buyer and its Subsidiaries relating to the Business and the Purchased Assets at the Closing and (b) use commercially reasonable efforts to (i) give Sellers and their representatives reasonable access to such materials and certain other Seller IT Assets such as computers, servers and other information technology equipment to the extent relating to the Business and the Purchased Assets (ii) furnish to Sellers and their representatives such financial and operating data and other information relating to the Business and the Purchased Assets on or before the Closing Date and (iii) to cause the employees of Buyer and its Affiliates to cooperate with Sellers and their representatives, in each case, to the extent reasonably requested by Sellers in connection with the sale, transfer, conveyance, assignment, delivery, winding-up, disposal or abandonment of any of the Excluded Assets, the winding-up of the Sellers or any of their Affiliates, or relating to the Bankruptcy Cases or in connection with accounting, Tax or other similar needs relating to the operation of the Business by Sellers and their Affiliates prior to the Closing. Any such access or cooperation shall be (a) granted in a manner as not to interfere unreasonably with the conduct of the business of Buyer or its Affiliates and (b) conducted during normal business hours upon reasonable advance notice to Buyer and (z) in the event Sellers or their representatives physically access any properties of Buyer or its Subsidiaries pursuant to this <u>Section 8.1</u>, conducted under the supervision of Buyer's personnel, and Sellers shall be responsible for any out of pocket expenses incurred in connection with any such access or cooperation requested by Sellers pursuant to this <u>Section 8.1</u>. Notwithstanding the foregoing, Buyer may withhold such access, if it determines (in its reasonable judgment) such access could (I) result in the disclosure of trade secrets or competitively sensitive or classified information to third parties, (II) violate any Contract or any Law, (III) be adverse to the interests of Buyer or any of its Affiliates in any pending or threatened Action or (IV) result in the waiver of or otherwise jeopardize the protection of any legal privilege or work-product privilege; <u>provided</u> that, to the extent practicable and in accordance with such Contract or Law, and in a manner that does not result in the waiver of any such privilege, Buyer shall use commercially reasonable efforts to make reasonable and appropriate substitute disclosure arrangements under circumstances in which these restrictions apply; <u>provided</u>, <u>further</u>, that nothing in this <u>Section 8.1</u> shall limit in any respect any rights any party may have with respect to discovery or the production of documents or other information in connection with any litigation. Access provided pursuant to this <u>Section 8.1</u> shall be subject to the terms of the Post-Closing Confidentiality Agreement.

8.2    <u>Tax Matters.</u>

(a)    Buyer and Sellers shall cooperate fully, and shall cause their respective Affiliates to cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns regarding Taxes of, or with respect to, the Business or the Purchased Assets. Such cooperation shall include the retention of and (upon the other party's request) the provision of records and information reasonably

relevant to any such Action and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

(b)    The parties agree for purposes of this Agreement, the amount of Taxes relating to the operation of the Business or the ownership of the Purchased Assets for any taxable period beginning on or before and ending after the Closing Date (a "Straddle Period") shall be allocated to the portion of such period ending on the end of the Closing Date as follows: (i) with respect to property or similar periodic or ad valorem Taxes, the amount allocable to the portion of the period ending on the Closing Date shall equal (A) the amount of such Taxes for such entire Straddle Period, multiplied by (B) a fraction, the numerator of which is the number of days during the Straddle Period that are in the portion of such Straddle Period ending on the end of the Closing Date, and the denominator of which is the number of days in the entire Straddle Period, and (ii) with respect to all other Taxes, the amount allocable to the portion of the period ending on the end of the Closing Date shall be determined based on a closing of the books as of the end of the Closing Date.

(c)    All Transfer Taxes shall be borne and paid by Buyer. The parties shall cooperate to prepare and timely file any Tax Returns or other filings relating to Transfer Taxes as may be required by Law. The parties shall reasonably cooperate in executing any appropriate tax exemption certificates in connection with the transactions contemplated in this Agreement to reduce or eliminate any such Transfer Taxes.

(d)    Buyer shall be entitled to make, in its sole discretion, an election under Section 338(g) of the Code (and any comparable election under state or local Tax Law) (a "Section 338(g) Election") with respect to FM Chile. The Company shall use commercially reasonable efforts to provide Buyer with assistance reasonably requested by Buyer in connection with any Section 338(g) Election pursuant to this Section 8.2.

(e)    In the event that Buyer declines to make a Section 338(g) Election with respect to FM Chile, Sellers and Buyer shall, and shall cause their respective Affiliates to, reasonably cooperate (i) in making an election to close the taxable year of FM Chile for which such election is available as of the end of the day on the Closing Date, in accordance with the procedures set forth in Treasury Regulations Section 1.245A-5(e)(3)(i) and (ii) otherwise to elect to close the taxable years of FM Chile for income Tax purposes as of the end of the day on the Closing Date, in the case of this clause (ii), to the extent permitted under applicable Law.

8.3    Wrong Pocket Assets; Intercompany Accounts; Further Assurances.

(a)    If, at any time after Closing, it is determined that either Sellers or their Affiliates, on one hand, or Buyer and its Subsidiaries, on the other hand, possess any interest in, to or under any Contracts, rights, Intellectual Property or other interests or assets that should have been transferred or assigned (directly or indirectly) to Buyer as part of the Purchased Assets or that should have been retained by Sellers as part of the Excluded Assets (in each case, collectively, the "Wrong Pocket Assets"), then (i) either party shall promptly

notify the other party of such Wrong Pocket Asset and shall promptly transfer or assign or cause its Subsidiaries or Affiliates to transfer or assign, as applicable, such Wrong Pocket Assets (and any related Liabilities) and (ii) such Wrong Pocket Assets shall be transferred or assigned at the expense of the party seeking such transfer or assignment, as applicable, for no additional consideration.

(b)    Prior to the Closing, the Company shall cause FM Chile to take such actions as are necessary to settle, effective as of prior to the Closing, all intercompany accounts between or among FM Chile, on the one hand, and any Affiliate of FM Chile, on the other hand, so that, as of Closing, there are no intercompany obligations, fees, payables or receivables between or among FM Chile, on the one hand, and any Affiliate of FM Chile, on the other hand.

(c)    Subject to the terms of this Agreement, whether before or after the Closing Date, each party shall, and shall cause its Subsidiaries to, use commercially reasonable efforts to obtain the consents, waivers, approvals, orders and authorizations and execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably requested by the other party in order to evidence or consummate the Transactions and comply with the terms of this Agreement and the Transaction Documents.

## ARTICLE IX.
## CONDITIONS PRECEDENT

9.1    <u>Conditions to Each Party's Obligation</u>.

The respective obligations of the parties to effect the Transactions are subject to the satisfaction (or, to the extent permitted by applicable Law, waiver by the Company (on behalf of Sellers) and Buyer), at or prior to the Closing, of each of the following conditions:

(a)    <u>No Injunctions or Restraints</u>. No Governmental Order or Law restraining, enjoining or preventing the consummation of the Transactions shall be in effect.

(b)    <u>Sale Order</u>. The Bankruptcy Court shall have entered the Bid Procedures Order and the Sale Order, each of which shall be a Final Order, in full force and effect and not subject to a stay, vacation or reversal.

9.2    <u>Conditions Precedent of Buyer</u>.

The obligations of Buyer under this Agreement shall be subject to the satisfaction (or, to the extent permitted by applicable Law, waiver by Buyer) at or prior to the Closing, of each of the following conditions:

(a)    <u>No Misrepresentation or Breach of Covenants and Warranties</u>.

(i)    Sellers shall have complied in all material respects in the performance of any of its or their respective covenants and agreements herein required to be performed or satisfied at or prior to the Closing;

(ii)     (I) each of the Seller Fundamental Representations shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at and as of such time (except for those representations and warranties which address matters only as of a specific date in which case such representation or warranty shall have been true and correct in all material respects as of such date) and (II) each of the other representations and warranties of Sellers set forth in ARTICLE IV shall be true and correct in all respects (without giving effect to any qualifications or limitations as to materiality (including the word "material"), "Material Adverse Effect" or words of similar import set forth therein) as of the date hereof and as of the Closing as though made at and as of such time (other than such representations and warranties that relate to an earlier date, which shall be so true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not have, individually or in the aggregate, a Material Adverse Effect; and

(iii)    there shall have been delivered to Buyer a certificate from Sellers, dated as of the Closing Date and signed on behalf of Sellers by an authorized officer of the Company, to the effect that the conditions set forth in Sections 9.2(a)(i) and 9.2(a)(ii) have been satisfied.

(b)     Absence of Certain Changes. Between the date hereof and the Closing Date, there shall have been no Material Adverse Effect.

(c)     Closing Deliveries. Sellers shall have made or caused to have been made all other deliveries set forth in Section 2.7(a) (except for those that by their nature can only be made at the Closing).

9.3     Conditions Precedent of Sellers. The obligations of Sellers under this Agreement shall be subject to the satisfaction (or, to the extent permitted by applicable Law, waiver by Sellers), at or prior to Closing, of each of the following conditions:

(a)     No Misrepresentation or Breach of Covenants and Warranties.

(i)     Buyer shall have complied in all material respects in the performance of any of its covenants and agreements herein required to be performed at or prior to the Closing;

(ii)    (I) each of the Buyer Fundamental Representations shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as though made at and as of such time (except for those representations and warranties which address matters only as of a specific date in which case such representation or warranty shall have been true and correct in all material respects as of such date) and (II) each of the other representations and warranties of Buyer set forth in ARTICLE V shall be true and correct in all respects (without giving effect to any qualifications or limitations as to materiality (including the word "material"), "Material Adverse Effect" or words of similar import set forth therein) as of the date hereof and as of the Closing as though made at and as of such time

56

(other than such representations and warranties that relate to an earlier date, which shall be so true and correct as of such date), except, where the failure of such representations and warranties to be so true and correct would not have, individually or in the aggregate, a Material Adverse Effect.

(iii)    and there shall have been delivered to Sellers a certificate from Buyer, dated the Closing Date and signed on behalf of Buyer by an authorized officer of Buyer, to the effect that the conditions set forth in Sections 9.3(a)(i) and 9.3(a)(ii) have been satisfied.

(b)    Closing Deliveries. Buyer shall have made all of the deliveries set forth in Section 2.7(b) (except for those that by their nature can only be made at the Closing).

9.4    Frustration of Conditions.

Neither Buyer nor Sellers may rely on the failure of any condition set forth in Section 9.2 or Section 9.3 to be satisfied if such failure was caused by the failure of Buyer, on the one hand, or Sellers, on the other hand, respectively, to (a) use commercially reasonable efforts to consummate the Transactions and (b) otherwise comply in all material respects with their obligations under this Agreement.

# ARTICLE X.
# TERMINATION

10.1    Events of Termination

Notwithstanding anything to the contrary, this Agreement may be terminated, and the Transactions may be abandoned, at any time prior to the Closing as follows:

(a)    by mutual written consent of Buyer and the Company;

(b)    by Buyer or the Company, by written notice to the other party, if the Sellers consummate any sale or other disposition of all or substantially all of the Purchased Assets to a Person other than Buyer (each, an "Alternate Transaction");

(c)    by Buyer, if (i) the Company or any other Seller withdraw the Sale Motion, (ii) the Company or any other Seller moves to voluntarily dismiss the Bankruptcy Cases or the Bankruptcy Court otherwise orders, (iii) the Company or any other Seller moves for conversion of the Bankruptcy Cases to Chapter 7 of the Bankruptcy Code or the Bankruptcy Court otherwise orders, (iv) the Company or any other Seller moves for appointment of an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code or a trustee in the Bankruptcy Cases or the Bankruptcy Court otherwise orders, (v) Buyer is not selected as the Successful Bidder or Back-Up Bidder at the conclusion of the Auction, (vi) Buyer has been selected as Back-Up Bidder and the Back-Up Termination Date has occurred, or (vii) there is in effect a Final Order of a Governmental Authority of competent jurisdiction restraining, enjoining, or otherwise prohibiting the consummation of the Transactions;

(d)      by Buyer, by written notice from Buyer to the Company, if there has been a breach or inaccuracy of a covenant, representation or warranty made by Sellers in this Agreement, and such breach or inaccuracy would result in a failure of any of the conditions in <u>Section 9.2(a)</u> to be satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by Sellers prior to the earlier of (i) fifteen (15) Business Days after receipt of written notice from Buyer requesting such breach or inaccuracy be cured or (ii) the Outside Date; <u>provided</u>, that the right to terminate this Agreement pursuant to this <u>Section 10.1(d)</u> shall not be available to Buyer if the failure of Buyer to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach or inaccuracy, or if the conditions in <u>Section 9.3</u> are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by Buyer in this Agreement;

(e)      by the Company, by written notice from the Company to Buyer, if there has been a breach or inaccuracy of a covenant, representation or warranty made by Buyer in this Agreement, and such breach or inaccuracy would result in a failure of any of the conditions in <u>Section 9.3(a)</u> to be satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by Buyer prior to the earlier of (i) fifteen (15) Business Days after receipt of written notice from the Company requesting such breach or inaccuracy be cured or (ii) the Outside Date; <u>provided</u>, that the right to terminate this Agreement pursuant to this <u>Section 10.1(e)</u> shall not be available to the Company if the failure of Sellers to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach or inaccuracy, or if the conditions in <u>Section 9.2</u> are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by Sellers in this Agreement;

(f)      by Buyer or the Company, by written notice to the other party, if any Governmental Authority of competent jurisdiction shall have issued a Governmental Order, enacted any Law or taken any other action restraining, enjoining or otherwise prohibiting the consummation of the Transactions and, in the case of Governmental Orders and other actions, such Governmental Orders or other action shall have become Final Orders; <u>provided</u>, the right to terminate this Agreement pursuant to this <u>Section 10.1(f)</u> shall not be available to the party seeking to terminate if any action of such party or any failure of such party to act has contributed to such Governmental Order or other action and such action or failure constitutes a breach of this Agreement that would result in a failure of any of the conditions in <u>Section 9.2(a)</u>, in the case of any action or failure on the part of Sellers, or a failure of any conditions in <u>Section 9.3(a)</u>, in the case of any action or failure on the part of Buyer;

(g)      by Buyer or the Company, by written notice from Buyer or the Company to the other, if the Closing has not occurred on or prior to March 31, 2025 (the "<u>Outside Date</u>"); <u>provided</u>, that the right to terminate this Agreement pursuant to this <u>Section 10.1(g)</u> shall not be available to any party whose breach of any provisions of this Agreement results in the failure of any of the conditions in <u>Sections 9.2(a)(i)</u>, <u>9.2(a)(ii)</u>, <u>9.3(a)(i)</u> or <u>9.3(a)(ii)</u>, as applicable, not to be satisfied.

10.2    Effect of Termination.

(a)    If this Agreement is terminated pursuant to Section 10.1, all rights and obligations of the parties hereunder shall terminate without any liability of any party hereto or other Person; provided, that (a) the provisions of, and the parties rights and obligations under, the Confidentiality Agreement, Section 1.2 (Matters of Construction; Definitions), Section 3.4 (Deposit), this Section 10.2 (Effect of Termination) and ARTICLE XI (Miscellaneous) will survive termination of this Agreement and (b) subject to Section 10.2(b), nothing herein will relieve any party from liability for Fraud or any willful breach of this Agreement occurring prior to termination.

(b)    In consideration of Buyer's and its Affiliates having expended considerable time and expense in connection with this Agreement and the negotiation thereof, and the identification and quantification of assets to be included in the Purchased Assets, and to compensate Buyer as a stalking-horse bidder in connection with the Auction, (i) if this Agreement is terminated (w) by Buyer or the Company pursuant to Section 10.1(b); (x) by Buyer pursuant to and in accordance with Section 10.1(c) in the event that (1) the Company or any other Seller withdraw the Sale Motion, (2) (A) Anglo, the Company or any other Seller moves to voluntarily dismiss the Bankruptcy Cases or (B) any other third party moves to voluntarily dismiss the Bankruptcy Cases and the Bankruptcy Court enters such order, (3) (A) Anglo, the Company or any other Seller moves for conversion of the Bankruptcy Cases to Chapter 7 of the Bankruptcy Code or (B) any other third party moves for conversion of the Bankruptcy Cases to Chapter 7 of the Bankruptcy Code and the Bankruptcy Court enters such order, (4) Buyer is not selected as the Successful Bidder or Back-Up Bidder at the conclusion of the Auction and an Alternate Transaction is consummated or (5) Buyer has been selected as Back-Up Bidder, the Back-Up Termination Date has occurred, and an Alternate Transaction is consummated; (y) by Buyer pursuant to Section 10.1(d); or (z) otherwise the Bankruptcy Court issues a Governmental Order approving the termination of this Agreement by Sellers in order to allow the respective boards of directors of Sellers to fulfill their respective fiduciary duties under applicable Law in a circumstance that relates to an Alternate Transaction or (ii) if, at any time, the Bankruptcy Court issues a Governmental Order approving the termination of this Agreement by Sellers in order to allow the respective boards of directors of Sellers to fulfill their respective fiduciary duties under applicable Law in a circumstance that is unrelated to an Alternate Transaction (the foregoing clauses (i) and (ii), each, a "Qualifying Termination"), then in each such event, the Company (on behalf of Sellers) shall pay to Buyer (1) an amount equal to 3% of the Purchase Price (the "Break-Up Fee") and (2) the Expense Reimbursement Amount by wire transfer at, or within two (2) Business Days after (A) in the event of a termination pursuant to Section 10.1(d) or the foregoing clause (ii), the date of such termination or (B) for any other Qualifying Termination the earlier of (I) the consummation of such Alternate Transaction or (II) one hundred twenty (120) days following such termination; provided, that, in the event of a termination described in the foregoing clause (i)(w), clause (i)(z) or pursuant to provision (4) or (5) of the foregoing clause (x), the Break-Up Fee and the Expense Reimbursement Amount shall be paid solely from the proceeds of such Alternate Transaction; provided, further, that, for the avoidance of doubt, under any circumstance, including in the event that the proceeds of such Alternate Transaction are insufficient for

such payment, the Break-Up Fee and the Expense Reimbursement Amount shall be payable in accordance with applicable Law. If this Agreement is terminated for any reason other than (I) a Qualifying Termination (II) a termination pursuant to Section 10.1(a), or (III) a termination pursuant to Section 10.1(c)(iv), 10.1(c)(v) or 10.1(c)(vi), then Buyer shall pay to the Company (on behalf of Sellers) an amount equal to the Approved Expenditure Amount as of the date of such termination (the "Reverse Break-Up Fee"); provided, that if Buyer is required to pay Sellers the Reverse Break-Up Fee as a result of the termination of this Agreement pursuant to Section 10.1(g), Sellers shall promptly (and no more than thirty (30) days following payment of the Reverse Break-Up Fee) assign, convey and deliver (or cause to be assigned, conveyed or delivered) to Buyer (such delivery to be in a manner reasonably directed by Buyer and at Buyer's cost) all (i) un-used Inventory funded by the Approved Expenditure Amount pursuant to Section 7.1(c) and (ii) the amount of cash (if any) actually received by the Company and its Subsidiaries solely on account of such Inventory as an advanced payment from the applicable customer under a Contract related to an Approved Expenditure Amount, net of any refunds paid or payable or other obligations owing or arising out of Approved Expenditure Amounts or Contracts in respect thereof (whether to such customer or other customers), including to terminate or otherwise winddown such Approved Expenditure Amounts or Contracts following termination of this Agreement, that are not otherwise satisfied in full by the Reverse Break-Up Fee. Absent Fraud, the payment of (x) the Break-Up Fee and the Expense Reimbursement Amount to Buyer or (y) the Reverse Break-Up Fee (and, in the case of a termination pursuant to Section 10.1(e), the Deposit) to the Company (on behalf of Sellers), in each case, pursuant to this Section 10.2(b), shall be Buyer's and Sellers' and their respective Affiliates sole and exclusive remedy against the other party or any of such party's Affiliates, stockholders, members, directors, officers or agents for any losses suffered as a result of the failure of the Closing to occur, any breach of this Agreement or the failure of the Transactions to be consummated.

(c)    For avoidance of doubt, (i) any Break-Up Fee and Expense Reimbursement Amount (collectively, the "Bid Protections") that are payable to Buyer pursuant to Section 10.1(b) shall be payable whether the Alternate Transaction is consummated pursuant to Section 363 of the Bankruptcy Code or pursuant to a plan and (ii) the Bid Protections shall not be due and payable more than once under any circumstance.

## ARTICLE XI.
## MISCELLANEOUS

11.1    Survival of Representations, Warranties and Covenants

None of the representations, warranties, covenants or agreements of any party contained in this Agreement shall survive the Closing, other than each covenant and agreement set forth in this Agreement that by its terms is to be performed following the Closing, which shall survive the Closing until fully performed in accordance with its terms. No party or any of its respective Affiliates shall have any Liability with respect to any representation, warranty, covenant or agreement from and after the time that such representation, warranty, covenant or agreement ceases to survive hereunder; provided, that the foregoing shall not limit any claim for Fraud.

60

11.2    Waiver.

Any party to this Agreement may by action taken by its board of directors, or officers thereunto duly authorized, waive any of the terms or conditions of this Agreement by an agreement in writing executed in the same manner (but not necessarily by the same Persons) as this Agreement. No waiver by any of the parties of any default, misrepresentation or breach of representation, warranty, covenant or other agreement hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation or breach hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence. No waiver by any of the parties of any of the provisions hereof shall be effective unless explicitly set forth in writing and executed by the party sought to be charged with such waiver.

11.3    Notices.

All notices and other communications among the parties shall be in writing and shall be deemed to have been duly given (i) when delivered in person, (ii) when delivered by FedEx or other nationally recognized overnight delivery service, or (iii) when delivered by email (in the case of this clause (iii), solely if receipt is confirmed), addressed as follows:

(a)    If to Buyer:

> Cummins Inc.
> 301 East Market Street
> Indianapolis, IN 46204
> Attention: Malene Prince – Assistant General Counsel
> E-mail: malene.prince@cummins.com

> with a copy (which shall not constitute notice) to:

> Sidley Austin LLP
> One South Dearborn Street
> Chicago, IL 60603
> Attention: Pran Jha, Dennis M. Twomey
> E-mail: pjha@sidley.com, dtwomey@sidley.com

(b)    If to the Company (on behalf of Sellers), to:

> First Mode Holdings, Inc.
> 300 Lenora Street #1445
> Seattle, Washington 98121
> Attention: First Mode Legal
> Email: legal@firstmode.com

61

with copies (which shall not constitute notice) to:

Latham & Watkins LLP
330 North Wabash Ave, Suite 2800
Attention: Bradley C. Faris; Caroline Reckler
Email: bradley.faris@lw.com; caroline.reckler@lw.com

or to such other address or addresses as the parties may from time to time designate in a written notice delivered in accordance with this Section.

11.4    Assignment.

No party shall assign this Agreement or any part hereof without the prior written consent of the other parties; provided, however, Buyer may assign this Agreement or any such rights to an Affiliate that is, for U.S. federal income tax purposes, a United States person or whose regarded owner is a United States person without the prior written consent of any party; provided, further, that no such assignment shall relieve Buyer of its obligations hereunder. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

11.5    Rights of Third Parties.

Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any Person, other than the parties, any right or remedies under or by reason of this Agreement; provided, however, that, notwithstanding the foregoing the Company Releasees and Buyer Releasees are intended third-party beneficiaries of, and may enforce, Section 11.16(a) and Section 11.16(b) respectively and Prior Company Counsel and the Designated Persons shall be intended third-party beneficiaries of, and may enforce, Section 11.17.

11.6    Expenses.

Subject to Section 3.2(a) or as otherwise specifically provided herein, each party shall bear its own expenses incurred in connection with this Agreement and the Transactions whether or not such transactions shall be consummated, including all fees of its legal counsel, financial advisers and accountants.

11.7    Governing Law.

This Agreement, and all claims or causes of action based upon, arising out of, or related to this Agreement or the Transactions, shall be governed by, and construed in accordance with, the Laws of the State of Delaware, without giving effect to principles or rules of conflict of laws to the extent such principles or rules would require or permit the application of Laws of another jurisdiction.

11.8    Captions; Counterparts.

The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement. This

Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11.9    Schedules and Annexes.

The Schedules and Annexes referenced herein are a part of this Agreement as if fully set forth herein. All references herein to Schedules and Annexes shall be deemed references to such parts of this Agreement, unless the context shall otherwise require. Any disclosure made by a party in the Schedules with reference to any section or schedule of this Agreement shall be deemed to be a disclosure with respect to all other sections or schedules to which the relevance of such disclosure is reasonably apparent on the face of such disclosure. Certain information set forth in the Schedules is included solely for informational purposes and may not be required to be disclosed pursuant to this Agreement. The disclosure of any information shall not be deemed to constitute an acknowledgment that such information is required to be disclosed in connection with the representations and warranties made in this Agreement, nor shall such information be deemed to establish a standard of materiality.

11.10    Entire Agreement.

This Agreement (together with the Schedules and Annexes to this Agreement) and the other Transaction Documents constitute the entire agreement among the parties relating to the Transactions and supersede any other agreements, whether written or oral, that may have been made or entered into by or among any of the parties or any of their respective Subsidiaries relating to the Transactions. No representations, warranties, covenants, understandings or agreements, oral or otherwise, relating to the Transactions exist among any of the parties, except as expressly set forth in the Transaction Documents.

11.11    Amendments.

This Agreement may be amended or modified in whole or in part by Buyer and the Company.

11.12    Severability.

If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect. The parties further agree that if any provision contained herein is, to any extent, held invalid or unenforceable in any respect under the Laws governing this Agreement, they shall take any actions necessary to render the remaining provisions of this Agreement valid and enforceable to the fullest extent permitted by Law and, to the extent necessary, shall amend or otherwise modify this Agreement to replace any provision contained herein that is held invalid or unenforceable with a valid and enforceable provision giving effect to the intent of the parties.

11.13    Jurisdiction; Waiver of Jury Trial.

(a)    For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court, the parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive

jurisdiction of, the Bankruptcy Court. After Sellers are no longer subject to the jurisdiction of the Bankruptcy Court, the parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, the State of Delaware's Court of Chancery (or, if the Delaware Chancery Court shall be unavailable, any other court of the State of Delaware or, in the case of claims to which the federal courts have exclusive subject matter jurisdiction, any federal court of the United States of America sitting in the State of Delaware), and, in each case, appellate courts therefrom, and each of the parties irrevocably submits to the exclusive jurisdiction of each such court in any such Action, waives any objection it may now or hereafter have to personal jurisdiction, venue or to convenience of forum, agrees that all claims in respect of such Action shall be heard and determined only in any such court, and agrees not to bring any Action arising out of or relating to this Agreement or the Transactions in any other court. Nothing herein contained shall be deemed to affect the right of any party to serve process in any manner permitted by Law or to commence legal proceedings or otherwise proceed against any other party in any other jurisdiction, in each case, to enforce judgments obtained in any Action brought pursuant to this <u>Section 11.13(a)</u>.

(b)      Each party waives, to the fullest extent permitted by applicable Law, any right it may have to a trial by jury in respect of any Action arising out of this Agreement the other Transaction Documents or the Transactions. Each party (i) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such party would not, in the event of any Action, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other parties have been induced to enter into this Agreement by, among other things, the mutual waiver and certifications in this <u>Section 11.13(b)</u>.

11.14   <u>Enforcement.</u>

The parties agree that irreparable damage would occur, and that the parties would not have any adequate remedy at law, if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to specifically enforce the terms and provisions of this Agreement, without proof of actual damages or otherwise, in addition to any other remedy to which any party is entitled at law or in equity. Each party agrees to waive any requirement for the securing or posting of any bond in connection with such remedy. The parties further agree not to assert that a remedy of specific enforcement is unenforceable, invalid, contrary to law or inequitable for any reason, nor to assert that a remedy of monetary damages would provide an adequate remedy. The remedies available to the Company pursuant to this <u>Section 11.14</u> shall be in addition to any other remedy to which it is entitled at law or in equity.

11.15   <u>Non-Recourse.</u>

Except to the extent otherwise set forth in the other Transaction Documents, this Agreement may only be enforced against, and any claim or cause of action based upon, arising out of, or related to in any manner this Agreement, or the negotiation, execution or performance of

64

this Agreement, or the Transactions (including any representation or warranty made in, in connection with, or as an inducement to this Agreement) may only be brought against, the entities that are named as parties (and, for the avoidance of doubt, shall not be brought against any past, present or future, Affiliate, director, officer, employee, incorporator, member, partner, stockholder, agent, attorney, advisor, or representative or Affiliate of any of the foregoing, in each case, of the entities that are named as parties) and then only with respect to the specific obligations set forth herein with respect to such party.

11.16   <u>Waivers and Releases</u>.

(a)      Effective as of the Closing, each Seller, for itself and each of its controlled Affiliates and any former, current or future estates, heirs, executors, administrators, trustees, successors and assigns of any of the foregoing (each, a "<u>Company Releasor</u>"), irrevocably, knowingly and voluntarily releases, discharges and forever waives and relinquishes all claims, demands, obligations, liabilities, defenses, affirmative defenses, setoffs, counterclaims, Actions and causes of action of whatever kind or nature, whether known or unknown, which any Company Releasor has, may have, or might have or may assert now or in the future, against Buyer, its Affiliates or any of its or their respective former, current or future directors, officers, employees, general or limited partners, managers, members, direct or indirect equityholders, controlling persons, Affiliates, attorneys, assignees, agents, advisors, or representatives, or representatives or Affiliates of any of the foregoing, or any former, current or future estates, heirs, executors, administrators, trustees, successors or assigns of any of the foregoing (each, a "<u>Company Releasee</u>") arising out of, based upon or resulting from any Contract, transaction, event, circumstance, action, failure to act or occurrence of any sort or type, whether known or unknown, and which occurred, existed or was taken or permitted at or before the Closing to the extent relating to the Business or the Purchased Assets; <u>provided</u>, that nothing contained in this <u>Section 11.16(a)</u> shall release, waive, discharge, relinquish or otherwise affect the rights or obligations of any Person under this Agreement, any other Transaction Document or any other agreement delivered or required to be delivered pursuant hereto or any claims of Fraud. Each Seller shall, and shall cause its controlled Affiliates to, refrain from, directly or indirectly, asserting any claim or demand, or commencing, instituting or causing to be commenced any legal proceeding of any kind against a Company Releasee based upon any matter released pursuant to this <u>Section 11.16(a)</u>. Each Company Releasee to whom this <u>Section 11.16(a)</u> applies shall be a third-party beneficiary of this <u>Section 11.16(a)</u>.

(b)      Effective as of the Closing, Buyer, for itself and each of its controlled Affiliates and any former, current or future estates, heirs, executors, administrators, trustees, successors and assigns of any of the foregoing (each, a "<u>Buyer Releasor</u>"), irrevocably, knowingly and voluntarily releases, discharges and forever waives and relinquishes all claims, demands, obligations, liabilities, defenses, affirmative defenses, setoffs, counterclaims, Actions and causes of action of whatever kind or nature, whether known or unknown, which any Buyer Releasor has, may have, or might have or may assert now or in the future, against any Seller or its Affiliates or any of its former, current or future directors, officers, employees, general or limited partners, managers, members, direct or indirect equityholders, controlling persons, Affiliates, attorneys, assignees, agents,

advisors, or representatives, or representatives or Affiliates of any of the foregoing, or any former, current or future estates, heirs, executors, administrators, trustees, successors or assigns of any of the foregoing (each, a "Buyer Releasee") arising out of, based upon or resulting from any Contract, transaction, event, circumstance, action, failure to act or occurrence of any sort or type, whether known or unknown, and which occurred, existed or was taken or permitted at or before the Closing to the extent relating to the Business or Purchased Assets; provided, that nothing contained in this Section 11.16(b) shall release, waive, discharge, relinquish or otherwise affect the rights or obligations of any Person under this Agreement, any Transaction Document or any other agreement delivered or required to be delivered pursuant hereto or any claims of Fraud. Buyer shall, and shall cause its Subsidiaries to, refrain from, directly or indirectly, asserting any claim or demand, or commencing, instituting or causing to be commenced any legal proceeding of any kind against a Buyer Releasee based upon any matter released pursuant to this Section 11.16(b). Each Buyer Releasee to whom this Section 11.16(b) applies shall be a third-party beneficiary of this Section 11.16(b).

11.17   Waiver of Conflicts Regarding Representations; Non-Assertion of Attorney-Client Privilege.

(a)    Conflicts of Interest. Buyer acknowledges that Latham & Watkins LLP ("Prior Company Counsel") have, on or before the Closing Date, represented one or more of the equityholders of the Company, the Company, and its Subsidiaries and other controlled Affiliates, and their respective officers, employees and directors (each such Person, other than FM Chile, a "Designated Person") in one or more matters relating to this Agreement or any other agreements or Transactions (including any matter that may be related a litigation, claim or dispute arising under or related to this Agreement or such other agreements or in connection with such transactions) (each, an "Existing Representation"), and that, in the event of any post-Closing matters in which Buyer or any of its controlled Affiliates, on the one hand, and one or more Designated Persons, on the other hand, are or may be adverse to each other (each, a "Post-Closing Matters"), the Designated Persons reasonably anticipate that Prior Company Counsel will represent them in connection with such matters. Accordingly, Buyer (i) waives and shall not assert, and agrees after the Closing to cause its controlled Affiliates to waive and to not assert, any conflict of interest arising out of or relating to the representation by Prior Company Counsel of one or more Designated Persons in connection with one or more Post-Closing Matters (the "Post-Closing Representations"), and (ii) agrees that, if a Post-Closing Matter arises, Prior Company Counsel may represent one or more Designated Persons in such Post-Closing Matter even though the interests of such Person(s) may be directly adverse to Buyer or any of its controlled Affiliates, and even though Prior Company Counsel may have represented the Company or its Subsidiaries in a matter substantially related to such dispute. Without limiting the foregoing, Buyer (on behalf of itself and its controlled Affiliates) consents to the disclosure by Prior Company Counsel to the Designated Persons of any information learned by Prior Company Counsel in the course of one or more Existing Representations, whether or not such information is subject to the attorney-client privilege of the Company or any of its Subsidiaries and/or Prior Company Counsel's duty of confidentiality as to the Company or any of its Subsidiaries and whether or not such disclosure is made before or after the Closing.

66

(b)      Attorney-Client Privilege. Buyer (on behalf of itself and its controlled Affiliates) waives and shall not assert, and agrees after the Closing to cause its controlled Affiliates to waive and to not assert, any attorney-client privilege, attorney work-product protection or expectation of client confidence with respect to any communication between Prior Company Counsel, on the one hand, and any Designated Person or the Company or any of its Subsidiaries (collectively, the "Pre-Closing Designated Persons"), on the other hand, or any advice given to any Pre-Closing Designated Person by any Prior Company Counsel, occurring during one or more Existing Representations (collectively, "Pre-Closing Privileges") in connection with any Post-Closing Representations, including in connection with a dispute between any Designated Person and one or more of Buyer and its controlled Affiliates, it being the intention of the parties that all rights to such Pre-Closing Privileges, and all rights to waiver or otherwise control such Pre-Closing Privilege, shall be retained by the Company, and shall not pass to or be claimed or used by Buyer, except as provided in the last sentence of this Section 11.17(b). Furthermore, Buyer (on behalf of itself and its controlled Affiliates) acknowledges and agrees that any advice given to or communication with any of the Designated Persons subject to a Pre-Closing Privilege shall not be subject to any joint privilege (whether or not the Company or one more of its Subsidiaries also received such advice or communication) and shall be owned solely by such Designated Persons. For the avoidance of doubt, if a dispute arises between one or more of Buyer and its controlled Affiliates, on the one hand, and any of the Designated Persons, on the other hand, then Buyer shall make available to the Company, acting on behalf of the applicable Designated Persons, all books and records of the Buyer subject to Pre-Closing Privileges, and Buyer shall (and shall cause its controlled Affiliates to) waive any Pre-Closing Privileges of Buyer or its controlled Affiliates applicable to such books and records. Notwithstanding the foregoing, if a dispute arises between Buyer or any of its Subsidiaries, on the one hand, and a third party other than a Designated Person, on the other hand, Buyer shall (and shall cause its controlled Affiliates to) assert the Pre-Closing Privileges on behalf of the Designated Persons to prevent disclosure of privileged materials to such third party; provided, however, that such privilege may be waived only with the prior written consent of the Company, acting on behalf of the applicable Designated Person.

(c)      Miscellaneous. Buyer acknowledges that it has had the opportunity (including on behalf of its Affiliates) to discuss and obtain adequate information concerning the significance and material risks of, and reasonable available alternatives to, the waivers, permissions and other provisions of this Agreement, including the opportunity to consult with counsel other than Prior Company Counsel. This Section 11.17 shall be irrevocable, and no term of this Section 11.17 may be amended, waived or modified, without the prior written consent of the Company, acting on behalf of the applicable Designated Persons and their respective controlled Affiliates and Prior Company Counsel affected thereby.

11.18   Public Announcements.

The initial press release relating to this Agreement shall be a joint press release, the text of which shall be agreed to in writing by the Buyer, on the one hand, and the Company, on the other hand. Thereafter, unless otherwise required by or reasonably necessary to comply with applicable Law (including (x) the Bankruptcy Code, Bankruptcy rules, and applicable local rules

of the Bankruptcy Court to the extent reasonably necessary to obtain entry of the Bid Procedures Order or, if the Buyer is selected as the winning bidder, the Sale Order and (y) in any filing made by the Company or its Affiliates with the Bankruptcy Court and as may be necessary or appropriate in the good faith determination of Company or its representatives to obtain Court approval of the Transactions or in connection with conducting the Auction), Governmental Orders of the Bankruptcy Court or the rules or regulations of any applicable securities exchange, and except for disclosure of matters that become a matter of public record as a result of the Bankruptcy Cases and any filings or notices related thereto, the Buyer, on the one hand, and the Company, on the other hand, shall consult with each other before either such party or their respective Affiliates or representatives issue any other press release or otherwise makes any public statement with respect to this Agreement, the Transactions or the activities and operations of the other parties hereto with respect to this Agreement and the Transactions and shall not, and shall cause their respective Affiliates and representatives not to, issue any such release or make any such statement without the prior written consent of the Company or the Buyer, respectively (such consent not to be unreasonably withheld, conditioned or delayed), except that no such consent shall be necessary to the extent disclosure is made on the record at a hearing in connection with this Agreement or the Bankruptcy Cases; <u>provided</u>, that nothing in this Agreement shall restrict or prohibit (a) the Company, Buyer or their respective Affiliates from making any announcement to their respective employees, customers and other business relations to the extent that such announcement consists solely of, or is otherwise consistent in all material respects with previous press releases, public disclosures or public statements made by any party hereto in accordance with this Agreement, including in investor conference calls, securities Law filings, Q&As or other publicly disclosed statements or documents, in each case under this clause (ii), to the extent such disclosure is still accurate in all material respects (and not misleading) or (b) Buyer or its Affiliates from making any announcement to their employees or existing or prospective limited partners or other investors, in each case, subject to the terms of the Confidentiality Agreement.

11.19   <u>Fiduciary Obligations</u>.

Without limiting the rights of Buyer under this Agreement or any Transaction Document and rights to receive the Bid Protections pursuant to <u>Section 10.2(b)</u>, nothing in this Agreement or the other Transaction Document will require Sellers or any of their respective boards of directors to take any action, or to refrain from taking any action, to the extent any such board of directors determines, in good faith, upon the advice of counsel, that taking or failing to take such action is required in order for such board of directors to comply with its fiduciary obligations under applicable Law. Without limiting the rights of Buyer in this Agreement or the other Transaction Documents and rights to receive the Bid Protections pursuant to <u>Section 10.2(b)</u>, for the avoidance of doubt, Sellers retain the right to pursue any transaction or restructuring strategy, including an Alternate Transaction, that, in the good faith and business judgment of the board of directors of any Seller, upon the advice of counsel, is required in order for such board of directors to comply with its fiduciary duties under applicable Law to maximize the value of their businesses and estates; <u>provided</u> that Sellers must use their reasonable best efforts to respond promptly to information requests from Buyer relating to any Alternate Transaction.

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF the parties have hereunto caused this Agreement to be duly executed as of the date first above written.

**CUMMINS INC.**

By: _____
Name: Jeffrey Wiltrout
Title: Vice President – Corporate Development

FIRST MODE HOLDINGS, INC.


By: _____
Name: Julian Soles
Title:   Chief Executive Officer


SNYCHRONOUS LLC


By: _____
Name: Julian Soles
Title:  Authorized Signatory


FIRST MODE IPP LTD


By: _____
Name: Julian Soles
Title:   Authorized Signatory


FIRST MODE PTY LTD


By: _____
Name: Julian Soles
Title:   Authorized Signatory


FIRST MODE SA PTY


By: _____
Name: Julian Soles
Title:   Authorized Signatory


[Signature Page to Asset Purchase Agreement]

FIRST MODE SA HOLDINGS


By: _____
Name: Julian Soles
Title:   Authorized Signatory

**Exhibit A**

**Escrow Agreement**

**[See attached.]**

**Exhibit B**

**Sale Order**

**[See attached.]**

**Exhibit C**

**Form of Bill of Sale and Assignment Agreement**

**[See attached.]**

**Exhibit D**

**Form of Intellectual Property Assignment Agreement**

**[See attached.]**