## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ------------------------------------------------------------- | x | |
| In re: | : | Chapter 11 |
| | : | |
| FIRST MODE HOLDINGS, INC., *et al.*,[1] | : | Case No. 24-12794 (KBO) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| ------------------------------------------------------------- | x | |

## DEBTORS' MEMORANDUM OF LAW
## IN SUPPORT OF AN ORDER CONFIRMING THE SECOND AMENDED JOINT
## CHAPTER 11 PLAN OF FIRST MODE HOLDINGS, INC. AND ITS DEBTOR
## AFFILIATE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**LATHAM & WATKINS LLP**
Ray C. Schrock (admitted *pro hac vice*)
Annemarie V. Reilly (admitted *pro hac vice*)
Brian S. Rosen (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: ray.schrock@lw.com
      annemarie.reilly@lw.com
      brian.rosen@lw.com
- and -
Caroline Reckler (admitted *pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
Email: caroline.reckler@lw.com
- and -
Jeffrey T. Mispagel (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
Email: jeffrey.mispagel@lw.com

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Michael R. Nestor (No. 3526)
Kara Hammond Coyle (No. 4410)
Joseph M. Mulvihill (No. 6061)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: mnestor@ycst.com
      kcoyle@ycst.com
      jmulvihill@ycst.com

*Counsel for Debtors and Debtors in Possession*

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: First Mode Holdings, Inc. (7177), and Synchronous LLC (1829). The Debtors' address is 3417 1st Ave S, Seattle, WA, 98134.

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ....................................................................................................1

BACKGROUND ........................................................................................................................2

I.     Prepetition Restructuring Efforts and the Chapter 11 Cases. ..............................................2

II.    The Investigation. ..........................................................................................................5

III.   The Plan and Solicitation Process. ..................................................................................7

THE PLAN SHOULD BE CONFIRMED ................................................................................10

I.     The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code. ..............10

     A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)). ...........................................................................10

          1.    The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code. ......................................................11

          2.    The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code. ....................................................12

          3.    The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code. ....................................................16

          4.    The Plan Complies with Section 1123(d) of the Bankruptcy Code. ..........26

     B.    The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)). ...........................................................................26

          1.    The Debtors Complied with Section 1125 of the Bankruptcy Code. ........27

          2.    The Debtors Complied with Section 1126 of the Bankruptcy Code. ........28

     C.    The Plan Was Proposed in Good Faith (§ 1129(a)(3)). .........................................29

     D.    The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)). ....................................30

     E.    The Plan Does Not Require Additional Disclosures Regarding Directors, Officers, and Insiders (§ 1129(a)(5)). ....................................................31

     F.    The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)). ...........................................................................32

G.    The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)). ...................................................................................32

H.    Acceptance of Impaired Classes in Accordance with Section 1129(a)(8)............33

I.    The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)). ...................................................................................34

J.    At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)). ..................................................................................36

K.    The Plan Is Feasible (§ 1129(a)(11)). ....................................................36

L.    All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)). ...........................38

M.    Sections 1129(a)(13) through 1129(a)(16) Do Not Apply to the Plan. .................38

N.    The Plan Satisfies the "Cramdown" Requirements of 11 U.S.C. § 1129(b). ........39

O.    The Plan Is the Only Plan Currently on File. .........................................41

P.    The Debtors Complied with Section 1129(d) of the Bankruptcy Code. ................42

Q.    Section 1129(e) is inapplicable. .........................................................42

R.    The Modifications to the Plan Do Not Require Resolicitation and Should be Approved. ..................................................................................42

II.    The Waiver of a Stay of the Confirmation Order and the Proposed Modifications to the Plan Are Appropriate. ...................................................................44

CONCLUSION ...................................................................................45

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*In re 11,111, Inc.*,
   117 B.R. 471 (Bankr. D. Minn. 1990) ...................................................................................41

*In re 203 N. LaSalle St. L.P.*,
   190 B.R. 567 (Bankr. N.D. Ill. 1995), *rev'd on other grounds sub nom. Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999) .................................................................................................................34, 40, 42

*In re 47th and Belleview Partners*,
   95 B.R. 117 (Bankr. W.D. Mo. 1988) ..................................................................................38

*In re AAIPharma, Inc.*,
   No. 05-11341 (PJW) (Bankr. D. Del. Feb. 22, 2006) ...........................................................18

*In re Abbotts Dairies of Pennsylvania., Inc.*,
   788 F.2d 143 (3d Cir. 1986)..................................................................................................30

*In re Abeinsa Holding, Inc.*,
   562 B.R. 265 (Bankr. D. Del. 2016) .....................................................................................21

*In re Adelphia Commc'ns. Corp.*,
   368 B.R. 140 (Bankr. S.D.N.Y. 2007)..................................................................................34

*In re Aleris Int'l, Inc.*,
   2010 WL 3492664 (Bankr. D. Del. May 13, 2010)...............................................................27

*In re Am. Solar King Corp.*,
   90 B.R. 808 (Bankr. W.D. Tex. 1988)..................................................................................44

*In re Ambanc La Mesa L.P.*,
   115 F.3d 650 (9th Cir. 1997) ................................................................................................41

*In re Armstrong World Indus., Inc.*,
   348 B.R. 111 (D. Del. 2006).................................................................................................11

*In re Aztec Co.*,
   107 B.R. 585 (Bankr. M.D. Tenn. 1989) ..............................................................................41

*In re Bowles*,
   48 B.R. 502 (Bankr. E.D. Va. 1985).....................................................................................40

*In re Buttonwood Partners, Ltd.*,
   111 B.R. 57 (Bankr. S.D.N.Y.)............................................................................................41

*In re Century Glove, Inc.*,
   1993 WL 239489 (D. Del. Feb. 10, 1993) ..............................................................34

*In re Chapel Gate Apartments, Ltd.*,
   64 B.R. 569 (Bankr. N.D. Tex. 1986) ....................................................................32

*In re Coram Healthcare Corp.*,
   315 B.R. 321 (Bankr. D. Del. 2004) .................................................................20, 24

*In re Dex One Corp.*,
   No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013) ..............................................45

*In re Emerge Energy Servs. LP*,
   2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019) ..................................................24

*In re Exaeris, Inc.*,
   380 B.R. 741 (Bankr. D. Del. 2008) .......................................................................20

*In re Flintkote Co.*,
   486 B.R. 99 (Bankr. D. Del. 2012) .........................................................................38

*In re Freymiller Trucking, Inc.*,
   190 B.R. 913 (Bankr. W.D. Okla. 1996) ...............................................................40

*In re Future Energy Corp.*,
   83 B.R. 470 (Bankr. S.D. Ohio 1988) ....................................................................32

*In re Gatehouse Media, Inc.*,
   No. 13-12503 (MFW) (Bankr. D. Del. Nov. 6, 2013) ............................................45

*In re Gen. Wireless Operations Inc.*,
   2017 WL 5461361 (Bankr. D. Del. Oct. 26, 2017) ................................................44

*In re Genesis Health Ventures, Inc.*,
   266 B.R. 591 (Bankr. D. Del. 2001) .................................................................11, 42

*In re Geokinetics Inc.*,
   No. 13-10472 (KJC) (Bankr. D. Del. Apr. 25, 2013) .............................................45

*In re GSE Env't, Inc.*,
   No. 14-11126 (MFW) (Bankr. D. Del. July 25, 2014) ...........................................45

*In re Heritage Org., L.L.C.*,
   375 B.R. 230 (Bankr. N.D. Tex. 2007) ..................................................................38

*In re Indianapolis Downs, LLC*,
   486 B.R. 286 (Bankr. D. Del. 2013) .................................................................20, 24

**Page(s)**

*In re Jersey City Med. Ctr.*,
   817 F.2d 1055 (3d Cir. 1987) .............................................................................12

*In re Johns-Manville Corp.*,
   68 B.R. 618 (Bankr. S.D.N.Y. 1986) ...............................................................41

*In re Lapworth*,
   1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998) ...........................................27

*In re Lason, Inc.*,
   300 B.R. 227 (Bankr. D. Del. 2003) .................................................................34

*In re Lisanti Foods, Inc.*,
   329 B.R. 491 (D.N.J. 2005), *aff'd*, 241 F. App'x 1 (3d Cir. 2007) ................32

*In re Madison Hotel Assocs.*,
   749 F.2d 410 (7th Cir. 1984) ...........................................................................31

*In re Martin*,
   91 F.3d 389 (3d Cir. 1996) ..............................................................................18

*In re Marvel Ent. Grp., Inc.*,
   222 B.R. 243 (D. Del. 1998) ............................................................................18

*In re Master Mortg. Inv. Fund, Inc.*,
   168 B.R. 930 (Bankr. W.D. Mo. 1994) ............................................................20

*In re Momentum Mfg. Corp.*,
   25 F.3d 1132 (2d Cir. 1994) .............................................................................28

*In re Nat'l Truck Funding LLC*,
   588 B.R. 175 (Bankr. S.D. Miss. 2018) ...........................................................44

*In re Nutraquest, Inc.*,
   434 F.3d 639 (3d Cir. 2006) .............................................................................18

*In re Nutritional Sourcing Corp.*,
   398 B.R. 816 (Bankr. D. Del. 2008) .................................................................11

*In re Pero Bros. Farms, Inc.*,
   90 B.R. 562 (Bankr. S.D. Fla. 1988) ................................................................38

*In re Physiotherapy Holdings, Inc.*,
   No. 13-12965 (KG) (Bankr. D. Del. Dec. 23, 2013) ........................................45

*In re PPI Enters. (U.S.), Inc.*,
   228 B.R. 339 (Bankr. D. Del. 1998), *aff'd*, 324 F.3d 197 (3d Cir. 2003) ................30

**Page(s)**

*In re Prussia Assocs.*,
    322 B.R. 572 (Bankr. E.D. Pa. 2005) .................................................................38

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000).................................................................................30

*In re River Vill. Assocs.*,
    161 B.R. 127 (Bankr. E.D. Pa. 1993), *aff'd*, 181 B.R. 795 (E.D. Pa. 1995) ..........31

*In re Rivera Echevarria*,
    129 B.R. 11 (Bankr. D.P.R. 1991) .......................................................................41

*In re S&W Enter.*,
    37 B.R. 153 (Bankr. N.D. Ill. 1984) .....................................................................11

*In re Sea Garden Motel & Apartments*,
    195 B.R. 294 (D.N.J. 1996) .................................................................................38

*In re Source Home Ent., LLC*,
    No. 14-11553 (KG) (Bankr. D. Del. Feb. 20, 2015), Dkt. No. 650........................45

*In re Spansion, Inc.*,
    426 B.R. 114 (Bankr. D. Del. 2010) ..............................................................20, 24

*In re T-H New Orleans L.P.*,
    116 F.3d 790 (5th Cir. 1997) ...............................................................................31

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del. 2011), *overruled in part on other grounds*, 464
    B.R. 208 (Bankr. D. Del. 2011) ...........................................................................38

*In re Two Streets, Inc.*,
    597 B.R. 309 (Bankr. S.D. Miss. 2019).................................................................38

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012)...................................................................................38

*In re W.T. Grant Co.*,
    699 F.2d 599 (2d Cir. 1983).................................................................................20

*In re Washington Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) .....................................................................20

*In re World Health Alts., Inc.*,
    344 B.R. 291 (Bankr. D. Del. 2006) .....................................................................20

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) ............................................................20, 21, 24

**Page(s)**

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
    987 F.2d 154 (3d Cir. 1993) ............................................................12, 40

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988) ..................................................................38

*Norwest Bank Worthington v. Ahlers*,
    485 U.S. 197 (1988), *rev'd on other grounds* .......................................42

*TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968) ..............................................................................18

## STATUTES

11 U.S.C.
    §§ 101–1532 ............................................................................................1
    § 365(f) .................................................................................................45
    § 507(a)(2) ......................................................................................35, 39
    § 507(a)(8) ...........................................................................................35
    § 1107 .....................................................................................................4
    § 1108 .....................................................................................................4
    § 1122 ..............................................................................11, 12, 13, 43
    § 1122(a) ..............................................................................................11
    § 1123 ................................................................................11, 20, 43
    § 1123(a) ..............................................................................................13
    § 1123(a)(1) .........................................................................................13
    § 1123(a)(2) .........................................................................................13
    § 1123(a)(3) .........................................................................................14
    § 1123(a)(5) ....................................................................................14, 15
    § 1123(a)(6) .........................................................................................15
    § 1123(a)(7) .........................................................................................16
    § 1123(b) ........................................................................................16, 17
    § 1123(b)(1) .........................................................................................17
    § 1123(b)(1)–(6) ..................................................................................17
    § 1123(b)(3)(A) .......................................................................18, 20, 23
    § 1123(d) ..............................................................................................27
    § 1125 ............................................................................27, 28, 29, 44
    § 1125(a) ..............................................................................................28
    § 1125(a)(1) .........................................................................................28
    § 1125(b) ........................................................................................27, 28
    § 1125(c) ..............................................................................................28
    § 1126 ............................................................................27, 29, 30
    § 1126(c) ..............................................................................................30
    § 1126(f) ...........................................................................................9, 29
    § 1126(g) ..........................................................................................9, 29
    § 1127 ...................................................................................................44
    § 1127(a) ..............................................................................................43

Page(s)

§ 1129 .................................................................................................................. 2, 11, 30, 46
§ 1129(a)(1) ...................................................................................................................... 11
§ 1129(a)(2) ................................................................................................................. 27, 30
§ 1129(a)(3) ................................................................................................................. 30, 31
§ 1129(a)(4) ................................................................................................................. 31, 32
§ 1129(a)(5) ....................................................................................................................... 33
§ 1129(a)(5)(A)(i) .............................................................................................................. 32
§ 1129(a)(5)(A)(ii) ............................................................................................................. 32
§ 1129(a)(6) ....................................................................................................................... 33
§ 1129(a)(7) ................................................................................................................. 33, 34
§ 1129(a)(8) ................................................................................................... 34, 35, 37, 40
§ 1129(a)(9) ................................................................................................... 35, 36, 37
§ 1129(a)(9)(A) .................................................................................................................. 35
§ 1129(a)(9)(B) .................................................................................................................. 35
§ 1129(a)(9)(C) ............................................................................................................. 35, 36
§ 1129(a)(10) ............................................................................................................... 35, 37
§ 1129(a)(11) ........................................................................................................... 37, 38, 39
§ 1129(a)(12) ..................................................................................................................... 39
§ 1129(a)(13) ..................................................................................................................... 39
§ 1129(a)(14) ..................................................................................................................... 39
§ 1129(a)(15) ..................................................................................................................... 39
§ 1129(a)(16) ..................................................................................................................... 39
§ 1129(b) ...................................................................................................................... 35, 40
§ 1129(b)(1) ....................................................................................................................... 41
§ 1129(b)(2)(B)(ii) ........................................................................................................ 41, 42
§ 1129(b)(2)(C)(ii) ........................................................................................................ 41, 42
§ 1129(c) ............................................................................................................................ 42
§ 1129(d) ............................................................................................................................ 43
§ 1129(e) ............................................................................................................................ 43

28 U.S.C. § 1930(a) ............................................................................................................ 39

**RULES**

Fed. R. Bankr. P.
3017 ..................................................................................................................................... 27
3018 ..................................................................................................................................... 27
3019 ............................................................................................................................... 43, 44
3020 ..................................................................................................................................... 45
3020(e) ................................................................................................................................ 45
6004 ..................................................................................................................................... 45
6004(h) ................................................................................................................................ 45
6006 ..................................................................................................................................... 45
6006(d) ................................................................................................................................ 45
9019 ..................................................................................................................................... 20
9019(a) ................................................................................................................................ 18

**Page(s)**

## OTHER AUTHORITIES

H.R. Rep. No. 95-595, *reprinted in* 1978 U.S.C. C.A.N. 5963 (1977) ..........................................11

H.R. Rep. No. 595, 95th Cong., 1st Sess. (1977) ..........................................................................27

S. Rep. No. 95-989, *reprinted in* 1978 U.S.C. C.A.N. 5787 (1978)..............................................11

S. Rep. No. 989, 95th Cong., 2d Sess. (1978) ..............................................................................27

The above-captioned debtors (collectively, the "**Debtors**" or "**First Mode**") submit this memorandum of law (this "**Memorandum**") in support of confirmation of the *Second Amended Joint Chapter 11 Plan of First Mode Holdings, Inc. and Its Debtor Affiliate under Chapter 11 of the Bankruptcy Code* (as modified, amended, or supplemented from time to time, the "**Plan**")[2] [Docket No. 353], pursuant to sections 1125, 1126, and 1129, respectively, of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**").  In support of confirmation of the Plan, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Debtors commenced these cases (the "**Chapter 11 Cases**") with two goals: (a) to maximize value for all stakeholders through a sale of their assets; and (b) to administer the Chapter 11 Cases in an efficient manner that would provide finality through a confirmed chapter 11 plan and an orderly wind-down of the Debtors' estates.  The Debtors are on the verge of achieving these goals.  The Plan is supported by all of the Debtors' major stakeholders and has not received any formal or unresolved objections.  The Plan was accepted by 100% of the received ballots in Class 4 (General Unsecured Claims), the only class entitled to vote on the Plan.  This result is a testament to the overwhelming consensus among the Debtors' stakeholders that the Plan provides the best achievable result for the Debtors' estates.

2.      The Plan enables the Debtors to pay or otherwise satisfy all administrative and priority claims, other than DIP Facility Claims.  The Plan also provides for a significant, if not full recovery to Holders of General Unsecured Claims that are Participating GUC Holders, reflecting a significant contribution obtained through the Plan Settlement (as defined below) between the Debtors and Anglo American.  Without such contribution, the Debtors would have no viable

---

[2]      Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Plan.

alternative to liquidation under chapter 7, and Holders of General Unsecured Claims would receive no recovery. Confirmation of the Plan will therefore represent a significant achievement for the Debtors' stakeholders.

3. As set forth in the Voting Report[3] submitted by Omni Agent Solutions, Inc. ("**Omni**"), the Confirmation Declarations,[4] and this Memorandum, the Plan satisfies all applicable provisions of section 1129 of the Bankruptcy Code and otherwise complies with all applicable sections of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and non-bankruptcy law. The Debtors have made certain changes to the Plan to resolve informal comments received from other parties in interest, but the Plan has received no formal objections. Accordingly, and for all of the reasons set forth herein, the Debtors respectfully request that the Bankruptcy Court confirm the Plan.

## **BACKGROUND**

### I. **Prepetition Restructuring Efforts and the Chapter 11 Cases.**

4. First Mode was founded in 2018 as an engineering consultancy business. Following the acquisition of a majority stake in First Mode by Anglo American,[5] the Company aspired to develop products to abate the use of diesel in heavy industry applications (starting with ultra-class mine haul trucks and rail freight locomotives). These products were intended to

---

[3] *Declaration of Jeriad R. Paul Regarding the Solicitation and Tabulation of Votes on, and Elections to Opt In to the Third Party Release Contained in, the Second Amended Joint Chapter 11 Plan of First Mode Holdings, Inc. and its Debtor Affiliate* [Docket No. 356] (the "**Voting Report**").

[4] As used herein, the *Declaration of Lyle Bauck in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of First Mode Holdings, Inc. and its Debtor Affiliate under Chapter 11 of the Bankruptcy Code* [Docket No. 357] (the "**Bauck Declaration**") and the *Declaration of Carol Flaton in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of First Mode Holdings, Inc. and its Debtor Affiliate under Chapter 11 of the Bankruptcy Code* [Docket No. 358] (the "**Flaton Declaration**" and, collectively, the "**Confirmation Declarations**").

[5] "**Anglo American**" means Anglo American Technical & Sustainability Ltd, Anglo American Services (UK) Ltd., Anglo American International Holdings Limited, and other affiliates thereof.

comprise an initial product offering of zero-emissions haulage systems based on hydrogen fuel cell technology, which was diversified, based on customer feedback and the infancy of the hydrogen economy, to include diesel-battery hybrid and battery electric systems. Additionally, recognizing that successful product deployment requires macro-level planning and integration, the Company provided certain services to ensure that the necessary infrastructure was also delivered as well as seamless integration with customers' existing fleets and management systems.[6]

5.    The Company operated in a highly competitive and capital-intensive industry. As a growth stage company, it faced challenges in securing customers due to high production costs. As a result, by the summer of 2023, the Company became overly highly indexed to its primary client relationship with Anglo American and began to face significant liquidity pressures, which were exacerbated by the termination of certain operational and financing agreements between the Debtors and Anglo American. To address its financial and operational challenges, in August 2024, the Company retained Latham & Watkins LLP ("**Latham**"), PJT Partners LP ("**PJT**"), and M3 Advisory Partners, LP ("**M3**")[7] to assist in evaluating the Company's strategic options. In the months that followed, the Company, with the support of its advisors, undertook a concerted effort to effectuate a sale or other restructuring transaction on terms that would inure to the benefit of the Debtors' key stakeholders and be acceptable to Anglo American, as its sole secured lender.[8] The Debtors also appointed three independent directors: Neal Goldman, Carol Flaton, and Jill Frizzley (together, the "**Independent Directors**").[9] On August 28, 2024, the Board formed a restructuring

---

[6]    A detailed description of the Debtors and their businesses, and the facts and circumstances surrounding the Chapter 11 Cases, are set forth in greater detail in the *Declaration of Colin Mark Freed in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 15] (the "**First Day Declaration**").

[7]    The Debtors have since also retained Young Conaway Stargatt & Taylor, LLP ("**Young Conaway**") and Omni.

[8]    *See* First Day Declaration ¶ 5.

[9]    *See id.*

committee comprised of the Independent Directors (the "**Restructuring Committee**"), which was charged with negotiating and recommending a potential transaction.[10]  While the Company and its advisors pursued a variety of options, this process culminated in the pursuit of a stalking horse bid for the purchase of substantially all of the Debtors' assets and a chapter 11 filing to maximize the value of the Debtors' estates.

6.      On December 15, 2024 (the "**Petition Date**"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

7.      On December 15, 2024, the Debtors also entered into that certain Asset Purchase Agreement by and among the proposed stalking horse bidder, Cummins Inc. ("**Cummins**" or the "**Stalking Horse Bidder**"), the Debtors, and certain non-Debtor direct and indirect subsidiaries (the "**Stalking Horse APA**").  The Stalking Horse APA provided that the Stalking Horse Bidder would purchase the majority of the Debtors' assets along with various assets of certain non-Debtor affiliates for a purchase price of $15 million, plus the assumption of certain Assumed Liabilities (as defined in the Stalking Horse APA).  In connection with the Stalking Horse APA, the Debtors further entered into that certain Restructuring Support Agreement with the DIP Lender and the Consenting Parent (the "**RSA**").

8.      As part of the sale process contemplated under the RSA, the Debtors continued to seek additional Qualified Bids (as defined in the Bid Procedures Order) and scheduled an auction. However, the Debtors did not receive any additional Qualified Bids prior to January 27, 2024 (the "**Bid Deadline**").  Following the passing of the Bid Deadline, and consistent with the terms of the

---

[10]      *See id.*

Bid Procedures Order, the Debtors cancelled the Auction and declared Cummins to be the Successful Bidder (as defined in the Bid Procedures Order).[11]  The Bankruptcy Court entered the order approving the sale of Debtors' assets to Cummins, and the sale closed on February 11, 2025.[12]

9.      On January 9, 2025, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed an official committee of unsecured creditors [Docket No. 111] (the "**UCC**") in the Chapter 11 Cases.  The Debtors have worked collaboratively with both the U.S. Trustee and the UCC throughout the Chapter 11 Cases in order to facilitate consensual resolutions to various issues.  Reflecting this collaboration, following entry of the Disclosure Statement Order (as defined below), the UCC provided a letter expressing support for the Plan to be included in the solicitation packages provided to members of the Voting Class (as defined below).

**II.     The Investigation.**

10.     At the beginning of November 2024, it became evident that the Debtors' marketing process for an out-of-court transaction might not be achievable, and that a bankruptcy filing might be necessary to maximize the value of the Debtors and their non-Debtor direct and indirect subsidiaries (collectively, the "**Company**").[13]  As a result, the Company initiated an independent investigation to determine whether, in the context of a bankruptcy, the Debtors might have potential claims against various parties and constituencies, including those affiliated with the Company.[14]  To that end, the Restructuring Committee commenced an investigation into potential

---

[11]     *See* [Docket No. 219].

[12]     *See* [Docket Nos. 249 and 267].

[13]     *See* Flaton Declaration ¶ 8.

[14]     *See id.*

claims that the Company might hold against third parties, including, but not limited to, its current and former directors, officers, employees, lenders, stockholders and/or advisors (collectively, the "**Investigation Parties**"), in order to evaluate, among other things, the existence, validity, and value of any such potential claims and make a recommendation to the full Board in connection therewith.[15]    The Restructuring Committee was advised and assisted in this investigation (the "**Investigation**") by Young Conaway.[16]    Among other things, the Investigation included an assessment of allegations asserted by certain of the Company's founders (the "**Founders**") as set forth in a letter to the board of directors of First Mode Holdings, Inc., dated November 8, 2024 (the "**Founder Letter**").[17]   More specifically, in furtherance of the Investigation, Young Conaway reviewed thousands of pages of relevant documents for the period of November 2020 through the present and conducted extensive interviews of eleven (11) individuals, including members of the Company's board and upper management, certain former directors and/or officers and representatives of Anglo American.[18]    In addition, Young Conaway met with counsel for the Founders to discuss, in detail, the allegations made by the Founders in the Founder Letter, which aided Young Conaway in its evaluation of the viability of the asserted claims against the applicable Investigation Parties.[19]   Young Conaway met with and reported to the Restructuring Committee throughout the process, and researched the potential for any viable claims held by the Debtors and their estates against any of the Released Parties under the Plan.[20]   Young Conaway also provided transparency to the UCC, holding weekly meetings to discuss the facts and potential claims as well

---

[15]    *See id.* at ¶ 9.

[16]    *See id.* at ¶ 10.

[17]    *See id.* at ¶ 9.

[18]    *See id.* at ¶ 11.

[19]    *See id.* at ¶ 12.

[20]    *See id.* at ¶ 13.

as producing certain relevant documents.[21]   The Restructuring Committee ultimately concluded that the facts underlying the Investigation did not support any viable or valuable causes of action against the Investigation Parties that are Released Parties under the Plan that are worthy of pursuit.[22]

### III.   The Plan and Solicitation Process.

11.     On December 22, 2024, the Debtors filed the initial version of the Plan and the Disclosure Statement.[23]  On February 7, 2025, following the Bankruptcy Court's entry of the order approving the Disclosure Statement (the "**Disclosure Statement Order**"),[24] the Debtors filed the solicitation version of the first amended Plan and the solicitation version of the first amended Disclosure Statement.[25]  On March 21, 2025, the Debtors filed the second amended version of the Plan.[26]

12.     The Plan maximizes the value of the Debtors' Estates on terms supported by the major parties in interest in the Chapter 11 Cases.[27]  More specifically, the Plan details, among other things:  (a) the sources of consideration for Plan distributions; (b) the vesting of assets in the Plan Administrator; (c) authorization of the Debtors and Plan Administrator, as applicable, to take all actions necessary to effectuate the Plan; (d) the settlement and discharge of Claims and Interests

---

[21]     *See id*.

[22]     *See id*. at ¶ 14.

[23]     *Disclosure Statement for Joint Chapter 11 Plan of First Mode Holdings, Inc. and its Debtor Affiliate under Chapter 11 of the Bankruptcy Code* (as may be amended or otherwise modified from time to time, the "**Disclosure Statement**").  *See* [Docket Nos. 82 and 83].

[24]     *See* [Docket No. 252].

[25]     *See* [Docket Nos. 253 and 254].

[26]     *See* [Docket No. 353].

[27]     The Plan constitutes a separate Plan for each of the Debtors, and any classification of Claims and Interests set forth herein applies separately to each of the Debtors.  For purposes of administrative convenience, the Plan consolidates the process by which distributions will be made under the Plan, but the Plan does not contemplate substantive consolidation.

as set forth in the Plan; (e) the preservation and vesting of Causes of Action that were not acquired by a Successful Bidder in the Debtors and Plan Administrator, as applicable; and (f) certain release, exculpation, and injunction provisions.

13.     On January 24, 2025, the Debtors caused the Publication Notice (as defined in the Disclosure Statement Order) to be published in *The Financial Times* and the *Wall Street Journal*, respectively.[28]

14.     On February 7, 2025, the Debtors caused the Notice and Claims Agent to serve the Solicitation Packages and the Confirmation Hearing Notice in accordance with the terms of the Disclosure Statement Order.[29]

15.     On March 5, 2025, the Debtors filed the Plan Supplement.[30]  On March 7, 2025, the Debtors caused the notice of filing of the Plan Supplement to be served upon parties in interest.[31]  On March 21, 2025, the Debtors filed the *Notice of Filing of Revised Exhibits D and E to the Plan Supplement*.[32]

16.     Pursuant to the Disclosure Statement Order, the Voting Deadline for all Holders of Claims in Classes entitled to vote on the Plan was March 14, 2025, at 4:00 p.m. (prevailing Eastern Time).

17.     The Debtors solicited votes on the Plan only from Holders of Claims in Class 4 (collectively, the "**Voting Class**").

---

[28]     *See Certificate of Publication* [Docket No. 189].

[29]     *See Affidavit of Service* [Docket No. 303]; *Affidavit of Supplemental Service* [Docket No. 309]; *Affidavit of Supplemental Service* [Docket No. 325] (the "**Affidavits of Solicitation**").

[30]     *See* [Docket No. 319].

[31]     *See Affidavit of Service* [Docket No. 325].

[32]     *See* [Docket No. 355].

18.    Contemporaneously herewith, the Debtors filed the Voting Report of the Notice and Claims Agent, which is summarized below in detail:

| Class 4 – General Unsecured Claims | | | |
|---|---|---|---|
| **Accept** | | **Reject** | |
| **Number**<br>*(% of Number)* | **Amount**<br>*(% of Amount)* | **Number**<br>*(% of Number)* | **Amount**<br>*(% of Amount)* |
| 20<br>*(100%)* | $21,093,978.00<br>*(100%)* | 0<br>*(0%)* | 0<br>*(0%)* |

19.    Certain Holders of Claims and Interests were not entitled to vote because either (i) their rights were Unimpaired and they were conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or (ii) their rights were Impaired and they would not receive any distribution under the Plan and, therefore, were deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  The following Classes of Claims and Interests were not entitled to vote on the Plan, and the Debtors did not solicit votes from Holders of such Claims and Interests:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | Prepetition Secured Loan Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 5 | Intercompany Claims | Unimpaired or Impaired | Not Entitled to Vote (Presumed to Accept) or Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Intercompany Interests | Unimpaired or Impaired | Not Entitled to Vote (Presumed to Accept) or Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Equity Interests | Impaired | Note Entitled to Vote (Deemed to Reject) |

20.     Concurrently herewith, the Debtors have filed proposed findings of fact, conclusions of law, and order confirming the Plan (the "**Confirmation Order**").

### THE PLAN SHOULD BE CONFIRMED

21.     This Memorandum is divided into three parts.  Part I establishes the Plan's compliance with each of the applicable requirements for Confirmation, including that certain of the discretionary contents of the Plan, such as the Plan's release provisions, are appropriate and should be approved.  Part II establishes that the waiver of a stay of the Confirmation Order is appropriate.

22.     For the reasons stated herein and in light of the evidentiary support to be offered at the Confirmation Hearing, the Debtors respectfully request that the Bankruptcy Court find that the Debtors have satisfied their burden and confirm the Plan.

## I.     The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code.

23.     To confirm the Plan the Bankruptcy Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[33]  As set forth herein, the Plan fully complies with all relevant sections of the Bankruptcy Code— including sections 1122, 1123, 1125, 1126, and 1129—as well as the Bankruptcy Rules and applicable non-bankruptcy law.

### A.     The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).

24.     Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."[34]  The legislative history of section 1129(a)(1)

---

[33]     *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120, n.15 (D. Del. 2006); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 616 n.23 (Bankr. D. Del. 2001).

[34]     *See* 11 U.S.C. § 1129(a)(1).

of the Bankruptcy Code explains that this provision also encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a chapter 11 plan of liquidation, respectively.[35]  As explained below, the Plan complies with the requirements of sections 1122, 1123, and 1129 of the Bankruptcy Code, as well as other applicable provisions.

> 1.      **The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.**

25.      The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, as follows:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

26.      For a classification structure to satisfy section 1122 of the Bankruptcy Code, not all substantially similar claims or interests need to be grouped in the same class.[36]  Instead, claims or interests designated to a particular class must be substantially similar to each other.[37]  Courts in this jurisdiction have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[38]

---

[35]    S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C. C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C. C.A.N. 5963, 6368 (1977); *In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123."); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008).

[36]    *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 159 (3d Cir. 1993).

[37]    *Id.*

[38]    Courts have identified grounds justifying separate classification, including:  (a) where members of a class possess different legal rights, and (b) where there are good business reasons for separate classification.  *See e.g.*, *John Hancock*, 987 F.2d at 158–59 (holding that, as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes).

27.     The Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into seven separate Classes, with Claims and Interests in each Class differing from the Claims and Interests in each other Class in a legal or factual way.[39]   The Plan's classification scheme follows the Debtors' capital structure—secured debt, unsecured debt, and equity are classified separately, and the Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in such Class.[40]   In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan.[41]   For example, the classification scheme distinguishes between Holders of Prepetition Secured Loan Claims (Class 3) from Holders of DIP Facility Claims (unclassified), because of the different circumstances of each Class.  In addition, Other Priority Claims (Class 2) are classified separately due to their required treatment under the Bankruptcy Code.  Accordingly, the Debtors submit that the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code.

### 2.     The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.

28.     Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan must satisfy.  The Plan satisfies each of these requirements as set forth below.

(a)     *Designation of Classes of Claims and Equity Interests (§ 1123(a)(1)).*

29.     Section 1123(a)(1) requires that a plan must designate classes of claims and classes of equity interests, subject to section 1122 of the Bankruptcy Code.  As discussed above, Article

---

[39]   *See* Plan, Art. III.

[40]   *See* Bauck Declaration ¶ 9.

[41]   *See id.*

III of the Plan designates five Classes of Claims and two Classes of Interests, subject to section 1122. Accordingly, the Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

(b)    *Specification of Unimpaired Classes (§ 1123(a)(2)).*

30.    Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan."[42]  The Plan meets this requirement by identifying each Class that is Unimpaired.[43]

(c)    *Treatment of Impaired Classes (§ 1123(a)(3)).*

31.    Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan."[44]  The Plan meets this requirement by setting forth the treatment of each Class in Article III that is Impaired.

(d)    *Equal Treatment within Classes (§ 1123(a)(4)).*

32.    Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[45]  The Plan meets this requirement because Holders of Allowed Claims or Interests will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such Holders' respective Class.[46] Accordingly, the Plan satisfies the equal treatment standard of section 1123(a)(4) of the Bankruptcy Code.

---

[42]    U.S.C. § 1123(a)(2).

[43]    *See* Plan, Art. III.A–B.

[44]    11 U.S.C. § 1123(a)(3).

[45]    11 U.S.C. § 1123(a)(4).

[46]    *See* Plan, Art. III.

(e)      *Means for Implementation (§ 1123(a)(5))*.

33.      Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.[47]   Article IV of the Plan provides for the means by which the Plan will be implemented, which includes (among other things):

> a.      in consideration for, and as a requirement to receive, the distributions and other benefits provided pursuant to the Plan, including the Anglo Plan Funding, the good-faith global and integrated compromise and settlement of all actual and potential disputes between and among the Debtors and Anglo American, including without limitation, any and all issues relating to (1) the incurrence of the obligations under the Prepetition Facility Agreement, the termination of any facilities thereunder, and acceleration of any loans thereunder, (2) the Umbrella Supply Agreement and the termination thereof, (3) the HEV Purchase Order and the termination thereof, and (4) the Relationship Agreement (the "**Plan Settlement**");

> b.      the sources of consideration for Plan distributions, including, among other things, Cash on hand, the Anglo Funding Amount, the proceeds of all non-Cash assets of the Debtors' Estates, and any proceeds of retained Causes of Action of the Estates;

> c.      the appointment of the Plan Administrator to act for the Debtors and to implement the Plan and to make distributions thereunder and to take any action necessary to wind down and dissolve the Debtors' Estates pursuant to the terms of the Plan;

> d.      the appointment of the Plan Administrator to act as the sole officer and manager, as applicable, of the Debtors with respect to their affairs as of the Plan Effective Date;

> e.      the winding down of the Debtors' Estates by the Plan Administrator and the establishment of the Wind-Down Amount in accordance with the terms of the Wind-Down Budget; and

> f.      the authorization and approval in all respects of all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date.

---

[47]      11 U.S.C. § 1123(a)(5).

34.    Thus the Debtors submit that the Plan satisfies section 1123(a)(5) of the Bankruptcy Code and the Debtors should be authorized to implement all transactions and pay all related necessary payments contemplated by the Plan and Plan Supplement.

(f)    *Issuance of Non-Voting Securities (§ 1123(a)(6)).*

35.    Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of nonvoting equity securities.[48]    The Plan contemplates the orderly wind-down of the Debtors' operations and affairs and does not provide for the issuance of equity or other securities of the Debtors.[49]    Accordingly, the requirements of section 1123(a)(6) of the Bankruptcy Code are inapplicable to the Plan.

(g)    *Directors and Officers (§ 1123(a)(7)).*

36.    Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy."[50]

37.    In accordance with Article IV.G of the Plan, as of the Effective Date, the Plan Administrator shall act as the sole officer, director, and manager, as applicable, of the Debtors with respect to their affairs.  Subject in all respects to the terms of the Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind down and dissolve any of the Debtors.[51]    Article IV.G of the Plan further provides that the Plan Administrator shall act for the Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions of the Plan (and all certificates of formation, membership agreements,

---

[48]    11 U.S.C. § 1123(a)(6).

[49]    *See* Plan, Art. IV.M.

[50]    11 U.S.C. § 1123(a)(7).

[51]    *See* Plan, Art. IV.L and N.

and related documents are deemed amended by the Plan to permit and authorize the same).[52]

Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code.

> **3.** **The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.**

38.     Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may:  (a) impair or leave unimpaired any class of claims or interests; (b) modify or leave unaffected the rights of holders of secured or unsecured claims; (c) provide for the settlement or adjustment of claims against or interests in a debtor or its estate or the retention and enforcement by a debtor, trustee, or other representative of claims or interests; (d) provide for the assumption or rejection of executory contracts and unexpired leases; (e) provide for the sale of all or substantially all of the property of the Debtors' estates, and the distribution of the proceeds of such sale among holders of claims or interests; or (f) "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."[53]

39.     The Plan is consistent with section 1123(b) of the Bankruptcy Code.  Specifically, under Article III of the Plan, Classes 1, 2, and 3 are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the Holders of Claims within such Classes.[54]  On the other hand, Classes 4 and 7 are Impaired because the Plan modifies the rights of the Holders of Claims and Interests within such Classes as contemplated by section 1123(b)(1) of the Bankruptcy Code.[55]  Classes 5 and 6 may be impaired or unimpaired under the Plan at the option of the Debtors. In addition, as of the Effective Date, Article V of the Plan provides for the deemed rejection of all

---

[52]    *Id.* at Art. IV.G.

[53]    *See* 11 U.S.C. § 1123(b)(1)–(6).

[54]    *See* Plan, Art. III.

[55]    *See id.*

Executory Contracts and Unexpired Leases (a) not previously assumed pursuant to an order of the

Bankruptcy Court, (b) not assumed and assigned in accordance with any Sale Transaction

Documentation, (c) not previously rejected pursuant to an order of the Bankruptcy Court, (d) not

the subject of a pending motion to reject, assume or assume and assign as of the Effective Date, or

(e) identified on the Assumed Contracts List (as defined in the Plan).[56]

40.     The Plan also contains provisions implementing certain settlements, releases and

exculpations, compromising claims and interests, and permanently enjoining certain causes of

action.  Each of these discretionary provisions are proper because, among other things, they are

the product of extensive good-faith, arm's-length negotiations, supported by the Debtors and their

key constituents, were an essential component of the compromises embodied in the Plan, and are

consistent with the Bankruptcy Code and Third Circuit law.

(a)     *The Plan Settlement Satisfies Section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019*

41.     Section 1123(b)(3)(A) of the Bankruptcy Code provides that a plan may "provide

for . . . the settlement or adjustment of any claim or interest belonging to the debtor or to the estate,"

and Bankruptcy Rule 9019(a) further provides, in relevant part, that "[o]n motion by the trustee

and after notice and a hearing, the court may approve a compromise or settlement."  In the context

of a plan, the debtor "can elect to release claims as a part of the plan and as a part of the fresh start,

concentrating on the business affairs and forgetting about litigation that may have questionable

value or no value at all, just to settle past scores of charges and expressions of discontent."[57]  "[T]he

debtor should be given considerable latitude in addressing" whether to release claims as part of its

---

[56]     *Id.* at Art. V.A.

[57]     Transcript of Hearing at 44-45, *In re AAIPharma, Inc.*, No. 05-11341 (PJW) (Bankr. D. Del. Feb. 22, 2006), Dkt. No. 893.

plan.[58]  In considering whether approval of a proposed settlement is appropriate, courts in this District have examined the *Martin* factors: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors.[59]

42.     The Debtors propose that the compromises embodied in the Plan Settlement satisfy the *Martin* factors, as they are fair and equitable, in the reasonable range of potential litigation, and obviate the expense, delay, inconvenience and uncertainty inherent to any litigation in connection with the Plan.  After consideration of the potential claims among and between the Debtors and Anglo American as part of the investigation, and following extensive deliberation and discussions between the Restructuring Committee and its advisors, the Debtors determined that entry into the Plan Settlement with Anglo American would benefit the Debtors and their Estates.[60]

43.     The Plan Settlement was a key inducement for Anglo American to provide support and funding for the Chapter 11 Cases.[61]  Without Anglo American's support of the Plan, including in its roles as Prepetition Secured Lender and DIP Lender, the Debtors believe that they would have almost certainly been forced to convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.[62]  Specifically, without Anglo American's entry into the Restructuring Support Agreement and the transactions contemplated thereby, the Debtors reasonably believed that they would not be able to obtain sufficient financing on terms that would allow the Debtors to pursue

---

[58]   *Id*. at 45.

[59]   *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996); *accord In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006) (finding that the *Martin* factors are useful when analyzing a settlement of a claim against the debtor as well as a claim belonging to the debtor); *see also TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re Marvel Ent. Grp., Inc.*, 222 B.R. 243, 250 (D. Del. 1998) (proposed settlement held in best interest of the estate).

[60]   *See* Bauck Declaration ¶ 23.

[61]   *See id*.

[62]   *See id*.

the Sale Transaction and the Plan.[63]  Further, the Debtors would not have received access to the

Anglo Plan Funding, without which General Unsecured Creditors could not be expected to receive

a recovery in the Chapter 11 Cases.[64]

44.    Further, and as noted above, the Restructuring Committee determined, following

the Investigation undertaken by Young Conaway, that the facts underlying the Investigation did

not support any prima facie claims against the Investigation Parties, including Anglo American.[65]

Accordingly, the Plan Settlement is fair and equitable, value-maximizing, and in the best interest

of the Debtors' estates, and should thus be approved.

(b)    *The Debtor Release Is Appropriate Under Section 1123(b) of the Bankruptcy Code.*

45.    Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may

provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the

estate."[66]  Further, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy

Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and

in the best interests of the estate."[67]  Courts in this jurisdiction generally analyze five factors when

---

[63]    *See id.*

[64]    *See id.*

[65]    *See* Flaton Declaration ¶ 14.

[66]    11 U.S.C. § 1123(b)(3)(A).  *See In re Coram Healthcare Corp.*, 315 B.R. 321, 334–35 (Bankr. D. Del. 2004) (holding that standards for approval of settlement under section 1123 of the Bankruptcy Code are generally the same as those under Bankruptcy Rule 9019).  Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness."  *In re Exaeris, Inc.*, 380 B.R. 741, 746–47 (Bankr. D. Del. 2008) (internal citations omitted); *see also In re W.T. Grant Co.*, 699 F.2d 599, 613 (2d Cir. 1983) (examining whether settlement "fall[s] below the lowest point in the range of reasonableness") (alteration in original) (internal citations omitted); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (stating that settlement must be within reasonable range of litigation possibilities).

[67]    *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Washington Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether the compromise is fair, reasonable, and in the best interest of the estate.") (internal citations omitted).

determining the propriety of a debtor release, commonly known as the *Zenith* or *Master Mortgage* factors.[68]  The analysis includes an inquiry into whether there is:  (a) identity of interest between the debtor and non-debtor; (b) substantial contribution to the plan by the non-debtor; (c) the necessity of the release to the reorganization; (d) overwhelming acceptance of the plan and release by creditors and interest holders; and (e) payment of all or substantially all of the claims of the creditors and interest holders.[69]  These factors are "neither exclusive nor conjunctive requirements" but rather serve as guidance to courts in determining fairness of a debtor's releases.[70]

46.    Article IX.C. of the Plan provides for releases by the Debtors as of the Effective Date, of, among other things, certain Claims, rights, and causes of action that the Debtors may have against the Released Parties[71] (the "**Debtor Release**").  The Debtor Release meets the applicable standard because it is fair, reasonable, and in the best interests of the Debtors' estates.

47.    As an analysis of the *Zenith* factors demonstrates, the Debtor Release embodied in Article IX.C of the Plan should be approved.  ***First***, an identity of interest exists between the Debtors and the parties to be released.  Each of the Released Parties, as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed and would have been unlikely to participate in the negotiations and compromises that led to the ultimate formation of the Plan and various purchase and sale agreements without the Debtor

---

[68]    *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) (citing *In re Zenith Elecs. Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999); *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994)).

[69]    *See In re Washington Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011) (citing *Zenith*, 241 B.R. at 110 and *Master Mortg.*, 168 B.R. at 937).

[70]    *Id.* (citing *Master Mortg.*, 168 B.R. at 935).

[71]    "**Released Party**" means, collectively, and in each case, in their respective capacities as such: (a) the Debtors; (b) the Prepetition Secured Lender; (c) the DIP Lender; (d) the Consenting Parent; (e) Anglo (including, for the avoidance of doubt, Anglo American Services (UK) Limited); (f) with respect to each Entity in clauses (a) through (e), each such Entity's current and former Affiliates; and (g) with respect to each Entity in clause (a) through (f), each such Entity's Related Parties; provided, however, that, notwithstanding the foregoing, any Holder of a Claim or Interest that is not a Releasing Party shall not be a Released Party.

Releases.[72]  Like the Debtors, these parties support confirmation of the Plan.[73]  ***Second***, many of the Released Parties have made a substantial contribution to the Chapter 11 Cases.  The Released Parties played an integral role in the formation of the Plan and have expended significant time and resources analyzing and negotiating the issues present in the Chapter 11 Cases, including by agreeing to compromise or waive their own rights and Claims to help to facilitate the Plan Settlement.[74]  The Debtors' directors, officers, and employees acted at every turn in an effort to preserve the value of the business and maximize value for their stakeholders, including by: (a) attending 11 meetings of the Debtors' board of directors and 13 meetings of the Restructuring Committee of the Debtors' board of directors since August, 2024; (b) engaging with the Debtors' advisors regarding the Sale Process; and (c) expending hundreds of hours preparing materials and responding to diligence requests, additional reporting, and other tasks relating to the bankruptcy and Sale Process.[75]  Anglo American, in addition to providing significant non-monetary value through its support of the Plan, provided a delayed draw DIP financing facility of up to $26,000,000 to fund the Chapter 11 Cases and the Sale Process, participated in the transaction in order to ensure the success of the Plan, and provided meaningful value for unsecured creditors through the Anglo Plan Funding, which provides up to $28,870,592 to fund a distribution to Holders of Claims under the Plan.[76]  Without these contributions, the Debtors believe that neither

---

[72]   *See* Bauck Declaration ¶ 28.

[73]   *See id*.  *See also In re Abeinsa Holding, Inc.*, 562 B.R. 265, 284 (Bankr. D. Del. 2016) (finding that "there is an identity of interest between the Debtors and the Released Parties arising out the shared common goal of confirming and implementing the Plan."); *see also Zenith*, 241 B.R. at 110 (concluding that certain releasees who "were instrumental in formulating the Plan" shared an identity of interest with the debtor "in seeing that the Plan succeed and the company reorganize").

[74]   *See* Bauck Declaration ¶ 27.

[75]   *See id*.

[76]   *See id*.

the Plan and the transactions contemplated therein, nor the Sale Process, would have been possible.[77]

48.     **Third**, the Debtor Release is essential to the Debtors' restructuring because it constitutes an integral term of the Plan.  Indeed, absent the Debtor Release, it is highly unlikely the Released Parties would have agreed to support the Plan.[78]  As described above, many of the Released Parties contributed substantial value to the Chapter 11 Cases and did so with the understanding that they would receive releases from the Debtors.  In the absence of these parties' support, the Debtors believe that they would not be in a position to confirm the Plan and conclude the Chapter 11 Cases.[79]

49.     **Fourth**, the Plan was overwhelmingly accepted by the Voting Class.[80]  The only Classes rejecting the Plan were deemed to do so because they were not receiving any recovery under the Plan.

50.     Accordingly, for the reasons set forth above, the Debtor Release is a reasonable exercise of the Debtors' business judgment, satisfies the *Zenith* Factors, and should be approved under section 1123(b)(3)(A) of the Bankruptcy Code.

                    (c)     *The Third-Party Release is Wholly Consensual and Appropriate Under Section 1123(b) of the Bankruptcy Code.*

51.     Article IX.D of the Plan provides that each Releasing Party[81] shall release any and all Causes of Action such parties could assert against the Debtors and other Released Parties (the

---

[77]  *See id.*

[78]  *See id* at ¶ 29.

[79]  *See id.*

[80]  *See* Voting Report, Ex A.

[81]  "**Releasing Party**" means, collectively, and in each case, in their respective capacities as such: (a) the Debtors; (b) the Prepetition Secured Lender; (c) the DIP Lender; (d) the Consenting Parent; (e) Anglo (including, for the avoidance of doubt, Anglo American Services (UK) Limited); (f) all Holders of Claims and Interests in the Voting Class who either vote to accept the Plan or abstain from voting on the Plan, and, in each case, opt-in to

"**Third-Party Release**," and together with the Debtor Release, the "**Releases**").  The Releasing Parties include, among others, the Debtors and their Estates, Anglo American, the Plan Administrator, all Holders of Claims and Interests in the Voting Class who either vote to accept the Plan or abstain from voting on the Plan, and, in each case, opt-in to the Third-Party Release, and all Holders of Claims and Interests in any Non-Voting Class who return an opt-in form pursuant to the procedures set forth in the Disclosure Statement Order.  The Third-Party Release is consensual, consistent with established Third Circuit law, and integral to the Plan, and therefore should be approved.[82]

52.     Numerous courts have recognized that a chapter 11 plan may include a release of non-debtors by other non-debtors when such release is consensual.[83]  Consensual releases are permissible on the basis of general principles of contract law.[84]  And a third party release will be consensual so long as parties that have taken an affirmative action in respect of Confirmation and therefore manifested their consent to the release.[85]

53.     It is undeniable that the Third-Party Release in the Plan is consensual.  The Third-Party Release applies only to parties that have taken an affirmative action to opt in to the Third-

---

the Third-Party Release; (g) all Holders of Claims and Interests in any Non-Voting Class who return an opt-in form pursuant to the procedures set forth in the Disclosure Statement Order; (h) with respect to each Entity in clauses (a) through (g), each such Entity's current and former Affiliates; and (i) with respect to each Entity in clause (a) through (h), each such Entity's Related Parties (solely to the extent such Releasing Party is legally entitled to bind such Related Party to the releases contained in the Plan under applicable non-bankruptcy law). *See* Plan, Art. I.A.113.

[82]   The Debtors negotiated the structure of the Third-Party Release with the U.S. Trustee and the UCC.

[83]   *See, e.g.*, *In re Indianapolis Downs, LLC*, 486 B.R. 286, 305 (Bankr. D. Del. 2013) (collecting cases); *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (stating that "a third party release may be included in a plan if the release is consensual").

[84]   *In re Coram Healthcare Corp.*, 315 B.R. 321, 336 (Bankr. D. Del. 2004).

[85]   *Indianapolis Downs*, 486 B.R. at 305 ("Courts in this jurisdiction have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected."); *Zenith*, 241 B.R. at 111 (approving non-debtor releases for creditors that voted in favor of plan); *Spansion*, 426 B.R. at 144 (recognizing that "[c]ourts have determined that a third party release may be included in a plan if the release is consensual and binds only those creditors voting in favor of the plan").

Party Release.[86]  Here, the grantors of Third-Party Release elected to opt into the Third-Party

Release by checking a box on their ballots or by returning an opt-in form to the Debtors pursuant

to the procedures set forth in the Disclosure Statement Order.  Furthermore, the ballots distributed

to Holders of Claims in the Voting Class and the Notice of Non-Voting Status distributed to

Holders of Claims and Interests in the Non-Voting Classes (each as defined in Disclosure

Statement Order) each quoted the entirety of the Third-Party Release provision in the Plan and

clearly informed such Holders of the steps they should take if they wished to grant the Third-Party

Release.[87]  20 parties in interest have opted into the Third-Party Release, demonstrating that

Holders were in fact adequately put on notice of their ability to opt in and that the Third-Party

Release was entirely consensual.[88]  As such, the Third-Party Release is consensual as to all Holders

of Claims and Interests who decided to affirmatively opt into the Third-Party Release.  Thus the

Debtors submit that the Third-Party Release should be approved.

>    (d)    *The Exculpation Provision Is Appropriate Under Section 1123(b) of the Bankruptcy Code.*

54.    Article IX.E of the Plan provides for the exculpation of the Exculpated Parties[89]

(such provision, the "**Exculpation**") for any liability that may otherwise arise out of or relate to,

among other things, the Debtors' sale process, the Chapter 11 Cases, solicitation of the Plan, and

the negotiations and agreements made in connection therewith.  The Exculpation is appropriately

---

[86]    *In re Emerge Energy Servs. LP*, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (striking down third-party release only as to those parties who took no affirmative act).

[87]    *See* Disclosure Statement Order, Exhibit 2.

[88]    *See* Voting Report, Exhibit A.

[89]    "**Exculpated Party**" means (a) the Debtors, (b) any Committee, and (c) solely to the extent they are estate fiduciaries, each such Entity's current officers, directors (including any sub-committee of directors), members (including ex officio members), financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such on or after the Petition Date and prior to or on the Effective Date.

limited to estate fiduciaries and does not exculpate acts or omissions that are determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence. The Debtors believe that the Exculpation is critical because the Exculpated Parties have participated in the Chapter 11 Cases in good faith, and such provision is necessary to protect them from collateral attacks related to any good-faith acts or omissions in connection with, or related to, among other things, the marketing process, acts in furtherance of the Sale Process, the Chapter 11 Cases, and the Plan.[90] Moreover, the Debtors are unaware of any claims against any Exculpated Party that would be subject to the Exculpation under the Plan. Accordingly, the Debtors believe that the exculpation provision is consistent with applicable law and should be approved.

      (e)      *The Injunction Provision Is Appropriate Under Section 1123(b) of the Bankruptcy Code.*

55. The injunction provision set forth in Article VIII.H of the Plan ("the **Injunction Provision**") implements the Plan's release and exculpation provisions, in part, by permanently enjoining all entities from commencing or maintaining any action against the Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such claims or interests released or subject to exculpation. The Injunction Provision is therefore a key provision of the Plan because it enforces the Debtor Release, the Third Party Release and the Exculpation Provision that are centrally important to the Plan.[91] Moreover, the Injunction Provision is narrowly tailored to achieve its purpose.[92] Accordingly, the Debtors respectfully submit that the injunction provision must also be appropriate.

---

[90]    *See* Bauck Declaration ¶ 35.

[91]    *See id.* at ¶ 37.

[92]    *See id.*

4.      **The Plan Complies with Section 1123(d) of the Bankruptcy Code.**

56.      Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."

57.      The Plan complies with section 1123(d) of the Bankruptcy Code.  The Plan provides for the satisfaction of monetary defaults under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned under the Plan by payment of the cure amount, if any, on or about the Effective Date, subject to the limitations described in Article V.[93]

B.      **The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)).**

58.      The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires the plan proponent to comply with the applicable provisions of the Bankruptcy Code.[94] The legislative history to section 1129(a)(2) provides that section 1129(a)(2) is intended to encompass the disclosure and solicitation requirements set forth in section 1125 and the plan acceptance requirements set forth in section 1126 of the Bankruptcy Code.[95, 96]  As set forth below, the Debtors have complied with these provisions, including sections 1125 and 1126 of the Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by distributing the Disclosure

---

[93]      *See* Plan, Art. V.B, E.

[94]      *See* 11 U.S.C. § 1129(a)(2).

[95]      *See In re Lapworth*, 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *In re Aleris Int'l, Inc.*, 2010 WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) ("[S]ection 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the solicitation and disclosure requirements under sections 1125 and 1126 of the Bankruptcy Code."); S. Rep. No. 989, 95th Cong., 2d Sess., at 126 (1978); H.R. Rep. No. 595, 95th Cong., 1st Sess., at 412 (1977).

[96]      11 U.S.C. § 1125(b).

Statement and soliciting acceptances of the Plan through their Notice and Claims Agent in accordance with the Disclosure Statement Order.

### 1.    The Debtors Complied with Section 1125 of the Bankruptcy Code.

59.    Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a chapter 11 plan of liquidation "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[97] Section 1125 ensures that parties in interest are fully informed regarding the debtor's condition so that they may make an informed decision whether to approve or reject the plan.[98]

60.    Section 1125 is satisfied here.  Before the Debtors solicited votes on the Plan, the Bankruptcy Court approved the Disclosure Statement in accordance with section 1125(a)(1) of the Bankruptcy Code.[99]  The Bankruptcy Court also approved the contents of the solicitation materials provided to Holders of Claims entitled to vote on the Plan, the non-voting materials provided to parties not entitled to vote on the Plan, and the relevant dates for voting and objecting to the Plan.[100] As stated in the Voting Report and Affidavits of Service, the Debtors, through the Notice and Claims Agent, complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code.[101]  The Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular Class.  Here, the

---

[97]    11 U.S.C. § 1125(b).

[98]    *See In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994) (finding that section 1125 of the Bankruptcy Code obliges a debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

[99]    *See* Disclosure Statement Order.

[100]    *Id.*

[101]    *See* Voting Report ¶¶ 7-8; *see also* Affidavits of Solicitation.

Debtors caused the Disclosure Statement to be transmitted to all parties entitled to vote on the Plan.[102]  Based on the foregoing, the Debtors submit that they have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order.

### 2.    The Debtors Complied with Section 1126 of the Bankruptcy Code.

61.    Section 1126 of the Bankruptcy Code provides that only holders of allowed claims and equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan.[103]  As set forth above, the Debtors did not solicit votes on the Plan from the following Classes:

- Classes 1 (Other Priority Claims), 2 (Other Secured Claims), and 3 (Prepetition Secured Loan Claims) are Unimpaired under the Plan (collectively, the "**Unimpaired Classes**").[104]  Pursuant to section 1126(f) of the Bankruptcy Code, Holders of Claims in the Unimpaired Classes are conclusively presumed to have accepted the Plan and, therefore, were not entitled to vote on the Plan.

- Classes 5 (Intercompany Claims) and 6 (Intercompany Interests) are either Unimpaired or Impaired under the Plan at the option of the Debtors.[105]  Pursuant to sections 1126(f) or 1126(g) of the Bankruptcy Code, Holders of Claims in Classes 5 and 6 are either conclusively presumed to have accepted or deemed to have rejected the Plan and, therefore, were not entitled to vote on the Plan.

- Class 7 (Equity Interests) is Impaired under the Plan and receives no distribution under the Plan.[106]  Pursuant to section 1126(g) of the Bankruptcy Code, Holders of Interests in Class 7 are deemed to have rejected the Plan and, therefore, were not entitled to vote on the Plan.

---

[102]    *See* Voting Report ¶ 6; *see also* Affidavits of Solicitation.

[103]    *See* 11 U.S.C. § 1126.

[104]    *See* Plan, Art. III.A.

[105]    *Id.*

[106]    *Id.*

62.     Accordingly, the Debtors solicited votes only from the Voting Class—Class 4—because, as of the commencement of solicitation, only Class 4 was both Impaired and entitled to receive a distribution under the Plan.[107]

63.     With respect to the Voting Class, section 1126(c) of the Bankruptcy Code provides that:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of [section 1126], that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of [section 1126], that have accepted or rejected such plan.

64.     The Voting Report, summarized above, reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.[108]  Based on the foregoing, the Debtors submit that they have satisfied the requirements of section 1129(a)(2).

**C.     The Plan Was Proposed in Good Faith (§ 1129(a)(3)).**

65.     Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[109]  The Third Circuit has found that "good faith" requires that "there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code."[110]  The good faith requirement must be viewed in light of the totality of the circumstances surrounding the establishment of the chapter 11

---

[107]     *Id.  See generally* Affidavits of Solicitation.

[108]     *See generally* Voting Report.

[109]     11 U.S.C. § 1129(a)(3).

[110]     *In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 347 (Bankr. D. Del. 1998) (citing 11 U.S.C. § 1129), *aff'd*, 324 F.3d 197 (3d Cir. 2003); *see also In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) ("[F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.") (alteration in original) (quoting *In re Abbotts Dairies of Pennsylvania., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)).

plan.[111]  In assessing good faith, courts should look to a chapter 11 plan itself to determine whether it seeks relief in good faith and is otherwise consistent with the Bankruptcy Code.[112]  Failure to satisfy the section, on the other hand, generally requires a finding of "misconduct in the bankruptcy proceedings, such as fraudulent misrepresentations or serious nondisclosures of material facts to the court."[113]

66.     The Plan was proposed in good faith with the goal of maximizing the value of the Debtors' Estates for the benefit of all stakeholders.  Throughout the Chapter 11 Cases, the Debtors, their board of directors, and their management team have upheld their fiduciary duties to stakeholders and protected the interests of all constituents.[114]

67.     Importantly, the Plan is supported by the Debtors' key economic stakeholders, including Anglo American and the UCC.[115]  And no party has objected to Confirmation on the basis that the Plan fails to satisfy this provision of the Bankruptcy Code.  Accordingly, the Plan satisfies section 1129(a)(3) of the Bankruptcy Code.

**D.     The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)).**

68.     Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Bankruptcy Court as reasonable.[116]  Courts have construed

---

[111]   *In re T-H New Orleans L.P.*, 116 F.3d 790, 802 (5th Cir. 1997).

[112]   *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984).

[113]   *In re River Vill. Assocs.*, 161 B.R. 127, 140 (Bankr. E.D. Pa. 1993), *aff'd*, 181 B.R. 795 (E.D. Pa. 1995).

[114]   *See* Bauck Declaration ¶ 40.

[115]   *See id*.

[116]   11 U.S.C. § 1129(a)(4).

this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Bankruptcy Court as to their reasonableness.[117]

69.      The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.  All payments made or to be made by the Debtors for services or for costs or expenses in connection with the Chapter 11 Cases prior to the Effective Date, including all Professional Fee Claims, have been approved by, or are subject to approval of, the Bankruptcy Court.[118]   Article II.A.2 of the Plan provides that all final requests for payment of Professional Fee Claims shall be filed no later than 45 days after the Effective Date for determination by the Bankruptcy Court, after notice and a hearing, in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior orders of the Bankruptcy Court.[119]   Accordingly, the Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

### E.      The Plan Does Not Require Additional Disclosures Regarding Directors, Officers, and Insiders (§ 1129(a)(5)).

70.      The Bankruptcy Code requires the plan proponent to disclose the affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan.[120]   Section 1129(a)(5)(A)(ii) of the Bankruptcy Code further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[121]

---

[117]   *In re Lisanti Foods, Inc.*, 329 B.R. 491, 503 (D.N.J. 2005) ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court."), *aff'd*, 241 F. App'x 1 (3d Cir. 2007); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

[118]   *See* Plan, Art. II.A.2.

[119]   *Id.*

[120]   11 U.S.C. § 1129(a)(5)(A)(i).

[121]   11 U.S.C. § 1129(a)(5)(A)(ii).

71.     Because the Plan provides for the wind-down of the Estates' remaining assets and dissolution of the Debtors, section 1129(a)(5) of the Bankruptcy Code is inapplicable.  In any event, Article IV.G of the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code, to the extent applicable, by providing for the appointment of the Plan Administrator. Accordingly, the Plan complies with section 1129(a)(5) of the Bankruptcy Code.

**F.      The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)).**

72.     Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan.  Section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Chapter 11 Cases.

**G.      The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)).**

73.     Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," provides, in relevant part:

> With respect to each impaired class of claims or interests—
>
> (A)     each holder of a claim or interest of such class—
>
>> (i)      has accepted the plan; or
>>
>> (ii)     will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . . .

74.     The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes, and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate

against the estimated recoveries under that debtor's proposed plan.[122]  As section 1129(a)(7) of the Bankruptcy Code makes clear, the best interests test applies only to holders of non-accepting impaired claims or interests.

75.    Consistent with the liquidation analysis (the "**Liquidation Analysis**") prepared by the Debtors' management and advisors and attached as Exhibit C to the Disclosure Statement, a chapter 7 liquidation beginning on the Effective Date would provide *no* recovery for Holders of Claims that voted or were deemed to reject the Plan.  Subject to the assumptions and limitations described in the Liquidation Analysis, a hypothetical chapter 7 liquidation of the Debtors would yield approximately $0 to $610,000 in net proceeds (after taking into account liquidation expenses), which, in any event, are far less than the total amount of DIP Facility Claims. Furthermore, as discussed herein, there are no causes of action that would provide meaningful recoveries to Holders of Claims that voted or were deemed to reject the Plan.  The record is clear: Holders of Class 4 General Unsecured Claims are not entitled to any recoveries in a liquidation scenario.[123]  Accordingly, the best interests test of section 1129(a)(7) of the Bankruptcy Code is satisfied.

### H.    Acceptance of Impaired Classes in Accordance with Section 1129(a)(8).

76.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.  As set forth in the Voting Report,

---

[122]    *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 442 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Century Glove, Inc.*, 1993 WL 239489, at *7 (D. Del. Feb. 10, 1993); *In re Adelphia Commc'ns. Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (stating that section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation"); *In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("Section 1129(a)(7)(A) requires a determination whether 'a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.'") (internal citations omitted).

[123]    *See* Bauck Declaration ¶ 50-51.

Class 4 (General Unsecured Claims) voted to accept the Plan.  Because Class 4 is the only Voting

Class, the only Impaired Classes not voting to accept the Plan are the Deemed Rejecting Classes

(as defined below).  Section 1129(a)(8) is not satisfied, however, as discussed more fully above

and below, the Plan may nevertheless be confirmed because the Debtors have satisfied

section 1129(a)(10) of the Bankruptcy Code—at least one non-insider Impaired Class accepted the

Plan—and section 1129(b), which allows the Debtors to "cram down" any rejecting classes under

certain conditions that are satisfied here.

**I.      The Plan Provides for Payment in Full of All Allowed Priority Claims
(§ 1129(a)(9)).**

77.     Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be

paid in full on the effective date of a plan and that the holders of certain other priority claims

receive deferred cash payments.[124]   In particular, pursuant to section 1129(a)(9)(A) of the

Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy

Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive

on the effective date cash equal to the allowed amount of such claims.  Section 1129(a)(9)(B) of

the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1)

or (4) through (7) of the Bankruptcy Code—generally wage, employee benefit, and deposit claims

entitled to priority—must receive deferred cash payments of a value, as of the effective date of the

plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a

value equal to the allowed amount of such claim on the effective date of the plan (if such class has

not accepted the plan).  Finally, section 1129(a)(9)(C) of the Bankruptcy Code provides that the

holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority

---

[124]    11 U.S.C. § 1129(a)(9).

tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.

78.     The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  Article II.A of the Plan provides that each Holder of an Allowed General Administrative Claim will be paid the full unpaid amount of such Allowed General Administrative Claim in Cash:  (a) on the Effective Date or as soon as reasonably practicable thereafter or, if not then due, when such Allowed General Administrative Claim is due or as soon as reasonably practicable thereafter; (b) if a General Administrative Claim is Allowed after the Effective Date, on the date such General Administrative Claim is Allowed or as soon as reasonably practicable thereafter or, if not then due, when such Allowed General Administrative Claim is due or as soon as reasonably practicable thereafter; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtors, with the consent of the Prepetition Secured Lender; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court.  Furthermore, no Holders of the types of Claims specified by 1129(a)(9)(B) are impaired under the Plan.  And Article II.C of the Plan provides that Holders of Allowed Priority Tax Claims will receive either (a) the full unpaid amount of such Allowed Priority Tax Claim in Cash on the later of the Effective Date and the date on which such Priority Tax Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Priority Tax Claim is due or as soon as reasonably practicable thereafter), or (b) equal annual installment payments in Cash, of a total value equal to the Allowed amount of such Priority Tax Claim, over a period ending not later than five (5) years after the Petition Date.  Accordingly, section 1129(a)(9)(c) is satisfied.  Notably, the Debtors will have sufficient funds (including the Anglo Plan Funding) to pay such Claims in full as contemplated in

the Plan.[125]   The Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code.

### J.     At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)).

79.     Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.[126]   Class 4 (General Unsecured Claims) is comprised of impaired non-insider Claim holders and has voted to accept the Plan.   Therefore, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

### K.     The Plan Is Feasible (§ 1129(a)(11)).

80.     Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that a plan is feasible as a condition precedent to confirmation.[127]   Specifically, the Bankruptcy Court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.[128]

---

[125]   *See* Bauck Declaration ¶ 56.

[126]   11 U.S.C. § 1129(a)(10).

[127]   11 U.S.C. § 1129(a)(11).

[128]   *Id.*

To demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.[129] Rather, a debtor must provide only a reasonable assurance of success.[130]  There is a relatively low threshold of proof necessary to satisfy the feasibility requirement.[131]  Moreover, where the plan contemplates a liquidation of the estates, as here, courts have either held that such plans inherently satisfy section 1129(a)(11), or performed a limited inquiry into whether the liquidation itself is feasible.[132]

81.    Under either standard, the Plan is feasible.  The Plan provides for the liquidation of the Debtors' Estates, and as such, the Plan obligations will be satisfied without the need for further reorganization of the Debtors.[133]

82.    Furthermore, the Debtors have thoroughly analyzed their ability to meet their respective obligations under the Plan, and the Debtors project that the amounts reserved in the Professional Fee Escrow Account will be sufficient to satisfy the Professional Fee Claims and the Wind-Down Amount will be sufficient to administer the wind down of the Debtors' estates.[134]

---

[129]    *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed."); *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012); *In re W.R. Grace & Co.*, 475 B.R. 34, 115 (D. Del. 2012).

[130]    *Kane*, 843 F.2d at 649; *Flintkote*, 486 B.R. at 139; *W.R. Grace*, 475 B.R. at 115.

[131]    *See, e.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting approvingly that "The Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility.") (internal citations omitted); *In re Sea Garden Motel & Apartments*, 195 B.R. 294, 305 (D.N.J. 1996); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *overruled in part on other grounds*, 464 B.R. 208 (Bankr. D. Del. 2011).

[132]    *See In re Heritage Org., L.L.C.*, 375 B.R. 230, 311 (Bankr. N.D. Tex. 2007) ("Several courts take a narrow approach and interpret the plain language of § 1129(a)(11) to say that feasibility need not be established when liquidation is proposed in the plan. . . .  Other courts take a broader approach and apply the feasibility test to plans of liquidation, focusing their analysis on whether the liquidation itself, as proposed in the plan, is feasible."); *compare In re 47th and Belleview Partners*, 95 B.R. 117, 120 (Bankr. W.D. Mo. 1988) (holding that feasibility is inapplicable to plans proposing to sell all estate assets), *and In re Pero Bros. Farms, Inc.*, 90 B.R. 562, 563 (Bankr. S.D. Fla. 1988) (same), *with In re Two Streets, Inc.*, 597 B.R. 309, 317 (Bankr. S.D. Miss. 2019) (holding that, where a plan proposes to sell all estate assets, feasibility means the sale itself, as proposed in the plan, is feasible).

[133]    *See* Bauck Declaration ¶ 59.

[134]    *See id.*

Thus the Debtors believe they will have sufficient cash to satisfy all Priority and Administrative Claims under the Plan, including all Professional Fee Claims and Priority Tax Claims.[135] Accordingly, the Debtors submit that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(11) of the Bankruptcy Code.

**L.      All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)).**

83.      Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."  Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.

84.      The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article II of the Plan provides for the payment of fees owed pursuant to 28 U.S.C. § 1930(a).

**M.      Sections 1129(a)(13) through 1129(a)(16) Do Not Apply to the Plan.**

85.      The Debtors have no obligations to pay retiree benefits and, as such, section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Plan. Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.  Since the Debtors are not subject to any domestic support obligations, the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply.  Likewise, section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code.  Because neither of the Debtors is an "individual," the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply.  Finally, each of the Debtors are a moneyed, business, or commercial corporation, and therefore, section 1129(a)(16) of the Bankruptcy Code, which

---

[135]      *See id* at ¶ 56.

provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust be made in accordance with any applicable provisions of non-bankruptcy law, is not applicable to the Chapter 11 Cases.

### N.   The Plan Satisfies the "Cramdown" Requirements of 11 U.S.C. § 1129(b).

86.     The only Impaired Class entitled to vote—Class 4 (General Unsecured Claims)—has voted to accept the Plan.  Class 7 (Equity Interests) and, to the extent Impaired under the Plan, Class 5 (Intercompany Claims) and Class 6 (Intercompany Interests), were deemed to reject the Plan (the "**Deemed Rejecting Classes**"), requiring the Debtors to "cram down" these Classes pursuant to section 1129(b) of the Bankruptcy Code.   Section 1129(b) provides that if all applicable requirements of section 1129(a), other than section 1129(a)(8), are met, a plan may be confirmed so long as it does not discriminate unfairly and is fair and equitable with respect to each class of claims and interests that is impaired and has not accepted the plan.[136]   The Debtors' satisfaction of these conditions is discussed in detail below.  No party has objected to Confirmation on the basis that the Plan fails to satisfy this provision of the Bankruptcy Code.

87.     *The Plan Does Not Discriminate Unfairly*.  The Plan does not discriminate unfairly with respect to the Deemed Rejecting Classes.  The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists.[137]  Rather, courts typically examine the facts and circumstances of the particular case to determine whether unfair discrimination exists.[138]  At

---

[136] *See* 11 U.S.C. § 1129(b); *see John Hancock*, 987 F.2d at 157 n.5 ("Under [Section 1129(b)], the plan must also satisfy all of the requirements of [Section 1129(a)] except for subsection (a)(8) . . . and must not 'discriminate unfairly' against and must be 'fair and equitable' with respect to all impaired classes that do not approve the plan.").

[137] *See In re 203 N. LaSalle St. L.P.*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established"), *rev'd on other grounds sub nom. Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999).

[138] *See In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) (explaining that "whether or not a particular plan does [unfairly] discriminate is to be determined on a case-by-case basis"); *In re Freymiller Trucking, Inc.*, 190 B.R.

a minimum, however, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so.[139]  In other words, section 1129(b)(1) does not prohibit discrimination between classes; it prohibits only discrimination that is unfair.[140] Accordingly, between two classes of claims or two classes of interests, there is no unfair discrimination if (a) the claims or interests in each such class are dissimilar from those in the other class,[141] or (b) taking into account the particular facts and circumstances of the case, there is a reasonable basis for disparate treatment of otherwise similar claims or interests.[142]

88.    Here, no Deemed Rejecting Class is similarly situated to another Class, given their distinctly different legal character from all other Claims and Interests.  The unfair discrimination prong of the cramdown test is thus satisfied.

89.    *The Plan Is Fair and Equitable with Respect to Each Deemed Rejecting Class.* Sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) provide that a plan is fair and equitable with respect to a class of impaired unsecured claims or interests if the plan provides that the holder of any claim or interest that is junior to the claims or interests of such class will not receive or retain any property under the plan on account of such junior claim or interest.  This central tenet of bankruptcy law—the "absolute priority rule"—requires that, if the holders of claims or interests in a particular class that votes to reject a plan receive less than full value for their stakes, then no

---

913, 916 (Bankr. W.D. Okla. 1996) (finding that determination of unfair discrimination requires court to "consider all aspects of the case and the totality of all the circumstances").

[139] *See In re Ambanc La Mesa L.P.*, 115 F.3d 650, 654-55 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986).

[140] *In re 11,111, Inc.*, 117 B.R. 471, 478 (Bankr. D. Minn. 1990).

[141] *See, e.g., Johns-Manville*, 68 B.R. at 636.

[142] *See, e.g., In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y.); *In re Rivera Echevarria*, 129 B.R. 11, 13 (Bankr. D.P.R. 1991).

holder of claims or interests in a junior class may receive property under the plan on account of such claims or interests.[143]   The absolute priority rule also requires that senior classes cannot receive more than a 100 percent recovery for their claims.[144]

90.     The Plan satisfies the absolute priority rule with respect to all Deemed Rejecting Classes.  No Holders of Claims and Interests junior to such Holders will receive or retain any property on account of their Claims and Interests,[145] and no Holders of Claims or Interests senior to Holders in Deemed Rejecting Classes are receiving more than full payment on account of the Claims in such senior Classes.[146]   Accordingly, the Plan satisfies the requirements of sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) of the Bankruptcy Code and is fair and equitable with respect to all Deemed Rejecting Classes.

**O.     The Plan Is the Only Plan Currently on File.**

91.     Section 1129(c) of the Bankruptcy Code provides, as applicable, that a bankruptcy court may confirm only one plan.  The Plan is the only chapter 11 plan filed by any party in the Chapter 11 Cases and the only one submitted to the Bankruptcy Court for confirmation.  Section 1129(c) therefore permits confirmation of the Plan.

---

[143] *203 N. LaSalle*, 526 U.S. at 441-42 (explaining that, under the absolute priority rule, "a plan may be found to be 'fair and equitable' only if the allowed value of the claim [in a dissenting class of impaired unsecured creditors] is to be paid in full . . . or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property'" (citations omitted)); *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) (stating that "the absolute priority rule 'provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan'"), *rev'd on other grounds* (alteration in original) (internal citations omitted).

[144] *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 612 (Bankr. D. Del. 2001).

[145] To the extent Intercompany Claims in Class 5 are Reinstated, such treatment is for administrative convenience only and is not on account of such existing Claims.  *See* Plan, Art. III.F.

[146] *See* Plan, Art. III.

**P.      The Debtors Complied with Section 1129(d) of the Bankruptcy Code.**

92.      The purpose of the Plan is not to avoid taxes or the application of section 5 of the

Securities Act of 1933.  Moreover, no governmental unit or any other party has requested that the

Bankruptcy Court decline to confirm the Plan on such grounds.  Accordingly, the Plan satisfies

the requirements of section 1129(d) of the Bankruptcy Code.

**Q.      Section 1129(e) is inapplicable.**

93.      The provisions of section 1129(e) of the Bankruptcy Code apply only to "small

business cases" as defined therein.  The Chapter 11 Cases are not "small business cases."

Accordingly, Section 1129(e) of the Bankruptcy Code is inapplicable in the Chapter 11 Cases.

**R.      The Modifications to the Plan Do Not Require Resolicitation and Should be Approved.**

94.      Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify

its plan at any time before confirmation as long as such modified plan meets the requirements of

sections 1122 and 1123 of the Bankruptcy Code.[147]  Further, section 1127(a) provides that when

the proponent of a plan files the plan with modifications with the court, the plan as modified

becomes the plan.[148]  Bankruptcy Rule 3019 provides that modifications after a plan has been

accepted will be deemed accepted by all creditors and equity security holders who have previously

accepted the plan if the court finds that the proposed modifications do not adversely change the

treatment of the claim of any creditor or the interest of any equity security holder.[149]  Courts

interpreting Bankruptcy Rule 3019 have consistently held that a proposed modification to a

---

[147]   11 U.S.C. § 1127(a).

[148]   *Id.*

[149]   Fed. R. Bankr. P. 3019.

previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated.[150]

95.     The Debtors filed the *Second Amended Joint Chapter 11 Plan of First Mode Holdings, Inc. and Its Debtor Affiliate under Chapter 11 of the Bankruptcy Code* on March 21, 2025, to address technical revisions to the Plan on the request of the UCC and other parties in interest.  The modifications to the solicitation version of the Plan are not material changes.  Rather, they are technical modifications to the solicitation version of the Plan, none of which reflect material differences to the recoveries of any affected Class—i.e., no Holder of a Claim in the Voting Class is "likely" to reconsider its acceptance.

96.     As indicated above, all modifications to the solicitation version of the Plan were non-material.  Indeed, all of the Holders of Claims in the Voting Class are receiving the same recovery under the Plan.  Moreover, the UCC and Anglo American had the opportunity to review and comment on the Plan before it was filed.  Therefore, the modifications are immaterial and have been consented to after negotiations among sophisticated consenting parties, and the modifications comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.  Accordingly, the Debtors submit that no additional solicitation or disclosure is required on account of the modifications, and that such modifications should be deemed accepted by all creditors that previously accepted the solicitation version of the Plan.

---

[150]   *See, e.g.*, *In re Gen. Wireless Operations Inc.*, 2017 WL 5461361, at *4 (Bankr. D. Del. Oct. 26, 2017) (finding that additional disclosure was not required where modifications did not "materially and adversely change the treatment of any Claims or Interests"); *see also In re Am. Solar King Corp.*, 90 B.R. 808, 823 (Bankr. W.D. Tex. 1988); *In re Nat'l Truck Funding LLC*, 588 B.R. 175, 178 (Bankr. S.D. Miss. 2018) ("The disclosure requirements under § 1125 apply to a modified plan only if the modification is material.").

43

## II.     The Waiver of a Stay of the Confirmation Order and the Proposed Modifications to the Plan Are Appropriate.

97.     Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  Each rule also permits modification of the imposed stay upon court order.

98.     The Debtors submit that good cause exists for waiving and eliminating any stay of the Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the Confirmation Order will be effective immediately upon its entry.[151]  First, the Restructuring Support Agreement contains a milestone that the Plan become effective no later than seven calendar days after entry of the Confirmation Order.[152]  Moreover, the Chapter 11 Cases and the related transactions have been negotiated and implemented in good faith and with a high degree of transparency and public dissemination of information.[153]  Additionally, each day the Debtors remain in chapter 11, they incur significant administrative and professional costs.  Based on the foregoing, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the Confirmation Order may be effective immediately upon its entry.

---

[151]   *See, e.g.*, *In re Source Home Ent., LLC*, No. 14-11553 (KG) (Bankr. D. Del. Feb. 20, 2015), Dkt. No. 650 (waiving stay of confirmation order and causing it to be effective and enforceable immediately upon its entry by the court); *In re GSE Env't, Inc.*, No. 14-11126 (MFW) (Bankr. D. Del. July 25, 2014), Dkt. No. 340 (same); *In re Physiotherapy Holdings, Inc.*, No. 13-12965 (KG) (Bankr. D. Del. Dec. 23, 2013), Dkt. No. 197 (same); *In re Gatehouse Media, Inc.*, No. 13-12503 (MFW) (Bankr. D. Del. Nov. 6, 2013), Dkt. No. 137 (same); *In re Dex One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013), Dkt. No. 192 (same); *In re Geokinetics Inc.*, No. 13-10472 (KJC) (Bankr. D. Del. Apr. 25, 2013), Dkt No. 280 (same).

[152]   "**DIP Credit Agreement**" means that certain *Superpriority Senior Secured Debtor-in-Possession Loan Agreement*, dated as of December 15, 2024, as may be amended, supplemented, or modified from time to time, among the Debtors and the DIP Lender.

[153]   *See* Bauck Declaration ¶ 70.

## **CONCLUSION**

99.     The Plan complies with and satisfies all applicable requirements of section 1129 of the Bankruptcy Code.  Therefore, the Debtors respectfully request that the Bankruptcy Court enter the proposed Confirmation Order and grant such other and further relief as is just and proper.

[*Remainder of page intentionally left blank*]

Dated:  March 21, 2025                                    Respectfully Submitted,
        Wilmington, Delaware

**LATHAM & WATKINS LLP**                           */s/ Joseph M. Mulvihill*
Ray C. Schrock (admitted *pro hac vice*)           **YOUNG CONAWAY STARGATT &**
Annemarie V. Reilly (admitted *pro hac vice*)      **TAYLOR, LLP**
Brian S. Rosen (admitted *pro hac vice*)           Michael R. Nestor (No. 3526)
1271 Avenue of the Americas                        Kara Hammond Coyle (No. 4410)
New York, NY 10020                                 Joseph M. Mulvihill (No. 6061)
Telephone:  (212) 906-1200                         Rodney Square
Facsimile:  (212) 751-4864                         1000 North King Street
Email:  ray.schrock@lw.com                         Wilmington, DE 19801
        annemarie.reilly@lw.com                    Telephone:  (302) 571-6600
        brian.rosen@lw.com                         Facsimile:  (302) 571-1253
                                                   Email:  mnestor@ycst.com
 - and -                                                   kcoyle@ycst.com
                                                           jmulvihill@ycst.com
Caroline Reckler (admitted *pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767
Email:  caroline.reckler@lw.com


 - and -

Jeffrey T. Mispagel (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone:  (213) 485-1234
Facsimile:  (213) 891-8763
Email:  jeffrey.mispagel@lw.com


*Counsel for Debtors and Debtors in Possession*